# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

THOMAS L. REMPFER <u>et al.</u>      *
     *
     *
     Plaintiffs,      *
     *     Civil Action No. 05-2350 (JR)
     vs.      *
     *
UNITED STATES DEPARTMENT      *
OF THE AIR FORCE BOARD FOR THE      *
CORRECTION OF MILITARY RECORDS *
<u>et al.</u>      *
     Defendants.      *
\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

## PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

Pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), plaintiffs hereby respectfully request that this Court to deny the defendants' Motion to Dismiss. The defendants' claim that this court lacks jurisdiction to review either the discharges of the plaintiffs directly or the decision of the Air Force Board for the Correction of Military Records due to the statute of limitations are, in the first case an undecided issue, and in the second case legally incorrect based upon recent decisions of this Court.

This Court should also not dismiss for lack of jurisdiction based upon the claim that this involves only "state action" and has no federal character because this Court has absolute jurisdiction to review BCMR decisions and the actions complained of were incident to federal service, the result of a federally implemented mandate, and carried out by an active duty, Title 10, federal officer.

Finally, this Court should deny the defendants' motion to dismiss because the plaintiffs were discharged against their will and the AFBCMR has ignored its own procedures, identical legal precedent, and relied upon an erroneous interpretation of the law in conducting its review.

Taking the facts and all reasonable inferences in a light most favorable to the plaintiffs, and for all of these reasons noted, the plaintiffs respectfully request this Court to deny the defendants' motion to dismiss.

## FACTUAL AND PROCEDURAL BACKGROUND

In the fall of 1998, Plaintiffs Thomas Rempfer and Russell Dingle were pilots in the Connecticut Air National Guard. Plaintiffs' First Amended Complaint (hereinafter, "FAC"), ¶5. In December 1997, Secretary of Defense William Cohen announced a policy to vaccinate the total force against anthrax – the total force included both the active Armed Forces and Reserve Components. Defendants' Motion To Dismiss ("Defs' Memo"), Attachment 1. In March 1998, the program went into effect. Id. Due to concerns about the vaccine, then Captain Rempfer and Major Dingle were assigned to "Tiger Team Alpha" by their squadron Commanding Officer, Colonel Walter Burns, USAF, to investigate the anthrax vaccine because of widespread concern about taking it by a number of the squadron's pilots. FAC, ¶ 8. See also AR-0004 TLR.[1]

As a result of their investigation, both officers (and the team as a whole) came to the rather shocking conclusion that the order to take the anthrax vaccine was illegal because the vaccine was not licensed against aerosolized anthrax and was by definition "investigational". FAC, ¶ 9. The officers also concluded that the drug was being used for an unapproved or off-label use – which was precisely prohibited by a federal law, 10 U.S.C. §1107, that was passed by Congress in the wake of the Gulf War experience and Department of Defense miscues with off-

---

[1] Plaintiffs use the number convention for the Academic records of either plaintiff Rempfer (TLR) or Dingle (RED), as appropriate.

label use of drugs and vaccines.  AR-0011-TLR.  In fact, Col Burns even agreed with the lack of scientific evidence.[2]

 After sharing their concerns with their commander, both men, as well as others who objected to the vaccine in the fall of 1998, were ordered to resign.  See, e.g., AR-0024-TLR.  See also, AR-0037-TLR.  During a subsequent Department of Defense Inspector General investigation, Col. Burns admitted this fact under oath when he stated "I asked them to resign from the Connecticut Air National Guard."[3]  AR-0038-TLR.  Col. Burns was the plaintiffs' Commanding Officer at the time, as well as being in the paygrade of O-6, while Captain Rempfer and Major Dingle were an O-3 and O-4 respectively.  Importantly, Col. Burns was also a federal active duty officer, not a State Guardsman.  AR-0034-TLR. Col. Burns also stated:

> So we asked them to retire ... Or resign, yes. Well, asked them to resign from the Connecticut Air National Guard.[4]

 He later states, perhaps sensing that this is problematic, "Can I ask a question ... I'm getting the feeling that I'm the one being investigated here, rather than MG Weaver."[5]  AR-Finally, if there were any doubt about the meaning of his words, Colonel Burns clarified his

---

[2] See CD Rom video of Col Burns' brief, provided with 22 Nov 2004 Advisory Opinion response.  AR-0223-TLR.  Col Burns' quote at time slice 13:45: "There's some questions on how well does this stuff work. Several of you brought up the cutaneous threat versus the inhalation threat … You're looking for the peer reviewed, extensive scientific study that clearly proves, without a doubt, this stuff works against inhalation anthrax – that doesn't exist ."

[3] This statement was given during a DoD IG investigation into Major General Weaver, who was ultimately sanctioned for his actions in testifying before Congress.  DoD IG Case #74-998, filed 14 JAN 00, excerpts of which are included in Plaintiff Rempfer's original AFBCMR submission, beginning at AR-0112-TLR.  Later portions, received by Rempfer pursuant to FOIA Requests, were included in a 21 Jul 2004 Supplemental Submission to AFBCMR, which is not part of the Admin Record, as noted in Plaintiffs' FAC, ¶20, 23.

[4] Plaintiff Rempfer 21 Jul 2004 Supp. Submission, Exhibit 1, Attachment 5.

[5] Id.

position by confirming that he ordered then Captain Rempfer (and three others) to leave the

squadron and resign. He said, recounting his conversation with the men: "You're not doing us

any good here. So I need you to move on out. And they eventually did."[6] AR-0038-TLR. This

was followed by his point blank admission that the resignations were forced: "Some of the guys

wanted to come in and talk to me and give me an earful. And some of them left resisting – I

mean, *they didn't really want to leave, but they knew they had to*."[7] (emphasis added).

Therefore, in March and April of 1999, Captain Rempfer and Major Dingle did as they

were ordered to do by their Commanding Officer – they resigned. FAC, ¶13. After a number of

other court and administrative actions, including requests to get records released that were

improperly withheld by the government, seeking to be reinstated to flying status, or filing claims

to validate their legal opinion and give them an avenue of redress for their discharges, Plaintiffs

petitioned the Air Force Board for the Correction of Military Records in March 2004 to correct

their records to accurately reflect the events that took place in the fall of 1998 and spring of

1999. AR-003-TLR.

## PROCEDURAL BACKGROUND: AFBCMR

Not long after plaintiff Rempfer's submission to the AFBCMR in March 2004, he

received additional information in April 2004 from his second Freedom of Information Act

(FOIA) request, which resulted in his 21 July 2004 submission to AFBCMR, not included in the

Administrative Record. See, *infra*, fn. 2. On 29 Oct 2004, plaintiff was served a copy of the

National Guard Bureau Advisory Opinion in his case. AR-0197-TLR. Plaintiff submitted a

response on 22 Nov 2004. AR-0198-TLR. Plaintiff was served a HQ USAF/JAA Advisory

---

[6] Id.

[7] Id.

Opinion dated 10 Feb 2005, which included an explanation of the Doe v. Rumsfeld litigation, from the USAF point of view, including a "recommend[ation that] the BCMR not treat *Doe v. Rumsfeld* controlling at this time." AR-272-75-TLR. The Advisory Opinion concerned another plaintiff's case, but plaintiff Rempfer was invited to comment, given the unity of their positions. AR-276-293. The AFBCMR denied plaintiff Rempfer's petition on 31 Mar 2005. AR-0003-09-TLR. Plaintiffs filed a petition for reconsideration with AFBCMR when the Doe v. Rumsfeld litigation was finalized. That petition, the subsequent JAA Advisory opinion, the Response by Plaintiff's Counsel dated 26 Oct 2006, and the final denial by AFBCMR on 20 Feb 2007, have not been included in the Administrative Record.

