**Major Thomas L. Rempfer**
**3811 Phelps Rd.; W. Suffield, CT  06093 — Home (860) 668-1512 — Cell 680-8452 — TRempfer@aol.com**

Board for Correction of Air Force Records                                      July 21, 2004
SAF / MRBR
550-C Street West, Suite 40
Randolph AFB, TX  78150-4742

Dear Sir or Madam:

I respectfully submit the following supplemental inputs in accordance with AFI 36-2401 and AFP 36-2607. These supplemental inputs augment my original DD Form 149 (attach 1), requesting a correction of my military records.

I reaffirm, my case is very straightforward based on being wrongfully dismissed.  Though the details are fairly complex and historic, the letter from my Congressman (attach 2) reflects the reality that anyone who is willing to look into the details concurs with my conclusions and call for reinstatement.

Of particular concern in the present request is that my Office Performance Report (OPR) be rectified and rewritten simply because it excluded the reasons for my dismissal, and the events that led up to my dismissal, despite my documented request for inclusion, as documented by my supplemental inputs in this submission (footnoted in attach 1).

My original application to the BCMR, as well as this supplemental submission, both support my contention that I was wrongfully dismissed from the CT Guard after being tasked by my commanders to review the Department of Defense (DoD) Anthrax Vaccine Immunization Program (AVIP) through a short notice investigative team called "Tiger Team Alpha." Our team's assessment of the program was that it was illegal. In accordance with my oath of office, I was obligated to refuse to comply with the mandate. Unfortunately, I was subsequently ordered to resign, following threats and disparagement from members of my chain of command, despite myriad unanswered legitimate questions regarding the legality of the mandate revealed during our inquiry.

The Wing Commander who formed our investigative panel was a federal military officer apparently acting outside the provisions of state and federal law. The commander's later admitted involvement in my dismissal, over what I believed was an illegal order, is central to my concerns, as well as the unprofessional and coerced nature of the dismissal, the lack of due process involved, and the subsequent public obfuscation of the true nature of my forced termination. These events have remained unresolved for almost six years despite my appeals through multiple state and federal venues.

For your information, I've previously submitted an application for reinstatement as well to the Governor of CT, John Rowland, in March 2004 in accordance with Connecticut General Statutes (C.G.S.).  His office promptly responded that the Adjutant General of the CT Guard would review and respond to my concerns.  To date, I have not received a response from the Connecticut Military Department concerning my C.G.S. appeal, although my Congressman, Robert Simmons, did receive a negative reply to his inquiry (attach 2) about my case. That response (attach 3) did not address the concerns raised in my complaint. These letters, and more background data (attach 1), are each included with this submission to the BCMR, and also have been subsequently provided to the new CINC of the CT Guard, Governor M. Jodi Rell.

The diligence in resubmitting this application to the BCMR is due to my training that requires military officers to address problems and not ignore them. From the outset of the dilemma I've detailed in my original submission to your board, as well as these supplemental data points, I've remained focused on resolving the legitimate questions originally posed by our investigative panel.

I continue to look to the BCMR to assist my family and me in resolving this ongoing unsettled state of affairs. I am available to your Board to answer any questions you may have and specifically request an audience to make further arguments as they surface in the upcoming weeks and months.

My specific goals for the BCMR continue to include:

1.  Properly document my official duties for my commander on Tiger Team Alpha on my OPR, as well as the fact that our findings about the investigational use of the vaccine were not reported.
2.  Properly document the constructive nature of my dismissal based on the commander saying or implying that I was a "hard liner," a "traitor," and was "spooging America" if I did not leave.
3.  Properly document and include that my commander admitted: an "official government position on some of their [Tiger Team Alpha's] issues does not exist," yet requested my resignation.
4.  Properly document and include in my revised OPR that I questioned the efficacy of inhalation anthrax for the anthrax vaccine, as well as the legality of the mandate with my commander.
5.  Properly include that the commander admitted data proving efficacy "doesn't exist," and that additional subordinate commanders precluded debate or discussion of this pivotal legal issue.
6.  Properly include in my retroactively corrected OPR that federal court rulings ultimately verified my concerns about the mandate, and that I provided Tiger Team Alpha duties as OPR inputs.
7.  Recommend or direct my reinstatement to the CT ANG and to my previous flying duties.
8.  Direct lost pay, longevity, "command pilot" rating, and reinstatement to rank of LtCol, commensurate with CT laws that allow reinstatement at rank commensurate with lost service.

I re-contend that your board has the authority to take these actions on my behalf, partially due to the disturbing absence of the factual documentation in my OPR of events listed in the background information below, as well as my previous submission. I reiterate that the normal three year deadline is clearly tolled by the recent federal court ruling, with subsequent rulings to follow in the near future as to the validity of the FDA's re-licensing of the anthrax vaccine.

Due to the federal origins of the AVIP, your board is an appropriate level of jurisdiction for my requests, most importantly the correction of my OPR. I reiterate my request an audience with your board during an objective hearing in order to make my case as you justly adjudicate the issues related to my refusal to submit to the anthrax vaccine, my coerced resignation, and the resultant hostile and wrongfully constructed retaliatory dismissal.

Very respectfully,

Major Thomas L. Rempfer

**Attachments**:

1. Original DD Form 149, plus information supplemental to original application to the BCMR

2. Letter from Rep. Simmons to the Commander of the CT Guard's 103rd Fighter Wing, Col. Scace,

   Plus letter from Rep. Shays to the new CINC of the CT ANG, CT's Governor -- M. Jodi Rell

3. Letters of response from Col. Scace and Adjutant General Cugno to Representative Simmons

4. December 2000 letter from Attorney General Blumenthal to MG Cugno and his responses

5. Excerpts from Col Burns' January 18, 2001 Residual Testimony to the DoD IG – 2nd FOIA, APR 2004

6. Complete residual FOIA transcript of Col Burns January 18, 2001 testimony (note – original,

   Partial 1st FOIA transcript attached to original BCMR application)

7. Officer Performance Reports from 2002, 1998, & 1996 -- Additional reports available upon request

8. Time slice excerpts from 103rd FW Commander, Col. Burns', anthrax vaccine briefing, October '98

9. Relevant excerpts from the Air National Guard Commander's Legal Deskbook

10. Memo from USAF Legal Experts confirming: "illegal orders must be disobeyed"

**Note**: **CD ROM of Col Burns' CT Guard Briefing on Anthrax Vaccine,**

**With insinuation of treason, available upon request (reference attach 8).**

# <u>Attachment 1</u>

# Original DD Form 149,
# Plus information supplemental to
# Original application to the BCMR

**APPLICATION FOR CORRECTION OF MILITARY RECORD**
**UNDER THE PROVISIONS OF TITLE 10, U.S. CODE, SECTION 1552**
*(Please read instructions on reverse side BEFORE completing this application.)*

Form Approved
OMB No. 0704-0003
Expires May 31, 2006

The public reporting burden for this collection of information is estimated to average 30 minutes per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing the burden, to Department of Defense, Washington Headquarters Services, Directorates for Information Operations and Reports (0704-0003), 1215 Jefferson Davis Highway, Suite 1204, Arlington, VA 22202-4302. Respondents should be aware that notwithstanding any other provision of law, no person shall be subject to any penalty for failing to comply with a collection of information if it does not display a currently valid OMB control number.
**PLEASE DO NOT RETURN YOUR COMPLETED FORM TO THE ABOVE ADDRESS. RETURN COMPLETED FORM TO THE APPROPRIATE ADDRESS ON THE BACK OF THIS PAGE.**

**PRIVACY ACT STATEMENT**

**AUTHORITY:** Title 10 US Code 1552, EO 9397.

**ROUTINE USE(S):** None.

**PRINCIPAL PURPOSE:** To initiate an application for correction of military record. The form is used by Board members for review of pertinent information in making a determination of relief through correction of a military record.

**DISCLOSURE:** Voluntary; however, failure to provide identifying information may impede processing of this application. The request for Social Security number is strictly to assure positive identification of the individual and appropriate records.

**1. APPLICANT DATA** *(The person whose record you are requesting to be corrected.)*

| a. BRANCH OF SERVICE *(X one)* | ARMY | NAVY | X | AIR FORCE | | MARINE CORPS | COAST GUARD |
|---|---|---|---|---|---|---|---|

b. NAME *(Print - Last, First, Middle Initial)*  Rempfer, Thomas L.

c. PRESENT OR LAST PAY GRADE  O-4

d. SERVICE NUMBER *(If applicable)*  No

e. SSN

**2. PRESENT STATUS WITH RESPECT TO THE ARMED SERVICES** *(Active Duty, Reserve, National Guard, Retired, Discharged, Deceased)*
USAF Reserves

**3. TYPE OF DISCHARGE** *(If by court-martial, state the type of court.)*
Honorable from CT ANG

**4. DATE OF DISCHARGE OR RELEASE FROM ACTIVE DUTY** *(YYYYMMDD)*
25 MAR 99

**5. I REQUEST THE FOLLOWING ERROR OR INJUSTICE IN THE RECORD BE CORRECTED:** *(Entry required)*

1. Correct OPR from duty in CT ANG (Connecticut Air National Guard)
2. Reinstatement to flying duty for CT ANG

**6. I BELIEVE THE RECORD TO BE IN ERROR OR UNJUST FOR THE FOLLOWING REASONS:** *(Entry required)* [See attached requested remedy sheet.]

1. My OPR does not reflect my duties for my commander
2. Those duties identified the anthrax vaccine mandate as illegal
3. I was wrongfully discharge now that a federal judge concurred
4. I should be reinstated and my OPR reaccomplished to set the record straight

**7. ORGANIZATION AND APPROXIMATE DATE** *(YYYYMMDD)* **AT THE TIME THE ALLEGED ERROR OR INJUSTICE IN THE RECORD OCCURRED** *(Entry required)*
September 1998 - March 1999

**8. DISCOVERY OF ALLEGED ERROR OR INJUSTICE**

a. DATE OF DISCOVERY *(YYYYMMDD)*
2008 12 22

b. IF MORE THAN THREE YEARS SINCE THE ALLEGED ERROR OR INJUSTICE WAS DISCOVERED, STATE WHY THE BOARD SHOULD FIND IN THE INTEREST OF JUSTICE TO CONSIDER THE APPLICATION.
The Federal Court ruling on Dec. 22, 2003 makes it a matter of law that the AVIP was illegal absent a final rule for use with inhaled anthrax, both issues I discovered.

**9. IN SUPPORT OF THIS APPLICATION, I SUBMIT AS EVIDENCE THE FOLLOWING ATTACHED DOCUMENTS:** *(If military documents or medical records are pertinent to your case, please send copies. If Veterans Affairs records are pertinent, give regional office location and claim number.)*
I will provide any additional documents when interviewed by the board, plus see Cover & Attch(s) enclosed.

| 10. I DESIRE TO APPEAR BEFORE THE BOARD IN WASHINGTON, D.C. *(At no expense to the Government)* *(X one)* | X | YES. THE BOARD WILL DETERMINE IF WARRANTED. | | NO. CONSIDER MY APPLICATION BASED ON RECORDS AND EVIDENCE |
|---|---|---|---|---|

**11.a. COUNSEL** *(If any)* **NAME** *(Last, First, Middle Initial)* **and ADDRESS** *(Include ZIP Code)*
SELF & Hanscom AFB ADC
Capt. Grover Baxley, USAF

b. TELEPHONE *(Include Area Code)*  860-668-1512

c. E-MAIL ADDRESS  Grover.Baxley@hanscom.af.mil
Thomas.Rempfer@hanscom.af.mil

d. FAX NUMBER *(Include Area Code)*  860-668-1513    781-377-3983

**12. APPLICANT MUST SIGN IN ITEM 15 BELOW.** If the record in question is that of a deceased or incompetent person, LEGAL PROOF OF DEATH OR INCOMPETENCY MUST ACCOMPANY THE APPLICATION. If the application is signed by other than the applicant, indicate the name *(print)* _____ and relationship by marking one box below.

| SPOUSE | | WIDOW | | WIDOWER | | NEXT OF KIN | | LEGAL REPRESENTATIVE | | OTHER *(Specify)* |
|---|---|---|---|---|---|---|---|---|---|---|

**13.a. COMPLETE CURRENT ADDRESS** *(Include ZIP Code)* **OF APPLICANT OR PERSON IN ITEM 12 ABOVE** *(Forward notification of all changes of address.)*
3811 Phelps Rd.
W. Suffield, CT 06093

b. TELEPHONE *(Include Area Code)*  same

c. E-MAIL ADDRESS  TRempfer@Aol.com

d. FAX NUMBER *(Include Area Code)*  same

**14. I MAKE THE FOREGOING STATEMENTS, AS PART OF MY CLAIM, WITH FULL KNOWLEDGE OF THE PENALTIES INVOLVED FOR WILLFULLY MAKING A FALSE STATEMENT OR CLAIM.** *(U.S. Code, Title 18, Sections 287 and 1001, provide that an individual shall be fined under this title or imprisoned not more than 5 years, or both.)*

CASE NUMBER *(Do not write in this space.)*

**15. SIGNATURE** *(Applicant must sign here.)*

**16. DATE SIGNED** *(YYYYMMDD)*
2004 05 19

**DD FORM 149, MAY 2003**          PREVIOUS EDITION IS OBSOLETE.

**Supplemental background information for resubmission of application for reinstatement**:

? The following supplemental background information augments the original background information provided with my initial March 2004 application to the BCMR. The following supplemental data includes clarifications concerning various CT Guard leaders and events involving the anthrax vaccine over the past six years. This data includes:

1. Clarifications on the origin of the relayed veiled threat that officers who challenged the anthrax vaccine mandate would never work in the military again.
2. Clarifications on the unique, unprecedented, and acknowledged "uncertain" command authority status of the CT Guard's federal Wing Commander, Col. Burns.
3. Clarifications, based on newly available DoD Inspector General testimony by the commander of the CT Guard in 1998 and 1999 – Col. Burns, reference his role in my termination.
4. Clarifications about absent FOIA document responses from the CT Guard and evidence of undue command influence on the state's militia by authorities outside the chain of command.
5. Clarifications about additional missing FOIA documents, plus the officially prohibited discussion of the key legal issues pertaining to the anthrax vaccine – efficacy – despite the acknowledgement of the "unanswered" and "legitimate" nature of these questions.
6. Clarifications about further missing FOIA documents demonstrating support for Tiger Team Alpha's efforts, and illustrations of the failure to officially document the team's duties.
7. Clarifications on correspondence from CT Guard officials spanning four years that impugn the reputations and efforts of the Tiger Team Alpha officers, while ignoring the gravity and implications of the team's findings and the documented facts regarding ordered dismissals.


**Clarifications:**

**1. Clarifications on the origin of the relayed veiled threat that officers who challenged the anthrax vaccine mandate would never work in the military again.**

The most recent previous commander of the CT Guard 103rd Fighter Wing, Col. Scace, who replaced Col. Burns, was the officer that relayed the threat to me in the late fall / early winter of 1998 that officers would never serve in the military again if they caused any problems regarding challenging the anthrax vaccine mandate. The nature of this threat was also corroborated based on the fact that it was additionally relayed to a Congressional staff representative at the same timeframe as is evidenced by the quotes transcribed from emails in my original application to the BCMR. This matter is also a matter of public record documentation within then Maj. Dingle's and my testimony to Congress on March 24, 1999. This allegation was reviewed, and was left unchallenged, by National Guard authorities upon their review of that testimony (Reference: National Guard Bureau Office of Policy and Liaison Hearing Summary — available upon request). This background helps to place in perspective Col. Scace's contention in his May 2004 letter to Rep. Simmons (attach 2/3) that he was not "compelled" by the "entreaties" of my application for reinstatement. It is also important to note that Col. Scace did not in anyway directly respond to the seriousness of those "entreaties," or the points made, but instead continues to refer to resignations as voluntary personal decisions, versus the documented professional process that occurred within the Tiger Team Alpha tasking. Col. Scace also ignores the documented facts pertaining to the ordered resignations as officially found by the Freedom of Information Commission.

a. Ignoring the concerns of Tiger Team Alpha in 1998 and 1999 by officers tasked to question the problems with the anthrax vaccine and its mandate follows the same pattern presently of CT Guard officers reviewing my application for reinstatement. CT Guard officials have wholly ignored in their response to Rep. Simmons the fact that the federal court confirmed the lack of proper licensure of the anthrax vaccine during the period in question. Instead Guard leaders merely insist that the federal judge ruled subsequently following the presentation by the Food and Drug Administration of a new never previously finalized license for the vaccine on December 30, 2003. To the contrary though, the lack of previous proper approval vindicates the original concerns of the Tiger Team Alpha officers, notwithstanding the very real probability that the subsequent final licensure of the anthrax vaccine may be found by the federal court to be noncompliant with the Federal Food Drug and Cosmetic Act and the Administrative Procedures Act.

b. Col. Scace also wholly ignores the fact that a Connecticut Commission corroborated the fact that the officers involved were "ordered" to resign following the Tiger Team Alpha inquiry (see references in original application to the BCMR.

