**Major Thomas L. Rempfer**

**3811 Phelps Road; West Suffield, Connecticut    06093**

AFBCMR                                                                November 22, 2004

1535 Command Drive EE Wing 3rd Floor

Andrews AFB, MD  20762-7002


Subject:     Comments on the NGB's Advisory Opinion, re docket #BC-2004-00944

To:          AFBCMR

From:        Major Thomas L. Rempfer, ▓▓▓▓▓▓▓▓▓▓


Dear AFBCMR Members,

In response to a letter from SAF/MRBR, dated October 29, 2004, my comments on the National Guard Bureau's (NGB) advisory for my Air Force Board for Correction of Military Records (AFBCMR) case follow.


**Introduction:**

I concur with the NGB JAG's opinion, in part 6.e.1., which stated, "based on the dates of ... Judge Sullivan's injunction, and because the three year limit may be waived, it may be proper to consider" my case "for possible corrective action." Judge Sullivan's new "permanent" injunction confirmed that the DoD's "involuntary anthrax vaccination program, as applied to all persons, is rendered illegal absent informed consent or a Presidential waiver.[1]" The NGB prepared their advisory prior to the judge's latest injunction. This development is central to my case.

However, I disagree with several aspects of the NGB's opinion based on the fact that the arguments preceded the federal court's latest injunction, or plainly ignored the evidence submitted in my original application and my supplemental filing. The NGB omissions follow patterns discussed throughout my original application to the

---

[1] http://www.dcd.uscourts.gov/Opinions/2004/Sullivan/03-707c.pdf.

AFBCMR. The NGB also consistently uses terms such as "alleges" and "claims" to describe events that have been conclusively established as fact. Interestingly, the NGB was an integral part of some of these 'alleged' events that they fail to notice as fact or wholly ignore in their advisory.

Therefore, please accept the following points as a response to the NGB's advisory:

## 1. My commanders tasked me to investigate the anthrax vaccine program in an officially charged duty known as "Tiger Team Alpha."

Though the NGB advisory, part 3.b., stated "Major Rempfer alleges he was part of a team that reviewed the AVIP [anthrax vaccine immunization program] for his CT ANG unit in 1998," it is important to ascertain from the outset that this "allegation" was long ago established as fact. **My commanders tasked me to investigate the anthrax vaccine program in an officially charged duty known as "Tiger Team Alpha."** Though the NGB advisory, part 3.b., stated "Major Rempfer alleges he was part of a team that reviewed the AVIP [anthrax vaccine immunization program] for his CT ANG unit in 1998," it is important to reiterate that this fact was upheld by the CT Freedom of Information (FOIA) Commission, docket # FIC 2000-303, dated January 10, 2001. The Commission wrote the "following facts are found and conclusions of law":

> "It is found that, during 1998 and 1999, the Connecticut Army National Guard [hereinafter "the Guard"] was in the process of addressing the controversial issue of an anthrax vaccine program, that the complainant herein was an officer in the Guard during such time, that he was assigned by the Guard to research the vaccine, that he decided not to take the vaccine, and that he ultimately resigned his commission as a Guard officer as a result of the anthrax vaccine controversy, after being ordered to so resign."[2]

The 103rd Fighter Wing's (FW) commander, Col Walter Burns, officially documented the team's findings and questions. He also documented his interactions with the NGB — the entity providing you the opinion regarding my case. Documentation included:

---

[2] http://www.state.ct.us/foi/2001fd/20010110/FIC2000-303.htm. At para. 12.

2

AR-0199TLR

a. Col Burns wrote an official memo to the NGB in October 1998. I provided the memo to the AFBCMR as an attachment to my complaint.[3] Presumably the NGB JAG reviewed the memo as well. Col Burns discussed in the memo the "unanswered questions posed by some of my folks." In this NGB memo Col Burns acknowledged that an "official government position on some of their [Tiger Team Alpha's] issues does not exist." The unanswered questions lacking an "official government position" related to the experimental use of the anthrax vaccine for inhaled anthrax.

b. A transcript of Col Burns testimony to the DoD Inspector General's (IG) was also previously attached in two parts, one with each of my complaint submissions. Col Burns explained to IG investigators the origins of Tiger Team Alpha, confirming Tiger Team Alpha's existence and our concerns about the legality of the AVIP saying, "A couple of the more vocal officers felt like the anthrax policy was immoral and illegal. And -- as a result of this concern, I put a team of people together to try to capture all of their concerns."

c. An official briefing to the entire 103rd FW is provided with this comment (Attachment 1 – CD of Col Burns' briefing). In this briefing, Col Burns acknowledged our team's unanswered questions stating, "I'll tell you right up front some of the things I don't have answers to ..." Col Burns also acknowledged during this briefing about Tiger Team Alpha's unanswered concerns over proven efficacy of the vaccine with respect to the "cutaneous threat versus the inhalation threat."[4] Col Burns closed the briefing reiterating, "I still owe you some more answers on some of this stuff and I'm still working on it. As I get answers I'll try to get the word out." To the best of my knowledge, Col Burns did not share the existence of Tiger Team Alpha with the 103rd FW. Tiger Team Alpha was also specifically ordered not to share our research.

d. During the briefing, Col Burns attempted to address questions about the safety of the vaccine by stating that the "safety and sterility of the particular lot of vaccine we have ... I don't have those answers for you today, but I'm going to do my best to find them because I think something prudent that we do so, because there is enough evidence out there that non-quality controlled vaccine did get to the field."

---

3 Burns, W. "Col, USAF/CTANG Commander. Memo to "NGB/CF (MG Paul Weaver)." October 1998.

4 Col Burns videotaped meeting discussing unanswered anthrax vaccine issues and possible refusals prior to October 1998 unit training assembly.

AR-0200TLR

Col Burns also stated, "Bottomline is on our particular lot I owe you some answers on the safety and quality control piece ..." The questions our team asked of Col Burns, recovered via FOIA, were also included as an attachment to my complaint.

e. In Col Burns' DoD IG testimony he also confirmed that he had Tiger Team Alpha "get together and try and capture the sentiments of all the people who had concerns, whether little or big, concerning the anthrax policy. And they did that."[5] Col Burns testified that he then "condensed it into a memo" and sent it "to MGen Weaver and BGen McKinley, who were the Director and the Deputy Director [of the Air National Guard] at the time."

f. Col Burns told the DoD IG he was "not equipped to answer the issues and the questions that [were] outlined in [the] attachment," and he pleaded, "Please give me some help." Col Burns specifically testified, in answering investigator's questions, confirming my participation in Tiger Team Alpha, saying, "now-MAJ Rempfer, and [redacted], And there were a couple other people on that Tiger Team." Col Burns also recognized our team's legitimate concerns in this testimony by stating, "There are unanswered questions that are legitimate questions."[6]

g. Finally, Col Burns told the DoD IG about Tiger Team Alpha, referencing the letter he wrote to the NGB summarizing our concerns, by saying, "And I wanted this to be my official notification to them that I had some troubles and I needed some help."

