

# DEPARTMENT OF THE AIR FORCE
## HEADQUARTERS UNITED STATES AIR FORCE
### WASHINGTON DC

19 September 2006

MEMORANDUM FOR AFBCMR

FROM: HQ USAF/JAA
      1420 Air Force Pentagon
      Washington DC 20330-1420

SUBJECT: Records Correction Application - Thomas L. Rempfer (BC-2004-0094)

This is in response to your request for our analysis of issues raised by the applicant in his request for reconsideration of your 2005 denial of his application for correction of his records. That application, predicated on illegality of the DoD Anthrax Vaccine Immunization Program (AVIP), requested that the AFBCMR reinstate him to Connecticut Air National Guard with back pay, allowances, longevity, lost aeronautical rating, rank, and a corrected officer performance report. The Board indicated that should the ongoing litigation (*Doe v. Rumsfeld*) surrounding the AVIP result in plaintiffs prevailing against the Secretary of Defense, the Board would reconsider the applicant's request.

In the litigation, the Government appealed the D.C. Circuit Court's injunction, but that injunction dissolved by operation of law when the Food and Drug Administration (FDA) classified the antivirus vaccine as safe and effective, and as not misbranded. On 9 February 2006, the U.S. Court of Appeals for the D.C. Circuit dismissed the litigation and remanded to the D.C. District Court the responsibility to consider the government's request to vacate its opinion in light of the FDA's classification of the vaccine.

In two e-mails constituting the basis of his request for reconsideration, the applicant asserts that, "the court's rulings confirmed the AVIP was illegal...." He further asserts that the appellate court's decision to remand the issue of vacation of the District Court's opinion instead of reversing it as requested by the government frees the AFBCMR to "adjudicate my case based on the merits presented." The applicant misinterprets the content and context of the appellate court decision. It did not leave intact a District Court judgment signifying that the plaintiffs had prevailed against the Secretary of Defense. The District Court opinion was but the articulation of its basis for issuing the injunction, which dissolved when the FDA acted. As the Court of Appeals specifically pointed out, the District Court's order never granted declaratory or any other form or relief except the injunction.

Accordingly, we recommend denial of this application for reconsideration.

RICHARD A. PETERSON
Deputy Chief, Administrative Law Division
Office of The Judge Advocate General

Attachment: AFBCMR File

AR-0612TLR

AIR FORCE BOARD FOR CORRECTION OF MILITARY RECORDS

IN THE MATTER OF: LtCol Thomas Rempfer
DOCKET NUMBER: BC-2004-00944
INDEX CODE: 110.02
COUNSEL: Dale F. Saran
HEARING DESIRED: YES


Mr. Markeiwicz and Members of the Board,

        Please allow me to introduce myself and to ask your indulgence with
this submission on behalf of LtCol Rempfer. While I am, by dint of my years
as a Marine officer, a stickler for formality, I would like to depart from the
normal, rather dry, format and present a story to you that leads us up to
the current moment in time. I will address, at the end, what I consider to
be the technical legal arguments regarding the District Court decisions in
the finale of the <u>Doe v. Rumsfeld</u> saga, as well as some of the USAF JAA
Advisory opinions and why they are clearly in error. These matters are
important and will help to demonstrate why there has been, in keeping with
the standard before the Board, a "material error and injustice" in LtCol
Rempfer's case.
        But to begin, I believe it is imperative that the Board have an
understanding of the background surrounding the Anthrax Vaccine
Immunization Program (AVIP) and of a particular federal law, 10 U.S.C.
§1107. I realize the Board has had some experience and education in this
matter, but I believe it is incomplete and I ask for some indulgence. I do not
want to be pedantic, or talk down to the Board, but I feel I am uniquely
qualified to provide some insight into the matter and not because I have
some papyrus on the wall which says "juris doctor". I am a former Marine
Corps attack helicopter pilot who became a Judge Advocate. I served as
both a defense counsel and prosecutor while on active duty. I also happen
to be one of the few military attorneys who defended three separate anthrax
refusal cases, as well as representing a client in testimony before Congress
on the Anthrax Program, while I was on active duty as a Marine. Thus, I
believe that I may be able to provide some additional clarity on the issue
that will help the Board to understand why there has been a material error
and injustice in the analysis of LtCol Rempfer's petition to this point.


        Before I begin my brief history, I would like to point out the simplicity
of our position before the Board. It may help to understand why LtCol
Rempfer's record needs to be corrected to cure the manifest injustice done
to him. The reasons are straightforward:

1 - LtCol Rempfer was given an illegal order.


AR-0613TLR

K    $\frac{613}{6}$

2 - He refused to comply with it.

3 – Because of this refusal, he was singled out, publicly humiliated, castigated, ordered to stay away from his unit, and then told that he "had to go".

4 – He resigned under duress, because of threats, public humiliation, and a direct order to resign.

Deleted: his career threatened, unless he resigned

Deleted: and

Deleted: these

His petition for redress is also quite simple:

1 – His judgment that the order was illegal has now been validated through the Article III courts of this country.

2 – He seeks to have his records corrected by this Board to reflect that he acted honorably and was forced to resign because of the illegal actions of his commander.

3 – He also requests the appropriate remedies, under the powers granted to this Board, to correct his records, provide the appropriate "back" date of rank and pay as noted in his original petition (however nominal the amount may be) and, if the Board feels it appropriate, attorney's fees (I have to ask).

Let me begin by summarizing our position.

Deleted: succinctly and summarize

The Department of Defense's (DoD) Anthrax Vaccine Immunization Program (hereinafter AVIP) was illegal from its inception and then Captain Rempfer was one of the few officers with the moral courage to point this out to his chain of command. What is doubly ironic about LtCol Rempfer's case is that, despite what has been printed and said about him publicly, Tom Rempfer only undertook to find out about the AVIP at the insistence of his Commanding Officer. He is neither a rabble-rouser nor a malcontent, but an officer bound by his integrity.

LtCol Rempfer was punished because he followed through on the orders given to him by his chain of command to investigate the AVIP – and he provided an answer inconsistent with the one his superiors expected or wanted. Despite this, I will not do to other officers what they have done to LtCol Rempfer, such as engage in ad hominem attacks against them, nor seek to demean their views. I will start with the assumption, stated many times by the United States Supreme Court, that these are matters "about which reasonable men might well differ."[1] This does not mean, however, that I will let them off the hook. Their actions, inactions, and own words condemn far more than I ever could.