## PROCEDURAL BACKGROUND: *DOE V. RUMSFELD*

In separate proceedings, but directly related to the present claims, a different group of plaintiffs were suing the Department of Defense and the Food and Drug Administration over the Anthrax Vaccine Immunization Program (AVIP), asking for injunctive relief and a declaratory judgment. Doe v. Rumsfeld, 297 F.Supp.2d 119 (D.D.C. 2003). The complaint alleged that the AVIP was in violation of a federal law, 10 U.S.C. §1107, enacted by Congress in the wake of investigations into Gulf War Illness, as a result of DoD's use of various drugs and biologics used pursuant to an FDA waiver in the first Gulf War. Suit was filed in March of 2003 and a preliminary injunction granting plaintiffs' relief was issued by this Court on Dec. 22, 2003. Id. Within days, the Food and Drug Administration (FDA) issued a final rule on the safety and efficacy of the anthrax vaccine and the government moved for a stay of the injunction, which was granted on 7 January 2004. Doe v. Rumsfeld, 297 F.Supp.2d 200 (D.D.C. 2004).

After more motions, the plaintiffs challenged the FDA's "final rule" issued on 30 Dec 2003 for being in violation of its own Agency rules and therefore null and void – thus, rendering

the AVIP again illegal.  The plaintiffs again prevailed on summary judgment.  Doe v. Rumsfeld, 341 F.Supp.2d 1 (D.D.C. 2004).  The court issued a permanent injunction prohibiting the inoculation of any servicemembers using the AVIP, until and unless the FDA issued a proper finding of safety and efficacy for the anthrax vaccine.  Id.  In February of 2005, the defendants asked for, and were later granted, a modification to the injunction to permit the use of the Anthrax Vaccine Adsorbed (AVA) under an Emergency Use Authorization, if such was found to be necessary under the applicable regulations.  Doe v. Rumsfeld, slip op. 2005 U.S. Dist. Lexis 5573 (D.D.C., Apr. 6, 2005).

An appeal of the Doe opinion granting the permanent injunction was taken, but ultimately dismissed as moot in February of 2006 by the D.C. Circuit Court of Appeals, Doe v. Rumsfeld, 172 Fed. Appx. 327 (D.C. Cir. 2006), and remanded because the FDA had by then allegedly issued a proper final rule and order in December 2005.  70 Fed. Reg. 75180, 75182 (Dec. 19, 2005).  The case was sent back to the Honorable Emett Sullivan for consideration of the government's request to vacate the Doe opinion. The Government ultimately withdrew its request to vacate the opinion.[8]

## PLAINTIFFS' COURT OF FEDERAL CLAIMS AND DISTRICT COURT LITIGATION

The plaintiffs filed suit against the named defendants in the Court of Federal Claims on March 24, 2005.  The defendants moved to dismiss for a number of reasons, pursuant to Rule 12(b)(1) in May 2005.  After responsive filings and a request to transfer the action to this Court, the Court of Federal Claims ultimately dismissed the action for lack of jurisdiction in April of 2006.  While the action was pending in the Court of Federal Claims, and in light of the

---

[8]  Plaintiffs' counsel, Mark S. Zaid, is co-counsel in the Doe v. Rumsfeld litigation. A new lawsuit, also before Judge Sullivan, was filed in December 2006 challenging the sufficiency and legality of the FDA's December 2005 Order. The parties have fully briefed the Government's Motion to Dismiss. John Doe #1 et al. v. FDA et al., Civil Action No. 06-2131 (D.D.C.)(EGS).

happenings in <u>Doe v. Rumsfeld</u>, as well as the plaintiffs' own AFBCMR petitions, plaintiffs filed

suit with this Court in December 2005. This Court presumably does not need a detailing of

occurrences before it, but it bears mentioning because the AFBCMR had indicated in its original

denial a willingness to reconsider its opinion if the plaintiffs in <u>Doe v. Rumsfeld</u> prevailed

against the DoD. Plaintiffs submitted such a request, which was recently denied in March 2007

(not included in the Administrative Record).

<b><u>ARGUMENT</u></b>

I. **PLAINTIFFS HAVE FILED A TIMELY CAUSE OF ACTION AGAINST THE AIR FORCE BOARD FOR THE CORRECTION OF MILITARY RECORDS IN THIS COURT**

    A. <u>The Air Force Board Accepted Plaintiffs Submission using its discretionary power to consider applications outside of the 3 year period.</u>

A servicemember may petition to have his records corrected within 3 years of the time

that the servicemember or his heirs "discovers the error or injustice." 10 U.S.C. §1552(b). The

separate services are instructed to implement boards staffed by civilians to hear such claims. <u>Id.</u>

at (a)(1). These boards act under the own regulations of the Secretary concerned; in this case,

the Air Force Board for the Correction of Military Records (hereinafter, the "AFBCMR"). <u>See</u>

Air Force Instruction (AFI) 36-2603, dtd 1 March 1996. Under its time limits, the regulation

notes that "ordinarily applicants must file an application within 3 years after the error or injustice

was discovered, or, with due diligence, should have been discovered." AFI 36-2603, para. 3.5.

The regulation goes on to allow that the Board broad discretion to "excuse untimely filing in the

interest of justice." <u>Id.</u> at 3.5.1.

LtCols Rempfer and Dingle were constructively discharged in the winter of 1998 and

ordered to resign in January of 1999 via calls to their homes. Then Captain Rempfer's transfer

order was effective on March 25, 1999.  See AFBCMR's coordinated correction to Rempfer's discharge order, not included in the Administrative Record.  Exhibit 2.

This would ordinarily seem to fall outside of the 3 year time for filing a complaint for correction, however, none of the facts surrounding what happened to LtCol's Rempfer or Dingle is ordinary.  After their order to resign, and during the time that both men were carrying out the duties to which they had been assigned at Tiger Team Alpha, both members were publicly humiliated and slandered by their commanders because of their stance, both in private correspondence and in interviews with local media, regarding the AVIP.  See Supplemental filing of LtCol Rempfer with the AFBCMR, dtd 21 July 2004, p. 23-24, fn. 40-42, Exhibit 1 to this Response.

Because of the controversy surrounding the anthrax vaccine and reports of serious adverse reactions, a number of Air National Guard pilots resigned or transferred rather than take the vaccine – this caused great consternation and had an effect on readiness.  As a result of the losses, questions were asked by Congressional Committees about whether the AVIP was in fact having a deleterious effect on readiness.  See Government Accounting Office Report 01-92T, "Anthrax Vaccine: Preliminary Results of GAO's Survey of Guard/Reserve Pilots and Aircrew Members", 11 Oct 2000.[9]  Beyond the vaccine's legal status, there was a significant 'numbers game' about who left and for what reasons.  Some of this can be gleaned from submissions by LtCol Rempfer to the AFBCMR, specifically pp. 23-25 and the Attachments to LtCol Rempfer's supplemental filing dated 21 July 2004.  Exhibit 1 to this Motion.  Col. Burns, a federal active duty officer in the Air Force, claimed that pilots left because they wanted to "spend more time with their families and at their more lucrative full time jobs."  Id. at p. 23, n. 40.

---

[9] See *http://www.gao.gov/cgi-bin/getrpt?GAO-01-92T*. See also *http://www.gao.gov/cgi-bin/getrpt?GAO-02-445* (Final Report).

The importance of this issue to the timely filing is this: senior officers, including Major General Weaver, then commander of the entire Air National Guard, made representations under oath before Congress about why people were no longer with the Air National Guard. Congress was understandably asking why people had left. Officers like Col. Burns and MGen Weaver did not want to publicly admit that the anthrax vaccine, in addition to all of the questions about its legality and safety, was also causing pilots to defy orders and be fired, offer their resignations, retire, or seek transfer.

Legally, a federal active duty pilot could be coerced by the threat of prosecution under the Uniform Code of Military Justice (UCMJ), while a Guardsman could not. Therefore, both Col. Burns and MGen Weaver attempted to obfuscate exactly what was happening by claiming that people like the plaintiffs had "voluntarily resigned" to pursue their more "lucrative employment" as private pilots. A Department of Defense Inspector General Investigation was later conducted when it became public that MGen Weaver might have been less than forthcoming about exactly who left and why.