**2. Clarifications on the unique, unprecedented, and acknowledged "uncertain" command authority status of the CT Guard's federal Wing Commander, Col. Burns.**

It is also important to reiterate, and further corroborate, the fact that Col. Burns did not have the command authority to coordinate the dismissals of officers from the CT Guard, in accordance with the Guard's own legal guidance referred to in the Marconi memo (see commander's staff judge advocate memo included in original application to the BCMR). Please also see relevant excerpts from the Air National Guard Commander's Legal Desk Book included with this resubmission package (attach 9).

**3. Clarifications, based on newly available DoD Inspector General testimony by the commander of the CT Guard in 1998 and 1999 – Col. Burns, reference his role in my termination.**

It is equally important to call your attention to Col. Burns' additional testimony to the DoD Inspector General's (IG) office (residual testimony included with this document – attachs 5/6 – plus, the initial partial testimony was included in the original application for reinstatement to the BCMR). Since the initial submission to Gov. Rowland, a complete response by the DoD IG provided these residual elements of Col. Burns' testimony. In this testimony Col. Burns makes several important admissions / distinctions, not previously available for the initial reinstatement request:

a. Col. Burns testified: "I asked them to resign from the Connecticut Air National Guard. Now, some of them allege that they were ordered to resign. Okay? I did not order them to resign. I can't speak for anyone else in the chain of command. But I did not order them to resign. I didn't have that authority. But I did ask them to, and they all did."

b. Though Col. Burns specifically stated that he, "can't speak for anyone else in the chain of command," he does not explain the fact that another member of the chain of command, Col. Swift, did call at least four officers on the phone in January of 1999, officers who spoke out publicly, ordering their resignations. The CT FOI Commission heard testimony concerning these facts and found in favor of the officers, confirming the "ordered" resignations.

    c.   Additionally, from a good order and discipline and military cultural perspective, it is reasonable to conclude that Col. Burns' indistinguishable distinction that he merely "asked them to resign" is nothing less than an order coming from a commander at the time that the officers assumed had command authority in the CT Guard.

    d.   At no time in Col. Burns testimony to the DoD IG did he forthrightly explain his previous public insinuations of treason (attach 8) regarding the officers in the CT Guard that were professionally concerned about the ethical and legal propriety of the anthrax vaccine order.

## 4. Clarifications about absent FOIA document responses from the CT Guard and evidence of undue command influence on the state's militia by authorities outside the chain of command.

Col. Burns' testimony to the DoD IG on January 18, 2001 also revealed an important admission that "I captured all my e-mail and all the other hard copy stuff." This is directly relevant to the CT Guard's FOIA response, or lack there of, in FOI Commission case # 2000-303 &304.[1]

    a.   Extremely limited emails were retrieved via the FOIA case, including, but not limited to, those between Col. Burns and myself.

    b.   Emails to or from HHQ were not included. These emails should have demonstrated the coordination between Col. Burns and HHQ regarding the pressure to dismiss officers in the CT Guard without proper command authority to do so by either Col. Burns or the Pentagon officials Col. Burns admitted receiving pressure from. The lack of such documented communications are central to the present case.

    c.   Such communiqués were wholly absent from the CT Guard FOIA responses:
         ☞  I.e., Col. Burns: "those senior to me (not just those in CT) wanted to take aggressive action or implied aggressive action was appropriate."[2]

## 5. Clarifications about additional missing FOIA documents, plus the officially prohibited discussion of the key legal issues pertaining to the anthrax vaccine – efficacy – despite the acknowledgement of the "unanswered" and "legitimate" nature of these questions.

Col. Burns' testimony also revealed, "But we did find a doctor who was an ex-biological research doctor for the Army, back when it was legal to do that. And they were doing both offensive and defensive biological warfare research. ... And we taped that, by the way. Connecticut has that tape somewhere."

    a.   Despite our requests, this tape was not retrieved via the FOIA case.

    b.   This tape and briefing demonstrated the serious questions posed by CT Guard officers, and Col. Burns' testimony admitted the legitimacy of those questions:
         ☞  "There are unanswered questions that are legitimate questions."[3]

    c.   This briefing also specifically precluded the discussion of efficacy; the key legal issue related to the mandatory use of the vaccine, and the inherent violations of US law. A memo documenting the preclusion of discussion of efficacy was provided via FOIA, and is available upon request. Food Drug and Cosmetic Act efficacy requirements are thoroughly discussed in original application to the BCMR.

---

1 http://www.state.ct.us/foi/2001fd/20010110/FIC2000-303.htm, http://www.state.ct.us/foi/2001fd/20010110/FIC2000-304.htm.

2 Burns, W. Email to Captain Rempfer. April 21st, 1999.

3 DoD IG testimony, previously submitted, January 18, 2001.

6.  **Clarifications about further missing FOIA documents demonstrating support for Tiger Team Alpha's efforts, and illustrations of the failure to officially document the team's duties.**

An email note by then LtCol Daniel Peabody, expressing encouragement to Major Dingle ("Russ") and myself ("Buzz"), was not retrieved via FOIA, further demonstrating the withholding of documents.

a.  This note demonstrated tacit support and encouragement of other unit members over what began as the Tiger Team Alpha tasking.  The acknowledgement of the hard work involved in this note by Col. Peabody (footnoted excerpt below), the current CT Guard Wing Commander, stands in stark contrast to Col. Burns' and Pentagon's subsequent public assertions that the officers involved chose to leave the Guard in order to concentrate on their personal lives and to avoid deployment.[4] This note also reflects a different reality than that publicly asserted by Col. Scace and MG Cugno. Col. Burns' communiqués to HHQ that would have created such an impression were also not included in the FOIA responses (see Pentagon Press Briefing excerpts in original application for reinstatement to the BCMR).

b.  Col. Burns' comments under oath to the DoD IG also demonstrated the widespread concerns of unit members beyond the officers involved with Tiger Team Alpha:
    ✏ "There was significant resistance in the entire squadron in that October-November-December time frame."

c.  Officers in the CT Guard privately expressed their dismay that a complete FOIA response was not provided to LtCol Dingle and myself, despite the fact that all documents were allegedly provided to CT Guard State HHQ SJA's responsible for complying with FOIA.

d.  The pattern demonstrated by the failure to comply with the FOIA with documents adding credence to the credibility to, or existence of, Tiger Team Alpha followed the pattern of obscuring the team's existence and findings, and the apparent alternative tactic of instead impugning the honorable intentions and well-research findings of the officers involved.

e.  This pattern was also indicated by the failure to document in any manner in professional records, such as officer performance reports (OPR's), the dutifully assigned and complied with tasking of Tiger Team Alpha that led to our ordered dismissals. After leaving the CT Guard, I specifically requested that our Tiger Team Alpha duties be included in my

---

4

| Subj: | ...no subject... |
| Date: | 3/25/99 7:04:34 PM !!!First Boot!!! |
| From: dpeabody@CTBDL.ANG.AF.MIL Reply-to: dpeabody@CTBDL.ANG.AF.MIL To: TRempfer@aol.com CC: redingle@ziplink.net |

Buzz, Russ,

Great job in D.C. yesterday. Thanks for all your hard work and dedication.

It is appreciated and respected my more people than you might sometimes

think. Hang in there guys!

Dan

DANIEL PEABODY, LTC, CTANG

118FS/DO

DSN: 636-8531

DPEABODY@CTBDL.ANG.AF.MIL

---------------------- Headers ----------------------------

Return-Path: <dpeabody@ctbdl.ang.af.mil>

Received: from rly-yb03.mx.aol.com (rly-yb03.mail.aol.com [172.18.146.3]) by air-yb04.mail.aol.com (v58.16) with SMTP; Thu, 25 Mar 1999 14:04:34 -0500

performance report. This did not occur, putting the onus on me to document through the FOIA the Tiger Team Alpha duties and tasking in order to make the events a matter of record. An email (footnoted excerpt below), passed onto the CT Guard officers authoring my performance report, specifically addresses this request. [5] The actual officer performance report for the period in question is provided as attachment 7. This performance report omits my Tiger Team Alpha duties, despite the preemptive request for such official documentation. This email was also absent from the FOIA response despite the fact that the officer involved contended he provided all relevant materials regarding our tenure in the CT Guard to the state's Staff Judge Advocate.

f.   It is also relevant to note that previous performance reports by the CT Guard documented my performance as one of the "best" observed. Subsequent reports from the USAF Reserves also noted my status as an "anthrax vaccination expert" (also included in attach 7). This

---

[5]

Subj:   re: OPR?

Date:   5/15/99 8:59:44 PM !!!First Boot!!!

From: dpeabody@CTBDL.ANG.AF.MIL Reply-to: dpeabody@CTBDL.ANG.AF.MIL  To: TRempfer@aol.com

Buzz,

Thanks for the note. Sorry for not responding re the status of your OPR. I

started to track it down today and got distracted by something else. I had

hoped to get it to you tonight either personally or through Bulldog and if

I do not I will fax you a copy or update on its status tomorrow. Thanks

for your patience.

DANIEL PEABODY, LTC, CTANG

118FS/DO

DSN: 636-8531

DPEABODY@CTBDL.ANG.AF.MIL

--------------

Original Text

From: <trempfer@aol.com>, on 5/15/99 12:45 AM:

Dan,

First of all I wanted to say thanks for passing on the messages coming into

the ANG for me. And your words of encouragement after the hearings.

I hoped to check on the OPR status for my records. So you understand where

I'm coming from I'll summarize the main things that I'm hoping are in or

not in the OPR:

1. If there's any mention of the Anthrax policy, I feel it's only

appropriate that my involvement in the Tiger Team is also mentioned. We've

discussed this before, and I believe you have our best interests in mind in

this realm.

2. I've served as an additional duty liaison officer for the CT LO program,

and was last fall as well, so I was hoping that additional duty was included

as well. No one ever asked for OPR inputs as I recall but I also never

really offered any, so I'm not sure if that was known. Anyway, if the OPR

is still in the works, please include it if able. I handle the high schools

in Suffield, Windsor Locks, Simsbury, Canton, E. Granby and Granby.

Please send a fax of the OPR over to the house when you get a chance.

Local fax # is 668-1513. Thanks Dan and we'll see you around. Hope Kuwait went okay.

Fly safe & keep the faith!,

Buzz

---------- Headers -----------

Return-Path:

Received: from  rly-zb04.mx.aol.com (rly-zb04.mail.aol.com [172.31.41.4]) by air-zb03.mail.aol.com (v59.4) with SMTP; Sat, 15 May 1999 16:59:43 -0400

officer performance report documentation before and after my 1998 and 1999 service in the CT Guard once again stands in direct conflict with the manner in which my performance is openly defamed by Col. Scace and MG Cugno, without substantiation, in their letters to state and federal officials.

**7.   Clarifications on correspondence from CT Guard officials spanning four years that impugn the reputations and efforts of the Tiger Team Alpha officers, while ignoring the gravity and implications of the team's findings and the documented facts regarding ordered dismissals.**

Both the December 2000 and May 2004 official responses by the CT Guard officials (supplied as attachments 3 & 4 to this supplemental reinstatement application submission) impugned the reputations of LtCol Dingle and myself as Tiger Team Alpha officers. Such disparaging representations of our officially performed duties cannot be overlooked, and must be challenged as a matter of principle. Such depictions of myself and LtCol Dingle were not based on an intellectually honest or forthright vetting of the timeline of events, and instead appear to be more appropriately an attempt to use continued disparagement tactics in the name of military good order and discipline in order to obscure the initial tasking and findings of Tiger Team Alpha, which revealed a patently illegal military mandate.

    a.   In MG Cugno's letter (attach 4) to the Attorney General of CT, dated December 26, 2000, the Adjutant General refers to LtCol Dingle's and my "contempt for the chain of command," a slanderous and libelous remark if applied to any professional military officer. Without providing justification for such remarks, the Adjutant General instead states that morale problems would occur, and a rift would be widen, within the unit if the officers involved were to return to the service in the CT Guard. Clearly such comments were not warranted or justified and must be withdrawn and corrected in order to ensure that such a rift does not occur upon my return to service for our state in the CT Guard.  Any morale problems and rifts are the direct result of the disparagement of the officers involved with Tiger Team Alpha by the CT Guard leadership, and the fact that this leadership did not forthrightly convey to unit members the severity and implications of the investigative team's findings. In fact, we were ordered not to share our final research with unit members.

    b.   In MG Cugno's letter dated December 27, 2000 he additionally implies that I ceased my flying duties prior to the AVIP mandate's enforcement. This is true, but only because all military pilots have been trained to **temporarily** ground themselves from flight duties when significantly distracting personal or professional events occur that might impede any aspect of their flying operations. In the same spirit of commonsense that demanded a full analysis of the improprieties related to the AVIP, I did ground myself for a short period once faced with prospect of the unit leadership's unwillingness to fully explore the problems related to the potential illegality of the anthrax vaccine mandate.

    c.   In this letter MG Cugno also raises the issue of "following orders." This is important because it was central to the concept of whether or not following illegal orders is a soldier's duty. Please see USAF legal opinion memo by MG Fiscus on the requirement to disobey patently illegal orders attached to this resubmission application for reinstatement (attach 10). The official USAF legal position settles the dispute that illegal order "must be disobeyed." Tiger Team Alpha's officers did precisely that while questioning the legality of the anthrax vaccine mandate at a time when the mandate was illegal. This fact is irrefutable based on the federal judge's December 2003 ruling that the AVIP was illegal, and the FDA's subsequent attempts to properly license the vaccine, though these belated attempts remain the subject of federal judicial review. Tiger Team Alpha's charge demanded analysis rather than the summary ordered dismissals that the officers received. If such an

critical analysis had occurred in 1999, in lieu of our forced expulsions, the December 2003 federal court ruling may have been avoided altogether.

d.  In this same letter MG Cugno states that the officers involved "manipulated the system," but upon a full reflection on the events involved it may be more apparent that this accusation is misplaced and may be more aptly applied to those who forced our discharges.

e.  In MG Cugno's most recent communiqués to Representative Robert Simmons, he rejects the prospect of returning pilots to flying duty with the CT Guard, instead insinuating "misconduct" and "criminal" violations. As with the allegations of contempt for the chain of command, and manipulation of the system, as well as Col. Burns' insinuation of treason, these slanderous remarks must be withdrawn and recanted either by MG Cugno or by the appropriate investigative authorities reviewing his conduct. Further, MG Cugno's implication of the controlling nature of the UCMJ and Article 92 regarding failure to obey orders is likewise misplaced as the Guard Commander's Legal Deskbook specifically clarifies that the UCMJ did not apply to CT Guardsman in state status. If violations of the CT Code of Military Justice did occur, on the other hand, there were proper processes for punishments and discharge that could have been followed. The failure to follow these processes additionally follows an important pattern demonstrated throughout the events regarding Tiger Team Alpha's duties and the implementation of the AVIP.

**Conclusion**:

Throughout the events related to implementation of the anthrax vaccine program in the CT Guard officers officially tasked to do so by their commanders raised serious acknowledged legitimate concerns about the potential illegality of the military mandate. A federal court later confirmed these illegalities. While a federal military officer, with no legal command authority, coordinated and requested these state officer's dismissals outside the provisions of state law, state Guard leaders have persisted in obscuring and suppressing the findings of the official investigative team and have attempted to paint resignations as voluntary personal decisions to resign. Col. Burns' testimony confirms that the discharges occurred only after being pressured by the chain of command to do so.