Though the NGB suggests I "allege" I was a part of a team — implying the veracity of my statement is suspect — in reality the facts more than bear out that I was a part of an officially sanctioned internal investigation. Moreover, the NGB knows this directly, because my commander reported the findings of our investigation to the NGB itself. Tiger Team Alpha's concerns about the anthrax vaccine's use for inhalation anthrax, and its concern over the legality of the AVIP, are rooted in indisputable facts, findings, and testimony, as well as in written and visual documents. Many of these facts were

---

5 Testimony by former CT ANG 103rd Fighter Wing Commander on January 18, 2001 relating to anthrax vaccine refusals and dismissals of Air Reserve Component officers.

6 DoD IG testimony, previously submitted, January 18, 2001.

4

AR-0201TLR

obtained through FOIA, despite attempts by the CT ANG to withhold this evidence. The CT Guard was found in violation of CT FOIA law and fined as a result of its acts.[7]

## 2. Tiger Team Alpha warned commanders that the anthrax vaccine was "investigational," "experimental," and required "informed consent."

The NGB's "background" information in the cover letter to their advisory implied that Tiger Team Alpha "claims" to have "independently determined the DoD AVIP was illegal and unsafe." Additionally the NGB advisory, in part 3.b., maintained that my review of the AVIP 'convinced' me to "not take the shot" and that it was an "illegal order to request [me] to have the vaccine." In response, it is important to reiterate that at the time Tiger Team Alpha presented concerns about the legal status of the mandatory program, trusting that our chain of command would properly assess the substance of our findings. This did not occur. Instead, cautions about the potential illegality of the AVIP were dismissed — concerns a federal court later validated. I resigned my state commission in the CT ANG under duress, and was grounded from flying duty. Tiger Team Alpha's cautions included:

a. Loss of FDA validation – An FDA inspection report was presented to our commander in October 1998, and was recovered via FOIA. This FDA report clearly stated the anthrax vaccine manufacturer's operations had lost FDA validation early that same year (Attachment 2, 1st page, line 1, "The manufacturing process for anthrax vaccine is not validated").

b. Unresolved legal questions – Questions delivered to the commander by Tiger Team Alpha (attached to complaint) unmistakably explained the legal concerns. Tiger Team Alpha questioned the "off label" and the "investigational" use of the vaccine. Additionally, the team questioned the "experimental" use of the vaccine without providing "informed consent," required by DoD regulations and US law.[8]

c. Legality of orders – The commander acknowledged tiger Team Alpha's concerns in multiple written documents, previously discussed. In addition, in the videotaped Wing briefing Col Burns specifically acknowledged, "You're looking

---

7 http://www.state.ct.us/foi/2001fd/20010110/FIC2000-304.htm.  At para. 22.

8 Dingle, RE. Rempfer, TL. Tiger Team Alpha inputs to the 103rd FW/CC.  September and October 1998.

AR-0202TLR

for the peer reviewed extensive scientific study that clearly proves without a doubt this stuff works against inhalation anthrax – that doesn't exist." (Attachment 1 – CD)[9] This admission, coupled with the facts listed in item b), above, effectively meant we warned that the order to submit to the AVIP was not legal, absent informed consent or an executive waiver from the President.

d. Efficacy issues – Col Burns reiterated in this October 1998 briefing (on CD) about questions relating to proof of required efficacy data for the vaccine saying, "Now, for those of you in here that want a clear, absolutely, pivot bound without a shadow of a doubt proof - I don't have it here, plain and simple ..."

e. Censorship – Tiger Team Alpha's questions and concerns about the efficacy of the vaccine were later specifically prohibited from official discussions and informational gatherings per written command guidance (Attachment 3, see "Givens" – "#3", "The efficacy of the current vaccine will not be debated."

Based on these well-documented facts, and as a former member of Tiger Team Alpha, I can assert that our team's cautioning the commander about the illegality of the AVIP mandate is not a "claim:" it is a _fact_. This fact is conclusively derived from Tiger Team Alpha's written questions, Col Burns' videotaped dialogue, and his DoD IG testimony. It is also important to note that we asked the same questions as those now asked and answered by a federal court. The court ultimately declared the AVIP in violation of U.S. law. In Col Burns words, we asked for the "peer reviewed extensive scientific study that clearly proves without a doubt this stuff works against inhalation anthrax." Col Burns' response mirrored the court's opinion saying, "That doesn't exist." Therefore, the legal bar for a mandatory AVIP didn't exist either.

### 3. As a member of Tiger Team Alpha, and a CT ANG officer, I was coerced into resigning my commission and grounded from flying duty.

The NGB's advisory stated that I "claim" I was "pressured to resign and leave the CT ANG," in part 3.c. Again, this is no "claim:" it is _fact_. This fact is born out,

9 Col Burns videotaped meeting discussing unanswered anthrax vaccine issues and possible refusals prior to October 1998 unit training assembly (drill).

AR-0203TLR

despite the CT ANG's best efforts to withhold documents that proved this point. Facts supporting my contention include:

a. Conclusions of law – "Conclusions of law" documenting my ordered resignation resulted from a CT Freedom of Information Commission case. They wrote, "It is found that ... he ultimately resigned his commission as a Guard officer as a result of the anthrax vaccine controversy, after being ordered to so resign." [10] Col John Swift, the 118th Fighter Squadron (FS) Commander, issued this order to four officers telephonically (covered in detail in my complaint). Each testified in person at a state hearing under oath as to this fact. The officers included: LtCol Russell Dingle (Tiger Team Alpha co-investigator), LtCol Dominic Possemato, Capt Enzo Marchese, and myself. There is no genuine issue of material fact debatable here. Even if I offered no additional evidence, these conclusions of law — alone — prove I was forced to resign. But more evidence does exist.

b. Documented problems with Col Burns' testimony – Col Burns' testimony to the DoD IG (previously referenced) acknowledged, "So we asked them to retire ... Or resign, yes. Well, asked them to resign from the Connecticut Air National Guard." Col Burns added, "No. No. I asked them to resign from the Connecticut Air National Guard. Now, some of them allege that they were ordered to resign. Okay? I did not order them to resign. I can't speak for anyone else in the chain of command. But I did not order them to resign. I didn't have that authority. But I did ask them to, and they all did." In fact, I personally informed Col Burns in a formal meeting with two witnesses that Col Swift had ordered us to resign.

c. More problems with Col Burns' testimony – Col Burns added to his DoD IG testimony, when pressed by the DoD IG investigators about his requests for pilots to resign. Col Burns paraphrased what he told us at the time stating, "You're not doing us any good here. So I need you to move on out. And they eventually did."[11] He also told the IG, "Some of the guys wanted to come in and

---

10 http://www.state.ct.us/foi/2001fd/20010110/FIC2000-303.htm. At para. 12.