---

[1] See, e.g., Ross v. Day, 232 U.S. 110 (1914)

AR-0614TLR

614
OL

The Anthrax Vaccine Immunization Program: A History

In December 1997, Secretary of Defense William Cohen announced a multi-service vaccination program - the AVIP for the total force.  Cohen's directive, requiring that all Active and Reserve component members receive anthrax vaccinations, was ostensibly based on a threat to U.S. Forces from second and third world nations or terrorists who sought ready access to a weapon of mass destruction ("WMD").  Members of the Armed Forces were ordered to be vaccinated against anthrax (Bacillus anthracis), using the only vaccine in existence at the time (and still), the Anthrax Vaccine Adsorbed (AVA).  This vaccine was originally tested, developed, and manufactured in the 1950's and 1960's.[2]  In 1970, the Division of Biologics Standards of the National Institute of Health granted the Michigan Department of Public Health (which did business under the name of the Michigan Biological Products Institute) a license for the AVA.[3]  This is not in dispute and many military personnel have been led to believe through disinformation that this means that the AVA was licensed and could be used as a legitimate vaccine for the Anthrax bacteria in weaponized, aerosolized form (also called inhalational or pulmonary anthrax).

That is not, nor has it ever been, the case, either factually or legally.

Drug Licensing and How the AVA Slipped By

In 1973, because of a number of tragedies and near mishaps involving drugs and vaccines, Congress moved the Division of Biologics Standards from the NIH to the Food and Drug Administration involuntarily.  This was part of a larger reorganization designed to protect U.S. consumers from some of the vagaries in the manufacture and marketing of pharmaceuticals.

A slight detour is necessary at this point to look at the history of this Congressional reorganization, in order to understand the licensure process for vaccines generally, and this vaccine in particular.  This history explains how the AVA slipped through the cracks of this licensure process.  Lest this seem like trivia, the failure of the AVA to be fully licensed resulted in the first injunction in Doe v. Rumsfeld, 297 F. Supp. 2d 119 (D.D.C. 2003), the import of which the Air Force Judge Advocate opinion has either missed entirely or intentionally misconstrued for reasons that I will make clear later.

---

[2] Brachmann, et al. "Field Evaluation of a Human Anthrax Vaccine", American Journal of Public Health, vol. 52, No. 4, April, 1962, pp. 632-45.

[3] The license is now held by BioPort under number 1260, a change from the original license no. 99, granted by the Division of Biologics Standards on 10 Nov 1970. See 36 Fed. Reg. 8704, 8705 (May 11, 1971).

3

AR-0615TLR

In the beginning of the 1960's through the mid 1970's, drug and vaccine regulation underwent a series of sweeping changes in response to several near disasters that raised a public outcry. The regulatory structure regarding drugs and biologics (and a number of other products) was a hodge-podge of statutes, overseen by numerous federal agencies. The most comprehensive act, the Food, Drug and Cosmetic (FD & C) Act of 1938 was signed into law by Franklin Roosevelt after a tragedy in 1937, when a drug manufacturer marketed and sold a mixture of diethylene glycol, the primary ingredient in car anti-freeze, and sulfanilamide as a throat elixir. One-hundred seven (107) people died as a result – there were no clinical tests or studies done by the manufacturer prior to the product being put on the market for U.S. consumers.[4]

The government now took authority over the advertising and labeling of products, as well as the ability to establish a system for obtaining pre-marketing clearance for new drugs. Manufacturers were required to submit New Drug Applications (NDAs) containing evidence that a drug was "*safe for its intended use*"[5]. Despite this grant, little direct oversight was done until the thalidomide scare of the late 1950's. Thalidomide was an extremely effective sleeping pill, manufactured and marketed in Europe, but not licensed in the U.S. The FDA would not approve the drug for U.S. distribution because of concerns of an FDA medical officer, Dr. Frances Kelsey, about the drug's safety. Notwithstanding this, the sponsoring U.S. manufacturer widely distributed the drug to doctors for use with their patients. Later, thalidomide was found to cause terrible malformations of fetuses when taken by pregnant women. Children were born without arms or other deformities, typically of their limbs.

This led to Congressional inquiry and nationwide media coverage of the birth defects of many European children. Hearings followed, chaired by Senator Estes Kefauver from Tennessee. The Kefauver-Harris Amendments of 1962 to the FD & C Act contained several important new provisions regarding pharmaceuticals. First, all clinical testing of investigational new drugs (INDs) must be considered under an IND application. This is a slightly different version of the NDA, as IND's typically involve the testing of an already licensed drug for a completely different purpose.[6] IND's may also consist of a different dosage of a licensed drug, or a slightly different

---

[4] The sulfanilamide tragedy of 1937 is referenced on the FDA's history page of its website as being the impetus for the 1938 FD&C Act, 21 U.S.C. §301. See http://www.fda.gov/oc/history/historyoffda/section2.html.

[5] 21 U.S.C. §301 (1938).

[6] One of the more intriguing examples of this is minoxidil, the key ingredient in Rogaine, for the treatment of baldness. Minoxidil is a vasodilator and was originally licensed for the treatment of hypertension. It just happened to help regrow hair, but had to go through the IND process in order to be licensed for that purpose.

4

AR-0616TLR

formulation, or even the same exact drug just taken a different way.[7]
These IND's would have to include reports of pre-clinical studies to
justify proposed human testing and the subjects *must give their
informed consent* to participate. Second, Good Manufacturing
Practices were established and any drug not in compliance with current
GMP would be deemed adulterated. Finally, the 1962 Amendments
required that all new drugs, in addition to being safe, must show *efficacy*,
or **effectiveness for their intended use**, prior to marketing. The FDA
issued final rules several months after the enactment of the legislation that
set up, in large part, the regulatory system we have today for drugs.

There is a catch.