LtCol's Rempfer and Dingle were two of this class of officers whose orders to resign were described as "voluntary resignations". These officers then began their quest to have the truth about the circumstances of their resignations known and corrected. In fact, as LtCol Rempfer's petition to AFBCMR shows, in February of 1999, he and 7 other pilots sent a letter explaining that they had been forced out over the anthrax vaccine, in direct contrast to what MGen Weaver and Col. Burns were telling Congress and the American public. Id.

The problem for plaintiffs is, and was, that the records that would prove their constructive discharge and compelled resignations were in the possession of the military, both the federal active duty forces, and the CT Air National Guard, and these bodies, as well as particular

individuals, were less than forthcoming about what had happened.  This resulted in multiple

Freedom of Information Act requests and two petitions by the plaintiffs, which were noted in

their submissions to AFBCMR. AR cite needed. LtCol Rempfer's first FOI Act petition to

actually obtain his records and the records surrounding his discharge took two years to be

satisfactorily resolved.  See LtCol Rempfer's original petition, footnote 2, 3, referring to FOI Act

hearing #FIC 2000-303, final report dtd 10 Jan 2001, AR 21-25, 236-253.  The FOI Committee

found conclusively that the plaintiffs' records had been wrongfully withheld from them.  See Id.

LtCol Rempfer first asked for his records on 15 July 1999. Exhibit 1, p. 8 (fn. 5).

       This is not a case of a servicemember who was asleep at the switch and now comes late to

ask for relief.  LtCol Rempfer began from the earliest possible time to seek redress, but he

needed the documents in the hands of the government to be able to adequately make his case for

review.[10]  The government, both the state and federal personnel charged with complying with the

FOIA, refused to do so.  This was specifically found by the Connecticut FOI Committee, in

paragraphs 15, 16, and 17 of its decision.[11]  The Committee stated:

> It is concluded that the respondent [William A. Cugno, Adjutant General, State of
> CT] violated §§1-210 and 1-212(a), G.S., by failing to promptly provide the
> complainant [LtCol Rempfer] with such records in response to his requests,
> absent any proven exemptions.
> 17.  It is further found that the violations described in paragraphs 11 and 15
> above, were without reasonable grounds.

Id., at para. 16-17.

---

[10] It is worth noting that Plaintiff Dingle also filed an identical FOI Act petition which was heard
finally on the same date, 10 Jan 2001, with the same results.  The Committee noted that Plaintiff
Dingle's case #FIC 2000-304 was consolidated with Plaintiff Rempfer's.

[11] The Committee report can be found online at *http://www.state.ct.us/foi/2001fd/20010110
/FIC2000-303.htm*.

This was only the first of a series of investigations that would allow the Plaintiffs to actually obtain the information they needed to pursue the correction of their records. Pursuant to a second request in spring of 2004, the Plaintiffs received some additional emails and other documents in April of 2004 regarding their duties and actions in the fall of 1998 and spring of 1999 – some 5 years after they began asking for the necessary documentation to state their claim for correction of their records. See, e.g., Exhibit 1. Excerpts of emails that were not included in the first FOI Act hearing by the senior officers in Plaintiffs chain of command are documented in footnotes to his supplemental petition to AFBCMR in July 2004. These emails show conclusively that LtCol Rempfer was asking for his work on the Tiger Team to be included in his OPR before it was even finished! See, e.g., attachment 1, footnote 5 (email dtd 5/15/99) in Plaintiff's 21 July 2004 Supplement, Exhibit 1.

A Department of Defense IG Investigation that took place from 2000 to 2001 also contains testimony from some of the actors involved in plaintiffs' dismissal. This was not obtained in full until 2004, after Plaintiff Rempfer's March 20, 2004 original complaint. When it was, LtCol Rempfer diligently culled through the materials he received and submitted the July 2004 supplemental response. Again, Exhibit 1, but not included in the Administrative Record.

For all of these reasons, the plaintiffs' petition of March 19, 2004, can hardly be called "late" or "untimely" as defined in the statute or the applicable Air Force Instruction. It is particularly egregious for a government officer to accuse plaintiffs of being untimely when it was governmental interference, both by federal active duty officers, such as Colonel Burns, and CT ANG Officers, including MGen Cugno, that prohibited plaintiff from obtaining the documents necessary to petition for his records to be corrected.

The Air Force Instruction specifically states that the 3 years for filing includes the time that the "error or injustice was discovered, or, with due diligence, should have been discovered." AFI 36-2603, 3.5. In this case, the plaintiffs have exercised every reasonable effort to obtain the

documents necessary to prove their claim for correction and have been consistently thwarted by federal (Col. Burns) and state (MGen Cugno) officers, since they first were ordered to resign. More importantly, and conclusive for this Court's consideration, is the fact that the AFBCMR accepted these arguments and both of Plaintiffs' petitions were accepted as timely filed.  AR-0008-TLR ("The application was timely filed.")    As will be shown below, this decision by AFBCMR creates a cause of action for plaintiffs that can not be dismissed as untimely under 28. U.S.C. §2401.

B. <u>The Government has misstated the law it has offered in support of dismissal under 28 U.S.C. §2401</u>

This court has already decided the issue at bar adversely to the defendant in <u>Lebrun v. England</u>, 212 F. Supp. 2d 5 (D.D.C. 2002).  The legal issues presented in that case are identical to the claims made by plaintiffs here.  Lebrun was a Naval Academy midshipman in the early 1960's who was discharged from the Academy for an honor code violation in the winter of his final year – Dec. 18, 1965.  Lebrun petitioned the Board for the Correction of Naval Records (BCNR) to correct his discharge and several other prayers for relief, including an allegation of constructive discharge, and filed it in March 1993.  The BCNR nevertheless decided to hear the petition on the merits and a substantial record was compiled, notwithstanding the intervening quarter century and deaths of some of the individuals involved.

After a split decision by BCNR against Lebrun, he petitioned this Court to review the decision of BCNR and asked for declaratory and injunctive relief in June of 2000.  The government moved to dismiss under 28 U.S.C. §2401, citing the six year statute of limitations and the doctrine of laches.  That motion was denied after this Court reviewed some of the same precedents the defendants now cite in their brief.  The Lebrun Court found that a Correction

Board's decision is a separate cause of action and may be reviewed by the court, and that the review of the underlying discharge is necessarily distinct.

> [W]hile the purported injury in this case took place in 1966, when the BCNR chose to waive the review limitation period . . . and address the merits of the plaintiff's claim . . . the limitation period for judicial review began when its decision became final.

Lebrun, 212 F.Supp.2d at 13. The plaintiffs here provide a review of some of the precedent to ensure the Court understands the exact nature of the issue and why this Court was correct in its rejection of the Government's argument in Lebrun.

The Government's claim is that the plaintiffs' causes of action 1 and 3 are not timely filed within the 6 year statute of limitations and therefore that this Court cannot review the plaintiffs' discharges. The defendants cite Kendall v. Army Board For Correction of Military Records, 996 F.2d 362, 365 (D.C. Cir. 1993), for this proposition. The problem is that Kendall is totally inapposite. Kendall was court-martialed in 1975 and sought review of his court-martial discharge with the Army BCMR in 1977, which is statutorily prohibited. See 10 U.S.C. §1552(f)(1983)(cited in opinion). The ABCMR denied his petition. Some 10 years later, Kendall again sought review of his discharge with the ABCMR based upon the failure of his defense counsel to call the alleged victim of his assaults as a witness. The ABCMR again denied relief, this time for filing well past the 3 year time because the error of which Kendall complained "should have been . . . discovered on 12 September 1975." Kendall then went to the district court for relief where he was again denied for filing well out of time.

What is important to note are two quotes from the appellate court opinion upholding the District Court's dismissal, which directly contradict the proposition for which the government has cited the case. First, the Kendall court noted that "because Kendall failed to raise his current claims in the military court system until over 10 years after his discharge and was therefore too

late to raise them properly, he is barred from raising them in federal court *absent a showing of good cause and prejudice.*" Kendall, 996 F.2d at 366 (emphasis added). This necessarily implies that a showing of good cause and prejudice would entitle a servicemember to raise such claims outside of the 6 year statute of limitations.[12] Second, the Kendall Court stated that "even if the district court has jurisdiction to review ABCMR decisions on untimely appeals, *an issue we do not decide today*, there is no reversible error in the Board's application[.]" Id. at 367 (emphasis added). Thus, the defendant's motion to dismiss asserts Kendall stands for something much broader than it does, besides its factual distinction from plaintiffs' case.