Professional military officers are not above the law and are not beyond the scrutiny of the requirements to allow due process for their personnel. This is a matter of state law as well, which was controlling in all the events that transpired in 1998 and 1999, not to mention the subsequent discovery processes included in the FOIA proceedings that followed. Accordingly, I ask that I be afforded a proper investigation so that the events involved are clarified on the public record in order to restore my reputation, and that of LtCol. Dingle and the other pilots forced to resign.

My request remains to be reinstated to the CT Guard as a pilot, which will not adversely impact the CT Guard once the record is corrected by the BCMR.  Additionally, since the CT Guard has explained one of the reasons that I cannot return is that my reinstatement would adversely impact the promotion opportunities of other officers that joined the CT Guard after my departure, it is appropriate that I be reinstated to the grade of Lieutenant Colonel in the CT Guard, with federal recognition directed by the BCMR, so as not to be placed junior to my fellow officers with less time in service. This is in concert with the spirit and specific provisions of the CT General Statutes under which I applied for reinstatement, as well as being within the authority granted to the BCMR

Correction of my OPR from 1998 / 99 to properly document the events is also required and requested.

# Attachment 2

## Letter from Rep. Simmons
## To the Commander of the CT Guard's
## 103rd Fighter Wing, Col. Scace

# <u>Attachment 2, Continued</u>

## Letter from Rep. Shays to the new CINC of the CT ANG, CT's Governor -- M. Jodi Rell

# <u>Attachment 3</u>

# Letters of response from Col. Scace And Adjutant General Cugno to Representative Simmons

# <u>Attachment 4</u>

## December 2000 letter from Attorney General Blumenthal To MG Cugno and his responses

# <u>Attachment 5</u>

# Excerpts from Col Burns' January 18, 2001 Residual Testimony to the DoD IG – 2nd FOIA Response, APR 2004

**Col. Burns testimony excerpts to the DoD Inspector General - 18 JAN 01:**

"I was then, and I still am, active duty. I was the first-ever, in peacetime, commander of an Air Guard wing as an active duty officer."

"We were the -- we were the first Air Guard unit for sure, and I am pretty sure one of the very first military units, that had to enforce the DOD AVIP..."

"A couple of the more vocal officers felt like the anthrax policy was immoral and illegal. And -- as a result of this concern, I put a team of people together to try to capture all of their concerns."

"MAJ Rempfer, now-MAJ Rempfer, and [redacted,] And there were a couple other people on that Tiger Team..."

Q  "Did your appoint them in writing? I mean, did you formalize it --"

"... General's office. I'd been in contact ... Yes. And quite frankly, they didn't have the answers either. I was told more than once, this is a command -- a leadership problem.  Deal with it."

"The bottom line is I was continually communicating via e-mail about how critical it was that I get the answers to those questions. And it wasn't until after we got back from the desert that I got any of the answers ..."

**[Note -- Tiger Team Alpha officers, including Rempfer and Dingle, and others, were discharged by the time Col. Burns "got any of the answers."]**

"I think it was that period that MG Weaver had a meeting with all the commanders that were present, and there were a lot of them from across the Guard. And he was aware, I had made him aware of my problem at the time. And I got up in front of all the Guard commanders that were there and just said, do not underestimate this anthrax thing, because it will -- resistance is out there. I said the internet is working. There are unanswered questions that are legitimate questions."

"And I wanted this to be my official notification to them that I had some troubles and I needed some help."

"There was significant resistance in the entire squadron in that October-November-December time frame."

"As an aside, I'll give you an example. The Air Force Surgeon General advised us to consult with any of our local veterinarians for their expertise. There's not a veterinarian in the entire Northeast, to include the Bronx Zoo, who has any experience with anthrax. So that's just another example of how the Department of Defense was ill-prepared to deal with implementing the anthrax policy. There are no vets in the Northeast that have a clue. ... It was a recommended source of information."

"But we did find a doctor who was an ex-biological research doctor for the Army, back when it was legal to do that. And they were doing both offensive and defensive biological warfare research. ... And we taped that, by the way. Connecticut has that tape somewhere."

"So we asked them to retire ... Or resign, yes. Well, asked them to resign from the Connecticut Air National Guard."

"No. No. I asked them to resign from the Connecticut Air National Guard. Now, some of them allege that they were ordered to resign. Okay? I did not order them to resign. I can't speak for anyone else in the chain of command. But I did not order them to resign. I didn't have that authority. But I did ask them to, and they all did."

> **[Note -- Col. Swift executed the calls ordering CT Guard pilots to resign. Officers complained to Col. Burns about these events. Each officer was told by Col. Swift to go to Col. Burns' office where out-processing packages were prepared for completion.]**

"All eight of these guys had no commitment to the federal government, or the state. They had met their obligations."

> **[Note – several officers had commitments to the state, and it became a matter of significant discussion within the chain of command. Pilots were not considered "refusals" only if they had no commitment, and therefore the substantive subject of commitments was central to the issue, as well as whether or not a "commander" has the authority to request the resignation of an officer who has such a commitment. A commander does not possess such authority, nor does he have the authority to order resignations.]**

"Can I ask a question ... I'm getting the feeling that I'm the one being investigated here, rather than MG Weaver."

"And again, as I said earlier, all eight of them, anthrax was the catalyst. ... For Rempfer, I'm pretty confident it was the only thing, if not the -- it was certainly the primary thing, if not the only thing, because they were very vocal in their resistance to the anthrax program."

"I did talk with Mr. Cragin's office about readiness as a result of those eight leaving. ... But he called ..."

"Those eight guys leaving did not affect our readiness in a measurable way. Or significantly (inaudible.)"

"The individual, I believe the [Operations] fell to C-2 [readiness] shortly after the eight guys left."

"I mean, but informally -- I mean, MG Weaver knew that I had lost eight pilots over the anthrax issue."

"So -- and none of the eight guys that I had had any commitment to the government at all."

"I captured all my e-mail and all the other hard copy stuff."

Q  "The concerns that you summarized that your -- that the Tiger Team had ... compiled for you.  You indicated that you didn't get any real satisfactory answers to those until you returned from your deployment, which had been early fall-late summer '99. In that regard, did you --"

"No, no, no. Spring-summer."

> **[Note -- the discharges of Rempfer and Dingle occurred in March and April.]**

"The anthrax -- editorial comment -- the anthrax program was a victim of poor preparation on the part of DoD and an underestimation of the power of the internet to spread rumor and innuendo very, very quickly. And DOD was unprepared to counter that in time. And it got out of hand."

"I guess just to -- the whole anthrax issue is -- it reminds me of the debate on abortion. And by that I mean two people who are identically trained, raised, and have almost identical beliefs can have violently opposing opinions on anthrax, just like they can have violently opposing opinions on abortion. And there's no middle ground. ... An I think there are representatives in Congress that are of the same opinion."

> **[Note -- Congressional Report 106-556 officially found and objected to the AVIP mandate based on the fact that the anthrax vaccine was "experimental."]**

Q  "Did you have any conversations, or, again, any kind of impression from your active duty counterparts that these concerns were as real to them as they seem -- were apparently to the Guard members?"

"Well, the concerns are still there, but they're masked under the threat of a court-martial, or an Article 15. See, you can hammer somebody on active duty. You can fine them, you can put them in jail, you know, failure to obey an order on up. A guardsman can go -- if he has no commitment, he can go see ya, and just stop coming to work. And there's not a thing you can do. ... But I thin, the issues are still just as prevalent on the active duty; they're just masked. And particularly some of the younger kids are afraid to speak up."

> **[Note -- CT Air Guard officer's commitments were ignored, and later denied.  To do otherwise would have required the losses to be acknowledged, and proper, non-coercive, discharges to occur.]**

# <u>Attachment 6</u>

# Complete residual testimony by Col. Burns To the DoD IG, January 18, 2001 -- Provided via 2nd FOIA response, April 2004

DEPARTMENT OF DEFENSE
OFFICE OF INSPECTOR GENERAL

OFFICE OF DEPARTMENTAL INQUIRIES


TAPE TRANSCRIPTION


x - - - - - - - - - - - - x
:                                    :
:          **INTERVIEW OF**          :
:                                    :
:       ████████████████            :
:                                    :
:                                    :
x - - - - - - - - - - - - x


January 18, 2001

THIS IS A PRIVILEGED DOCUMENT. Neither this document nor
information contained in this document will be disclosed
outside the Office of the Inspector General, Department of
Defense, without the approval of the Office of Departmental
Inquiries, Office of the Inspector General, Department of
Defense.

FOR OFFICIAL USE ONLY

**Diversified Reporting Services, Inc.**
1025 VERMONT AVENUE, N.W. SUITE 1250
WASHINGTON, D.C. 20005
(202) 296-2929

███████ - 01/18/01                                    2

```
1                   P R O C E E D I N G S
2           ███████      Okay, today is Thursday, January 18,
3    2001.  I'm ███████; with me is ███████  We are
4    investigators with the Office of Inspector General,
5    Department of Defense.  And we are commencing an in-person
6    interview with Air Force ███████  And sir, for
7    the record, would you state your full name and duty title and
8    position?
9           ███████  ███████  currently the
10   Vice Commander of the AES Center at Langley Air Force Base.
11          ███████  And that acronym stands for?
12          ███████  Aerospace Expeditionary Force Center.
13          ███████  Okay.  And did you have -- do you
14   acknowledge that we've provided you a copy of our For
15   Official Use Only and FOIA and Privacy Act statements?
16          ███████  Yes, you have.
17          ███████  Do you have any questions about the
18   uses of your testimony?
19          ███████:  No questions.
20          ███████  And do you acknowledge that this
21   interview is being recorded?
22          ███████  Yes, I do.
23          ███████  Okay.  Before we went on tape, I
24   advised you that we're looking into allegations that MG
25   Weaver of the Air National Guard and the Hon. Mr. Cragin
```



█████ - 01/18/01                                                      3

1    provided false testimony to a Congressional committee in

2    September, 1999, regarding the impact of the anthrax program,

3    immunization program, on the Air Guard and Reserve.

4              And with respect, what was your previous duty

5    assignment?

6              ████████ My████████ assignment was Commander of

7    the 103rd Fighter Wing at Bradley Field, Connecticut.

8              ████████ And is that referred to as the

9    Connecticut -- is that the Guard, the Connecticut Air

10   National Guard?

11             ████████ That is the primary unit in the

12   Connecticut Air Guard.  There is a tenant unit that's located

13   in Orange, Connecticut, that we were a -- we serviced them,

14   if you will.  But they did not work for me.  They work for

15   the Assistant Adjutant-General for Air in the state, for the

16   Connecticut Air Guard.

17             ████████ (Inaudible) swear?

18             ████████: Ah, yes.  That would be helpful.  At

19   this time, will you raise your right hand?

20   Whereupon,

21             ████████████

22   was called as a witness and, having been first duly sworn,

23   was examined and testified as follows:

24                       EXAMINATION

25             BY ████████                    

**Diversified Reporting Services, Inc.**
1025 VERMONT AVENUE, N.W. SUITE 1250
WASHINGTON, D.C. 20005
(202) 296-2929

███ - 01/18/01                                                    4

1        Q      And I trust that all the foregoing was truthful.

2        A      This applies (inaudible.)

3        Q      Okay.  Again, just so I'm understanding, you were

4    the Squadron Commander or Wing Commander --

5        A      Wing Commander --

6        Q      Wing Commander --

7        A      -- of the 103rd Fighter Wing, correct.

8        Q      And that was a tenant to, or a unit of, the

9    Connecticut Air --

10       A      It is a unit of the Connecticut Air National Guard.

11       Q      Okay.

12       A      I was not the Commander of the Connecticut Air

13   National Guard.  That was --

14       Q      Okay, of that unit.

15       A      -- that was BG George Demers.  I was the Commander

16   of the 103rd Fighter Wing, which was by a significant margin

17   the largest piece of the Connecticut Air Guard.  The only

18   other piece is an air control squadron located in Orange,

19   Connecticut.

20              BY ███████:

21       Q      Sir, what type of aircraft do they fly, and how

22   many personnel do you have in the wing?

23       A      We had 15 A-10 aircraft, and rough figures, we had

24   about 950 total personnel.

25       Q      How many of those were officers, roughly?



███ - 01/18/01                                                      5

 1        A    Roughly 100 or so of those.  Those are very rough

 2   figures.

 3        Q    Yes, sir.

 4             BY ████████

 5        Q    And who did you say was the Commander of the

 6   Connecticut Air Guard at the time you were there?

 7        A    It was BG George Demers.

 8        Q    Is that D-e-m-u-i-r-s?

 9        A    D-e-m-e-r-s.

10        Q    Okay.  And was he your rating or reporting senior?

11        A    It was a little different -- he was the one I

12   reported to for day-to-day operations.  But my reporting

13   official was actually the Adjutant-General, which is MG Bill

14   Cugno.

15        Q    I'm sorry, I didn't catch that last name.

16        A    Cugno.  C-u-g-n-o.

17        Q    Okay.  And it's also my understanding that -- are

18   you an active duty?

19        A    Yes.

20        Q    And you were then?  You're not like an ART or --

21        A    No.  I was then, and I still am, active duty.  I

22   was the first-ever, in peacetime, commander of an Air Guard

23   wing as an active duty officer.  There's another one since

24   then that's commanding the same (inaudible) this unit.  So

25   this is a very unusual set of circumstances.

**Diversified Reporting Services, Inc.**
1025 VERMONT AVENUE, N.W. SUITE 1250
WASHINGTON, D.C. 20005
(202) 296-2929

b7C

█████ 01/18/01                                                    6

1       Q    Okay.

2            BY █████████

3       Q    Sir, when did you assume your duties there with the

4   103rd, and when did you end your duties there?

5       A    Let me see -- July 1997 until June of 2000.  That

6   might be a month off, but that's pretty close.  Either three

7   or two.

8            BY █████████

9       Q    Can you kind of give us in a nutshell, and then we

10  can expound later, your involvement with the anthrax

11  immunization program?  When you were first advised it was

12  coming on board, and, you know, what -- in terms of

13  instruction, et cetera.

14      A    We were the -- we were the first Air Guard unit for

15  sure, and I am pretty sure one of the very first military

16  units, that had to enforce the DOD AVIP policy, because we

17  were scheduled to go to al-Jaber, Kuwait, in support of

18  Operation Southern Watch.  And --

19      Q    And can you put a time frame on when you were

20  notified?

21      A    Well, I'm trying to back it up here.  We were in

22  Southern Watch in April, I believe it was.

23      Q    Of?

24      A    Of '99.  And we had known that for at least a year

25  prior to that, because we had -- we needed enough spin-up

**Diversified Reporting Services, Inc.**
1025 VERMONT AVENUE, N.W. SUITE 1250
WASHINGTON, D.C. 20005
(202) 296-2929



01/18/01                                                          7

1   time to go.  So we had at least a year's notification.  And

2   we were --

3       Q    So that would have been, say, April '98?

4       A    Yes.  At least by then.

5            And what happened was we started telling the -- and

6   I don't know when the AVIP program came out officially.  I

7   don't remember that.  But as soon as we became aware that it

8   was going to apply to us, we started trying to figure out how

9   we were going to implement that policy in an Air National

10  Guard unit.

11           And we started educating the wing with what little

12  information we had, with the game plan of starting the

13  immunization program in October of '98.

14      Q    Okay.

15      A    So that that would give us plenty of time to be

16  prepared in time to go to --

17      Q    To deploy.

18      A    -- Southwest Asia, right.

19           Due to significant resistance to that shot in the

20  October time frame, we pushed that back to January.  And in

21  the intervening three months, I tried to get additional

22  information and guidance from the Department of Defense, the

23  Air Force and the Air National Guard, the United States Army

24  -- anywhere I could find information on anthrax.