11 Testimony by former CT ANG 103rd Fighter Wing Commander on January 18, 2001 relating to anthrax vaccine refusals and dismissals of Air Reserve Component officers. This testimony was DoD IG case (#74-998, filed 14 JAN 00) -- The first transcript submission via the FOIA was not complete due to ongoing investigations – transcript of Col Burns testimony to the DoD IG was missing pages: 1 to 8, 11 to 14, 16 to 19, 21 to 33, 38 to 39, 43 to 47, and 50 to the end. Complete transcript pending.

AR-0204TLR

talk to me and give me an earful. And some of them left resisting – I mean, they didn't really want to leave, but they knew they had to." I ask the AFBCMR to ponder the question why we "had to," but for the fact that we were forced to.

d. Col Burns' videotaped admissions – Col Burns' videotaped briefing captured the coercive backdrop to my resignation (previously referenced / CD included as attachment 1). Col burns said he considered an officer to be a "traitor" if they were concerned about the vaccine enough to refuse it, but would not resign. Col Burns stated: "If you do not get the shot during this time period ... Can't have that because words like traitor start coming up in my mind, and I don't have a lot of time for those kind of people." In this same briefing, though acknowledging that "I still owe you some more answers", Col Burns maintained, "if you're that distrustful of the government that employs you, you might think about going somewhere else to work." Despite acknowledging to the DoD IG about the "unanswered questions that are legitimate questions," Col Burns told the entire CT ANG during his briefing, "If you're not going to be ready to go to war whenever we're called, you are spooging America as far as I'm concerned."

e. Col Burns' official characterizations of Tiger Team Alpha – Col Burns explained the situation clearly to the NGB in his October 1998 memo (previously referenced and attached to complaint) that despite the fact that he acknowledge that an "official government position on some of their issues does not exist," he simultaneously referred to his Tiger Team Alpha members as "hard liners," asserting that "if we will lose some folks along the way, then my guess is we will be a better organization in the long run..."

f. Col Burns' defamation and its progeny – Col Burns' defamatory comments poisoned the atmosphere of our unit, and other top CT ANG commanders followed his lead. Slanderous accusations, communicated to enlisted personnel in the unit, included terms such as "cowards." Other allegations characterized Tiger Team Alpha's well-researched findings as "propaganda," originating from "Nazi websites."[12] One of the CT ANG leaders also published an article in a local newspaper, the *Journal Inquirer*, denigrating me by claiming my conduct did

---

12 CT ANG Non-commissioned officer allegations compiled via emails and interview from February to April, 1999.

8

"not uphold oath." My discussions of the about the Oath of Office in my complaint clearly express my sense of duty to support and defend the Constitution and the law. Now that the AVIP has been declared illegal, it is clear Tiger Team Alpha did uphold the Oath, despite allegations to the contrary.

g. Col Burns' and subordinate commander's threats to my career – In addition to the above examples of pressure to resign, Col Burns also wrote me an email (referenced in my complaint) stating, "those senior to me (not just those in CT) wanted to take aggressive action or implied aggressive action was appropriate." Additionally, Col Burns' vice commander at the time verbally relayed the veiled threat that if I didn't leave quietly I'd never work in the military again. I testified to this fact under oath to the US Congress in March of 1999.

The requests and orders for my resignation, as well as the disparaging written and verbal comments by CT ANG officials, constitute a "constructive discharge."[13] Col Burns' example constructed a hostile environment, forcing my resignation. This wrongfully coerced resignation is amply documented in written and videotaped media. Accusations that we failed to uphold the Oath of Office, and use of phrases such as "traitor," "hardliner," and "spooging America" — all the while requesting and ordering resignations — clearly fall outside the scope of any governing Air Force Instruction (AFI). I was forced to resign by the hostile environment created by Col Burns, and fostered by others.

Despite succumbing to the pressure to resign, I did so solely based on the word of Col Swift in December 1998 after the grounding policy was formulated. Col Swift assured me I would be re-hired if proven correct. Needless to say, I attempted this process in good faith to no avail in January of 2004, after the first federal court ruling, based on Col Swift's word. Only then did I seek redress with the AFBCMR.

Though the NGB contends that I "voluntarily transferred," in part 8.b., the facts bear out the truth, and the truth shows exactly the opposite of the NGB's claim. Moreover, case precedent exists within the AFBCMR process wherein a member's apparently voluntary departure from a unit was in reality coerced. In that case,

---

13 A constructive discharge is where circumstances are made intolerable for an employee, requiring them to leave their employment. Constructive discharge theory requires the employee to act reasonably.

AR-0206TLR

despite a presumptively voluntary signature on an application for retirement, the AFBCMR found that a wrongfully coerced retirement actually occurred. Then-Captain Leonard R. Kelley was "illegally coerced" into early retirement when he left the 186th ARW in 1997 according to the AFBCMR. Though the Privacy Act limits my access to particular events from that case, my point is born out by that case, nonetheless: my signature on my application for transfer was no different from Captain Kelley's — both were coerced. I request the AFBCMR consider the facts I have presented in light of the standards of review used for now-Lt Col Kelley's case.

### 4. My membership in Tiger Team Alpha was omitted from my Officer Performance Report (OPR), replaced with vagaries in violation of AFI's.

The NGB's advisory, in part 8.b., stated that my OPR from 1998 (included as an attachment to my supplemental complaint) showed no indication of "any mistake or injustice." This belies clear facts. The NGB JAG's review of my OPR apparently failed to consider Air Force Instructions detailing procedures for OPR completion and correction. This failure is evidenced by multiple omissions of facts by the NGB JAG, as well as by errors in the OPR itself:

a. Incorrect assertions – Though the NGB JAG contends, in part 6.e.3.c., that I "failed to appeal [my] OPR through the normal process," this is not accurate. AFI 36-2401, Table 1, "How to Submit Requests For Correction,"[14] specifically states that if a "ratee … [has] been discharged, separated, dismissed or dropped from the rolls" that the AFBCMR DD Form 149 process is the appropriate venue for appeal. I was discharged from the CT ANG, separated from the National Guard, and dropped from the rolls. Venue for my appeal thus rests in the AFBCMR, and I have indeed availed myself of this avenue of redress.