As I have already noted above, at the time of Kefauver-Harris
Amendments, the Division of Biologics Standards, which regulates vaccines,
did not belong to the FDA. It belonged to the Public Health Service and was
therefore controlled by the Public Health Service Act of 1944, to which the
Kefauver Amendments did not apply. Thus, at the time the Anthrax Vaccine
got its license in 1970, there was **no requirement to show efficacy**. But in
1973, DBS became the Center for Biologics Evaluation and Research
(CBER) and was involuntarily transferred under the FDA because of its own
problems, namely the release of a polio vaccine that had a virulent live
strain in the vaccine in the late 1950's. Some 200,000 people were
vaccinated with this strain, 70,000 became ill, and 200 were paralyzed, with
an estimated 10 dying. The vaccine was made at Cutter Laboratories and
this episode became known as the "Cutter Incident".[8] Having failed to set
up a regulatory process like the FDA had for drugs, the DBS was
transferred to the FDA and became subject to the Kefauver Amendments.
One practical aspect of the Kefauver Amendments was that, beginning in
1966, the FDA was required to review every over-the-counter drug approved
between 1938 and 1962 for evidence of efficacy. Biologics were added to
this list when CBER was transferred in 1973.

These vaccines and drugs would be reviewed by a panel and placed
into categories. Category I products would be considered safe, effective, and
not misbranded. Category II products were unsafe, ineffective, or
misbranded. Category III drugs would be split into two subcategories A and
B. Category IIIA products had inconclusive data, but the product would
remain on the market pending further study and IIIB drugs, also with
inconclusive data, would be removed from the market.

---

[7] See, generally, Bascom & Sutton, New Generation Vaccines, Center for Biologics Evaluation
and Research, U.S. Food and Drug Administration (1996). The licensure process consists of a
pre-clinical stage, followed by an IND stage, followed by a Product License Application process,
and finally, a post-licensure stage. See, also, 21 C.F.R. § 312. See "What Is A 'New Drug'
Within the Meaning of § 201(p) of the Federal Drug and Cosmetic Act", 133 ALR Fed 229,
(1999).
[8] http://www.fda.gov/oc/history/historyoffda/section5.html

AR-0617TLR

The review of the Anthrax Vaccine would take until Dec. 13, 1985, to be published. At that time, the Review Committee proposed to make AVA a Category I biologic, leaving the record open for 90 days for public comment, as it is required to do before making a final ruling. Because of the limited nature of the studies completed in the 1950's and 60's with the AVA and the requested license by the MBPI for its vaccine, the Committee's proposed rule stated that "**[i]mmunization with this vaccine is indicated only for certain occupational groups with risk of uncontrollable or unavoidable exposure to the organism. It is recommended for individuals who come in contact with imported animal hides, furs, wool, hair (especially goat hair), bristles, and bone meal, as well as laboratory workers involved in ongoing studies on the organism.**"[9] The final ruling by the FDA calling the AVA safe and effective did not come until 2004, in the middle of the <u>Doe v. Rumsfeld</u> saga.

In fact, to bring the relevance of this history to its conclusion and back on point to the immediate case, the dissolution of the first injunction issued in <u>Doe v. Rumsfeld</u> was the result of the FDA suddenly, miraculously, announcing the final rule of safety and efficacy of the AVA for both cutaneous exposure AND inhalational exposure to the bacteria, after 30 years, just 8 days after Judge Sullivan enjoined the DoD's anthrax vaccination program! In fact, the FDA actually issued its final ruling improperly, in violation of its own procedures, and resulted in the injunction being reinstated and made permanent. Then, the FDA final rule was reissued in early 2005 and left open for public comment and then finalized (again) in 2005. Thus, the FDA review that began as a result of the Kefauver Amendments, requiring review for efficacy of many drugs and biologics that were developed and made in the 1950's and 1960's, culminated in the finding of efficacy and safety AND, finally, a full license indicated for cutaneous AND inhalational anthrax exposure in 2005.

Let me just take one moment to make this point clearly, because it seems to get lost in the discussion about relation back doctrine and prospective application and retroactivity, etc. From 1970 until 2005, the AVA had a license that was indicated **only for cutaneous exposure to anthrax.** Both the label of the vaccine, the FDA's proposed 1985 rule, the data from the original license study, and the law in the area of vaccine licensure all make this abundantly clear. More pointedly, this issue was the crux of the case in <u>Doe v. Rumsfeld</u> and the basis for the judge's injunction. If the vaccine had been licensed for inhalational anthrax, the judge could not have issued the injunction; stated another way, in 1997 when the AVIP was announced, the AVA was NOT licensed for inhalational anthrax, nor was the vaccine approved for that purpose. The FDA only granted a license for that purpose this past year, in 2005. This point is crucial and cannot be overstated as it bears directly on LtCol Rempfer's case.

---

[9] 50 Fed. Reg. 51002, 51008 (1985).

AR-0618TLR

I will return to this history and its significance in due course, but it is important at this point to pull one other, separate, but equally important and closely related, thread into this tapestry.

The Gulf War Drugs, Informed Consent, and 10 USC §1107

In the buildup to Operation Desert Storm, there was a significant amount of consternation within DoD leadership about Saddam Hussein having Chemical-Biological Weapons. In particular, there were concerns about several CBW agents, including Soman, a nerve agent, and botulinum toxin (BT). DoD began a concerted effort as the War approached to get the FDA to grant an exemption from the FDA and Department of Health and Human Services regulations requiring informed consent of persons given Investigational New Drugs. These regulations are codified at 21 C.F.R. 50.23, among others.[10] The problem for the DoD was significant: there were potential, serious threats against service members and the only known possible treatments were not licensed for use as prophylaxis against Chem-Biological agents. DoD wanted to use several different pharmaceuticals for off-label (investigational) purposes. There was already a Memorandum of Understanding in place between the DoD and the FDA that governed the "investigational use of drugs, antibiotics, biologics, and medical devices", 52 FR 33472, September 3, 1987.[11] Most important is that the MOU stated that DoD would comply with FDA regulations governing informed consent for persons given IND's.

With the ramp up to the War, however, DoD wanted a waiver from the HHS/FDA regulations. The FDA was not inclined to do so and was very concerned about the ethical issues surrounding an involuntary waiver of informed consent. After some back and forth between the FDA Commissioner himself, Dr. David Kessler, and senior DoD leadership, including some very pointed memos about the need for DoD to obtain a waiver from the informed consent requirements of the FDA regulations, a compromise was reached. Essentially, the Commissioner himself would have to make a case-by-case determination for each of the requested waivers from Rule 50.23's informed consent requirements. Additionally, the Federal Regulations at 21 C.F.R. 50.23(d) would be amended to specifically encompass the exception that had been agreed upon. The proposed

---

[10] There is an excellent and scholarly review of the issues at stake leading up to the Gulf War conducted by the Rand Corporation, found on the Office of Secretary of Defense's own website, http://www.gulflink.osd.mil/library/randrep/mr1018.9.chap2.html. I cannot do it justice nor recommend it strongly enough for the Board's own edification.
[11] The MOU was initially between the Department of Health, Education, and Welfare and DoD in 1964, then revised in 1974 to indicate the procedures that would be followed "to ensure that the requirements of the Federal Food, Drug, and Cosmetic Act and its implementing regulations are fully met without jeopardizing or impeding the requirements of national security." It was revised again in 1987.