Next, the government cites Kendall for the proposition that the cause of action accrued when plaintiffs' discharges became final, in March and April of 1999. Kendall cites to Walters v. Sec'y of Defense, 725 F.2d 107, 114 (D.C. Cir. 1983), which the government also cites, for this point. Once again, the Walters court specifically did not address the tolling of the statute of limitations under §2401 when a servicemember seeks proper redress through the Boards for Correction of Military Records. The Court noted that "we need not and do not decide whether, had a named plaintiff sought and received a final decision from a discharge review board, the statute of limitations could have been tolled in any way." Walters, 725 F.2d at 115. Moreover, Lebrun noted that it had "not overlooked Walters . . . [h]owever, the judicial review that was being sought there was of the underlying discharge and not of an agency's review of the

---

[12] Plaintiffs here assert that given the additional evidence presented in Exhibit 2, which was presented to the AFBCMR, after a successful FOIA request, they have shown exactly the type of circumstance which requires equitable tolling.

discharge decision." Lebrun, 212 F.Supp. 2d 12, fn 11.  Therefore, the Government's argument

has already been directly rejected by this Court.[13]

The Government continues along this vein, citing cases for broad propositions for which

they do not stand.  In fact, as recently as 2006, in Carter v. Dep't of the Navy, 2006 U.S. Dist.

Lexis 59767 (D.D.C. 2006)(slip op.), a copy of which is attached at Exhibit 3, many of the same

grounds for dismissal that the government urges were reviewed and denied. Yet the case is cited

by the Government for the proposition that "… plaintiff's constitutional and statutory based

claims of wrongful discharge time barred because they accrued with plaintiff's dismissal, which

occurred more than 6 years prior to filing, but finding plaintiff's APA challenge to the decision

of the Board for Correction of Naval Records not time barred because decision of the board was

less than 6 years old[,]" Government Motion to Dismiss, at p. 17.  This Court in Carter noted that

while "[t]raditionally the District of Columbia Circuit has 'strictly construed' the six-year statute

of limitations . . . recent decision have expressed doubt about the jurisdictional nature of 28

U.S.C. §2401 and have held that it is subject to equitable tolling when the suit is analogous to a

suit against a private party." Carter. slip op. at *21, n. 13.

Carter also cites two other opinions for that same proposition, including Felter v. Norton,

412. F.Supp.2d 118, 123-24, and Irwin v. Dep't of Veterans Affairs, 498 U.S. 89, 111 (1990).

This Court pointed out the factors involved in an equitable tolling situation, where the petitioner

shows that (1) the petitioner has been pursuing his rights diligently, and (2) that some

extraordinary circumstance stood in his way, normally the actions of the defendant in delaying

the prosecution of his claim.  Id.

---

[13] If the Government's assertion is simply that this Court cannot review the underlying
discharges, but only the Board's decision on those, Carter and other authorities cited are
contrary.

Finally, <u>Carter</u> cites to the D.C. Circuit Court's decision in <u>Ortiz v. Sec'y of Defense</u>, 41 F.3d 738 (D.C. Cir. 1994) on the issue of whether pursuit of administrative remedies in either the BCMR or Discharge Review Boards tolls the application of §2401, which <u>Ortiz</u> implies. This Court did not reach the issue as it was unnecessary to do so.

The plaintiffs do not concede that the statute of limitations has accrued against them, and believe that <u>Carter</u> and <u>Lebrun</u> make it clear that (a) at the very least the plaintiffs have a cause of action to review the decisions of the AFBCMR, and that (b) the plaintiffs have a legitimate grievance to argue for equitable tolling and this Court to directly review the underlying discharges, given the conduct of the Government agents in 1998 and 1999. Additionally, the propositions for which the Government has cited authorities are decidedly less than the purpose for which they have been offered. In essence, the decisions are not that the 6 year statute of limitations absolutely runs from the date of discharge. <u>Carter</u> itself argues that even in a strict construction of §2401, there would likely be an equitable tolling.

In fairness to the defendants, the courts have not quite firmly settled how the principle of exhaustion of administrative remedies applies to the tolling of the statute of limitations on claims arising from BCMR actions. Even in individual cases where some plaintiffs have been dismissed for failure to timely file, such as <u>Kendall</u> and <u>Walters</u>, the courts have reserved the issue. In one case that does address the issue, <u>Bittner v. Sec'y of Defense</u>, 625 F. Supp. 1022 (D.D.C. 1985), which is cited by the Government, the decisions of the BCMR were ruled to be reviewable because the plaintiffs had exhausted their administrative remedies. Those who had not yet exhausted their administrative remedies were dismissed. <u>Bittner</u>, at 1026. Even that case, however, does not address the situation of these plaintiffs, where their ability to pursue the

administrative and legal remedies sought were in fact hampered by governmental conduct designed to interfere with their ability to obtain information to which they had an absolute right.

It is hypocritical for the Government to argue that §2401 ought to be strictly construed against the plaintiffs when the Government's own agents took action to delay and prevent the plaintiffs from obtaining the necessary information to pursue their claim. Certainly, §2401 is a statute in which the sovereign willingly gives up the immunity it could otherwise assert in order to allow prosecution of a certain class of meritorious claims, but that cannot mean that agents of the sovereign can delay claims until they are past the statute and then argue for a strict construction of §2401.

The Bittner decision, when read in conjunction with another case cited by the Government, Cottrell v. United States, 42 Fed. Cl. 144, 154 (Fed. Cl. 1998), makes it clear that Cottrell is good law only in the Court of Federal Claims and the Federal Circuit Court and on the issue of claims for money damages under 28 U.S.C. §2501 by military members. The Government asserts, however, that Cottrell means that any pursuit of administrative relief does not toll the statute of limitations. See Govt Motion to Dismiss, at 18 ("This means that the six-year clock continues to run during the period when an application is pending before the ABCMR"). A reading of Cottrell, however, reveals that it is based upon a premise that has been specifically rejected by subsequent decisions in almost every Circuit, even its own, but most importantly by this Court's dicta in Carter, if not its decision in Lebrun.

Cottrell was a female Army Lieutenant in initial training at the Adjutant's school. She was failing badly and was going to be dropped. She filed numerous actions and asserted a number of claims against her superiors, including money damages. Most of her claims were dismissed. The claims that remained were dismissed as untimely under §2501 and were not

tolled during the time when she was seeking redress through the Army BCMR. The <u>Cottrell</u>

court specifically found no jurisdiction under the Administrative Procedures Act to review her

claim. <u>See</u> 42 Fed. Cl. at 154. More important for this Court's consideration is that the <u>Cottrell</u>

court relied upon <u>Hurick v. Lehman</u>, 782 F.2d. 984, 987 (Fed. Cir. 1986), and <u>Mitchell v. United</u>

<u>States</u>, 26 Cl. Ct. 1329, 1331 (1992), for its premise that "[r]esort to a correction board is

permissive, not mandatory, and therefore does not toll the running of the statute of limitations."

<u>Cottrell</u> at 154-55. The problem is that this reliance by the <u>Cottrell</u> Court and the government is

completely misplaced and erroneous. The Honorable Diane Weinstein of the Court of Claims

conducted an exhaustive analysis of precedent available at the time (1992) and noted that only

the Federal Circuit followed the precedent that exhaustion of administrative remedies was

permissive, rather than required. The judge's scholarly opinion notes that

> these previous decisions by the Court of Claims, holding that no
> exhaustion of administrative remedies is required in military pay
> cases, are binding on this court, and have not been questioned by
> the Claims Court . . . [but] they are confusing and open to serious
> question, on grounds of judicial efficiency as well as lack of
> consistency with other similar cases (disability cases) and with the
> decisions of every other federal circuit court of appeals in military
> discharge cases.