25      Q    Before you go further, what form -- or how was it



████  01/18/01                                                    8

1    communicated, this resistance that you described?  How did

2    that become apparent?

3         A    Well, there were just people that flat said that

4    they were afraid for their own personal safety for taking the

5    anthrax shot.  A couple of the more vocal officers felt like

6    the anthrax policy was immoral and illegal.  And -- as a

7    result of this concern, I put a team of people together to

8    try and capture all of their concerns.

9         Q    Among the squadron members?

10        A    Among the -- well, among the wing.

11        Q    The wing, the wing.

12        A    And my executive officer at the time participated

13   in that.

14        Q    Who was that?

15        A    ████████████    He's now a full colonel.  He's

16   the ESSO, executive staff support officer, for the state of

17   Connecticut.

18             I know that Buzz Rempfer and ████████ were two

19   of those members.

20        Q    Is that MAJ Rempfer and --

21        A    MAJ Rempfer, now-MAJ Rempfer, and ████████████

22   And there were a couple other people on that Tiger Team that

23   -- I can't remember who was on there now.

24        Q    Did you appoint them in writing?  I mean, did you

25   formalize it --

b7C

1      A      No.

2      Q      -- with any kind of memorandum, or --

3      A      No.  No, no.  No, I just told them to get together

4   and try and capture the sentiments of all the people who had

5   concerns, whether little or big, concerning the anthrax

6   policy.  And they did that.

7           And what I did was I took that and I formatted it

8   and condensed it into a memo that I sent to MG Weaver and BG

9   McKinley, who was the Director and the Deputy Director at the

10  time.  And I said -- and my cover memo for that said, "I am

11  not equipped to answer the issues and the questions that are

12  outlined in this attachment.  Please give me some help."  And

13  I sent that to them.

14          It took -- I eventually got answers to those

15  questions.  But it took -- it was after we had come back from

16  the desert.  It was way too late.

17          Now, everything I just told you is factual.  I'd

18  like to share my opinion with you.  The Department of Defense

19  implemented the DOD AVIP program without educating the field,

20  in terms of what that program was all about.  And they

21  grossly underestimated the resistance to it, across the

22  board.

23          And I'm very comfortable saying that for the Army,

24  the Navy and the Marines, and everybody else.  They grossly

25  underestimated the resistance to that program.  And they were

Diversified Reporting Services, Inc.
1025 VERMONT AVENUE, N.W. SUITE 1250
WASHINGTON, D.C. 20005
(202) 296-2929



1   very late to me, to provide us in the field the tools we

2   needed to counter that resistance.  And I think that the

3   momentum of resistance got going way too fast, before DOD

4   ever had time to counter it.  And that's what's led us to

5   this whole program -- problem today.  That's an opinion

6   piece.

7        Q    Okay.

8        A    So, in the meantime we started giving the shots in

9   January of '99 --

10       Q    Well, before -- you sent the memorandum in the

11  fall?

12       A    Yes.  I sent that in probably the October time

13  frame.  In fact, I may have a copy of the cover letter, that

14  I can give you the exact time I sent that.  I left most of my

15  files in Connecticut, so I don't have -- in fact, I turned

16  most of them in for an FOIA request.

17            Let me see.  Well, I don't have a date on it.

18       Q    Well, actually, I was going to say, is this --

19       A    "Last month's (inaudible)" -- okay, must --

20  September.  It was the September time frame, because I talk

21  in the memo that we've got to begin shots in October, which

22  was the next month.

23       Q    Okay.

24       A    So September I sent this memo to them asking for

25  help.  And I had been in contact with the Air Force Surgeon



01/18/01                                                    11

1   General's office.  I'd been in contact --

2        Q    Prior to this time?

3        A    Yes.  And quite frankly, they didn't have the

4   answers either.  I was told more than once, this is a command

5   -- a leadership problem.  Deal with it.

6        Q    Let me present some documents to you.  Do you

7   recognize --

8        A    That's it.  That is --

9        Q    -- that this is the same --

10       A    -- that is the memo I sent to them, yes.

11       Q    And is this the attachment to that memorandum?

12  It's a list of six concerns.

13       A    Let me look at where (inaudible.)  Let me just see

14  here.  This may be the one I condensed down from their

15  original 20.  (Witness examines the document.)  Yes.  Yes,

16  this is the one I sent to Weaver and ▮▮▮▮▮▮

17       Q    Okay.  So if this -- this was in September --

18       A    But that, that is a summation of 15 or 20 issues

19  that they had brought up in this Tiger Team.

20       Q    In the Tiger Team.

21       A    And I sum -- because it was way too long to send to

22  these guys; they'd never read it.  So I summarized it, the

23  key, most critical ones, and sent that to them.

24            They in turn -- it's my understanding they in turn

25  sent it to the Surgeon General -- who was GEN Redmond at the



████ - 01/18/01                                                    12

1     time, I believe -- and the Air National Guard Air Surgeon,

2     who I believe was ████████.  And then I was working with

3     the Office of the Surgeon General, a couple of his -- there

4     were a couple civilians in -- ██████(phonetic) somebody I've

5     spoken with.

6            The bottom line is I was continually communicating

7     via e-mail about how critical it was that I get the answers

8     to these questions.  And it wasn't until after we got back

9     from the desert that I got any of the answers to the -- and

10    when they finally did answer these and other questions, it

11    was -- it was a great tool.  In fact, it helped a lot in

12    dealing with the rest of the anthrax problem.

13       Q    Now, before -- at the time you sent this memo, did

14    you make a phone call or give a heads-up?  Did you have any

15    conversations with MG Weaver personally, or any member of his

16    staff, that "I've got some concerns; I'm going to send you

17    this memo; this is what I've done" --

18       A    There was -- I don't recall if I actually called

19    him personally.  I was talking several issues with him at the

20    time.

21           But there was a -- I believe it was when the

22    California Guard lost a tanker.  And we had -- we the Guard

23    supported the memorial service in a big way.  A lot of the

24    commanders went to that.  I think it was that period that MG

25    Weaver had a meeting with all the commanders that were



███████ - 01/18/01                                                        13

1    present, and there were a lot of them from across the Guard.

2    And he was aware, I had made him aware of my problem at that

3    time.   And I got up in front of all the Guard commanders that

4    were there and just said, do not underestimate this anthrax

5    thing, because it will -- resistance is out there.   I said,

6    the internet is working.   There are unanswered questions that

7    are legitimate questions.   I said, make yourself smart before

8    you blindly walk into anthrax.

9              I don't know the timing of that.   I really don't.

10   It could have been after this, it could have been before.   I

11   don't recall.

12             But this was my -- I'm pretty sure I had let them

13   know informally, or at least through an e-mail.   And I wanted

14   this to be my official notification to them that I had some

15   troubles and I needed some help.

16       Q    In the first paragraph of this memorandum, you

17   indicate that "my purpose in writing each of you" -- meaning

18   MG Weaver and BG McKinley -- "this memo is to seek your

19   advice and to provide you some feedback on an issue that has

20   the potential of moving us from C-1 to C-4 overnight.   And I

21   also suspect this problem is not unique to the 103rd."

22             First of all, can you explain for the record C-1 to

23   C-4?   I believe it has to do with readiness?

24       A    (Inaudible), yes.   Because at this -- at the time I

25   wrote this, I had no idea what the magnitude of this

**Diversified Reporting Services, Inc.**
1025 VERMONT AVENUE, N.W. SUITE 1250
WASHINGTON, D.C. 20005
(202) 296-2929





■■■■■ - 01/18/01                                                    14

1    resistance to anthrax was.  And so that's why I said it had

2    the potential.  It turns out it didn't, but it had the

3    potential of, depending on the number of pilots that decided

4    not to take this thing, obviously that's going to affect my

5    readiness.

6             So I just -- at this point I didn't know what the

7    magnitude of the problem was.

8        Q    But at the time you sent this memorandum to MG

9    Weaver, do you recall what your readiness rating --

10       A    It was C-1.

11       Q    It was C-1?

12       A    And by the time I sent this, no one equipped.

13       Q    (Inaudible) --

14       A    This is in we're-working-the-issue stage.  Because

15   this is in the September-October time frame.  We didn't

16   actually give our first shot -- I'm pretty sure it was

17   January of '99.  So that two or three month period there, we

18   were working this issue and trying to figure out who was

19   going to take the shot and who wasn't.

20       Q    But -- I mean, in my view, and I look at even at

21   something having the "potential of moving us from C-1 to C-4

22   overnight" -- and if you didn't have a conversation with MG

23   Weaver or one of his staff before this memo, it would seem

24   that somebody would have picked up the phone and called you

25   to have you expound further, because that would be a

**Diversified Reporting Services, Inc.**
1025 VERMONT AVENUE, N.W. SUITE 1250
WASHINGTON, D.C. 20005
(202) 296-2929

1    significant -- I mean, it's very significant, I would think.

2         A    Well, and again, I can't recall exactly -- I mean,

3    I know I communicated with either e-mail -- more than likely

4    it was with BG McKinley -- and told him I was working this

5    anthrax thing.

6         Q    Okay.

7         A    But this is the first time that I put down that

8    there was a potential impact of affecting our readiness.

9              Now, I'll also tell you that those guys leaving the

10   unit did not affect our readiness.  So -- but the potential

11   was there.  I mean, if I'd had all my pilots quit, then

12   obviously that would have been pretty serious.

13             But it turns out that we met all our taskings in

14   Southwest Asia that we were asked to meet.  And within -- oh,

15   three to six months of us getting back from the desert, we

16   had replaced all the guys that had left.  So --

17        Q    When did you have your first -- it's our

18   understanding that at some point in time, eight pilots from

19   the Connecticut Guard --

20        A    Correct.

21        Q    -- left.

22        A    Right.

23        Q    And that their leaving took various forms.  Some, a

24   couple may have retired, some may have transferred or taken

25   jobs elsewhere.  But they were no longer on the books --



01/18/01                                                          16

1        A    Right.

2        Q    -- for Connecticut, I guess --

3        A    Correct.

4        Q    -- is the bottom line.  When did that first

5   manifest itself?  Was it one at a time, or --

6        A    There was significant resistance in the entire

7   squadron in that October-November-December time frame.  But

8   as we worked through this, and we brought in some outside

9   experts to help us explain the medical side of this thing,

10  that none of us were equipped to do --

11            As an aside, I'll give you an example.  The Air

12  Force Surgeon General advised us to consult with any of our

13  local veterinarians for their expertise.  There's not a

14  veterinarian in the entire Northeast, to include the Bronx

15  Zoo, who has any experience with anthrax.  So that's just

16  another example of how the Department of Defense was ill-

17  prepared to deal with implementing the anthrax policy.  There

18  are no vets in the Northeast that have a clue.

19            And we called the Bronx Zoo.  "Does anybody there

20  know anything about anthrax?"  No clue.

21       Q    Was that in writing to you as a suggestion?  I

22  mean, was it like -- if you want to have someone who can

23  speak to anthrax, your vet --

24       A    It was a recommended source of information.  Not

25  specific names, but they said, recommend -- you know,



███████ - 01/18/01                                                    17

1    veterinarians have been giving and taking -- primarily taking

2    -- anthrax shots for years, as have those in the wool

3    industry.  Recommend you contact a local vet and get their

4    opinion on that.

5             Well, there aren't any.  The only vets that take

6    anthrax are ones that are dealing with the wool industry, and

7    they're all out West.  Or you're actually in the wool

8    industry.  And the reason for that is the wool, because a lot

9    of the anthrax is still in our soil out West -- it's dormant,

10   but soil gets in the wool.  You're dealing with wool, it

11   comes out of the wool, and you could, you know, inhale it and

12   contract anthrax.  Very, very rare, but it does happen.

13            So anyway, that's just an example of how they're

14   telling us to do things that don't make sense and don't give

15   us the information we need.

16            BY ███████████

17       Q    Sir, how did they tell you to do that?  Was that --

18   it came back in a memo?  In an e-mail?  Phone call?

19       A    Um -- you know, I'm trying to -- I think -- no, I

20   don't want to say it was in the implementation, the guidance

21   policy or letter, or -- you know.  But I know it was written

22   down somewhere.  I don't know for sure.  I -- I intentionally

23   tried to dump all this stuff when I left up there.

24            But I know -- because I had my environmental health

25   people tracking down vets all over the Northeast, because we

**Diversified Reporting Services, Inc.**
1025 VERMONT AVENUE, N.W. SUITE 1250
WASHINGTON, D.C. 20005
(202) 296-2929



█████ - 01/18/01                                                    18

1    were advised to do that.  And we couldn't find any.

2            But we did find a doctor who was an ex-biological

3    research doctor for the Army, back when it was legal to do

4    that.  And they were doing both offensive and defensive

5    biological warfare research.  He was now at Texas A&M as a

6    professor.  And he came out to the unit and gave a couple-

7    hour presentation on how that -- why the vaccine is safe, and

8    why if you get anthrax you're going to die.  I mean, I meant

9    the doctor (inaudible) not the commander.

10           And we taped that, by the way.  Connecticut has

11   that tape somewhere.

12           But back to your original question.  The -- it was

13   in the December -- it was in October of when I started to

14   realize the magnitude of the resistance to the anthrax

15   program, particularly on the pilot side.

16           And -- I remember it was October because it was a

17   Family Day celebration when the whole wing was out.  And I

18   spent at least two hours of that afternoon, when we were

19   supposed to be having fun, in a meeting with all the pilots

20   trying to explain why we were going to implement DOD policy

21   on anthrax in the 103rd Fighter Wing.  Not a pleasant

22   meeting.

23           And then it was about the December -- certainly by

24   January; it may have started in December.  But by January of

25   '99, it was now official that these eight guys had decided

**Diversified Reporting Services, Inc.**
1025 VERMONT AVENUE, N.W. SUITE 1250
WASHINGTON, D.C. 20005
(202) 296-2929



███████ - 01/18/01                                              19

1    they were not going to take it, the anthrax shot, under any

2    circumstances.  And then, so we said, well, if you're not

3    going to take the anthrax shot, that means you're not

4    deployable.  That means there's no need for us to continue to

5    fly you.  So we stopped flying them, and then we asked them

6    to resign, because if they're not going to be deployable,

7    then they're not -- well, I don't have a use for them.

8         So we asked them to retire.  And over the next --

9    Q    Resign, or transfer, or --

10   A    Or resign, yes.  Well, asked them to resign from

11   the Connecticut Air National Guard.  And some of them did

12   retire.  Some of them just flat quit the military entirely.

13   Some of them transferred to the reserves.  A combination of

14   all of the above.  And that happened over the next six

15   months.  I mean, in other words they didn't leave right away

16   --

17   Q    Right.

18   A    You know, I told them, we'll work with you and, you

19   know, help you any way we can to transition to whatever

20   you're going to transition to.  And we did.  And they

21   eventually all left the unit.

22   Q    Now, it's our understanding that there was an

23   integrative process action team that the Air Force put

24   together, and that they were tracking, at least loosely,

25   people leaving or refusing to take the shot, take a series of



██████ 01/18/01                                          20

1   shots.  Did you receive any guidance on what would constitute

2   a refusal?

3        A    No.  No.  And I will tell you -- and this is an

4   opinion, now -- two out of the six, I am convinced that the

5   only reason they left the unit is over anthrax.  The other

6   six had other issues working, and anthrax was the straw that

7   pushed them over the edge.  Which I think is a contributor to

8   the difficulty in saying, X number of people left the unit

9   over anthrax, because in many, many cases it's not that cut

10  and dried.  Anthrax is a contributor in many cases.  But to

11  say it was the thing is not always crystal clear.

12       Q    I'm going to show you another document.  This

13  appears to be something provided to you by the personnel

14  community on -- from a ████████████████, subject: commander

15  options.  Just take a look at that and see if that is

16  familiar to you.  October '98.

17       A    Yep.  Well, I know ████████████ He's my chief of

18  MPF.  Mm-hmm, yep, I think I remember this.

19       Q    And what would have been the impetus for exploring

20  -- and these appear to be disciplinary options for the

21  commander to take for --

22       A    This would be if an individual chose to not leave

23  the unit, i.e., stay in the unit and not comply with DOD

24  policy.  I was looking at what are the options as a commander

25  that I had, to deal with that discipline problem?  And every


b7C

█████  01/18/01                                          21

1    state in the Guard has their own unique UCMJ.  And so I was

2    not all that familiar with it, so I was pursuing what my

3    options were, both administrative and UCMJ-wise.