b. OPR omissions – AIR FORCE INSTRUCTION 36-2406, "Personnel Evaluation Systems," states that "COMPLIANCE WITH THIS PUBLICATION IS MANDATORY."[15] This AFI "applies to all major commands … as well as … [the] Air National Guard (ANG)." Though the NGB stated that the omissions of my

---

14 http://www.e-publishing.af.mil/pubfiles/af/36/afi36-2401/afi36-2401.pdf
· 15 http://www.e-publishing.af.mil/pubfiles/af/36/afi36-2406/afi36-2406.pdf

AR-0207TLR

Tiger Team Alpha duties was within the "judgment" of my raters, in part
6.e.3.b., the AFI specifically requires, in section 1.1, for a rater to "provide
meaningful feedback," and a "reliable, long-term, cumulative record of
performance." My commander-directed duty as a member of Tiger Team Alpha
predominated the period covering this OPR, yet none of this duty is
documented. As well, my grounding from flying duty is not documented, nor is
the reason for my grounding — disagreements as to the legality of the AVIP.

c. Lack of performance feedback – The AFI's section 1.3, "Evaluator
Accountability," requires raters to "ensure personnel they supervise receive
performance feedback." No feedback occurred. This was documented on my
OPR. Feedback, in line with the AFI's requirement for proper evaluator
accountability, would have ensured proper documentation of the reasons for my
grounding and ordered resignation.

d. Deviations from OPR norms – According to the AFI 36-2406, section 3.2.1.3.,
"Responsibilities," a rater "assesses and documents what the ratee did."
Considering the fact that my Tiger Team Alpha duties comprised the vast
majority of my time during the rating period, and resulted in my grounding from
flight duty in the midst of my mission ready training, the failure to document
this grounding is highly unusual.

e. Disregarded ratee inputs – Section 3.2.1.4. of the AFI requires that a rater "gets
meaningful information from the ratee and as many sources as possible," and
that the "ratee is encouraged to provide the rater input on specific
accomplishments." Considering the fact that I did supply these inputs about my
Tiger Team Alpha duties to my chain of command (email evidence included in
complaint), and did specifically request this be included in my OPR, the failure to
include these inputs appears highly irregular and should be corrected. The CT
ANG appears to have accelerated the close out date of my OPR, well inside the
normal annual rating cycle, thus leaving my grounding outside of its coverage.

f. Failure to document disparities between raters – Section 3.6.5. of the AFI details
"Mandatory Comments" to "Explain any significant disagreement with a previous
evaluator on a performance report." Considering my next previous CT ANG OPR

11

AR-0208TLR

documented my service as exemplary, a significant disagreement exists. The earlier supervisor stated, "Captain Rempfer is undoubtedly the best officer I have led." To then be referred to as causing a "disappointment" in my OPR in question seems to be a departure from the AFI's.

g. Failure to document the factual record – Section 3.7.7. of the AFI discusses the requirement that "raters must ensure that information relied upon to document performance ... is reliable and supported by substantial evidence." As a result, to include information in my OPR that about how my "decision to resign from the unit and seek a position in another Air Force reserve component was a disappointment," this failed to fully document with "substantial evidence" and the actual reason I transferred. Such evidence, disclosed in these comments, and my previous complaints, includes the requests, orders, and coercion to resign over the AVIP mandate following my duties on Tiger Team Alpha. These facts should be included in a rewrite of a properly documented OPR.

h. Fraudulent innuendo – Section 3.7.20. of the AFI also prohibits "broad statements outside the scope of the evaluator's responsibility or knowledge." As well, section 3.9.1.2.1. prohibits "non-specific/vague comments about the individual's behavior or performance." For CT ANG raters to include any reference to my civilian airline career training adjacent to insinuations about voluntary decision to resign implied a linkage. This was not the case, and my supervisors knew this as a fact. Therefore, to discuss my departure, without including the fact that I was requested and ordered to resign, is misleading and disingenuous. Such "broad statements" by raters would be viewed negatively by any future records review / promotion process, without proper explanations.

i. Impermissible OPR editorializing – Section 3.7.25. of the AFI specifically prohibits "comments about [a] civilian occupation." Since my civilian occupation was referenced, but had absolutely nothing to do with my departure, such references should be removed upon the rewriting of my OPR. The misleading nature of this line of written documentation paralleled the misleading statements made by Col Burns publicly in the press. Col Burns stated in an interview with the Hartford Courant, "The orders to take a controversial drug were just the last

12

straw for pilots who would rather spend more time with their families, and at their more lucrative full-time jobs."[16]

j. Lack of candor and straightforwardness — Col Burns stated, according to his Hartford Courant interview that he challenged, "anyone concerned about safety to show him any evidence that the anthrax vaccine was unsafe or ineffective, and no one could." This statement stands in contradiction to Col Burns' admitting to the DoD IG two years later that he was "not equipped to answer the issues and the questions. ... Please give me some help." This lack of candor appears to have translated into the lack of documentation of Tiger Team Alpha in my OPR — because we did provide such evidence.

k. Candor and straightforwardness — Though my OPR did not include acknowledgment of my Tiger Team Alpha involvement, Col Burns was candid about this with the DoD IG. He also was straightforward with the DoD IG regarding the unadulterated version of why I resigned from the CT ANG. Col Burns testified, "And again, as I said earlier, all eight of them, anthrax was the catalyst. ... For Rempfer, I'm pretty confident it was the only thing, if not the -- it was certainly the primary thing, if not the only thing, because they were very vocal in their resistance to the anthrax program."

l. Breach of ethics — The lack of candor when documenting personnel losses attributable to the AVIP went to the top of the chain of command in the ANG. The Director of the ANG, MG Weaver, was the same NGB officer that Col Burns gave his original memo about Tiger Team Alpha's findings. MG Weaver himself provided troublesome testimony before the U.S. Congress. MG Weaver's testimony was scrutinized by the DoD IG and was found to have "lacked the necessary element of 'straightforwardness,' and so was inconsistent with guidelines for honesty as set forth by the Joint Ethics Regulations (JER)."[17] The Inspector General's analysis acknowledged that, "We understand the strong objections" about the General's testimony, and the "apparent opinion" that the General "intentionally misled the Subcommittee by understating the resistance

---

16 Hartford Courant. "Pilots Quit Guard Unit in Anthrax Argument." January 15, 1999.

17 Lieberman, J. Deputy DoD Inspector General analysis of September 29th, 2001 testimony before Congress. March 2nd, 2001.

13

AR-0210TLR

to AVIP." The DoD IG added that the General presented the information "in such a way as to lead recipients to confusion, misinterpretation, or inaccurate conclusions."