7

AR-0619TLR

"interim rule" would also be expedited and ratified immediately, with no time for public comment. DoD asked for a number of waivers, but two were granted: one was for pentavalent botulinum toxin (BT) vaccine and one for a drug called pyridostigmine bromide (PB), which was originally licensed to treat a degenerative brain disease known as myasthenia gravis. DoD desired it as a treatment against the nerve agent soman.

The efficacy of these two programs, viewed after the fact, is extremely questionable, but we need not engage in that debate. That has already been done, in Congress after the Gulf War.[12] But this debate, about the efficacy of these two investigational drugs and the possibility that they may have been causal factors in Gulf War Syndrome, coupled with DoD obfuscations and unresponsiveness to Congress, led to more pointed Congressional action (for our purposes), the passage of Title 10 U.S.C. § 1107.[13]

A bombshell report was released after exhaustive hearings conducted by the Senate, headed by Senator John D. Rockefeller IV, of West Virginia. The Report was entitled "Is Military Research Hazardous to Veterans' Health: Lessons Spanning Half a Century", S. Rep. 103-97, (1994). It specifically addresses the status of the anthrax vaccine and notes that

> Anthrax vaccine was given to approximately 150,000 military personnel in the Persian Gulf. Anthrax vaccine is considered effective for protecting against anthrax exposure of the skin; however it is unclear whether it provides protection against inhaling aerosolized anthrax. *[Note 108]* According to the Department of Defense, in biological warfare the anthrax would be sprayed, so the efficacy of the vaccine against aerosolized anthrax would have been the relevant test. *[Note 109]* As stated earlier in this report, the DOD has only one study indicating that the vaccine might be useful against aerosolized anthrax, but there are no data on humans.

(Italics in original). Footnote 108 even addresses the central issue to the AVA, 3 years before the announcement of the mandatory program. It states - "[i]n a letter dated July 27, 1992, FDA asked whether an IND should be required to test the anthrax vaccine against aerosolized anthrax." Id. As a

---

[12] See, for example, Presidential Advisory Committee on Gulf War Veterans' Illnesses: "Interim Report, Hearings on Gulf War Syndrome Before the Subcomm. on Human Resources and Intergovernmental Relations of the Comm. on Governmental Reform and Oversight," 104th Cong., 2d Sess. (March 11, 1996).

[13] See, e.g., U.S. Senate Committee on Veterans' Affairs Report 103-97, (also known as the "Rockefeller Report")(December 8, 1994). See, also, 106 H.R. 3460, Nov. 18, 1999, as well as, Presidential Advisory Committee on Gulf War Veterans' Illnesses: "Interim Report, Hearings on Gulf War Syndrome Before the Subcomm. on Human Resources and Intergovernmental Relations of the Comm. on Governmental Reform and Oversight," 104th Cong., 2d Sess. (March 11, 1996).

AR-0620TLR

result of inquiries like this one, the Presidential Advisory Committee on Gulf War Illness hearings, and a number of other reports, 10 U.S.C. §1107 was passed.

In its original form, first introduced in 1997 by Representative Patrick Kennedy (D, R.I.), the act would allow the government to inoculate service members without their informed consent in very limited circumstances, but require DoD to provide notice to all service members within 30 days of the administration of the unlicensed or unapproved product. Congressman Kennedy's remarks in introducing the bill are telling. He stated that "[m]ore can be done ... to rebuild trust, to avoid repeating past mistakes, and to prevent future health consequences similar to those experienced during and after the Gulf War."[14] Kennedy went on to state that "the men and women who served in the Gulf War had a right to know that the vaccines administered to them were investigational."[15]

The original version of 10 USC §1107 required DoD to inform members, either prior to or within 30 days of the administration of an investigational new drug, that (1) the drug was investigational, (2) the reasons for the drug's administration, and (3) the potential side effects of the drug, including side effects of the drug's interaction with other drugs or treatments administered to the individual.[16]

It is worth pointing out that a few months after the passage of this law, Secretary of Defense Cohen announced the AVIP.

After the Act was passed in 1997 as part of the National Defense Authorization Act for 1998 (fiscal year, from Oct 1997-Sep 1998), hearings in Congress, in both the Senate and the House, continued on the unapproved and unlicensed drugs used in the Gulf War. The deplorable recordkeeping and lack of information provided to service members became a major focus of some Congressional leaders. Further problems with medical records regarding drugs and vaccines in Bosnia only added to the consternation.[17] The Presidential Advisory Committee on Gulf War Illness reviewed the deployment and called it "an abysmal failure."[18] In June 1998, Christopher Shays, a vocal opponent of the FDA's waiver grant to DoD, was the Speaker of the House pro tempore. In remarks before the House, Shays noted that there had been 11 separate hearings on Gulf War Illness and still, there was no progress. He recommended that "the FDA should not grant a waiver of informed consent requirements allowing the Pentagon to

---

[14] 143 Cong. Rec. E637, April 10, 1997.
[15] Id.
[16] 10 U.S.C. §1107 (1997).
[17] The DoD used an IND to inoculate members against tickborne encephalitis. It did not go well. See *Defense Health Care: Medical Surveillance Improved Since Gulf War, but Mixed Results in Bosnia* (GAO/NSIAD-97-136, May 13, 1997).
[18] U.S. Senate Committee on Veterans' Affairs, National Narrowcast News Transcript, Statement of Senator Rockefeller, March 17, 1998.

9

AR-0621TLR

use experimental or investigational drugs unless the President signs off and approves."[19] This would become the cornerstone for all subsequent versions of 10 U.S.C. §1107 – the requirement for either informed consent from the service member for investigational drugs OR a Presidential waiver from the requirement. It is important to read the comments from Congress that come before the Act, for they reflect a cynical view of DoD rhetoric about the use of investigational drugs, and a frustration with the Department of Defense's immunization programs:

> In a time when military recruiting is at historic lows, and evidence of failure by the Department of Defense to properly inform military personnel of the true nature of medical treatment performed on members of the Armed Forces in past conflicts, **it is the duty of Congress to ensure that no member of the Armed Forces will be administered an unapproved drug without the informed consent of the member.**

106 H.R. 3460, Nov. 18, 1999

This language needs no elaboration or explanation.