<u>Mitchell</u>, 26 Cl. Ct. at 1331 (internal citations omitted).

The Government claims that this Court has already decided the issue in <u>Bittner</u>, but this

Court specifically reserved the issue in <u>Bittner</u>. The <u>Mitchell</u> court also went on to note that

there was no reason why this line of cases, such as <u>Cottrell</u> and <u>Hurick</u>, could be distinguished

from the other federal circuits nor why resort to correction boards should be different from other

administrative agencies. The Court there reluctantly found that "unless and until the Court of

Appeals for the Federal Circuit decides to revisit this question[,]" the plaintiff would be barred.

<u>Id.</u>

In the final analysis, this Court itself specifically rejected the <u>Cottrell</u>, <u>Hurick</u>, and <u>Mitchell</u> line of precedent and reasoning, instead opting for the majority view of every other circuit.[14]  In <u>Lebrun</u>, this Court analyzed the <u>Hurick</u> precedent, as well as the APA and other precedent, to ultimately reject "the defendant's statute of limitations challenge."  <u>Lebrun</u>, 212 F.Supp.2d, at 13.

## II.  THE PLAINTIFFS HAVE PROPERLY STATED A JURISDICTIONAL CLAIM FOR THIS COURT TO RENDER A DECISION ON THE MERITS.

### A.  <u>This Court has already decided that complaints for declaratory judgment or relief under the Administrative Procedures Act are not Tucker Act claims.</u>

The Government also moves this Court to dismiss this case for want of jurisdiction as to Counts I and III on the basis that the plaintiffs have filed a claim for money damages.  The Government simultaneously argues that the previous Court of Claims' dismissal for lack of jurisdiction must be given *res judicata* effect in this court and that the Complaint must be viewed as a claim for money damages under the Tucker Act.  The problem is, again, the defendants ignore the precedent they cite that has already unfavorably dealt with this issue.

This Court in <u>Carter</u> has addressed almost all of the Government's arguments for dismissal in this case, especially Tucker Act issues and claims for money damages, as well as the *res judicata* application of the Claims Court decision (dealt with below).   For dismissal under the Tucker Act, the Court stated that "as long as the sole remedy requested is declaratory or injunctive relief that is not negligible in comparison with the potential for monetary recovery, …[courts should] treat the complaint as something more than an artfully crafted attempt to circumvent the jurisdiction of the Court of Claims."  <u>Carter</u>, slip op. at *8, *citing* <u>Kidwell v.</u>

---

[14] The <u>Mitchell</u> Court conducted an exhaustive review and found that as of that opinion, every circuit except the 6th had found BCMR review a prerequisite for filing in the district court.

Dep't of the Army, 56 F.3d 279, 284 (D.C. Cir. 1995).  Just because there may be monetary

relief as a result of the court's action does not transform the claim into a Tucker Act case.  Id.,

slip op. at *10 (holding that "[a] complaint should not be categorized as seeking  monetary

damages 'merely because its success may lead to pecuniary costs for the government or benefits

for the plaintiff'")(internal citations omitted).  In fact, Carter notes specifically that "the District

of Columbia Circuit has conclusively held that actions under the APA which challenge decisions

of military corrections boards and seek only declaratory relief that is "not 'negligible in

comparison' with the potential monetary recovery" should not be construed as seeking monetary

relief."  Id., citing Tootle v Sec'y of the Navy, 446 F.3d 167, 169 (D.C. Cir. 2006)).  Thus, the

defendants' motion to dismiss Counts I and III under Rule 12(b)(1) and 12(b)(6) on these exact

issues have already been decided by this Court, adversely to the defendant.

      The plaintiffs' claims are quite simple, standard, and of a kind which have been dealt

with by this Court regularly.  The redress sought, namely a correction to the military records of

these officers, may have, as an ancillary result, the consequence of payment for back pay or other

losses of emoluments as a result of the actions of the federal officials complained of.  The

defendant's motion even acknowledges that in the complaint the "plaintiffs *allude* to damages",

not that the complaint specifically alleges money damages.  That is because the First Amended

Complaint asks for equitable relief, which may have a consequence that results in payment by

the Treasury.  As the Circuit Court's decision in Kidwell, citing with approval its own decision

in Vietnam Veterans of America v. Sec'y of the Navy, 843 F. 2d 528 (D.C. Cir. 1988), make

clear, claims for review and equitable or declaratory relief are not specifically for money

damages, but are a review of the actions of government officials under the APA and the payment

is merely a consequence of the benefit system set up by the agency.  The courts will not use that

fact when looking to whether or not there is jurisdiction. Accord Wolfe v. Marsh, 846 F. 2d 782 (D.C. Cir. 1988)(plaintiff tried to go from district court to claims court's jurisdiction under the Tucker Act and denied because case was a plea for equitable relief.).

    B.   <u>Any Claims dismissed in the Court of Claims for want of jurisdiction are not given res judicata effect by this court.</u>

It is unclear to the plaintiffs the basis for the defendant's claim that the Court of Claims decision must be given *res judicata* effect.  Any claims not justiciable by the Court of Claims for a lack of jurisdiction necessarily and logically can be adjudicated by this Court.  This means that the Court of Claims decision is not binding for *res judicata* purposes, as <u>Carter</u> explains.

It appears that the defendants are attempting to restyle the plaintiffs' complaints as a claim for money damages and therefore argue that the claims should have been litigated in the Court of Claims.  But as that opinion itself shows, the Court did not reach the merits of the claims at all and simply dismissed the complaint for want of jurisdiction.  In other words, that decision necessarily means that this Court must have jurisdiction over the plaintiffs' claims, unless that court was in error.  Thus, the import of the Court of Claims decision means that this Court is the proper one, unless that court was in error about its own jurisdiction.  The defendant seems to miss the logical import of the Court's denial of jurisdiction.

In sum, this Court has made clear that claims for corrections of service records, even those that may include an incidental prayer for relief about back pay or lost rank, are not claims for money damages.  The payment of money as a result of the review of the agency action under the APA may result in some pecuniary benefit, but this cause of action and case was never, and is not about, money.

III.    **A RULING ON THE VOLUNTARINESS OF THE DISCHARGES IS
NECESSARILY A JUDGMENT OF THE SUBSTANCE OF THE PLAINTIFFS'
COMPLAINT.**

The defendants ask this Court to dismiss the plaintiffs' complaint under Rule 12(b)(6) of

the Federal Rules of Civil Procedure, which would require a finding that taking all of the facts in

a light most favorable to the plaintiffs, there are no set of facts or inferences drawn therefrom

upon which the plaintiffs could prevail.  See, e.g. Bernard v. United States Dep't of Defense, 362

F. Supp. 2d 272, 277 (D.D.C. 2005).  In this case, the plaintiffs have quite clearly alleged facts

that, if assumed true as they must be on this motion, would clearly prove a case of either

constructive discharge or arbitrary or capricious action by the AFBCMR, depending upon which

view the Court takes with respect to its review.[15]

Either way, the facts as pleaded, particularly paragraphs 11, 12, and 13, mean that

plaintiffs can show that they were "ordered to resign".  Compl. ¶ 12.  "Ordered to resign" is

vastly different than the precedent the government cites about voluntary resignations and

difficult choices not amounting to constructive discharge.  Moreover, the government is asking

this Court to make a factual determination in its favor on a 12(b)(6) motion, without an

evidentiary hearing and with nothing more than the pleadings.  Even if this Court chooses to

review the AFBCMR actions, the plaintiffs still prevail because as pleaded in paragraph 20 of the

complaint, and as the Court can read for itself, the AFBCMR did not even address "the

substantiated allegations of coercion and the legality of the chain of command's orders for

resignations."  Id.  Therefore, the government's 12(b)(6) motion fails on its face – they cannot

---

[15] As noted above, if the Court chooses to decide that the statute of limitations was tolled under
equitable tolling doctrine, then it may review the discharge decision itself, as opposed to only the
Board decision, under a view that the statute of limitations was not tolled.  In either scenario, the
12(b)(6) standard allows the plaintiffs to go forward.

ask for an evidentiary ruling in their favor on a 12(b)(6) motion, i.e. they must accept the facts as plaintiff has pleaded them and they do not. They change them and ask this Court to so find under Rule 12(b)(6), which the rule does not allow.