4           And so that's what this is about.  What's the

5    boundary for me?  And in fact, during my time there, on the

6    officer side we did not have to do any of this, because they

7    all left the unit.  And then after we got back from Kuwait, I

8    had three of my enlisted troops who took the first three

9    shots, went to the desert and did a great job, came back, and

10   decided that they were not going to continue in the program.

11          And when I left Connecticut, one of them had

12   changed his mind and had resumed the program.  One of them

13   was facing administrative action.  And the other one had an

14   administrative action and a legal review process.  So -- I

15   don't know if that answered your question or not, but --

16      Q     But as of this -- if I understand you correctly,

17   with respect to the eight officers, you didn't have to employ

18   any of these disciplinary actions --

19      A     No.  No.  I asked them to resign from the

20   Connecticut Air National Guard.

21          Now, some of them allege that they were ordered to

22   resign.  Okay?  I did not order them to resign.  I can't

23   speak for anyone else in the chain of command.  But I did not

24   order them to resign.  I didn't have that authority.  But I

25   did ask them to, and they all did.

**Diversified Reporting Services, Inc.**
1025 VERMONT AVENUE, N.W. SUITE 1250
WASHINGTON, D.C. 20005
(202) 296-2929



01/18/01                                                    22

1        Q    In so doing, did you invoke any person in the chain

2   of command, anyone else that was saying, well, you can't

3   stay, or, you know, you need to leave because of -- you know,

4   General So-and-so?  Or, you know, that --

5        A    No.  I just told them, I said, if you are not

6   willing to stay worldwide-deployable in accordance with DOD

7   policy, I as a commander am not obligated to fly you in this

8   airplane.  And if you're not going to fly, as a pilot, I

9   don't have any other place to put you.  I need you to go

10  somewhere else.  And they did.

11       Q    It's also our understanding that Guard pilots, once

12  they've fulfilled any initial obligation they may have, that

13  they really could come and go --

14       A    Absolutely.  All eight of these guys had no

15  commitment to the federal government, or the state.  They had

16  met all their obligations.

17       Q    In that regard, if they were subject to -- had done

18  anything that would cause them to be subject to disciplinary

19  action, is it -- are they normally kept on?  Is their -- do

20  they have legal standing to be kept in the unit, so they can

21  face that disciplinary action?  Or is it typically, depending

22  on the nature of the offense, that they are just allowed to

23  leave rather than face --

24       A    It's actually all of the above.  And I am not --

25  being an active duty guy who didn't grow up in the Guard, I

Diversified Reporting Services, Inc.
1025 VERMONT AVENUE, N.W. SUITE 1250
WASHINGTON, D.C.  20005
(202) 296-2929



███ - 01/18/01                                    23

1    don't know every detail of that, which is why I had a very

2    good lawyer.

3            But I think the authority to keep someone on active

4    duty in the Guard is -- in order to do that, they have to do

5    something of a grievous nature while they are already on

6    Title 10 status.  I.e., they're on active duty, they're

7    deployed, or they're doing whatever they're doing on active

8    duty.  If they do something during that time, the commander

9    has the authority under Title 10 to keep them on beyond their

10   two weeks or whatever it is.

11       Q    Right, okay.

12       A    But in terms of this case, for example, I believe

13   the only way that they could have been prosecuted is under

14   the Connecticut Uniform Code of Military Justice.  And that -

15   - I am not familiar with that, because I never had to use

16   that.  In fact, I was told that no one has been prosecuted in

17   the state of Connecticut in over 30 years under the

18   Connecticut UCMJ.

19           And it is grossly out of date; I think it was the

20   original document from the early '50s, when the DOD UCMJ was

21   published.  And Connecticut's hasn't changed in the ensuing

22   50 years.  So -- and the Connecticut legislature is not

23   inclined to do anything about it.

24           So again, the Guard is a pretty unique (inaudible.)

25   And every state's different.  So I did not really pursue that

Diversified Reporting Services, Inc.
1025 VERMONT AVENUE, N.W. SUITE 1250
WASHINGTON, D.C. 20005
(202) 296-2929



█████ - 01/18/01                                               24

1    much.  Even though my MPF, my personnel chief gave me these

2    options, he was assuming that I had some UCMJ-type authority

3    to do that.  The Adjutant-General may have had it.  But I'm

4    pretty sure I did not.  But you need to talk to a lawyer

5    familiar with the ways of the Guard to get a definitive

6    answer on that one.

7         Q    Did you give a direct order to any of those eight

8    pilots to submit to the anthrax?

9         A    Yes.  Yes.  Yes, I said, we are going to enforce

10   DOD policy.  And you are ordered, as an officer in the

11   Connecticut Air Guard, to take this shot.  And they refused.

12        Q    So, individually, each of them --

13        A    No.  No, I did not go to each one of them and say

14   you're ordered.  I do believe that their -- the Group

15   Commander, the Opportunities Group Commander who they were

16   directly working for, did give them an individual order to

17   take that shot.

18        Q    And --

19        A    I'm pretty sure he did that.

20        Q    And then did they refuse then --

21        A    Yes.

22        Q    -- to take it?

23        A    Yes.  In fact, he may have even written it down for

24   me.  I don't -- I don't recall if he did or not.  But he may

25   have done that as well.  I know he gave them a verbal order.

**Diversified Reporting Services, Inc.**
1025 VERMONT AVENUE, N.W. SUITE 1250
WASHINGTON, D.C. 20005
(202) 296-2929



█████ - 01/18/01                                                    25

1       Q      And was it after they had refused, then, that you

2    asked them to retire?  I'm trying to just kind of follow the

3    -- see what the chronology --

4       A      Yeah.  Once they refused and said they were not

5    going to take the shot under any circumstances -- I had done

6    all the education that I could do, and they said not good

7    enough; we're not going to take it -- that's when I said,

8    okay, well, you're not worldwide-deployable.  We're under no

9    obligation to fly you.  I'd like you to please resign from

10   the Connecticut Air Guard.  And it went from there.

11              Can I ask a question?

12      Q      Sure.

13      A      I'm getting the feeling that I'm the one being

14   investigated here, rather than MG Weaver.

15      Q      Well, we're trying -- because we've got information

16   from many sources.  And we're trying to establish -- as you

17   know, MG Weaver testified that he -- well, I'll just read

18   that into the record for your interview.  "So when I hear of

19   all the" -- this is MG Weaver -- "So when I hear all of these

20   other figures about these mass resignations and whatnot,

21   they're just not fair.  There are challenges with explaining,

22   with discussing, as they all are, with the numbers of the

23   members of their unit on the anthrax issue.  But when it

24   really gets down to it, we've had 10,700 people inoculated

25   for anthrax in the Air National Guard, with one known



█████ 01/18/01                                    26

1    refusal."  End of quote.

2            It's that one known refusal that I'm trying to

3    establish, what did MG -- what was known to MG Weaver at the

4    time he made that testimony?  Because we already have

5    information from other sources that the eight Connecticut

6    pilots had left, you know, at the time he gave that

7    testimony.  And whether those were "known refusals" --

8    whether, did those people receive a direct order?  Did they

9    fail to obey a direct order of their commander?  Would they

10   have been subject to disciplinary action?  And then, were

11   they allowed to transfer or leave in lieu of that

12   disciplinary action?  And did that ever get documented as a -

13   - you know, refusal?  How did it get communicated to MG

14   Weaver, or the Air Guard, or anybody else that that was a

15   refusal?  So that's what we're trying to establish.

16       A    Well, the issue is how do you define refusal due to

17   anthrax?

18       Q    Right.  And did -- was it ever defined for you?

19       A    No.  No.  And again, as I said earlier, all eight

20   of them, anthrax was the catalyst.  Opinion, at least six of

21   the eight, it was one of many things.  For █████ and

22   Rempfer, I'm pretty confident it was the only thing, if not

23   the -- it was certainly the primary thing, if not the only

24   thing, because they were very vocal in their resistance to

25   the anthrax program.

**Diversified Reporting Services, Inc.**
1025 VERMONT AVENUE, N.W. SUITE 1250
WASHINGTON, D.C. 20005
(202) 296-2929



01/18/01                                                          27

1        Q      So with respect to these eight, did you have any

2   direct conversations with MG Weaver?  Did you personally

3   advise him, or BG McKinley, that "I have lost eight pilots

4   over this"?  I've had eight pilots refuse?  Prior to

5   September 1999, did that get communicated in an e-mail,

6   telephone --

7        A      Prior to September '99?  Let's see --

8        Q      Telephone call or any way?

9        A      -- let me keep my years right.  We went to the

10  desert in early '99.  So -- I cannot definitively say that I

11  personally told them.  But I am confident in saying it was

12  general knowledge in the Air National Guard nationwide that

13  Connecticut had lost eight pilots due to the anthrax issue.

14  I mean, it was in the papers, for nothing else.  And -- to

15  include the Air Force Times.

16              So -- but I did not -- I don't recall direct

17  conversations with them specifically stating the eight

18  anthrax.  Now, on a different side, I did talk with Mr.

19  Cragin's office about readiness as a result of those eight

20  leaving.

21        Q      Did you initiate that --

22        A      No.

23        Q      -- discussion?

24        A      (Inaudible) called me.  And I think it's -- in

25  retrospect I'm pretty sure that was part of his preparation



██████ - 01/18/01                                                    28

1   for his testimony.  I don't know if it was the testimony, or

2   some other testimony that he had.

3         But he called -- and I believe it was -- it may

4   have been after his testimony.  It was to reply in writing to

5   specific questions by, I believe Congressman Burton, who I

6   think is the Chair of whatever committee he was testifying

7   to.

8         And so --

9      Q   In that regard, we have a copy of an October 21,

10  1999, letter to Congressman Shays from Mr. Cragin's office.

11  And it says, "at your request I am submitting the following

12  information: a detailed summary of the conversations

13  subsequently referenced in my testimony with commanding

14  officers of several reserve units; information regarding my

15  trip to Stewart Air Force Base; and information regarding the

16  extent of my knowledge of, and involvement in, formulation of

17  the Air Force Reserve Interim Anthrax Policy."

18        And he proceeds to summarize conversations with

19  several of these commanders, one of whom is yourself.  And

20  can you -- do you recall having a personal conversation with

21  Mr. Cragin?

22     A   Yes.  His office called, and then -- I had known

23  Mr. Cragin from several other conferences and meetings over

24  the years.  And he called me and said, can I provide him, his

25  staff, with some information concerning the impact of the



███████ - 01/18/01                                          29

1   eight guys leaving on our readiness, and that sort of thing?

2   I don't know the exact details of what he asked for.  But,

3   you know, I said, sure, be happy to.  And then we in turn

4   provided it to him, and then he turned that into what I

5   assume is his -- that he used in his reply to Mr. Burton.

6        Q    Did you ever see a copy of (inaudible) what you

7   told him?

8        A    I have seen that, a copy of what I believe you have

9   there in your hand.  I believe there's like five or six

10  different commanders --

11       Q    Right.

12       A    -- with (inaudible.)  I have seen that, and it's an

13  accurate -- it captures what I pretty much told him.  Those

14  eight guys leaving did not affect our readiness in a

15  measurable way.  Or significantly (inaudible.)

16       Q    Okay, for the record I'm going to read that in.

17  It's titled, "Conversation with ████████████████████

18  ██████ Commander, 103rd Fighter Wing, Air National Guard,

19  Bradley, Connecticut."

20             ████████████ reported that his unit has 20 personnel

21  listed as overdue, and one on medical deferral.  All those

22  overdue were overdue for their fourth shots, and 13 of those

23  were scheduled for their fourth shots in early October.  He

24  also reported that three NCOs had taken three of the six

25  sixth shots, as required by the FDA protocol, but had



████████ ██ 01/18/01                                          30

1    recently said they would stop taking the shots.  ████████

2    attributed this action to elevated expectations that Congress

3    would soon stop the program."

4                 ████████████  was explicit in his assessment that he

5    had no readiness concerns related to anthrax.  He stated that

6    his greatest challenges came as the result of the recent

7    presidential call-up of reservists for air operations over

8    Kosovo.  He also said that the greatest need was to get the

9    threat briefing out to the troops.  He said, 'I do not have

10   issues related to anthrax affecting readiness.'"

11             And again, does that --

12        A    Yep.  That's accurate.  And the three individuals

13   he's talking about were the three that I talked about

14   earlier, that had taken the three shots, went to the desert,

15   came back and decided they weren't going to complete the

16   program.

17        Q    Now, at the time you had this conversation -- and

18   again, am I correct to understand that Mr. Cragin personally

19   had his staff make these phone calls and then the

20   conversation was with him?  Or was it a member of his staff?

21        A    Both.  But I did have a conversation with Mr.

22   Cragin to discuss various pieces of that.  And again, I don't

23   recall the exact details.  But I did talk directly with Mr.

24   Cragin.

25        Q    And at the time that you had this conversation, had

**Diversified Reporting Services, Inc.**
1025 VERMONT AVENUE, N.W. SUITE 1250
WASHINGTON, D.C. 20005
(202) 296-2929



01/18/01                                                    31

1     the eight pilots --

2          A     Oh, yes.  Yes.

3          Q     They had left?

4          A     They had -- I'm pretty sure they had already

5     actually left the unit.  They were -- I was not -- anthrax

6     was not a significant issue for me at that point in time.

7          Q     And did it become a significant issue (inaudible)?

8          A     Well, it stayed -- it became an issue again when it

9     came time to do the fourth, fifth and sixth shots, because

10    doing the fourth, fifth and sixth shots in a reserve unit,

11    whether that's Guard or Reserve, is very, very difficult to

12    schedule on the exact day that the shot is due.  And in fact,

13    I could never find anyone that could tell me what the exact

14    day was, because -- what does six months mean?

15              And then I tried to get some clarification on how

16    much leeway do we have in this six months?  Is it -- like,

17    can we slip this -- you know, if the six-month point comes on

18    a Tuesday, can I wait until the following weekend to recall

19    everybody and give a shot then?  Can I wait two months -- or

20    not two -- two weeks?  Can I give it two days early, if

21    there's a weekend?

22              I didn't get much help in that.  Basically I was

23    told to not intentionally deviate from the FDA-approved

24    protocol.

25         Q     Okay --



- 01/18/01                                          32

1       A    And we didn't.

2       Q    It appears that the unit must have then been -- you

3   know, it has 20 personnel listed as overdue and one on

4   medical deferral -- that there was a roster of some sort that

5   was monitoring --

6       A    You bet.  You bet.  We were tracking our anthrax

7   program very carefully.  And the 20 were -- again, it's, you

8   know, we had just come back from the desert, and they're

9   reservists, and some of them -- some of them come to drill,

10  some of them come at alternate times.

11           The other issue in a Guard unit is all your medics

12  are Guardsmen as well.  And you've got to bring them in as

13  well to give the shots.  And so it's a very difficult

14  challenge to implement the anthrax program in a Guard unit,

15  because you don't have a captive audience.  But we did, I

16  think we did a very, very good job, all things considered.

17           There's another issue here as well, is that the

18  medical tracking system in DEERS, both of them, are very slow

19  to respond.  In other words, you input something, I have no

20  idea how long it takes to report accurately to somebody up

21  here in Washington.  But it is not -- if I was to go to a

22  BEERS (phonetic) -- or not BEERS -- a METS (phonetic)

23  terminal, or a DEERS terminal for the Connecticut Air Guard

24  today, and pull up the data, I would guarantee you it would

25  not be accurate, because something that got entered last



01/18/01                                                    33

1    drill, for example, my guess is it wouldn't be in there.

2           So it's not instantaneously updated.  And yet a lot

3    of people were measuring us by the information that they were

4    getting out of the system from here in the city.  And that's

5    why we were tracking all of this by hand.

6      Q    Okay.

7      A    So that I knew on any day how many people were

8    overdue the shot, and who they were, and when they were

9    scheduled to have it again.