AFI 36-2401 specifically addresses the process for correcting OPR's, as well as "Time Limit Waivers" in section A.1.4. According to the AFI, "You can request a waiver of the 3-year time limit by citing unusual circumstances. I maintain such a request and subsequent approval are warranted in my case based on the unusual circumstances of the CT ANG being found in violations of FOIA law for withholding records, as well as the conclusions of law that documented my ordered resignation. The Joint Ethics Regulation violations by MG Weaver at the NGB add to the unusual circumstances. Additionally, if page limit waivers, detailed in section 3.8.3. for "complex cases" are warranted, or required by the board, the same unusual circumstances apply, since the entire subject matter revolves around an illegal military order, now validated by federal court rulings.

Ultimately, it should be clear to the Board that the entire chain of events is indefensible, particularly in light of the documented illegal attempts to withhold records, and the avoidance — in violation of AFI's — of documenting the facts of Tiger Team Alpha. Additionally, the NGB's willful ignorance in their review of these facts should be placed in similar perspective. I'm hopeful the AFBCMR will review the facts and correct the wrongs committed with respect to my OPR.

### 5. The NGB failed to consider the FOI Commissions findings.

a. Reference point #1, that **my commanders tasked me to investigate the anthrax vaccine program;** the FOIA findings of fact confirmed that we were indeed tasked to investigate the AVIP. Their conclusions of law: "It is found that ... the complainant ... was assigned by the Guard to research the vaccine"[18]

b. Reference point #2, that **Tiger Team Alpha warned commanders about the "investigational" / "experimental" status of the vaccine, and requiring "informed consent;"** the FOIA findings confirmed the fact that "the

---

[18] http://www.state.ct.us/foi/2001fd/20010110/FIC2000-303.htm. At para. 12.

AR-0211TLR

controversial issue of an anthrax vaccine program" was the subject of that FOIA proceeding. Multiple documents were recovered in this FOIA case, as well as other FOIA's through the DoD IG, verifying these contentions (i.e., Col Burns' video, Col Burns' memo to MG Weaver, and Col Burns' DoD IG testimony).

c. Reference point #3, that **I was coerced into resigning my commission and grounded from flight duties;** the FOIA findings again confirmed this fact as a conclusion of law: that I "decided not to take the vaccine, and that [I] ultimately resigned [my] commission as a Guard officer as a result of the anthrax vaccine controversy, **after being ordered to so resign.**"[19]

d. Reference point #4, that **my membership in Tiger Team Alpha was omitted from my OPR;** the FOIA findings confirmed this fact as well. The FOI Commission findings also illuminated the more important pattern of the CT ANG withholding documents that served to attempt to obscure Tiger Team Alpha's existence, and the fact that we were ordered to resign. The Freedom of Information Commission fined the CT ANG and wrote: "It is found that the respondents do not contend that the requested records that they maintain are exempt from mandatory disclosure. It is also found that they simply ignored the complainant's requests in this matter, and that such inaction resulted in the respondents' violations of the complainant's rights under the FOI Act, both in letter and spirit. It is further found that such violations were without reasonable grounds, within the meaning of §1-206(b)(2), G.S."[20]

The legal doctrine of *collateral estoppel* holds that an issue that has been previously litigated and necessarily determined in a previous action cannot be relitigated in a subsequent action. The issue of being my being ordered to resign was litigated in my FOIA case following a full and fair hearing. It is identical and necessary to the requested judgments in the present case. This effectively means the FOIA findings of fact on the issue that I was order to resign, despite the objections of the CT ANG, should be honored as such by your board ("mutuality" rule also applies). At a minimum, for the purposes of your board, I ask that the above facts be recognized.

---

19 http://www.state.ct.us/foi/2001fd/20010110/FIC2000-303.htm. At para. 12.
20 http://www.state.ct.us/foi/2001fd/20010110/FIC2000-304.htm.

AR-0212TLR

Additionally, I respectfully request this board recognize the documented violations of FOIA law in its consideration of my request for waivers of any and all page count restrictions and / or statute of limitations.    Though AFI 36-2603 states that "ordinarily, applicants must file an application within 3 years after the error or injustice was discovered, or, with due diligence, should have been discovered," your board has the authority to "excuse untimely filing in the interest of justice." According to section 3.5.2. of the AFI that guides the AFBCMR process, I "should" explain why a waiver "would be in the interest of justice."  I am hopeful that my explanations of the FOIA violations, the fact that it has taken over six years for the AVIP to be declared (twice) illegal by the federal court, and the fact that the NGB advisory has apparently willfully overlooked many of these issues, should serve as ample justification for my request.

## 6. The Federal Court rulings on December 22, 2003 and October 27, 2004 confirmed the initial concerns of Tiger Team Alpha about the "investigational" nature of the AVIP and the illegality of the mandate.

The NGB cover letter and advisory in my case preceded the federal court's most recent ruling on the anthrax vaccine, and therefore their recommended dismissal of my case should be placed in proper perspective by your board: they did not have all the facts. The AFBCMR now does. I also feel the need to comment on the NGB's contention with respect to a lack of retroactivity as it pertains to this decision.

The opinion of SMSgt Vandenberg, author of the NGB's cover letter, confuses the injunction issue with the significance of the retroactive nature, as well significance, of the court's ruling.  I grant the NGB their point that by definition you cannot make an injunction retroactive.  It is clearly a legal tool / remedy that seeks action from the present into the future.  However, it is not the injunction that I contend is retroactive, but instead the illegality of the AVIP mandate.  It is common sense that if the court found the AVIP to be illegal, based on improper licensing, than the license could not have been proper in the past.  Comments on the federal court's two rulings concerning the AVIP, and their retroactivity implications, follow:

16

a. The federal judge in the DC District court specifically confirmed in <u>Doe v.</u> <u>Rumsfeld</u>, 297 F. Supp. 2d 119 (D.C. Cir. 2003) that "This Court is persuaded that AVA [anthrax vaccine adsorbed] is an investigational drug and a drug being used for an unapproved purpose. As a result of this status, the DoD is in violation of 10 USC 1107, Executive Order 13139, and DoD Directive 6200.2."[21] For the purposes of this case I will not explain the entire ruling on why the anthrax vaccine is experimental.  Instead, I will let the rulings speak for themselves along with the judge's awareness written in his opinion that according to the "documents submitted to this Court under seal," and "statements made by DoD officials suggest that the agency itself has, at some point at least, considered AVA experimental with respect to inhalation anthrax." The judge continued, "Given all these factors, the Court would be remiss to conclude that the original license included inhalation anthrax. Having reached that conclusion, the DoD's administration of the inoculation without consent of those vaccinated amounts to arbitrary action."[22]  Thus, independent of whether the DoD *was* enjoined, it could *have been*, because its activities violated the law.

b. The federal judge reaffirmed in the Doe v. Rumsfeld case most recently in his October 27, 2004 ruling, a decision post-dating the NGB advisory, that the anthrax vaccine is a "drug unapproved for its intended use or an investigational new drug within the meaning of 10 U.S.C. § 1107. Accordingly, the involuntary anthrax vaccination program, as applied to all persons, is rendered illegal absent informed consent or a Presidential waiver.[23] The judge reaffirmed that the "men and women of our armed forces deserve the assurance that the vaccines our government compels them to take into their bodies have been tested by the greatest scrutiny of all public scrutiny. This is the process the FDA in its expert judgment has outlined, and this is the course this Court shall compel FDA to follow."  Though the DoD's reaction to this ruling maintains they are "convinced that the AVIP complies with legal requirements and that anthrax vaccine is safe

---

21 http://www.dcd.uscourts.gov/Opinions/2003/Sullivan/03-707.pdf.