It is also important to note that no drugs were grandfathered in under this Act. It applied across the board to all DoD activities, past, present, or future.

Thus, we return now to the issue presently before the Board and the case of LtCol Rempfer. At the time he was given the order to take the anthrax vaccine, LtCol Rempfer had concerns, as did many members of his squadron. His Commanding Officer, in order to assuage the concerns of his officers and troops, put together a team to investigate the AVA and the AVIP. This team was named Tiger Team Alpha and was tasked with researching and providing a report for the Commander.[20]

The crux of the problem is that Tom Rempfer and his colleagues, through no fault of their own, discovered that the AVIP was in violation of a federal statute, namely 10 U.S.C. §1107.

I want to explore the unusual nature and dynamic of this circumstance, for a moment, because it is certainly unique. The Tiger Team was in possession of indisputable evidence that the AVA was not licensed for the use to which it was being put. There was, at this time, an IND protocol ongoing by BioPort to get a license indication for the AVA against

---

[19] 144 Cong. Rec. H4616, June 16, 1998.

[20] As a minor point, a "tiger team" is a frequently used term in the aviation community for aviation investigations, short of an aircraft mishap board (AMB). Tiger teams are frequently used to conduct maintenance investigations and other related inquiries on behalf of a CO.

10

AR-0622TLR

aerosolized anthrax. This is exactly the use for which the AVIP program claimed the vaccine was already licensed and to which it was being put to test. Here is an even bigger irony: some service members were part of the study group for the IND protocol, part of which took place at Fort Detrick, Maryland. The soldiers were required to give their informed consent to participate![21] This produces an almost mind-bending result: namely, there is a class of service members taking the AVA for an indication against inhalational anthrax and they volunteered and were asked to give their informed consent to the treatment, at the exact same time that the DoD is ordering a second class of members to take the AVA without their informed consent and court-martialing them if they refused.

Deleted: Dietrich

So, not only was the AVA legally an investigational drug, and thus fell under 10 USC §1007, it was also a drug "unapproved for its applied use" because it was not approved for the purpose to which it was being put.

The team explained all of this to its CO and one can just imagine the reaction. The CO, Colonel Burns, USAF, through no fault of his own, likely presumed that it was all just a big misunderstanding and that his team would clarify the issue and everyone would gladly take the shot. He failed, however, to even consider the possibility that the order might contravene federal and state statutes, federal regulations, and internal DoD policies, among others. The CO, at this point, forwarded his concerns (according to his own testimony), but was told to essentially shut up and soldier on and tell his officers to do the same.

Comment [1]: You could use the commonly accepted abbreviation for commander as "CC" here, but as a Marine, I have no problem with you utilizing CO.

Back to the Future

Now, how do we judge and characterize LtCol Rempfer's refusal to go forward with an order he knows is illegal? He was castigated for maintaining his honor in the face of insuperable pressure from the highest levels of Government. He did not cave. He was ultimately ordered to resign.

Now, here is another important point. The USAF JA opinion has engaged in essentially a complete recreation of new facts. LtCol Rempfer alleges that he was ordered to resign. The USAF says, "no, it was voluntary." The Board has to decide who is telling the truth here. Both parties, one could argue, have reasons to "shade the truth" their way. What seems to be ignored, however, is that other independent, quasi-judicial bodies, not unlike this Board, have investigated these claims and found for LtCol Rempfer on this exact matter! For good reasons - namely, the facts.

As already noted in previous submissions, the DoD Inspector General questioned Col. Burns about his role in forcing LtCol Rempfer's resignation

---

[21] I myself have copies of the informed consent and waiver forms for the soldiers taking part in the study.

AR-0623TLR

– he admitted, point-blank - "I asked them to resign from the Connecticut Air National Guard."[22]

There it is, in black and white.  The man's own words, under oath.

He tried to backpedal by following up with this completely bizarre statement.

"Now, some of them allege that they were ordered to resign. Okay? I did not order them to resign. I can't speak for anyone else in the chain of command. But I did not order them to resign. I didn't have that authority. *But I did ask them to, and they all did.*"[23]

How can it be that Colonel Burns claims that he does not have that authority, yet he claimed to have the authority to order them to take an unlicensed vaccine in violation of federal law?  He believed he had the authority to ignore and override a Congressional Act, lawfully passed and signed by the President, but he claims he didn't have the authority to order a resignation.  His thought on that point, whether he thought he had the legal authority, is irrelevant to the question of whether or not he ordered them to resign.

Let's examine this in practical terms.  An Air National Guard Captain is called into the CO's office and "asked" to resign.  Are we to believe he called them in and said, "Please, gentlemen, I really would like you to resign, but you don't have to if you don't want to because I don't have that authority."  By his own admission, he didn't say that.  He states that "I asked them to, and they did."

Of course they did, they were being "asked" by an O-6 for their resignations.  What else were they going to do?  And this is what he is willing to admit.  Is it possible that pressed by the DoD IG, the good Colonel might have been half-stepping just a bit?

Other remarks certainly bolster this view.  Col. Burns stated at another time: "So we asked them to retire … Or resign, yes. Well, asked them to resign from the Connecticut Air National Guard."[24]  There is no qualifier there.  He later states, perhaps sensing that this is problematic, "Can I ask a question … I'm getting the feeling that I'm the one being investigated here, rather than MG Weaver."[25]  Finally, if there were any doubt in the above, it is removed by two remarks by Colonel Burns, confirming that he ordered then Captain Rempfer (and three others) to leave the squadron and resign.  He said, regarding his conversation with the men:

---

[22] This statement was given during a DoD IG investigation into MajGeneral Weaver, who was ultimately sanctioned for his actions in testifying before Congress.  DoD IG case (# 74-998, filed 14 JAN 00).
[23] Id.
[24] Id.
[25] Id.

12

AR-0624TLR

"You're not doing us any good here. So I need you to move on out. And they eventually did." Shocking.

Perhaps most telling is his admission that the resignations were not voluntary.