## IV. THE DEFENDANT'S CLAIM THAT THIS WAS A STATE CASE ALSO FAILS

The defendants also ask this Court to dismiss the action by claiming that the actions are not reviewable because the entirety of what happened is attributable to State action. This argument seems to misapprehend the nature of this action. The AFBCMR may hear requests from any current or former Air Force member to correct his or her records. 10 U.S.C. §1552. See also, AFI 36-2603. The defendant's argument about plaintiffs' state status fails as a matter of law as to the defendant AFBCMR. If the defendants' argument is that as to the Department of the Air Force and the other federal defendants, the complaint should separately fail, once again the Government has asked this court to make a factual ruling inconsistent with the facts as pleaded in the complaint – and thus has once again transformed Rule 12(b)(6) into a ruling on the merits. The defendants in their motion states

> Plaintiffs claim . . . the order to take the vaccine came from their Wing Commander, Col. Burns, who was, they say, "a federal active duty Air Force officer commanding the first state Guard unit to implement the federal AVIP mandate." Compl. ¶ 8. Even if this were the case, there should be no question that Col. Burns was acting in a state capacity at the time, as plaintiffs do not allege that they had been called into federal service[.]

Defendant's brief, at 41.

First, the plaintiffs do not merely "say" their Commander was in the active duty Air Force. Their Commander says it, as demonstrated by his own testimony, which plaintiffs submitted to the AFBCMR. See, e.g., Attachment 5 to Plaintiff Rempfer's AFBCMR 21 July 2004 Supplemental Submission (DoD IG Testimony of Col. Burns: "I was then, and I still am,

active duty. I was the first-ever, in peacetime, commander of an Air Guard wing as an active

duty officer."). Attachment 5 of Exhibit 1, with the full transcript of deposition under attachment

6. That is not an allegation; it is a fact. The Government has access to the records that

conclusively prove this (namely Col. Burns' USAF records) at any time it wants. If it can prove

otherwise, it should offer that evidence to the Court.

As to its second point, that Colonel Burns acted in a state capacity, again, the defendant

asks this Court to make more factual findings under Rule 12(b)(6), in contradistinction to the

plaintiffs' allegations. In fact, at the time of these events, this was exactly the complaint of

plaintiffs – they were being ordered by a federal active duty officer to carry out a federally

mandated program in contravention of federal law. The plaintiffs' submissions make it clear that

the federal program was also an incident to and a prerequisite for federal mobilization. See, e.g.

Statement of LtCol Rizzo, AR-142, ¶7. That is to say, the ANG officers were required to take

the vaccine, not as a matter of CT state law, but as an incident to call up by the federal

government into federal service. Their refusal to do so should not have subjected them to any

action by federal officials, nor state officials acting at the behest of federal officials. As the

plaintiffs' submission to AFBCMR point out, there were insinuations that "higher ups" were

looking closely at the actions of those who were opposing the program because of the

importance to the federal forces of the AVIP. Id. Col. Burns again, in his testimony, stated that

"We were the – we were the first Air Guard unit for sure, and I am pretty sure one of the very

first military units, that had to enforce the DOD AVIP…". Exhibit 1, Attachment 6.

Another point that defendants seem to miss is the unique nature of being an active duty

officer – Colonel Burns could not, as defendants allege, simply take off his active duty hat.

Being on active duty means necessarily being subject to the UCMJ and the orders of higher

authorities 24 hours a day.  See, e.g., United States v. Solorio, 483 U.S. 435 (1987).  Col. Burns

could not, like a Guardsman, wear one hat at a time.  He was subject to Title 10 as an active duty

Air Force officer at all times.  This means that he was required to carry out the orders and

regulations of his superiors, and one of them being the AVIP, promulgated by the Secretary of

Defense, at the same time that he was serving as a Title 32 Commander.  See, e.g., Perpich v.

Dep't of Defense, 496 U.S. 334, 345 (1990).  This was one of plaintiffs' chief grievances in their

petition, which the defendant seems to misunderstand about active duty federal service.  AR-

0030-TLR.  LtCol Rempfer pointed out this conflict, and the letters from the Judge Advocate of

the CT National Guard explaining the problems with Col. Burns' position.  Id.

## V.   THE AIR FORCE BOARD FOR THE CORRECTION OF MILITARY RECORDS VIOLATED THE LEGAL STANDARDS IT IS CHARGED WITH FOLLOWING.

### A.   The AFBCMR Entirely Ignored Plaintiffs Evidence Regarding Constructive Discharge, in Contravention of its own Rules and Precedents.

Plaintiff Rempfer's submissions to the AFBCMR were voluminous.  Consistent

throughout his pleadings before the Board (and this Court) were his repeated desire to have his

Officer Performance Report accurately reflect the work that he did for Tiger Team Alpha.  This

desire was for several reasons, as he noted in his petition.  First, the OPR is supposed to reflect

the actual work that an officer does; the defendant's position that plaintiffs' OPRs are laudatory

and therefore not correctable misses the point entirely.  It is a *non sequitur*.  Plaintiffs have

alleged that their OPRs did not properly document the work they did during the relevant time

period; the defendant's motion says, in essence, "but they're really good!"  And, therefore, the

logic seems to be, what's the complaint or what's the harm in not correcting them?  The harm, as

plaintiffs have demonstrated, is that the OPRs obfuscated and hid the truth; they are and were an

attempt to whitewash what was really going on – good, bad, or indifferent.  Therefore, it is

arbitrary and capricious, and a manifest injustice, to allow untruths about the duties performed to

stand as fact.  Plaintiff argued this extensively in his submissions to the AFBCMR, pointing out

the regulations governing his performance reports and their requirement to reflect accuracy.

LtCol. Rempfer's 22 Nov 04 Response to Advisory Opinion, ¶4.

   This applies with even more force to the plaintiffs' forced resignations.  Plaintiffs did not

just choose between one of two unpleasant alternatives, as the defendant alleges in a rather

lengthy, but inapplicable analysis of some precedents, with which the plaintiff would otherwise

agree.  The defendant again changes the facts on a 12(b)(6) motion.  Plaintiffs' submissions,

including the sworn testimony of Col. Burns, show that the plaintiffs' were ordered to resign.  In

fact, defendant's citation to precedent regarding court-martial is totally inapposite, as *plaintiffs*

*were not subject to the UCMJ at the time of their refusal*.  Defendants argue on the one hand that

this action should be dismissed because the plaintiffs were state actors and any harm is

attributable to the state, and then attempt to cast the plaintiffs' complaint as required to be

dismissed because they voluntarily resigned when faced with a court-martial under Title 10

(citing precedent for that proposition).  But the defendant can't have it both ways, factually, in

the same 12(b)(6) motion to dismiss.

  The positions are factually impossible (and logically inconsistent) – if plaintiffs were state

actors and the whole issue is one of state law (as defendant's brief alleges), then the plaintiffs

were not subject to the UCMJ while in state status.  Therefore, precedent regarding federal

officers who voluntarily choose one of two unpleasant alternatives is inapplicable to their

situation.  Plaintiffs faced no such choice under defendant's "state actor" theory.  If, however,

defendant would like to argue precedent such as <u>Veitch v. England</u>, 471 F.3d 174 (D.C. Cir.

2006), then defendant must necessarily concede the jurisdictional issue that the complaint alleges

federal action by the named defendants or their agents.