10     Q    With respect to tracking that every day, is -- was

11   your c-rating something that's updated daily?

12     A    No.  Once a month.

13     Q    Just once a month?

14     A    Mm-hmm.

15     Q    Okay.  And I think I may have already asked you,

16   but did your c-rating during your tenure as commander ever

17   fall below C-1 for any reason?

18     A    The Opportunities -- I have various measures.

19   There's the individual unit and then there's the total.

20     Q    Right.

21     A    The individual, I believe Opportunities fell to C-2

22   shortly after the eight guys left.  But the overall remained

23   C-1, because I had excess -- not excess; I had additional

24   pilots that I could pull in to fill those vacancies.

25          And then we, in two to three months after that we

**Diversified Reporting Services, Inc.**
1025 VERMONT AVENUE, N.W. SUITE 1250
WASHINGTON, D.C. 20005
(202) 296-2929



█████ - 01/18/01                                                    34

1   were back up to C-1, because we had hired a ton of guys in.

2              Now, individual units went C-2 or C-3, even, over

3   the time period I was there, due to either training or

4   personnel or equipment.  But not over anthrax.

5        Q    Okay.  Now, when you say you had pilots -- how long

6   did it take to fill those positions?

7        A    It was within four to six months.  Definitely

8   within six months of us getting back from the desert, we were

9   back up to full strength.  And so it wasn't -- it didn't take

10  very long to get back up to where we needed to be.  So --

11       Q    Getting back to your conversations with --

12  (interruption to tape.)

13              (End side A, tape 1.)

14              BY █████████

15       Q    [In progress] -- communicating to him that those

16  eight pilots left because of anthrax?  That they specifically

17  had refused?

18       A    Well, I had the exact same conversation that I had

19  with you.  I said, they left over the anthrax, but there were

20  many other contributing factors.  Anthrax was not the only

21  issue in their lives.  And so -- and back then, I did not

22  even isolate █████ and Rempfer, because I still, at the

23  time, felt like there were other things going on.  I think in

24  the subsequent time, as I've seen how enthusiastic they are

25  and aggressive they are in fighting this program, that that's

████ - 01/18/01                                                    35

1    clearly the primary issue for them.  I haven't even heard

2    from the other guys.

3            So -- but again, I -- some of the guys just left

4    quietly.  Some of the guys wanted to come in and talk to me,

5    and give me an earful.  And some of them left resisting -- I

6    mean, they didn't really want to leave, but they knew they

7    had to.

8            And so I think for the most part they all left --

9    as I said in one of the memos, there was really no bad blood

10   between the guys.  I mean, we helped them in several cases

11   get follow-on jobs with the Reserves.  And I think Rempfer in

12   particular got promoted shortly after he left, and went to

13   the Reserves.  So we didn't put any bad paper on them,

14   either.

15   Q    Did it get documented anywhere -- is it a matter of

16   record anywhere regarding those eight pilots that anthrax was

17   a factor in their decision to leave?

18       A    For LTC ███████ t did, because I wrote his

19   ~~OPERATION~~. _OPR_  For --

20   Q    What -- I mean, did you -- is that the only record,

21   that you documented it in his ~~OPERATION~~ _OPR_?

22       A    Oh, yeah.  Yeah.  I mean, there was no other place

23   to record it in.

24            And all of the other individuals, I saw their

25   ~~OPERATIONS~~ _OPR_, but my only -- I did not have a writing block.

Diversified Reporting Services, Inc.
1025 VERMONT AVENUE, N.W. SUITE 1250
WASHINGTON, D.C. 20005
(202) 296-2929



1    All I did was sign it and said I've read it.  And I don't

2    believe any of the other guys -- they did not use the A word,

3    but they may have said, you know, "left the unit because of

4    personal considerations," or something like that.  The fact

5    that they left the unit was documented, but why they left, it

6    was, I don't think it was documented.

7         Q    But again, but it's your testimony that it was

8    understood -- that you understood, or believed it to be

9    primarily anthrax?

10        A    Yes.  Primarily anthrax, yes.

11        Q    And did you communicate that to Mr. Cragin?

12        A    Well, again, I used the same words.  It was the

13   catalyst that helped them make their decision that now is the

14   time for me to take a stand and get out of the Connecticut

15   Air National Guard.  They weren't willing to do what we, the

16   unit, and the Department of Defense was asking them to do to

17   stay a viable pilot on a worldwide deployment (inaudible.)

18        Q    Why not -- this is asking for your opinion -- but

19   given all that you, what your firsthand experience was with

20   anthrax and the people in your unit, and based on any other

21   factors, did -- what was your reaction to MG Weaver making

22   the statement in September, that there had been only one

23   known refusal?  How did you interpret --

24        A    Well, my initial reaction was, I wonder what data

25   he got that from, and what his definition of refusal is.  And



██████ - 01/18/01                                                     37

1    my initial point of thought was that someone in his staff is

2    feeding him less than accurate data.

3              So I guess the answer to your question is I did

4    have questions about that, because it didn't make sense to

5    me.  Plus, not only what I had experienced at Connecticut,

6    but I think the Dover unit was having difficulties at that

7    time.  There were plenty of rumors around that other Guard

8    units were experiencing difficulties.

9              And so I kind of figured out that someone must be

10   using a fairly strict definition of refusal.  Or, the only

11   thing I can speculate on is that perhaps they're relying on a

12   documented, form you fill out when you leave the Guard, "I'm

13   leaving because of anthrax."  If that's the case, then that

14   very well could be exactly right on.  There's only one of

15   those around at that time that says I'm leaving because of

16   anthrax, and documented in that case.

17             And the only -- and the other point there is that,

18   as we previously just discussed, there was really no

19   documentation on my eight guys.  At least official

20   documentation.  I mean, I had plenty of memos and notes to

21   myself as we're working it with -- internally there.  But in

22   terms of official documentation, no, there wasn't any that

23   I'm aware of.

24             BY ████████████

25        Q    So, sir, none of that information was forwarded up?



01/18/01                                                    38

1   No documentation was forwarded?

2        A    No.  No.

3        Q    Okay.  And on --

4        A    Certainly not in a formal way.  I mean, but

5   informally -- I mean, MG Weaver knew that I had lost eight

6   pilots over the anthrax issue.

7        Q    Had you had the same conversation with MG Weaver

8   you had with Mr. Cragin?  That --

9        A    Same exact thing.  You know, I would say, it's a

10  complicated --

11       Q    It's a contributing factor?

12       A    Exactly.  It's a complicated -- it's not cut and

13  dried.  But anthrax pushed them over the edge.  Exactly the

14  same words.

15       Q    And again, when did you have that conversation?

16  Ballpark?

17       A    It was --

18       Q    Before or after September '99?

19       A    -- oh, before.  Before September '99.  This was

20  before we deployed in the desert.  And I think we were in the

21  desert in April of '99.  (Inaudible.)

22       Q    And would -- none of the unit manning documents

23  showing that you had lost these eight guys would reflect the

24  reasons that they left?

25       A    Not the reasons, no.



████████  01/18/01                                        39

1      Q    Okay.

2      A    I mean, they're there one day and they're gone the

3   next.

4      Q    Gotcha.

5      A    And then another thing there, see, several of these

6   guys stayed on our books for four of five months after they

7   weren't flying, but they stayed on the books.

8           BY ████████

9      Q    Can you explain that to us?

10     A    Well, I told them right up front.  I said, guys,

11  I'm not running you off.  I mean, I said, I want to help you

12  transition to whatever your new life is, whether that's a

13  civilian, a reservist -- whatever you're going to do, I'll

14  help you do that.

15          And so -- and we did that.  I mean, I -- a couple

16  of guys left immediately.  A couple of guys got hired by

17  either the Academy Liaison Program or the Reserves, and they

18  left fairly quickly.  A couple of guys, and I think Rempf --

19  or Dingle might be one of them, and Jacobson (phonetic) maybe

20  the other one -- that took at least six months, because --

21  you know?

22          And then finally I just kind of had to get to the

23  point and say, look, guys, I need you to move on here.  I

24  mean, you're not doing a whole lot here in the unit.  You

25  know, you're coming to drill and you're doing gofer work, but

**Diversified Reporting Services, Inc.**
1025 VERMONT AVENUE, N.W. SUITE 1250
WASHINGTON, D.C. 20005
(202) 296-2929



1    you're not doing us any good here.  So I need you to move on

2    out.  And they eventually did.

3              So they stayed on my book.  So if you were to look

4    at a -- go back and look at the manpower document, they would

5    still be on the book as a pilot, because the manpower

6    document doesn't capture whether they're current or not.

7    They're just documented --

8        Q    Is that also the source document for your readiness

9    ratings?

10       A    No.  No, that's just the personnel side, the

11   manpower side.

12       Q    Okay.  So even though they may have been on the

13   books, the manning document --

14       A    Right, right.

15       Q    -- what's the source document for your readiness,

16   then?

17       A    Well, the source documents -- and that probably

18   needs a little explanation.  The piece of the wing that is

19   tasked to report readiness is the fighter squadron.  I have

20   lots of pilots, at the headquarters and in the wing, that are

21   not in the squadron.

22             So when the squadron lost eight guys, I had enough

23   reserve capability out of the wing and the headquarters to

24   just fold them in there and continue business as usual.  And

25   then over the next four to six months, as I got guys in,



1    well, the wing guys went back to being wing guys and the

2    headquarters guys went back to being headquarters guys.

3            So there's excess capability, I guess, in there.

4    And that was how we were able to maintain our c-rating when

5    eight guys walk out the door.  So -- because that's not

6    intuitive, I guess, (inaudible.)  You know, you think, gosh,

7    25 percent of your guys leave, that's got to have an impact.

8    Well, I had a buffer there from the wing and --

9            I mean, for example, when we went to the desert, I

10   went as a line pilot.  Full colonel line pilot.  I did not go

11   as a commander; I did not go -- I went over there and flew

12   airplanes.  My Vice Commander, full colonel, went as a line

13   pilot.  Opportunities Group Commander went as a line pilot.

14   So you have three colonels going -- now, is that normal?  No.

15   But we -- they needed the line pilots, and we went as line

16   pilots.

17           So that was how we did that.  And the Wing

18   Commander and the Vice Commander don't count on any of the

19   pilot requirements.  Even though they're required to fly,

20   they're not sorts-reportable (phonetic.)  So that's why I

21   could very confidently say that it had no impact on our

22   readiness.  Because we did meet, and could meet, all of our

23   known tasks.

24       Q    Do you know whether or not that was -- that was

25   common practice in other units?

b7c
230

1    A    I don't know that it was.  But I suspect it was,

2    yeah.

3         And in fact, you know, I do not know of a single

4    Guard unit, or Reserve unit, who has not done their mission

5    as a result of the anthrax program.  They've struggled, but I

6    do not know of a single mission that was not accomplished --

7    from the heavy drivers to the tankers to the fighter guys.

8    Everyone that I'm aware of -- and I do the AES stuff at

9    Langley.  And the Guard is meeting all of their taskings.

10        So I'm not aware of it.  So when you say, when you

11   hear the Weavers and the Cragins of the world say it is not

12   affecting readiness in a meaningful or measurable way, I

13   think that is a very accurate statement.  I think commanders

14   in the field are maintaining readiness in spite of people

15   leaving their unit.  In spite of a tough recruiting world out

16   there, too.

17   Q    With respect to the books -- you know, the manning

18   document or otherwise -- it's been alleged, not particularly

19   in -- not necessarily in Connecticut -- but that commanders,

20   in order to be able to say that there was no appreciable, or

21   there was a negligible impact on readiness, purposefully

22   keeping people on the books until the new fiscal year so that

23   the end strength would be X.  Can you speak to that?

24   A    End strength for the Guard is a very key issue.

25   I'm not aware of anyone keeping people on the books who

Diversified Reporting Services, Inc.
1025 VERMONT AVENUE, N.W. SUITE 1250
WASHINGTON, D.C. 20005
(202) 296-2929


b7C
231

████████ - 01/18/01                                                      43

1    weren't actually there, though, in order to do that --

2    padding the books.

3        Q    Well, if they weren't flying?  Because it seems to

4    me --

5        A    Well --

6        Q    -- that you could have people, you know, grounded

7    for medical reasons, grounded for any number of reasons --

8        A    True.  But they're still part of the unit.  They're

9    still counters.

10       Q    But are they counted towards readiness, though?  I

11   mean, you can't put them --

12       A    No.

13       Q    If they can't be put --

14       A    No, no.

15       Q    -- in an airplane --

16       A    No, no.  They would not be counted towards

17   readiness.

18       Q    Okay.

19       A    But they're counted towards end strength --

20       Q    Okay.

21       A    -- because they're still part of the unit.

22       Q    All right.

23       A    There's a difference there.  End strength is just a

24   gross number of people.

25       Q    Okay.

**Diversified Reporting Services, Inc.**
1025 VERMONT AVENUE, N.W. SUITE 1250
WASHINGTON, D.C.  20005
(202) 296-2929



███████ - 01/18/01                                    44

1       A    The sorts-reporting is you have to be deployable

2    and trained and available, and all these other things.  So if

3    you're not current in the aircraft -- which in my case,

4    certainly towards the tail end there they were not current

5    anymore -- I couldn't have reported them even if I wanted to.

6    I could report them on my end strength, but not in terms of

7    sorts.

8            And since we, the unit, had grounded them -- you

9    know, strictly interpreting the rules, they were still

10   current in the airplane for a period of time.  But they were

11   grounded, so they were no longer available to go.  So we

12   didn't count them in the sorts-reporting.

13      Q    Okay.

14      A    But we did report, those of us who were in the wing

15   and other places, as counters against the sorts report.  That

16   was how we were able to maintain our c-rating.

17      Q    Did you have occasion to view a video, or did your

18   unit members remark that they had also seen MG Weaver on a

19   videotape in which he said he clarified or qualified his

20   remarks to Congress?  This would have been in October '99,

21   reportedly during a live, nationwide, closed-circuit

22   television briefing to the Air National Guard.  Do you -- did

23   you --

24      A    I remember, I remember that.  A warrior broadcast,

25   I think is what they call it.



█████ – 01/18/01                                           45

1          I don't remember -- now you see, at the time I did

2     not have a copy of his testimony.  So I had no idea what he

3     had told Congress.

4          Q    Okay.

5          A    And so if he was clarifying something, it wasn't

6     clear -- he was just telling us about anthrax.  So I didn't

7     make the connection then.  So -- I'm not saying he didn't.

8     I'm just saying I don't recall.  I remember him talking

9     anthrax.  I mean, it was a 45-minute to an hour pitch on

10    anthrax.

11         And I believe it was ██████████ or at least slides

12    developed by ████████ that were given.  Or it might have

13    been ██████████ slides, I forget.  He had a slide

14    presentation that he gave, and then MG Weaver had comments at

15    the end, if I remember that right.  All focused on anthrax.

16         Q    From an excerpt from MG Weaver's response during

17    that October '99 briefing, and he says, "So I was very much

18    aware, when I said one refusal, that was a refusal of a

19    person who had a commitment to the Air National Guard.  My

20    additional testimony also reflects that I was also very much

21    aware that people did, did walk, who again were volunteers of

22    our Air National Guard family."

23         Again --

24         A    Yeah, that makes sense.

25         Q    Was that -- was it known to you, or was it ever



01/18/01                                              46

1   established at any point in time, what a refusal was?  Or did

2   it get defined?

3        A    No.

4        Q    Did the Guard ever set something down --

5        A    No.

6        Q    -- "to all our Guard units, here's what we" --

7        A    No, no.  If it was defined, I was not aware of it.

8   I mean, I'm not -- I have no idea.

9             And after hearing that, it kind of makes sense to

10  me, because a Guardsman can -- if he's met all his, if he or

11  she has met all their commitments to the government, they can

12  just stop coming to drill if they want, and just say, I quit.

13  End of story.  Very few of them do.  Most of them kind of let

14  you know they're quitting.  But there's -- they go to drill,

15  after they've met their commitment, voluntarily.