22 http://www.dcd.uscourts.gov/Opinions/2003/Sullivan/03-707.pdf, pg. 28-29.

23 http://www.dcd.uscourts.gov/Opinions/2004/Sullivan/03-707c.pdf.

AR-0214TLR

and effective,"[24] a federal court found otherwise — in this case, twice. The vaccine was "investigational" and "being used for an unapproved purpose in violation of 10 U.S.C. § 1107, Executive Order 13,139, and DoD Directive 6200.2." The judge also vacated the anthrax vaccine license rule in his court order and summary judgment.

c. These rulings and military whistle blower directives[25] are directly applicable to my case. Those directives state in section 4.4., "No person may take or threaten to take an unfavorable personnel action, or withhold or threaten to withhold a favorable personnel action, in reprisal against any member of the Armed Forces for making or preparing a protected communication."[26] The written warnings from a U.S. Congress legislative staffer (included in my complaint) confirm such threats and retaliation did occur. In an email to me the staffer asked, "I've heard you were summoned, told to resign."[27] The staffer communicated that the Adjutant General for the CT Guard, who according to the staffer, said, "things would be OK 'as long as they keep quiet.'" Though facts were ignored by the NGB advisory, I did provide multiple "protected communications" to both the NGB Inspector General and the US Congress. These threats of retaliation were directly made to the very same congressional staffer who received and investigated our "protected communications."

Based on the significance of Tiger Team Alpha blowing the whistle on the DoD's AVIP, beginning in 1998, the federal court rulings play a significant role in the case before your board. Not only do these rulings confirm the concerns of Tiger Team Alpha, following dismissals at the time by the chain of command, but they also increase the implications and meaning of the overt retaliation that occurred, along with documented efforts to withhold evidence.

Based on each of these rulings, and the whistle blower implications in my case, I disagree with the NGB's position on the lack of relevance of the court's ruling to the issue of retroactivity: I was given an order that a federal court has found to be

---

24 http://www.anthrax.mil/whatsnew/pause.asp.

25 Department of Defense Directive 7050.6, the Military Whistleblower Protection Act.

26 http://www.dtic.mil/whs/directives/corres/pdf/d70506_062300/d70506p.pdf.

27 Retaliation warning emails from Congressional staffer. January 23rd and 24th, 1999.

AR-0215TLR

which found that the anthrax vaccine was "experimental." The NGB also ignored the CT Attorney General office's investigation, which found that "Mandatory vaccination of troops with a biologic product not licensed for its current use violates the Federal Food, Drug and Cosmetic Act and 10 U.S.C. § 1107." The CT Attorney General wrote, "I call upon the DoD to cease and desist from its illegal conduct and to abandon its plans for Anthrax Vaccine inoculation of the Armed Forces."[28]

These omissions by the NGB advisory cannot be overstated, for they lie at the very heart of the matter. In 1998 and 1999 our commanders acknowledged an inability to address our legitimate questions, and instead ignored our concerns, ultimately grounding pilots and forcing resignations. My commander likely acted in response to the NGB's inability to answer his questions. Similarly, the NGB's current inability to address the legitimate concerns of my complaint is complicated by their own willful ignorance of relevant issues. Moreover, their diversions of your board's attention through arguments that obfuscate the true issues should be noted.

## 8. Favorable recommendations from military officers and public officials warrant review as the AFBCMR's considers reinstatement to flying duty.

Since the NGB advisory specifically commented on my current USAFR supervisor's "favorable recommendation" for my return to flying, I will review similar referrals:

a. The current CT ANG 103 Wing Commander, Col Daniel Peabody, previously applauded my efforts. The day after I departed the unit he emailed me saying, "Thanks for all your hard work and dedication. It is appreciated and respected by more people than you might sometimes think. Hang in there..." (included as attachment to previous complaint).

b. The 118th Fighter Squadron Commander that hired me into the CT ANG in 1994 recently emailed state officials encouraging them to rehire me into the CT ANG (included as Attachment #4).

c. Representative Rob Simmons similarly recommended my reinstatement to the CT ANG (an attachment to the previous complaint).

---

28 http://www.cslib.org/attygenl/press/2001/health/dod.pdf.

AR-0217TLR

d. Representative Chris Shays similarly recommended my reinstatement to the CT ANG (an attachment to the previous complaint).

e. The CT Attorney General, Richard Blumenthal, similarly recommended consideration of my reinstatement to the CT ANG (an attachment to the previous complaint).

f. My previous F117 supervisor, Col Mace Carpenter, similarly recommended my reinstatement to the CT ANG (an attachment to the previous complaint).

g. My current USAF Reserve Academy Liaison Officer Director (an additional recruiting duty that I perform), Lt Col Perry Forgione, also recommended my reinstatement to the CT ANG (letter in possession of the 103$^{rd's}$ Col Peabody).

h. Col Sammie R. Young, a USAF Reserve Retired, who also served as a career civil servant regulator with the FDA, recommends favorable action on my case in his letter to the AFBCMR (Col Young's letter is Attachment #5 — he also discusses relevant regulatory issues and FDA history in his declaration for your board).