"Some of the guys wanted to come in and talk to me and give me an earful. And some of them left resisting – I mean, they didn't really want to leave, but they knew they had to."

How is there any other way to interpret that last statement? Why did they have to if, as he initially said, he didn't have that authority?

The DoD IG transcript and the CT Freedom of Information Commission make clear that LtCol Rempfer had that there is only one possible interpretation of those events.

> It is found that, during 1998 and 1999, the Connecticut Army National Guard [hereinafter "the Guard"] was in the process of addressing the controversial issue of an anthrax vaccine program, that the complainant herein was an officer in the Guard during such time, that he was assigned by the Guard to research the vaccine, that he decided not to take the vaccine, and that he ultimately resigned his commission as a Guard officer as a result of the anthrax vaccine controversy, **after being ordered to so resign.**[26]
> (emphasis added).

But this Board, and the USAF JA, believe that LtCol Rempfer should be judged under an impossible standard and that his record should reflect that he "voluntarily" resigned. The message is this – obey ALL orders, even illegal ones, because there will be no relief from the Boards for Correction of Military Records if you should maintain your integrity. Is that the result we truly want? Because that is exactly the current status quo and exactly what the Air Force JA memos are asking for.

I ask instead that this Board use its remedial powers to do exactly what this Board was set up to do – remediate these kinds of injustices. The military has set on a course that it simply will not back away from with chemoprophylaxis of Chem-Bio agents. And that is a fine policy that DoD can pursue, but it just can't violate federal law while doing it and expect an officer corps that is premised on integrity to blindly follow along.

Let me provide an analogy, a simplified example if you will, to more fully illustrate why this Board must use its powers to grant relief, before I finish with a discussion of Doe v. Rumsfeld. This example will also address the "presumptive lawfulness of orders" argument that is sure to be mentioned by JA opinions and perhaps even on the minds of Members of the Board.

---

[26] http://www.state.ct.us/foi/2001fd/20010110/FIC2000-303.htm, at para. 12.

AR-0625TLR

Let us suppose that LtCol, then Captain Rempfer, is a test pilot flying the new F-16Q (I made that up) and he has a VIP flight with the Secretary of the Air Force. While flying along at 25,000 feet, the following conversation takes place.

Comment [2]: I was promoted to Major on 1 Oct 96. An effective date of 1 Sept was administratively adjusted later based on an unrelated records error that caused my effective date on both the years' lists and my actual date of rank.

Deleted: Major

Deleted: Major

Secretary: Captain Rempfer.
Buzz: Yes, Sir.
Secretary: I want you to come right and drop down to 8000 feet. I need you to take this aircraft over Mach I.[27]
Buzz: Sir, with all due respect, I can't do that.
Secretary: Why not?
Buzz: Because, sir, that would put us squarely in restricted airspace under FAA regulations, as well as be a deviation from the filed flight plan. Most importantly, sir, it's illegal to fly above the speed of sound below 18,000 and over land. I'm sure you understand. There are also safety considerations.
Secretary: No, Captain, I do not. I am the Secretary of the Air Force and I just gave you an order. Moreover, I will get those regulations changed with the FAA when we get on the ground. I will personally ensure that the law is changed to allow what I just said.

Deleted: Major

Buzz: Sir, then we can land and do that and I'll be happy to take you back up with the law changed, but right now, that's illegal and could cost me my wings, as well as put us in a dangerous position by deviating from our planned route. There are good reasons for the FAA's rules and I cannot risk our safety by deviating absent some emergency.
Secretary: Captain, when this flight is over, your career as a pilot is, too. Furthermore, I will see to it that your life is miserable in the squadron. I advise you to resign now before I go forward with all of those threats.
Buzz: I will consider that, sir, but I will not fly the aircraft as you have instructed me.

Deleted: major

Let us suppose that after landing the Secretary does as he threatened, making Captain Rempfer's life in the squadron miserable and ordering him to resign, which he does.

Deleted: Major

Now what is this officer to do?

He has a Hobson's Choice – either comply with the illegal order and face potential adverse consequences, such as a mid-air collision (possibly), possible loss to his pilot rating with the FAA, AND his own integrity by following an order that is patently illegal because it violates known provisions of federal law, or not complying and being subject to loss of flight status, public humiliation by his CO, and other mistreatment sufficient to cause him to resign.

Moreover, if he chooses to resign and is later able to prove, by getting a copy of the flight recorder and the Secretary's patently illegal order, as well as other testimony showing how his CO forced him to resign, will we say

---

[27] Mach is the speed of sound.

AR-0626TLR

that this Board can provide no relief? Will this institution say that this is all "good to go"? This Board will offer no remedy – even if a federal court finds that the Secretaries actions were, at the time the order was issued, illegal (even if well-intentioned)?

This cannot be the case under our system of justice. This is exactly the case before this Board. There is no distinction in principle between the example I have provided and the current application before this Board.

We cannot demand that our officers be men and women of conscience and expect blind obedience simultaneously. More importantly, if they disobey and are proven wrong, then the old adage that orders are disobeyed at their peril applies. They accept the consequences of their actions. But when they disobey AND ARE PROVEN RIGHT, showing that the order was illegal, we cannot then validate that order anyway and say they still have to pay the same consequences as when they are wrong. That's what the USAF JA asks this Board to do. Deny relief or correction, even when the service member is right.

This means that under no circumstances can a person get correction in the case of refusal of an illegal order. This Board will not allow relief in either circumstance. This is impossible, both logically and morally, because it gives the same result for exactly opposite actions, when one is clearly right and one is clearly wrong. We say that the person who disobeys an illegal order is the same as the person who obeys it; by saying their service is the same – no correction for either one of their records. In fact, it is even worse than that – we say that the person who obeys the illegal order is correct (because they suffer no harm to their service record from the command that issued such an order) while the person of moral fortitude who stands against such an illegal order is punished AND will get no future equitable relief from the BCMR. This Board's actions are more than mere administrative actions; they provide content to the character of someone's service to this nation. It would stain the honor of those who serve with honor to say that the person who disobeys the illegal order and is proven right cannot be put on an even footing with someone who obeyed the illegal order.

I began this submission by noting that these are matters about which reasonable minds may differ. If that were the beginning and the end of the case, then Tom Rempfer would lose because of the discretion afforded to military decisions and the presumption of lawfulness given to orders, to which I have previously alluded.