   Addressing then defendant's federal precedent argument that requires dismissal under

Rule 12(b)(6) is once again recasting of the facts in the complaint by defendant in violation of

Rule 12(b)(6).  If this court must presume the facts as alleged and draw reasonable inferences therefrom in the plaintiffs' favor, there is no question that the case is beyond 12(b)(6) standards. Unlike Chaplain Veitch, plaintiffs here have multiple admissions by their Commanding Officer under oath that he ordered them to resign, that there was significant pressure from higher ups to do so, and there is a fact-finding body that specifically found that plaintiffs were ordered to resign.  The Connecticut Freedom of Information Committee conducted a factual hearing, within a year of the events that underlie this claim, in the state where it happened, and held that Plaintiffs Rempfer and Dingle (under the consolidated action, "complainant" is used): "was assigned to research the vaccine, that he decided not to take the vaccine, and that he ultimately resigned his commission as a Guard officer … after ***being so ordered to resign***."  CT FOI Commission, FIC 2000-303, Jan. 10. 2001, para. 12 (emphasis added).  Plaintiffs here can absolutely make out, and have made out in front of a prior fact-finding body, the exact claim they have made in the complaint.

This is not, as in Veitch and other precedents cited, naked allegations that cannot overcome the presumption of regularity and voluntariness to which defendant cites.  Plaintiffs are well past that hurdle.  Veitch and other precedent do not say that constructive discharge can never be made out and therefore summary judgment or 12(b)(6) dismissal would be appropriate in all cases; they merely point out that the burden is high and that Chaplain Veitch, given the facts of his case, simply could not make out such a claim.  Additionally, the Veitch district court case, 2005 U.S. Dist. Lexis 6257 (D.D.C. 2005) addressed the presumption of regularity, while the D.C. Circuit case is utterly inapplicable because of its procedural posture.  By the time of the Circuit Court opinion, Veitch had been charged under the UCMJ for disrespect and he argued a

constructive discharge under the Constitution, which the government allowed.[16]  The Circuit

Court was unsure if the theory would even lie and analogized a Title VII action analysis in its

opinion.  The court went on to announce a three part test to make out constructive discharge.

    Plaintiffs here are more like sailor David Carmichael in his claim that he was wrongfully

discharged by the Navy for failure to consider its own religious accommodation procedures.

See, Carmichael v. United States, 298 F. 3d 1367 (Fed. Cir. 2002).  In fact, plaintiffs here have

an arguably greater claim than Petty Officer Carmichael had, because there the Navy did not

follow its own discretionary policy of religious accommodation and discharged Carmichael

because of his religious objection to using his social security number.  In the instant case,

plaintiffs were ordered not to come around their unit any more and to resign because they

pointed out that an illegal order had been given and should not be obeyed.  Therefore, whether

this court looks at the underlying discharge or the AFBCMR's actions upon review, the actions

of the government agents is arbitrary and capricious, by definition, because it violated the law, or

ignores that violation after the fact.

    The AFBCMR's actions are also capricious and arbitrary because they fail to even

address the constructive discharge facts, while their own precedent is clear that such a claim may

be made out on far less.  See, e.g., AFBCMR Report, BC-2003-00343 (March 2004).[17]  In that

petition, an Air Force Major was serving with the Michigan Air National Guard from 1992

through 1995 when, in September of 1995, his full time military technician status was terminated

as a result of false claims by his commander that he had lost his flying status and his security

clearance.  This was demonstrably false.  Next, in October of 1995, his commander ordered him

---

[16] The Circuit Court also explained how a constructive discharge might lie as in the facts of
Tippett v. United States, 185 F.3d 1250 (Fed. Cir. 1999), improper legal advice about
resignation.

[17] See *http://boards.law.af.mil/AF/BCMR/CY2004/BC-2003-00343.doc.*

to go to Wright-Patterson Air Force Base to undergo unprescribed alcohol counseling. He refused to go. He was notified that if he did not go he would be required to resign or face "dishonorable discharge proceedings". Id., p. 2. He resigned instead, with the form reflecting a voluntary resignation. The AFBCMR noted that "his resignation was not voluntary but due solely to the commander's order to resign if he refused his commander's order to report to W-P AFB." Id. The Major later filed a National Guard Bureau IG complaint, which found that the resignation was in accordance with applicable directives. The officer then filed a Congressional Inquiry, which led to a DoD IG investigation that concluded the NGB investigation was incorrect and flawed.

The AFBCMR then conducted a review of the order to go to Wright-Patterson and noted that the order was illegal because the Major would have to be ordered to full time active duty for 30 days in order to comply. The Board also noted the normal processes under which an evaluation would have to be done before such alcohol treatment could be ordered. Relief for the constructive discharge was granted.

In another constructive discharge case before the AFBCMR in 2003, BC-2003-03023 (July 2004),[18] the AFBCMR granted relief for a Captain who claimed he was constructively discharged because his Commander prepared 2 OPRs for him, one good and one bad, and that this was used to coerce him into accepting early retirement because he was convinced his career was over. The Commander was ultimately dismissed because of an IG inspection that found he had abused his position and acted to discriminate against other members of the squadron. He also had threatened to get the petitioner removed from flying duties.

Both of these cases involved noting nearly as coercive or threatening as what plaintiffs here have endured, and yet in both cases, relief was granted and constructive discharge was

_____

[18] See http://boards.law.af.mil/AF/BCMR/CY2004/BC-2003-03023.doc.

found.  The first case (BC-2003-00343) is almost "four corners" on point with plaintiffs'.

Plaintiffs have alleged and shown that they were asked by their commander to investigate the

anthrax vaccine as part of their duties.  They did so and figured out the anthrax program was

illegal *ab initio*, as much to their surprise as anyone else's.  They told this to their commander.

He, and other superiors, ordered the plaintiffs to be quiet about this.  Plaintiffs refused to remain

silent, as well as refused to comply with a patently illegal order.  As a result, they were ordered

that they were not welcome to come around the squadron spaces and were ordered to resign.

They were also publicly slandered by being labeled "traitors", their integrity and reputations

impugned, for questioning the vaccine mandate.[19]

They later filed complaints to get documents, much like the Major above, to make out

their claim for constructive discharge.  Eventually, they were able to do so.  Those documents

included DoD IG investigation testimony by their commanders.  One of them, Major General

Weaver, was found to have given testimony to Congress that "lacked the necessary element of

straightforwardness, and so was inconsistent with guidelines for honesty."  See, e.g., *Stars and*

*Stripes*, May 11, 2001 "General's Anthrax Vaccine Testimony 'Inconsistent with Honesty' Says

Inspector", by Dave Eberhart (quoting the DoD IG Report, originally filed by plaintiff and a

group of fellow officers, cited *infra,* fn 2).  The issue he was less than straightforward about was

who among Guard pilots refused the vaccine.  The DoD IG concluded that Weaver presented the

truth "in such a way as to lead recipients to confusion, misinterpretation, or inaccurate

conclusions[.]"  Id.  Plaintiffs' direct superior, Col. Burns, provided the testimony cited, *infra*,

that plaintiffs were ordered to resign.

---

[19] See attachment 8, Exhibit 1; Col Burns' quote from video, also provided via CD Rom in 22
Nov 2004 Advisory Response.  AR-0223-TLR "…the last thing I want to do is have this unit
called up and some of you say well it's been nice being a Flying Yankee but I don't think I can
take that anthrax shot. I don't think I'm gonna go to war … Can't have that because words like
**traitor** start coming up in my mind, and I don't have a lot of time for those kind of people."

Col. Burns' contradictory public and private statements, provided in the submissions from plaintiffs' 21 Jul. 2004 Supplemental to the AFBCMR, as well as the GAO Report cited *infra*, show that the attempt to cast plaintiffs' resignations as voluntary was no accident. This was part of an intentional cover-up to get rid of plaintiffs, who had pointed out that from its inception, the AVIP was illegal, as well as hide the fact of plaintiffs' loss from flying duties and its impact on readiness. See GAO Report 01-92T, cited *infra*, p. 8 (noting that "25 percent of the pilots and aircrew members of the Guard and Reserve we surveyed have transferred to another unit, left the military, or moved to inactive status. Of these, 25 percent ranked anthrax immunization as the most important factor … ") GAO Report 01-92T, at p. 4. The issue that plaintiffs have attempted to show both the Board and this court is, which does not have the same urgency now, 8 or 9 years later, as it did then, is at the time:

> Congress and the Department of Defense have become increasingly concerned about the readiness of U.S. armed forces … The reserve components are experiencing difficulties in filling their ranks … at a time when DOD is relying on them more heavily to support operations around the world. Specifically, the retention of pilots and other aircrew members has been and continues to be a problem … The impact of an exodus of Guard and Reserve pilots and aircrew members would be significant.