16             If in fact that's what he said in the video, I can

17  -- that makes perfect sense to me.  Because it's very

18  different than the active duty rules.  They're all

19  volunteers.  That includes not only volunteering for overseas

20  duty; it includes volunteering for day or weekend drills and

21  that sort of thing.

22             So -- and none of the eight guys that I had had any

23  commitment to the government at all.

24        Q    Did you have -- you know, after your memo that you

25  sent to MG Weaver back in September, or -- once it became



01/18/01                                                      47

1    apparent that you were going to lose eight pilots, did you

2    have any conversations with any of the other wing commanders

3    or Guard units?

4         A    Oh, you bet.  I was --

5         Q    I mean, were there -- was there real concern out

6    there to them?

7         A    I was talking to all of the A-10 wing commanders,

8    particularly the two that were going to Southwest Asia with

9    us.

10        Q    Do you recall who those were in particular?

11        A    It was            who was in Pennsylvania, now

12   BG Skiff, Assistant Adjutant-General, and            who

13   was the Vice Wing Commander at Baltimore.  He's since

14           and I have no idea where he is.

15        Q    Would that be Maryland?

16        A    Maryland, right.  So I had lengthy discussions with

17   him.  I had several other wing commanders around that I was -

18   - I was talking with to, you know -- I felt like I was in a

19   bit of a disadvantage, because I was an active duty guy.  And

20   I'm saying, what am I missing in this Guard world that -- and

21   I come to find out I wasn't missing anything.  All the Guard

22   wings were having difficulty with anthrax.  And so I spent

23   some time, you know, just brainstorming different things with

24   different people.

25            So yes, I mean, the commanders' informal network

**Diversified Reporting Services, Inc.**
1025 VERMONT AVENUE, N.W. SUITE 1250
WASHINGTON, D.C. 20005
(202) 296-2929

b7C



1     was very much alive as we were talking among ourselves on how

2     to deal with this.

3         Q     In your -- we've already established that at least

4     in your view, for Connecticut, the anthrax, even though you

5     had eight people leave, that it did not have then, and

6     apparently did not at any time, have an appreciable impact on

7     your readiness.

8         A     Absolutely correct.

9         Q     Did the other commanders share that view? That it

10    was not appreciable?

11         A     In the A-10 community, absolutely. I mean, all the

12    A-10s -- which is a fairly tight community in the Guard world

13    -- they were all -- I mean, they were all affected to some

14    degree, but not appreciably. I think that's the key word

15    there.

16         And I talked to several F-16 wing commanders, and I

17    never heard a word from them about anthrax affecting them.

18    I've talked a lot with the St. Louis wing commander, who's

19    the other active duty guy now. They had challenges, and they

20    met them. And I don't know if they lost anybody or not, but

21    they worked through their challenges and they maintained

22    their readiness. They just got back from the desert a month

23    or so ago.

24         So I'm not aware of any -- on the fighter side in

25    particular -- any Guard wing commander who has had decreased



1    readiness because of anthrax.  There are plenty of innuendoes

2    and rumors, particularly on the airlift side.  But I'm not

3    aware of any factual problems on readiness.

4            My guess is if you look at the c-status, they're

5    all going to be C-1 or C-2.

6        Q    Okay.  Let me see if I can summarize that.  So,

7    with respect to Mr. Cragin's testimony that there was no

8    appreciable effect, is it your view that that was an accurate

9    --

10       A    Yes.  Yes.  Absolutely.

11       Q    Do you have any reason to believe that any part of

12   his testimony in that regard was false?

13       A    Not -- no.  Not that I can -- no.  From a readiness

14   perspective, absolutely not.  We were not appreciably

15   affected.

16       Q    And with respect to MG Weaver's statement that

17   there had been only one known refusal, you initially

18   questioned the source of his information --

19       A    Right.  Or the definition of refusal.  Because it

20   just didn't make sense to me that, only one.  So -- but in

21   terms of him misleading or lying to Congress, I really --

22   he's telling Congress what his staff has told him.  And the

23   missing piece is his definition of refusal, which he

24   clarified according to what you just told me.

25           So -- but yes, I did initially, when I heard that -



███ – 01/18/01                                                    50

1   – him say that, or I read the testimony, rather, that it did

2   raise some questions in my mind about how he defines that.

3        Q    And from your vantage point as the ███ Wing

4   Commander of the Connecticut Guard, and any knowledge from

5   any other source, do you have any reason to believe that that

6   was an intentional -- it was intentional on the part of MG

7   Weaver to deceive or misrepresent the impact of the vaccine

8   program on readiness or --

9        A    No.  No, I have no reason to believe that that was

10  an intentional intent to mislead.  None at all.

11            BY ███████:

12       Q    Sir, two questions.

13       A    Sure.

14       Q    Who was your Opportunities Group Commanders, sir?

15       A    ████████

16       Q    ████ – is it --

17       A    ████████████

18       Q    Right.  And he was a traditional Guardsman?

19       A    Yes.  And he's since retired.

20       Q    All right, sir.  And you may have answered this

21  question before, but in your conversations with Mr. Cragin

22  and MG Weaver, when you told them about the eight folks

23  leaving and that anthrax was one factor, did you mention to

24  them that none of these eight guys owed -- had any commitment

25  --



 - 01/18/01                                                51

1        A    Yes, I did.

2        Q    Okay.

3        A    Yes, I did.  They were aware that they had no

4    commitment to the government.

5            BY 

6        Q    And to the best of your knowledge, you had these

7    conversations well before, or at least before September 29,

8    1999?

9        A    September, yes.  With the exception of my personal

.0   conversation with Mr. Cragin.  In retrospect now, I'm pretty

.1   sure that was in part of his preparation to either go to the

.2   testimony, or it was immediately after, when he was answering

.3   written questions that the committee asked him.  So it was

.4   all about that same time.

.5           BY

.6       Q    You had a separate conversation with Mr. Cragin's

.7   staff?

.8       A    We had gotten a heads-up from the staff that Mr.

.9   Cragin was preparing for testimony to Congress, and to expect

!0   a phone call.  And I'm trying to remember if it was his exec

!1   I talked to initially, or Mr. Cragin himself.  And that brain

!2   cell's gone.  But I know for a fact I talked to Mr. Cragin

!3   personally to discuss readiness.  I'm not sure where it was

!4   in this process piece.

!5           But the things that you read there were very close



██████ - 01/18/01                                                52

1    to what he and I talked about.  So -- that's why I'm not

2    sure, did he testify and then have to answer those questions?

3    Or was the -- were the questions part of a follow-on from the

4    -- I don't know what that process was.

5              BY ████████

6        Q    Would you have made a memorandum for record for

7    yourself, to memorialize that conversation?

8        A    Probably not, no.  I wouldn't, because I -- no, I

9    wouldn't.

10       Q    Any notes?  No --

11       A    No.  No, I -- it just, there was -- anything to do

12   with anthrax just, we did it.  And I captured all my e-mail

13   and all the other hard copy stuff.  But the telephone calls I

14   didn't document that much.  So -- no, I wouldn't have

15   captured that.

16              ████████████  Would anyone else in the wing, sir,

17   have had conversations with Cragin or MG Weaver regarding

18   this issue?

19              ████████████  In your absence or in your stead?

20              █████████  My Vice Commander, who was COL Dan

21   Scase -- he's the wing commander up there now -- possibly

22   could have.  And the only other possible person would have

23   been ████████████  who I mentioned earlier, who was my

24   executive officer.

25              But I doubt if they talked to them.  It would have

**Diversified Reporting Services, Inc.**
1025 VERMONT AVENUE, N.W. SUITE 1250
WASHINGTON, D.C. 20005
(202) 296-2929



██████  01/18/01                                                          53

1    been very unusual if that happened.  But they may have; I'm

2    not going to rule that out.  And they're both still in

3    Connecticut, if you need to get in touch with them.

4              But I -- if they did, they would have told him

5    exactly the same thing I would have told them, because we

6    were all on the same sheet music with this thing.

7              BY ████████

8         Q    Just one last thing on this.

9         A    Sure.

10        Q    The concerns that you summarized that your -- that

11   the Tiger Team had --

12        A    Right.

13        Q    -- compiled for you.  You indicated that you didn't

14   get any real satisfactory answers to those until you returned

15   from your deployment, which had been early fall-late summer

16   '99.  In that regard, did you --

17        A    No, no, no.  Spring-summer.

18        Q    Spring-summer?

19        A    We got back at the end of April.

20        Q    Oh, okay.

21        A    Right.

22        Q    All right.  In that regard, did you get a

23   satisfactory response on the lot, the particular lot number -

24   -

25        A    Yes, we did.  Yes, we did.

███████ - 01/18/01                                          54

1        Q    And can you just say briefly what that, the

2   explanation was?

3        A    Well, they explained to us where our lot, the lot

4   that we were getting shots from, and when it was inspected,

5   the results of that inspection, and when it expired.  And

6   that there was no evidence that it was not pure and all those

7   other criteria the FDA set up.

8             And it answered the problem to my satisfaction,

9   because beforehand we had none of that information.  We

10  didn't even -- I mean, we knew the lot number, but we didn't

11  know much more about it other than that, other than the

12  allegations were that doses from that lot number were causing

13  people to have, to get sick.

14       Q    Had you already -- did -- I presume you underwent

15  the anthrax --

16       A    Oh, yeah.  Oh, yeah.

17       Q    -- program series.  Did you have any -- did that

18  raise any alarm for you with respect to the concerns they

19  were raising on the lot number and --

20       A    No.

21       Q    -- whether it had been --

22       A    No.

23       Q    -- arbitrarily or artificially extended, the

24  expiration date, or any of those kinds of concerns?

25       A    No, no, no.  I had no -- no personal concerns over



██████ - 01/18/01                                                    55

1    the safety of taking the anthrax vaccine.

2           Does it hurt?  You bet it hurts.  And it hurts like

3    crazy.  But it goes away in about a day or so, and then life

4    is good again.  And it does exactly what the little thing

5    says.  You'll get a knot, and it will hurt, and it will get

6    red.  And sure enough, it does all that.

7           The anthrax -- editorial comment -- the anthrax

8    program was a victim of poor preparation on the part of DOD

9    and an underestimation of the power of the internet to spread

10   rumor and innuendo very, very quickly.  And DOD was

11   unprepared to counter that in time.  And it got out of hand.

12          And when you combine that with the fact that we ran

13   out of stuff, that just throws fuel on an already pretty hot

14   fire.  So it will be interesting to see what happens when we

15   start giving shots again, if we start giving shots again.

16   Q     Any final comments, sir?  Anything that you thought

17   we were going to ask that we should have asked?  Or were

18   afraid we were going to ask?

19   A     I guess just to -- the whole anthrax issue is -- it

20   reminds me of the debate on abortion.  And by that I mean two

21   people who are identically trained, raised, and have almost

22   identical beliefs can have violently opposing opinions on

23   anthrax, just like they can have violently opposing opinions

24   on abortion.  And there's no middle ground.

25          And it's -- from a commander, it was one of the --

b7C

1   well, it is the only experience I have ever gone through

2   where I could not find a compromise position that everyone

3   could live with.  Either you're going to take it or you're

4   not going to take it, and I could not get -- there is no

5   middle ground.  Just like abortion: either you're pro-choice

6   or you're not.  There's not much middle ground.

7          And I think there are representatives in Congress

8   that are of the same opinion.  There are representatives,

9   there people in our military that are of the same opinion.

10  And I don't know where this is going to lead.  That's why I'm

11  saying, whenever we start giving shots again, it's going to

12  be interesting to see how the force reacts to it.

13         Q    Did you have any conversations, or, again, any kind

14  of impression from your active-duty counterparts that these

15  concerns were as real to them as they seem -- were apparently

16  to the Guard members?  Or --

17         A    Well, the concerns are still there, but they're

18  masked under the threat of a court-martial, or an Article 15.

19  See, you can hammer somebody on active duty.  You can fine

20  them, you can put them in jail, you know, failure to obey an

21  order on up.

22         A Guardsman can go -- if he has no commitment, he

23  can go seeya, and just stop coming to work.  And there's not

24  a thing you can do.

25         So I think -- the AN Guardsmen tend to be a little



██████ 01/18/01                                                57

1  more vocal, I think, because most of them are civilians 28

2  days out of 30; they're in the military the other two.  But I

3  think the issues are still just as prevalent on the active

4  duty; they're just masked.  And particularly some of the

5  younger kids are afraid to speak up.  My personal opinion.

6  So --

7                  ████████  All right.  Well, I do appreciate your

8  taking the time.  And I would just advise you that we would

9  like you not to discuss this with anyone.  We don't want to

10 taint the testimony of anyone else.

11         And with that, at 3:00 p.m., this interview is

12 completed.

13         (The interview was concluded at 3:00 p.m.)

14                  *  *  *  *  *


ᏏᎦ

**Diversified Reporting Services, Inc.**
1025 VERMONT AVENUE, N.W. SUITE 1250
WASHINGTON, D.C.  20005
(202) 296-2929

# <u>Attachment 7</u>

## Officer Performance Reports
## From 2002, 1998, & 1996 –
## Additional reports available upon request

# Attachment 8

# Time slice excerpts from previous CT Guard Commander, Col. Burns', Anthrax Vaccine Briefing, October '98

**Col Burns' Anthrax Vaccine Immunization Program (AVIP) Briefing – October 1998 Drill:**

CD ROM time slice notations based on 'Yes Video' Program on disk, or Windows Media Player:

00:25 – Purpose of viewing the mandatory anthrax vaccine briefing:  *"It's a force protection issue. The people going to the desert need to be protected against the biological threat, the very real threat, posed by Saddam Hussein and his folks. ... I need this crowd to get the word to our traditional guardsman over the drill as best you can ... mandatory."*

01:35 – *"I'll tell you right up front some of the things I don't have answers to …"*

02:25 – *"The wing policy was going to be all officers and everyone going to the desert were going to get the anthrax shot."*  **[Comment - This policy later changed multiple times.]**

03:20 – *"The problem is, which we have subsequently learned, is the Air Force, ANG, and DoD policy runs counter to the Air Force implementation plan ... DoD policy is if you go to the desert for 30 days or more you will get the shot - any less than that you will not get the shot."*

04:20 – *"The revised wing policy is, and it's even going to be revised from DoD somewhat, is if you're going to the desert for 30 days you will get the shot ... the 30 day policy, I'm told, is temporary."*
   **[Comment - Col Burns, counter to DoD policy, altered policy to a one-day requirement.]**

05:45 – The threat was discussed.

08:35 – *"Go see Lt Ferris and he'll tell you about the SCUD missiles that are loaded with anthrax ... We have very clear evidence of what that man* [Saddam Hussein] *and his regime is capable of doing ... go get smart on what the threat is in Southwest Asia."*

09:00 – The anthrax vaccine's package insert was discussed. *'This vaccine has not been tested ... for affects on fertility. That's a true statement.* [Re. the package insert] *… You know why? Because a lawyer wrote that - every pharmaceutical company in America has an insert in their product written by a lawyer to do one thing -- to protect them from whatever unknown that may come down ... it is a CYA [cover your ass] type thing that they use."*
   **[Comment - The actual reason for a package insert according to the FDA is: "A Patient Package Insert (PPI) contains information to aid a patient's understanding of how to safely use a drug product. It is part of the FDA-approved labeling."[6][1]]**

10:10 – Questions about fertility problems were discussed and dismissed. *"Some of you have mentioned, what about the fertility piece ... it does not affect fertility."*

11:35 – *"I cannot find any evidence, nor have any of you brought me any evidence ... I have to conclude therefore, as has DoD, that it does not represent a threat to reproductive capability …"*
   **[Comment – by January of 2002 birth defects, based on a retrospective US Navy study, were documented on the new FDA approved product label as "Category D" - meaning "positive evidence of human fetal risk based on adverse reaction data from investigational or marketing experience or studies in humans."[7][2]]**

---

6[1] http://www.fda.gov/cder/drugsatfda/instructionsRegulatory.htm.

7[2] http://www.fda.gov/cber/label/biopava0131022LB.pdf.