**9. Items #1 to 8 of this commentary on the NGB advisory reflect the facts demonstrating an injustice and errors occurred when I was grounded and ordered to resign from my flight duties with the CT Guard. These injustices warrant justice being served by the AFBCMR.**

The NGB advisory commented, in part 6.d., that the "key issue is whether [I have] proven that there is an injustice or an error in my record that requires correction." A review of items #1 to 8 demonstrates that errors requiring justice occurred. I will review my points, and those of the court, military officers and public officials who share these conclusions and corrective recommendations:

a. 1.  **My commanders tasked me to investigate the anthrax vaccine program in an officially charged duty known as "Tiger Team Alpha."**

b. 2.  **Tiger Team Alpha warned commanders that the anthrax vaccine was "investigational," "experimental," and required "informed consent."**

c. 3.  **As a member of Tiger Team Alpha, and a CT ANG officer, I was coerced into resigning my commission and grounded from flying duty.**

21

d. 4. **My membership in Tiger Team Alpha was omitted from my Officer Performance Report (OPR), replaced with vagaries in violation of AFI's.**

e. 5. **The NGB failed to consider the FOI Commissions findings.**

f. 6. **The Federal Court rulings on December 22, 2003 and October 27, 2004 confirmed the initial concerns of Tiger Team Alpha about the "investigational" nature of the AVIP and the illegality of the mandate.**

g. 7. **The NGB ignored much of the most relevant evidence in my case.**

h. 8. **Favorable recommendations from military officers and public officials warrant review as the AFBCMR's considers reinstatement to flying duty.**

The NGB advisory correctly asserts that the AFBCMR cannot technically "force a state action" based on the Constitutional requirement of separation of powers between the federal and state governments. This concept applies to the command and control as well as to the administration of the state versus the federal military. Though your board does not have the authority to force a state action, your board does have the authority to recommend my reinstatement to federal flight status in the USAF Reserves, the component of the federal USAF where I currently serve. As well, lost rank, longevity, ratings and pay issues can be remedied by your board.

With regard to the state versus federal issue, it is important to note that it was Col Burns, acting as a federal military officer and in command of the 103rd FW, who forced me out of the CT ANG. Col Burns held a "unique legal status," according to the cautions of his own JAG (the JAG's warning letter to Col Burns was attached to my complaint).[29]  Adding to the complications of the federal versus state command and control paradox, the AVIP, which forced pilots into resigning their state commissions, was a federal mandate delegated to the CT ANG by the DoD.

The legal implications of Col Burns' Title 10, federal active duty military officer, status in commanding a state National Guard Wing was discussed in my complaint. Perhaps the AFBCMR can act on my case based on the "unique" and unprecedented environment surrounding my discharge. If Col Burns, as a federal military officer, could force the resignation of a state CT ANG officer under Title 32 status,

---

29 Marconi, R. Staff Judge Advocate memo to 103rd FW/CC regarding the AVIP.  October 7th, 1998.

AR-0219TLR

consideration could perhaps be given to recommending or "requesting" my reinstatement to the CT ANG. If this cannot legally occur, I appeal to the AFBCMR to offer findings about the legality of Col Burns' "requests" for my resignation.

Furthermore, just as in the precedent AFBCMR case of now-Lt Col Leonard R. Kelley, a determination of my being "illegally coerced" into resignation is also warranted based on the facts that demonstrate that Col Burns constructed an environment in 1998 and 1999 that forced my resignation. If the legal technicalities of adjudicating a constructive termination are beyond the authority of the AFBCMR, the facts show that at a minimum I was wrongfully discharged after warning my commander about an illegal order per the latest federal court ruling.

My respectful request remains that the AFBCMR rule on my case to bring to a halt the retaliation for Tiger Team Alpha blowing the whistle on the DoD's AVIP. This retaliation effectively continues to this day due to the CT ANG's refusal to return me to flying status in accordance with the word of Col Swift.

**10.    Specific remedies requested, in addition to those in my complaint:**

a.  Correction of military records is requested by re-accomplishing my OPR, to include language deemed appropriate by the AFBCMR that reflects the facts represented in my original complaint, my supplemental filing, and this commentary on the NGB's advisory. Simply removing the OPR in question from my records is not an acceptable option as it will not set the record straight, nor accomplish the documentation of Tiger Team Alpha's duties or findings, which was previously avoided by the chain of command. In accordance with the AFI's, my OPR should reflect the reality of my duties and performance, and the events that caused me to be grounded and ordered to resign from my primary Air Force Specialty Code (AFSC) as an A-10 pilot.

b.  Back rank is requested as required based on the fact that those officers at least one year junior to me, in terms of date of commissioning in the CT ANG, have been promoted and have pinned on Lt Colonel. CT ANG promotions are based on seniority, as long as pilots have all other prerequisites for promotion accomplished, i.e., Professional Military Education (PME). My PME is complete.

23

AR-0220TLR

c. Back pay is requested as required to include 24 lost drill pay periods (unit training assemblies – UTA's) annually over the past almost six years. Additionally, back pay should include 48 lost flying training pay periods (flying training periods – FTP's) annually over the past almost six years.

d. Reinstatement is requested to flight status in the CT ANG or the USAF Reserves.

e. Additional remedies the AFBCMR deems appropriate, to include those detailed in my complaint, are requested.


**Conclusion:**

The NGB's advisory omissions follow the patterns of willfully ignoring the facts. This pattern has been meticulously documented throughout my application for correction of military records.   Placing the NGB's advisory in perspective is warranted. As well, I ask that the AFBCMR consider the prospect that if I had ever said, written, alleged, or filed a complaint about something that was not true, logic would suggest that I would have been prosecuted or sanctioned long ago by the DoD, the ANG or the USAF Reserves for making false statements and accusations. Instead, from the findings of Tiger Team Alpha in 1998 to the present, willful blindness has replaced a forthright analysis of my concerns.

My attempts to follow proper processes throughout this dilemma began with Tiger Team Alpha's investigation of the AVIP, continued with the CT FOIA case, and ultimately brought me to the consideration of the AFBCMR. In contrast, the conduct of the DoD has been improper. The CT ANG has been found to be in violation of the FOIA, and the DoD in violation of the Administrative Procedures Act, Title 10 of the U.S. Code, Executive Order and DoD Directives. These findings are documented in conclusions of law. I appeal to your board to act on my behalf in my attempt to resolve this case within the processes afforded to members of the armed forces through the AFBCMR.

The facts of my case are clear: 1. My commanders tasked me to investigate the anthrax vaccine program. 2. Our team found the program to be illegal based on the experimental status of the anthrax vaccine. 3. Our commanders resorted to threats against our careers, and insinuations of treason, while both requesting and ordering our

24

AR-0221TLR

resignations. 4. I was given the word of one commander that I would be rehired into the CT Guard if my concerns were validated. 5. The concerns about the past illegality of the anthrax vaccine mandate stand as case law today, validated by Congressional Reports, Federal Court Rulings and the CT Attorney General. 6. And finally, my attempts to return to the CT ANG by application, following the word and advice of my former commander, have been rebuffed (letter from 103rd OG/CC — Attachment 6).

Based upon these facts, and my continuous unsuccessful attempts to resolve my case through normal processes within the chain of command, I respectfully request an expeditious adjudication of my case in accordance with the spirit of Department of Defense Directive 7050.6, the Military Whistleblower Protection Act. I also respectfully request an audience with your board, particularly in light of the documented internal efforts to withhold and ignore evidence or arguments that add credence to my case.