It is "hornbook" law that "orders are presumed lawful and are disobeyed at the peril of the subordinate."[28] No one disputes this. Even in courts-martial, however, such a presumption is rebuttable and can be overcome by a sufficient showing. "In a prosecution for disobedience, lawfulness of the command is an element of the offense." See Unger v

---

[28] See, e.g. U.S. v. New, 55 M.J. 95 (CAAF, 2001).

15

AR-0627TLR

Ziemeniak, 27 M.J. 349, 358-59 (CAAF 1998). "An order is presumed
to be lawful, *but the presumption may be rebutted*" (emphasis added).
United States v. Austin, 27 MJ 227, 231-32 (CMA 1988).

    In Unger, a female Navy LT challenged the validity of an order to
provide a urine sample under direct observation by another woman.
Appellate case law had made clear the validity of the urinalysis program and
an order to submit to such an order. See Murray v. Haldeman, 16 M.J. 74
(CMA 1983). What is crucial about that case is that the Court of Appeals for
the Armed Forces (CAAF) did not decide the case as a matter of law.
Instead, the case was remanded to the trial court so that the finder of fact
could determine if the factual circumstances would render the search and
seizure "unreasonable" under the Fourth Amendment.

    The case of U.S. v. New is frequently cited by government proponents
for the proposition that "unless the order requires an obviously illegal act, or
is obviously beyond the issuer's authority, the service member will obey the
order." This, however, ignores the specific provision of the Manual for
Courts-Martial that states that "[t]he order must not conflict with the
statutory or constitutional rights of the person receiving the order." Manual
for Courts-Martial (1998 ed.), Para. 14c.(2)(a)(iv).

    This is exactly the case here. Statutory law, validly enacted by the
U.S. Congress, gives service members a right of informed consent with
regards to medical treatment with drugs either "investigational" or
"unapproved for their applied use." Period. There is no argument or
equivocation about that. The statute only allows the President to waive that
right in special, limited circumstances.

### Why LtCol Rempfer was Right: Doe v. Rumsfeld

    DoD *now* has FDA approval for the AVA against both inhalational and
cutaneous anthrax, given the final ruling that took place in 2005, and
therefore can go ahead with the inoculation because NOW the drug is being
to put to a use for which it is licensed. That is to say, it is no longer
investigational or being put to a use for which it is not approved and
therefore in violation of 10 U.S.C.§ 1107. This cannot, however, be - - - - | Deleted: 1007 |
somehow retroactively effective, much as the JA memo would like, and go
back in time and make the AVA licensed as of 1997.

    Because it wasn't.

    This is why the JA memos to this Board are almost humorous in their
attempt to cast LtCol Rempfer's position as asking for some retroactive effect
to the injunction. It's the exact opposite. LtCol Rempfer hasn't asked this
Board to give retroactive effect to anything – the District Court found
unequivocally for the Plaintiffs in Doe v. Rumsfeld, 297 F. Supp. 2d 119
(D.D.C. 2003). The court stated that "AVA is an investigational drug and a
drug being used for an unapproved purpose. As a result of this status, the

16

AR-0628TLR

DoD is in violation of 10 U.S.C. § 1107, Executive Order 13139, and DoD Directive 6200.2." Id. at 150.

The JA memo, however, attempts to conflate the remedy granted, namely an injunction, which is forward looking only, with the underlying facts in order to avoid the unpleasant reality (for them), that the AVIP was an illegal program at its inception. Let's examine this another way, under the JA analysis, when would the District Court have to rule in order for it to apply to render the AVIP illegal? According to their logic, the ruling would have to come BEFORE the program even took place because the injunction is a "prospective" remedy only and cannot be given "retroactive effect". In conducting this contortionism of time and space worthy of a Stephen Hawking theory, the JA Memo ignores both fact and law. A plaintiff can't come into court until there's a live controversy.

Whether the plaintiff prevailed in 1998, or 1999, or 2003, or 2004 is irrelevant. The point is that the plaintiff prevailed on the underlying facts. If the injunction is later dissolved, THAT cannot be given retroactive effect, which is what the JA memo would like, and somehow make the illegal order (the AVIP) back in 1997 now legal. Who again is asking for retroactive application? The JA is asking the Board to find that since the FDA finally made the AVA licensed for inhalational anthrax, it somehow means that it was licensed all along. This is even more preposterous given the FDA's findings of efficacy. The FDA actually went contrary to its own Committee's recommendation to find efficacy against inhalational anthrax AND it used the DoD data acquired from 1996-1999 as a basis for the finding of efficacy. For example, the FDA stated in its final rule, published after the District Court order and injunction, that "we use the following terms to refer to studies relevant to this final order... 3. *DoD pilot study*—The DoD pilot study was conducted from 1996 to 1999."[29] So, how can it be possible, under the JA logic, for the order to have been lawful and the AVA to have been licensed in 1997 when the basis for data that was accumulated three years into the AVIP? It's logically impossible.

If that weren't enough, two more points should end the discussion.

The District Court found, as a matter of law, on summary judgment that "*The involuntary anthrax vaccination program, as applied to all persons, is rendered illegal absent informed consent or a Presidential waiver.*"[30] It issued an injunction. The FDA provided the final ruling. The injunction was therefore dissolved as the AVA was now properly licensed. If DoD had therefore won, why was there an appeal? More specifically, why did DoD ask the Appeals Court to overturn the District Court's finding with respect to the AVIP? The government appeal, which was rendered moot by the FDA's issuance of a final order, asked for the Circuit Court to vacate the Distict Court's 2004 finding that the Anthrax Vaccine Immunization

Deleted: anthrax unlawful quote

Comment [3]: Spanu

Deleted: (We can skip the FDA's improper original final ruling).

Deleted: doD

---

[29] 70 FR 75180, 75182 (Dec. 19, 2005).
[30] http://www.dcd.uscourts.gov/Opinions/2004/Sullivan/03-707c.pdf

17

AR-0629TLR

Program was illegal from its inception. The Circuit Court declined to do so and instead remanded the case.[31]

Of interest is that in order to save face (and perhaps millions of dollars in awards to service members seeking correction of their records), the DoD has begun yet another media blitz, denying that it even lost in the first place. In an October 2, 2006, article in Air Force Times, the DoD proclaimed:

"DoD continues to believe the Anthrax Vaccine Immunization Program has been administered consistent with the law, and orders to military personnel to be vaccinated were lawful," said Pentagon spokesperson Cynthia Smith. "No judicial judgment has declared such orders to have been unlawful."[32]

Except, of course, the one from the DC District Court in December 2003 (Doe I).