Id., at 3.

Plaintiffs' forced resignations were a direct result of doing exactly what they were ordered to do by their superiors as part of Tiger Team Alpha – investigate the anthrax vaccine to allay fears of unit pilots and personnel about the vaccine. Unfortunately, their investigation revealed what no one had anticipated: the order to take the shot was in direct contravention to applicable federal laws and regulations, including the DoD's own regulations regarding vaccinations. See, e.g., DoD Directive 6205.3, DoD Immunization Program for Biological Warfare Defense, dated Nov. 26, 1993, para. 5.4.1.1. ("For biological threats for which the only available vaccine is an ND, it shall be administered under the 21 CFR 50 and 312 (reference (g))

and the established ND protocol and/or other applicable legal procedures.")  Reference (g) is entitled, at the back of the instruction, "Title 21, Code of Federal Regulations, Parts 50, 'Informed Consent of Human Subjects,' and 312, 'Investigational New Drug Application,' current edition."

Plaintiffs, just like the Major before the AFBCMR in 2003-00343, were given an illegal order and forced and coerced into resigning.  They petitioned for redress through every avenue available to them.  They even have, in support of their contentions, the ruling of this court that the anthrax vaccine program was, at its inception, in violation of a federal statute and therefore, patently illegal.  See Doe v. Rumsfeld, 341 F. Supp. 2d 1 (D.D.C. 2004).  The AFBCMR decision, and the initial discharges, were by simple definition arbitrary and capricious because they are without any support in law or fact.

B.  Defendants' and the AFBCMR's Opinions Regarding Doe v. Rumsfeld are Plain Legal Error.

The defendant in this case has asked this court "not [to] stray into whether or not the AFBCMR was 'correct' in its denial of plaintiff's claim that he was constructively discharged as the result of an illegal order . . . Instead, the Court should limit its review to a determination of whether the AFBCMR followed the proper procedures and laws in rendering its decision."  Def. Brief at 38.  This is the defendant's sincere hope because even a second year law student in civil procedure, upon reading the Doe line of cases, knows that the government lost.  The subsequent FDA actions that led to the injunction being lifted are of no avail on the underlying factual issue. It is simply unnecessary to rehash the defendant's arguments about retroactive application of an injunction and the other legal and mental gymnastics undertaken to make Doe say something other than what it does: at the time of the AVIP's inception, the order to take the anthrax vaccine was in violation of a federal statute, enacted to protect servicemembers against exactly the kind of debacle that occurred after the AVIP was announced.

George Santayana famously said that "those who cannot learn from history are doomed to repeat it." This may be the saddest aspect of the AVIP and <u>Doe</u> saga. The statute in question, 10 U.S.C. §1107, as the plaintiffs' motion for reconsideration to the AFBCMR points out, was enacted as a result of the injuries to servicemembers and violations of their rights that occurred in the run-up to the first Gulf War. It was also passed as a result of continued DoD cover-ups and failures in the aftermath of the Gulf War and in the Bosnian Conflict. The inference of regularity and proper actions by government officials can only go so far before it becomes nothing more than a bromide, a cliché without meaning. Congress' passage of §1107 was essentially a revocation of the presumption of regularity to which the DoD's actions would normally be entitled in light of Congress' experience in the post-Gulf War investigations it conducted.

The defendant would dearly like to have this court not to "stray" into <u>Doe</u>, but it is impossible not to as it is a necessary part of the inquiry, either in reviewing the plaintiffs' discharge *de novo* or in reviewing AFBCMR's actions on plaintiffs' petitions. If the AFBCMR followed the Judge Advocate Advisory opinion and that is an erroneous expression of the law (which it is), then the AFBCMR acted arbitrarily and capriciously. If the commanders above Plaintiffs Rempfer and Dingle ordered their resignation for refusal to follow a patently illegal order, then that action is by definition capricious – in fact, it is worse than that. Therefore, the court must look to <u>Doe</u> insofar as it proves conclusively that the orders at the time were unlawful, just as plaintiffs told their commanders.

There are two final points to be made. Defendant's claim that the court should not stray into an analysis of <u>Doe</u>, but then spend the next 3 full pages 'straying' and explaining why Doe does not mean that the orders were illegal at the time. The defendant's focus on the remedy granted and arguments about retroactivity, much like the JA Advisory opinion, are an excellent attempt to conflate the remedy granted in equity, namely an injunction, with the underlying factual determination by the <u>Doe</u> court, and thus cast the plaintiffs as asking for retrospective

relief.  The plaintiffs here, however, want relief now, for illegal actions then.  There is nothing retroactive about the <u>Doe</u> decision.  It was a factual determination about whether or not the Anthrax Vaccine Adsorbed (AVA) was or was not an investigational new drug (IND) or a drug "unapproved for its applied use" under the statute in question, 10 U.S.C. §1107.  If it was, then the order to take the vaccine was illegal in 1999, when the FDA's final order had not been issued.

The statute was in effect at the time (1998) and was updated to include even actions that occurred prior to its enactment.  Defendants tried in 1999 to use a drug that was "unapproved" for the use to which it was being put – a clear violation of the statute, as well as numerous internal regulations that required the informed consent of human subjects for use of Investigational New Drugs (INDs).  The plaintiffs pointed this problem out and since then have faced an unceasing barrage of attacks for essentially being the bearer of bad news.  The defendants seek to have retroactive effect given to the subsequent FDA actions to bring the anthrax vaccine into compliance with the law.  The arguments in the JA Opinion seek to cast the vaccine as safe and effective eternally, as if it were always so and the FDA compliance with the law is a mere technicality.  The plaintiffs' submissions to the Board on reconsideration detailing the history with pyridostigmine bromide pills during the Gulf War illustrate exactly why 10 U.S.C. §1107 does not allow this retroactive application of findings of efficacy and safety in forcing people to take vaccines and other medications.  The Code of Federal Regulations cited in the DoD's regulations have their origins in the Geneva Conventions prohibitions against human experimentation, a direct descendant of the Nazi War Crime Tribunals against doctors who used unwilling and unwitting subjects to further science.  It was, and it still is, no defense to say "we are the government and we mean and meant well".

For perhaps well-intentioned reasons, the government has been adamant in trying to establish a chemical-biological prophylaxis program to inoculate servicemembers against potential threats. This is laudable; but only if it complies with the law. The ends do not justify the means. Plaintiffs' only purpose in investigating the anthrax vaccine was to carry out their Commander's mandate. Unfortunately, their research revealed the illegality of the program. They pointed that out and now seem to have become the lightning rods for derision, ridicule, and denial of relief because they were proven right by a court of law. These plaintiffs, as demonstrated by the AFBCMR's actions and the opinions issued by the USAF JA and NGB, are being treated differently than any other plaintiffs. A read of the two AFBCMR petitions cited shows this to be true. This court represents the last resort for these plaintiffs on a rather long, arduous journey to vindicate their good name and give proper character to the service they gave this country. One of the plaintiffs, LtCol Russell Dingle, has unfortunately not lived to see the vindication of his hard work.

## <u>CONCLUSION</u>

For the reasons stated above, the Plaintiffs respectfully request that this court deny the defendants' Motion to Dismiss.

Dated: May 24, 2007

Respectfully submitted,

/s/

_____

Dale F. Saran, Esq.
MA Bar #654781
2 Stenton Avenue
Westerly, Rhode Island 02891
(401) 322-5049
dsaranusmc@msn.com

Mark S. Zaid, Esq.
D.C. Bar #440532
1920 N Street, N.W.
Suite 300
Washington, D.C. 20036
(202) 454-2809
ZaidMS@aol.com

*Attorneys for Plaintiffs*