11:45 – Questions about the safety of the vaccine were addressed: *"safety and sterility of the particular lot of vaccine we have ... I don't have those answers for you today, but I'm going to do my best to find them because I think something prudent that we do so, because there is enough evidence out there that non-quality controlled vaccine did get to the field."*

13:35 – *"Bottomline is on our particular lot I owe you some answers on the safety and quality control piece ..."*

13:45 – Questions about efficacy of the vaccine, a pivotal legal issue, were dismissed: *"There's some questions on how well does this stuff work. Several of you brought up the cutaneous threat versus the inhalation threat ... You're looking for the peer reviewed, extensive scientific study that clearly proves, without a doubt, this stuff works against inhalation anthrax – **that doesn't exist**."*

**[Comment - Effectiveness, according to the FDA, is the "desired measure of a drug's influence on a disease condition. Effectiveness must be proven by substantial evidence consisting of adequate and well-controlled investigations, including human studies by qualified experts, that prove the drug will have the effect claimed in its labeling."[8][3]]**

**[Comment - The law for soldiers for use of an "investigational new drug or a drug unapproved for its applied use" requires "that the member provide prior consent to receive the drug," and that this requirement may be "waived only by the President." [9][4]]**

14:45 – Efficacy studies in animals were discussed, but were not allowed by FDA at the time, including, *"the Army study they did with the 30 rhesus monkeys ...and granted this was not a published study and was not intended to be published."*

15:05 – *"Now, for those of you in here that want a clear, absolutely, pivot bound without a shadow of a doubt proof - I don't have it here, plain and simple ..."* **[Comment – key legal issue.]**

16:00 – *"It's a 1960's version and there's no doubt we can do better. I have no doubt that that's true. ... Why spend dollars and time and effort to come up with something that might work a little bit better whenever this one works good enough against whatever we expect to face."*

21:40 – Gulf War Illness questions were addressed and dismissed.

22:05 – *"If you're that distrustful of the government that employs you, you might think about going somewhere else to work."*

23:30 – *"It may be a contributor to the Gulf War Syndrome. I don't know. Nobody knows."*

**[Comment – anthrax vaccine was and is unresolved as to whether it is linked to Gulf War Illness IAW public law. [10][5] Brigadier General Eddie Cain, the Program Director for the DoD Joint Program Office for Biological Defense (JPOBD) that oversaw the AVIP asked the same unresolved questions the month following the expulsion of CT ANG officers:**

---

8[3] http://www.fda.gov/fdac/special/newdrug/bengloss.html.

9[4] http://www4.law.cornell.edu/uscode/10/1107.html. EFFECTIVE DATE OF 1998 AMENDMENT Pub. L. 105-261, div. A, title VII, Sec. 731(a)(2), Oct. 17, 1998.

10[5] See House Report 106-556, footnote #1: "the anthrax vaccine is still being studied as a potential causative or contributing factor in Gulf war veterans' illnesses." Ref. Public Law 105-277, title XVI, sec. 1603(d)." See: http://frwebgate.access.gpo.gov/cgi-bin/getdoc.cgi?dbname=106_cong_reports&docid=f:hr556.106.

*"how can DoD say that reported desert storm illnesses were not cause (sic) by the anthrax vaccine when we have no record of who received the shots. If we cannot answer these questions we (DoD & the Administration) are in big time trouble."***[11[6]]**]

28:05 – Vaccine requests for informed consent / or refusals were discussed and discarded under the insinuation of treason:  *"If you do not get the shot during this time period ... all you're doing is kicking the can ... if some of these issues are burning inside you. And you're going, 'whew, man I escaped that one -- I don't have to get the shot this time,' ... all you're doing is delaying that decision down the road, and from a commander's perspective all I'm asking you to do is to make that decision now, because this unit is on a very short string to go execute some war plans if the stuff hits the fan ... and the last thing I want to do is have this unit called up and some of you say well it's been nice being a Flying Yankee but I don't think I can take that anthrax shot. I don't think I'm gonna go to war ... Can't have that because words like **traitor** start coming up in my mind, and I don't have a lot of time for those kind of people".*

30:20 – A rhetorical question was asked by a CT ANG officer about DoD policy and Col Burns confirmed, *"you can't run counter to DoD policy."*  If they do, *"you'd have to argue with them."*
> **[Comment - Col Burns confirmed the contractions in DoD, AF and ANG policy, yet the CT ANG executed vaccinations and expulsions in conflict with established policy in the area of responsibility (AOR). This was the ethical dilemma Tiger Team Alpha inexorably found themselves in that fall of 1998, while key legal questions remained unanswered.]**

34:10 – Senior Guard officer has administrative control:  "If you get painted into a corner, there's your out.  The senior guard guy says this makes sense to do or it doesn't make sense to do."
> **[Comment – this demonstrated that CT Guard leaders understood the distinctions of Guard command authority versus the federal military Title 10 forces they support.]**

36:10 - Col Burns reiterated his new policy – if you were going to be in theatre for *"less than 30 days"* the vaccination was *"voluntary."*
> **[Comment - Pilots were kicked out, despite the fact they were volunteers to go to the theatre for less than thirty days without the vaccination, in accordance with DoD policy.]**

42:50 – Threat. *"Personal opinion – it's higher in the United States than it is over there."*

50:50 – If you do not take the vaccine, *"you'll be dead in 3 to 5 days."*  **[Comment – false.]**

53:45 – *"If you're not going to be ready to go to war whenever we're called, you are **spooging America** as far as I'm concerned."*  **[Comment – the AVIP became an unprecedented loyalty test.]**

55:10 – *"I still owe you some more answers on some of this stuff and I'm still working on it. As I get answers I'll try to get the word out."*  **[Comment – answers *owed* were never produced.]**

---

11[6] Congressional subpoenaed records of email exchange between US Army Brigadier General Eddie Cain and Colonel John Wade, with respect to 29 APR 99 Congressional testimonies. Email dated May 3, 1999.

# Attachment 9

# Relevant excerpts from the Air National Guard Commander's Legal Deskbook

## ANG - Commander's Legal Deskbook (excerpt):

**[Note – the below explanations, extracted from the same legal reference mentioned by CT Guard SJA LtCol. Marconi, of state versus federal authority, and state versus federal status, as well as the methodical processes that are intended to be followed in times of legal quandary, are directly relevant to the ethical dilemma of the anthrax vaccine mandate faced by CT Guard officers in 1998 and 1999.]**

Chapter 02, 02-06 Problem Solving - ANG and USAF Commanders Similar and Different Approaches (S).doc

## INTRODUCTION

... Air National Guard Commanders should understand that while there are many similarities between themselves and USAF Commanders, there are also many differences. The differences stem inherently from the state and federal responsibilities of the ANG, which require adherence to the laws of and control by two sovereigns. As a result, there are Air Force instructions that are not applicable to the Air National Guard, Air National Guard instructions that are not applicable to the Air Force, and state laws that are only applicable to the Air National Guard of that state. It is this basic difference that ANG Commanders need to keep in mind at all times as they lead and manage their people to accomplish their missions and responsibilities. ...

*INHERENT AUTHORITY OF COMMAND*

By nature of the position and the military structure, ANG and USAF Commanders have authority to govern the members under their command, limited only by applicable federal or state law. Generally, ANG and USAF Base Commanders have ultimate authority over all activities on their bases subject to applicable federal and state law, although for ANG Commanders the source of much of that authority is state law. ...

*STATE CONSTITUTIONS, STATUTES, AND STATE COURT DECISIONS*

USAF Commanders are subject to federal law, and often are not subject to state law, while ANG Commanders are subject to both federal and state law, and often must obey state law instead of federal law. This is partly due to the differences between Title 10 and Title 32 status, and whether a base is on exclusive federal land or state land. A review of the Table of Contents in this Deskbook will indicate the many topics which are also governed by or subject to state law. One example is that while the UCMJ governs military criminal conduct in the Title 10 Air Force, state law - military and civilian - and not the UCMJ governs the Title 32 Air National Guard. ...

## COMMANDER'S APPROACH TO PROBLEMS

When you, as an ANG Commander, are confronted with a problem, ask yourself the following questions: ...

4.       If no law exists which permits me to do what I want to do, or permits any other solution to the problem that is acceptable to me, is there anything that authorizes me to act pursuant to my inherent authority as the Commander?

         a.       If so, act under your inherent command authority.

5.    **If nothing authorizes you to exercise your inherent authority or you are prohibited from acting, you probably cannot and should not act**, since such action will be without authority, or may be illegal, and either may subject you to disciplinary or adverse administrative action, and/or personal liability for money damages.

While you may not always be able to do what you want to do to solve or deal with a problem that confronts you, with all the existing legal authorities and remedies at your disposal, and with the advice of your Judge Advocate, you should rarely confront a problem which is not capable of being resolved or dealt with satisfactorily.

## BOTTOM LINE

Because the decisions you make now often have legal ramifications which may later limit your adverse action options or flexibility, here is a suggestion which will help you RECOGNIZE when to seek the advice of your SJA before implementing that decision:

**Before you act (whether it be to command direct a urinalysis test, send a letter, etc.) ask yourself the following question: COULD WHAT I DO OR DECIDE LEAD TO ADVERSE ACTION AGAINST THE MEMBER OR TO LIABILITY AGAINST MYSELF? If the answer is yes, DO NOTHING AND MAKE NO DECISION UNTIL YOU HAVE CONSULTED YOUR SJA**.


Chapter 02, 02-07 Sources of Commander's Authority (S).doc

## INTRODUCTION

**The source of a Commander's authority depends upon the category and status of individual over which the Commander is attempting to exercise authority**.


## MILITARY MEMBERS

The Commander's authority over military members extends to conduct of such members whether they are on or off the installation.

1.    Commanders exercise authority by virtue of their status as a superior commissioned officer.

2.    The member, whether enlisted or officer, took an oath upon enlistment or commissioning to obey the lawful orders of those appointed over the member.

3.    State Codes of Military Justice (similar to the UCMJ, Articles 89, 90, and 92) may impose punishment upon those military members who fail or refuse to respect the Commander's authority.

4.    There are a myriad of instructions that define the limits of a Commander's authority.

5.    **Commanders need to be aware of the status of the member at the time of the alleged misconduct, and their status during duty (_i.e._, traditional, AGR, Air Guard Technician) to be able to take appropriate actions**.

Chapter 11, 11-05 Enforceability of Orders by Air Force Officers to ANG Personnel Not in Federal Service.doc

## STATUS OF ANG MEMBER

**The question sometimes arises as to whether an active duty Air Force officer may give an enforceable order to a member of the Air National Guard**. The answer depends in large part on the status of the Air National Guard member. ...

## ACTIVE STATE DUTY AND TITLE 10 DUTY

The situation is relatively clear with regard to state active duty and federal duty. It is unlikely that an active duty officer would have contact with a National Guard member performing state active duty, and **it is clear that the orders of an active duty officer would not be enforceable unless that officer were performing some state function clearly defined in the state Military Code**. On the other hand, it is clear that the orders of an Air Force officer are enforceable against a member of the National Guard performing federal (Title 10) duty when the member is subject to the federal Uniform Code of Military Justice (UCMJ).  An ANG officer may not command regular active duty Air Force organizations unless on EAD. ...

Chapter 11, 11-07 Status_of_National_Guard_Members -Revised_August 2002

## INTRODUCTION

**One of the most important issues in determining the power of the Commander to command the members of a National Guard Unit is a determination of the status of its members**. The status of National Guard members determines jurisdiction for administrative and criminal matters as well as medical benefits in the event of injury or liability in the event of the loss of government property.

**Members of the Air National Guard are part of the State militia. While the unit is organized, armed, and equipped wholly or partly at federal expense and is federally recognized, it remains a State organization under the command and control of state authorities, except when federalized**. Training is under the Sixteenth Clause of Section 8, Article I, of the Constitution and the appointment of officers is under the same authority. Federal benefits are strictly limited to those authorized by statute and regulation.

### **(Note – Officers Rempfer and Dingle were in state status during the events in question)**

# __Attachment 10__

## Memo from USAF
## Legal Experts Confirming
## "Only lawful orders must be obeyed;
## Illegal orders must be disobeyed"

-----Original Message-----
From: Fiscus Thomas Maj Gen AF/JA
Sent:  Wednesday, May 19, 2004 3:40 PM
To:    RSS - Key Air Staff & Sec Dir
Cc:    RSS - Key Air Staff & Sec Execs
Subject:   "Superior Orders" Defense in Courts-Martial

Airmen,

   In the wake of the Abu Ghraib prisoner abuse allegations, there has
been some discussion in the press alleging people were simply obeying orders
(the "superior orders" defense), and questions have been raised
relating to command responsibility.  Brig Gen Charlie Dunlap, ACC/JA, has
put together some data which I wanted to make available to you should you
receive questions from other airmen or members of the public about what the
law is with regard to these two topics.
   **Regarding the "superior orders" defense the law is this:
only lawful orders must be obeyed; illegal orders must be disobeyed.**  On
this point, the Manual for Courts-Martial states:  "An order requiring
the performance of a military duty or act may be inferred to be lawful and
it is disobeyed at the peril of the subordinate.  This inference does not
apply to a patently illegal order, such as one that directs the commission
of a crime."
   Obedience to orders will not be accepted as a defense to war crimes
unless the accused did not know, and could not reasonably have been expected
to know, that the act ordered was unlawful.
   This issue was raised in the 1973 case of U.S. v. Calley.  Lt
William Calley, you may recall, was prosecuted for murder for his
involvement in the My Lai incident during the Vietnam war.  He maintained he
should not be convicted because he was merely following the orders of his
superior commissioned officers.  His lawyers also contended that since
Calley was a  "person of the commonest understanding" he might not
know what the law required.
   The court did note that  "In the stress of combat, a member of
the armed forces cannot reasonably be expected to make a refined legal
judgment and be held criminally responsible if he guesses wrong on a
question as to which there may be considerable disagreement  ... "
   However, the court found that that wasn't the case at My Lai,
and rejected the notion that Calley might not know that the order was
patently illegal:  "Whether Lieutenant Calley was the most ignorant
person in the United States Army in Vietnam, or the most intelligent, he
must be presumed to know that he could not kill the people involved here."
   Obviously an order to kill innocent civilians is unlawful, but what
about treatment of enemy prisoners of war?  The 1949 Geneva Convention
Relative to the Treatment of Prisoners of War outlines the protections to
which enemy personnel are entitled.
   Specifically prohibited acts include:  murder; torture; corporal
punishment; mutilation; the taking of hostages; collective punishments;
execution without trial by proper authority; and all cruel, humiliating, and

degrading treatment.

The use of physical or mental torture or any coercion to compel detainees to provide information is prohibited. Detainees may not be threatened, insulted, or exposed to unpleasant or disparate treatment for refusal to answer questions. Failure to abide by these principles is a war crime subjecting the violator to the criminal process.

Regarding command responsibility, commanders - of course - are responsible for war crimes they personally commit or order committed. But, they are also responsible for their subordinates' violations they are aware of, or should be aware of, based on all the circumstances, and do not take all feasible measures to prevent or repress.

For example, after World War II, General Tomoyuki Yamashita, the former commander of Japan ' s 14th Army Group in the Philippines, was tried by a U.S. military commission for war crimes. Interestingly, he was not charged with personally committing or ordering any war crimes, but rather he was held accountable for those committed by his troops.

Specifically, he was alleged to have "unlawfully disregarded and failed to discharge his duty as commander to control the operations of the members of his command, permitting them to commit brutal atrocities and other high crimes against the people of the United States and of its allies."

General Yamashita was convicted despite his contention that, among other things, it was American military action that destroyed his ability to command and control his forces. His conviction was upheld by the Supreme Court and he was hung in Manila on February 23, 1946.

The bottom line is that as officers and leaders, commanders are expected to control the actions of those under their command. If they do not, they will be held personally accountable.

I hope this was helpful to you; don't hesitate to ask any specific questions. My POCs for this issue are Colonel Craig Smith and Mr Loren Perlstein, AFLSA/JAJM, 202-767-1539.

VR
Tom

THOMAS J. FISCUS
Major General, USAF
Deputy Judge Advocate General
DSN 224-5732, Comm (703) 614-5732
Fax DSN 224-8894