I am optimistic that the AFBCMR will take action to right an unambiguous wrong. I trust that by exhausting my administrative remedies through the AFBCMR my case will be successfully resolved, obviating the need to seek other remedies. Ultimately, my goal is to find justice for my family, my country and myself. I look forward to your response, and sincerely thank you for the opportunity to plead my case.


Very Respectfully,


Major Thomas L. Rempfer, USAF Reserves

AR-0222TLR

# Attachment 1:

# CD of Col Burns' briefing

# (Obtained via FOIA)

(3 Copies of CD attached above, on this page, for AFBCMR members. The disks each include both AFBCMR complaint filings, plus this AFBCMR NGB commentary, in addition to the Col Burns October 1998 AVIP briefing.)

26

AR-0223TLR

# Attachment 2:

# FDA form 483

# February 1998

27

AR-0224TLR

02/23/98   35   ☎301 594 1944                        CBER/OC                                    @002.020

| DEPARTMENT OF HEALTH AND HUMAN SERVICES<br>PUBLIC HEALTH SERVICE<br>FOOD AND DRUG ADMINISTRATION | DISTRICT ADDRESS AND PHONE NUMBER<br>U.S. Food + Drug Adm-N<br>1401 Rockville Pike<br>Rockville, MD 20852<br>(301) 827-6191 |
|---|---|
| NAME OF INDIVIDUAL TO WHOM REPORT ISSUED<br>TO: Robert C. Myers, DVM | PERIOD OF INSPECTION<br>2/4 - 20/98 | C.P. NUMBER<br>1873886 |
| TITLE OF INDIVIDUAL<br>Director | TYPE ESTABLISHMENT INSPECTED<br>Blood derivatives + vaccine |
| FIRM NAME<br>Michigan Biologic Products Instit | NAME OF FIRM, BRANCH OR UNIT INSPECTED<br>Same |
| STREET ADDRESS<br>3500 N. Martin Luther King Jr. Blvd. | STREET ADDRESS OF PREMISES INSPECTED<br>Same |
| CITY AND STATE (Zip Code)<br>Lansing, MI  48908 | CITY AND STATE (Zip Code)<br>Same |

DURING AN INSPECTION OF YOUR FIRM (I) (WE) OBSERVED:

ANTHRAX Vaccines

1.  The manufacturing process for Anthrax Vaccine is not validated.  For example,

      a.  The formulation tank has not been qualified for long term storage of formulated bulk Anthrax.  Storage times have varied from one week to four months between formulation and filling.  Lot FAV033 was formulated on 8/27/96, however it was not filled until 12/23/96.

      b.  The formulation tank has not been qualified for mixing time, demonstrating homogeneity of the suspension.  Mixing time is not specified in the batch record prior to filling and during the filling operations.  The product is ~~~~~~~~~~ and settles quickly in the tank.

      c.  The firm did not perform media fill challenges to validate aseptic manufacturing after harvest from the holding tank.  These operations include the transfer of the sublots from building ~~~ to building ~~~ for formulation.

Media fills are performed on fermentation and harvest trains, however not on a scheduled basis.

      d.  There is no validation of ~~~~~~ as a sporicide in anthrax production and potency testing facilities.

      e.  The analytical methods for determination of and ~~~~~~~ in Anthrax Vaccine are not validated with respect to accuracy, precision, linearity, specificity and limit of detection.

      f.  There is no validation of the length of time sublots are held until they are used in a lot.  Sublots have been held longer than 3 years prior to use.  There is no stability data to support this hold time.

| SEE REVERSE<br>OF THIS PAGE | EMPLOYEE(S) SIGNATURE | EMPLOYEE(S) NAME AND TITLE (Print or type)<br>Jeffrey A. _____, Investigator _____<br>Donna R. Leset, _____<br>Edward W. McKee, Jr. | DATE ISSUED<br>2/20/98 |

FORM FDA 483 (5/85)        PREVIOUS EDITION MAY BE USED.     INSPECTIONAL OBSERVATIONS PAGE  1 OF 19 PAGES

AR-0225TLR

# Attachment 3:

# 103rd FW memo

# Prohibiting discussion

# Of efficacy

# December 3rd, 1998

# (Obtained via FOIA)

AR-0226TLR

# 3 Dec 98 Anthrax Briefing

## *Players,*

Col Walt Burns 103 Fighter Wing Commander,
Col Bob McCusker 103 Operations Group Commander
LTC Jack Swift 118 Fighter Squadron Commander

Dr. David Huxsoll, Dean of Veterinarian Medicine LSU

Dr. (Maj.) Alexander Carre, Flight Surgeon 103 FW CT ANG

Dr. Meryl Nass, M.D. Parkview Hospital, Brunswick, Maine
Guest of one or our squadron members and is not scheduled to speak.

## *Goals:*

Inform all interested 103 FW personnel about medical issues involved with the anthrax shot.

Keep it to the specifics of whether of not the shot is a threat to your body. Specifically:

1.  What is the threat? Why is the DOD so set on inoculating all Total Force deployers?
2.  Is the shot likely to cause you to get sick from anthrax symptoms? Are there any serious side effects?
3.  What effect does the shot have on fertility for both males and females?
4.  Is there a mechanism by which the anthrax serum or antibodies can be passed on to our spouses through any type of physical contact.
5.  Does the vaccine cause mutenogenic effects that could be passed on through our DNA?
6.  Why has the vaccine not been tested for carcinogenic effects?
7.  What has been done to ensure the safety and purity of the vaccine since the FDA shut down the MBPI plant due to failures in quality control?

Note: In general terms these questions have all been answered to some degree in an official briefing by Col Burns and in several informal conversations with our members over the last three months. However, we feel that it is important have someone with a strong medical/biological background fill in the details that support these questions.

While the intent is not to make this an open, unlimited debate on all issues related to the current DOD Anthrax program discussion, questions and answers are encouraged with regard to clarifying the salient questions address in the above goals. We are limited on time.

The presentation and the question and answer period at the end will be video taped for the benefit of our members that will not be able to attend.

## *Givens:*

The Areas that are outside our control for members of the 103 FW and thus will not be debated here tonight.

1.  The Current DOD policy requiring all first deployers to be inoculated will not be removed or modified with in the next 12 months.
2.  The single source supplier of the vaccine (MBPI) will not change in the foreseeable future.
3.  The efficacy of the current vaccine will not be debated. While we recognize that there are widely varing proffesional opinions on this issue. There is only one vaccine that is authorized by the FDA and the DOD has mandated its use. Again this issue is outside the control of the members of the 103 FW.