This Court is persuaded that AVA is an investigational drug and a drug being used for an unapproved purpose. As a result of this status, the DoD is in violation of 10 U.S.C. § 1107, Executive Order 13139, and DoD Directive 6200.2...

The women and men of our armed forces put their lives on the line every day to preserve and safeguard the freedoms that all Americans cherish and enjoy. Absent an informed consent or presidential waiver, the United States cannot demand that members of the armed forces also serve as guinea pigs for experimental drugs.[33]

Or the second decision in 2004, which issued a permanent injunction.

Congress has prohibited the administration of investigational drugs to service members without their consent. This Court will not permit the government to circumvent this requirement. The men and women of our armed forces deserve the assurance that the vaccines our government compels them to take into their bodies have been tested by the greatest scrutiny of all - public scrutiny. This is the process the FDA in its expert judgment has outlined, and this is the course this Court shall compel FDA to follow.

Accordingly, it is by the Court hereby

**ORDERED** that Plaintiff's Motion for Summary Judgment is

---

[31] http://defense.iwpnewsstand.com/showdoc.asp?docid=PENTAGON-22-38-3

[32] Id.

[33] Doe v. Rumsfeld, 297 F. Supp. 2d 119, 150 (D.D.C. 2003).

18

AR-0630TLR

**GRANTED**. The FDA's Final Rule and Order is vacated and shall be remanded to the agency for reconsideration in accordance with this Memorandum Opinion and Order. Unless and until FDA properly classifies AVA as a safe and effective drug for its intended use, an injunction shall remain in effect prohibiting defendants' use of AVA on the basis that the vaccine is either a drug unapproved for its intended use or an investigational new drug within the meaning of 10 U.S.C. § 1107. **Accordingly, the involuntary anthrax vaccination program, as applied to all persons, is rendered illegal absent informed consent or a Presidential waiver.** (emphasis added).[34]

Finally, the government conceded at the last hearing at the district court that the only matter left for resolution was payment of plaintiff's attorney's fees.

"The two parties agree that, because the government did not prevail at the Court of Appeals, it now owes the plaintiffs payment for attorney's fees." This remains the only pending issue before Sullivan, the federal judge said with little explanation at the Sept. 7 hearing.

"Can the parties resolve the issue of attorney's fees?" he asked the litigants, offering to assign the case to a magistrate.

Ronald Wiltsie, representing the Justice Department, told Sullivan he anticipates the two parties could probably sort out the issue themselves, once the plaintiffs update a petition for fees initially submitted to the court in November 2004. The attorneys said they could probably agree on payment for plaintiff attorney fees by early next year.

After the hearing, Mark Zaid, who serves as plaintiff co-counsel, told Inside the Pentagon he would estimate their total fee request will top $312,000. In 2004, the plaintiffs also tallied expert fees of nearly $22,000.

Now, finally, on remand, note that the government conceded that the only matter left for resolution was the payment of plaintiff's attorney's fees. This is an extremely important point for two reasons. First, it means that contrary to the JA memo assertions, the district court granted more than simply an injunction as relief to the plaintiffs in Doe. The court also granted attorney's fees and the declaratory judgment. Thus the JA memo claims and all of the retroactivity talk is a smokescreen, meant to obscure the fact that the original AVIP was illegal and the district court so found, granting three remedies, a declaratory judgment, attorney's fees, and an injunction. Second, as a practical matter, how is it possible that the government is paying attorney's fees to plaintiff's if, as the JA memo and USAF seems to claim, the government won? The government does not pay attorney's fees to

---

[34] Doe v. Rumsfeld, ___ F. Supp. 2d ___, ___ (D.D.C. 2004).

AR-0631TLR

those who sue it when it wins. Unless the government has recently, without my knowledge, become a charitable organization giving attorneys fees to plaintiffs who sue it and lose, then any talk of a government victory is hogwash.

And so we come to this case's conclusion. If the Board Members have made it this far, I want to say thank you for your patience.

We have shown beyond any doubt that the order given to LtCol Rempfer at the inception of the AVIP was illegal. The conclusion of Doe v. Rumsfeld has made that issue no longer debatable. The government lost all of those arguments. LtCol Rempfer has submitted numerous documents showing that he was ordered to resign and, not only is it his word, other agencies investigating those matters also found that he was ordered to resign, that he was singled out for public humiliation, and that his promotion was delayed and he was removed from flying status as a result of his refusal to comply with the illegal order.

*Deleted: is*

But I also want to drive home one more point.

This case has potentially far-reaching implications. We all know that. Thousands of service members were punished for refusing the anthrax vaccine. Some were administratively separated. Some quit and left both Active Duty and the Reserves rather than take the vaccine. A finding of relief for this man could set a precedent that allows relief for thousands of service members. The government, either the DoD writ large or the Air Force, or any of the services, are loathe to admit such an institutional mistake and subject themselves or senior officials to scrutiny or ridicule, possible future litigation, and maybe even have to pay out chunks of money to aggrieved service members.



*Deleted: court-martialed*

To that I say, "So what?" What is so tragic about admitting such a mistake? Will the DoD end over such a decision? Will the Air Force or Navy or USMC go away because of this? No. We have survived atomic testing of veterans, Agent Orange scandals and cover-ups, the MKULTRA program involving CIA and Army testing of LSD on unknowing military members, but the institutions survive.[35]

If we reach the point where we acknowledge the correctness of LtCol Rempfer's cause but we simply decide that the cost-benefit analysis weighs against relief for him, then we should remove all references to honor, courage, or integrity from our service mottos and credos, as we are not worthy of the dignity accorded to those words.

I know that this is not the case.

---

[35] See Rockefeller Report and *United States et al. v Stanley*, 483 U.S. 669, 687, 710 (1987).

*Deleted: Nicholson v. US.*

AR-0632TLR

For the above reasons, I respectfully ask this Board to correct this material error, to order LtCol Rempfer's date of rank be backdated to the time he would have been promoted, noting his submission of the officer to whom he was senior being promoted before him, as well as back pay commensurate with such action, and an award of nominal attorney's fees.


Respectfully Submitted and Semper Fidelis,


Dale F. Saran
Attorney for LtCol Rempfer

21

AR-0633TLR