

**DEPARTMENT OF THE AIR FORCE**
WASHINGTON DC

**Office Of The Assistant Secretary**

AFBCMR
1535 Command Drive
EE Wing, 3rd Floor
Andrews AFB MD 20762-7002

MAR - 8 2007

Lieutenant Colonel Thomas L. Rempfer
c/o Mr. Dale Saran
3811 Phelps Road
West Suffield, CT 06093

Dear Mr. Saran

     After careful consideration of your client's request for
reconsideration of his application for correction of military
records, Docket Number BC-2004-00944-2, the Board determined there
was insufficient evidence of error or injustice to warrant
corrective action.  Accordingly, your client's application was
again denied.

     This decision does not preclude an additional request for
reconsideration, but such a request must be accompanied by newly
discovered relevant evidence that was not available at the time of
your original application.  Absent such additional evidence,
further consideration of your application is not possible.

     BY DIRECTION OF THE CHAIRMAN

RALPH J. PRETE
Chief Examiner
Air Force Board for Correction
of Military Records

Attachment:
Record of Board Proceedings

Cc: Counsel

AR-0004TLR

2-

MAR 8 2007

ADDENDUM TO
RECORD OF PROCEEDINGS
AIR FORCE BOARD FOR CORRECTION OF MILITARY RECORDS

IN THE MATTER OF:              DOCKET NUMBER: BC-2004-00944-2
                              INDEX CODE: 110.02

THOMAS L. REMPFER              COUNSEL: Dale Saran

                              HEARING DESIRED: Yes

---

APPLICANT REQUESTS THAT:

His record be changed to show his reinstatement into the
Connecticut Air National Guard (CTANG) and that an Officer
Performance Report be changed to more accurately reflect his
accomplishments.

---

STATEMENT OF FACTS

On 31 March 2005, the Board considered and denied his request but
because of ongoing litigation (*Doe v. Rumsfeld*) surrounding the
Anthrax Vaccination Program (AVIP) the Board provided a caveat
that should the plaintiffs in the aforementioned case prevail
against the Secretary of Defense, the Board would reconsider the
applicant's request.    For an accounting of the facts and
circumstances surrounding the applicant's request and the
rationale of the earlier decision by the Board, see the Record of
Proceedings at Exhibit G.

On 8 September 2006, the applicant submitted a request for
reconsideration (Exhibit H), as the US Court of Appeals for the
DC Circuit had provided a decision in the aforementioned case
(Exhibit I).   On 13 September 2006, the Board asked HQ USAF/JAA
for an advisory on the Court of Appeals judgment.   JAA provided
an advisory on 19 September 2006 that recommended denial of the
applicant's reconsideration (Exhibit J).    Applicant's counsel
provided an undated response to the JAA advisory that the AFBCMR
received on 26 October 2006 (Exhibit (K).

---

THE BOARD CONCLUDES THAT:                    AR-0005TLR

1.   The authority to reinstate an ANG member without the consent
of the Govenor lies outside the purview of this Board and is
therefore moot.   We originally agreed that should the plaintiffs
in *Doe v. Rumsfeld* prevail we would reconsider the applicant's
request to change his OPR for the period 9 July 1998 to

14 December 1998 to more fully represent his accomplishments. After careful and deliberate review of the HQ USAF/JAA advisory dated 19 September 2006, we conclude that the plaintiffs in *Doe v. Rumsfeld*, did not in fact prevail against the Secretary of Defense. Therefore, in the absence of evidence to the contrary, we find no compelling basis to recommend granting the relief sought in this application.

2. The applicant's case is adequately documented and it has not been shown that a personal appearance with or without counsel will materially add to our understanding of the issue(s) involved. Therefore, the request for a hearing is not favorably considered.

---

## THE BOARD DETERMINES THAT:

The applicant be notified that the evidence presented did not demonstrate the existence of probable material error or injustice; and that the application will only be reconsidered upon the submission of newly discovered relevant evidence not considered with this application.

---

The following members of the Board considered this application in Executive Session on 20 February 2007, under the provisions of AFI 36-2603:

    Mr. Thomas S. Markiewicz, Chair
    Mr. Michael K. Gallogly, Member
    Mr. James W. Russell, III, Member

The following documentary evidence was considered:

    Exhibit G.  Record of Proceedings, dated 31 Mar 05, with exhibits A through F.
    Exhibit H.  Applicant, Email, dated 7 Sep 05.
    Exhibit I.  US Court of Appeals, Judgment, dated 9 Feb 06.
    Exhibit J.  HQ USAF/JAA, Memorandum, dated 19 Sep 06.
    Exhibit K.  Counsel for Applicant, Email, dated 27 Oct 06.

THOMAS S. MARKIEWICZ
Chair

AR-0006TLR

CS2   MAR 2 2 20__

XX   ARR/I(al)

BR

# APPLICATION FOR CORRECTION OF MILITARY RECORD
## UNDER THE PROVISIONS OF TITLE 10, U.S. CODE, SECTION 1552
*(Please read instructions on reverse side BEFORE completing this application.)*

Form Approved
OMB No. 0704-0003
Expires May 31, 2006

The public reporting burden for this collection of information is estimated to average 30 minutes per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing the burden, to Department of Defense, Washington Headquarters Services, Directorate for Information Operations and Reports (0704-0003), 1215 Jefferson Davis Highway, Suite 1204, Arlington, VA 22202-4302. Respondents should be aware that notwithstanding any other provision of law, no person shall be subject to any penalty for failing to comply with a collection of information if it does not display a currently valid OMB control number.

**PLEASE DO NOT RETURN YOUR COMPLETED FORM TO THE ABOVE ADDRESS. RETURN COMPLETED FORM TO THE APPROPRIATE ADDRESS ON THE BACK OF THIS PAGE.**

## PRIVACY ACT STATEMENT

**AUTHORITY:** Title 10 US Code 1552, EO 9397.

**ROUTINE USE(S):** None.  *Reinstate AVG*

**PRINCIPAL PURPOSE:** To initiate an application for correction of military record. The form is used by Board members for review of pertinent information in making a determination of relief through correction of a military record.

**DISCLOSURE:** Voluntary; however, failure to provide identifying information may impede processing of this application. The request for Social Security number is strictly to assure proper identification of the individual and appropriate records.

**1. APPLICANT DATA** *(The person whose record you are requesting to be corrected.)*

| a. BRANCH OF SERVICE (X one) | ARMY | NAVY | X | AIR FORCE | | MARINE CORPS | | COAST GUARD |
|---|---|---|---|---|---|---|---|---|

b. NAME *(Print - Last, First, Middle Initial)*   Rempfer, Thomas L.

c. PRESENT OR LAST PAY GRADE   O-4

d. SERVICE NUMBER *(If applicable)*   No

e. SSN   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

**2. PRESENT STATUS WITH RESPECT TO THE ARMED SERVICES** *(Active Duty, Reserve, National Guard, Retired, Discharged, Deceased)*   USAF Reserves

**3. TYPE OF DISCHARGE** *(If by court-martial, state the type of court.)*   Honorable from CT ANG

**4. DATE OF DISCHARGE OR RELEASE FROM ACTIVE DUTY** *(YYYYMMDD)*   25 MAR 99

**5. I REQUEST THE FOLLOWING ERROR OR INJUSTICE IN THE RECORD BE CORRECTED:** *(Entry required)*

1. Correct OPR from duty in CT ANG (Connecticut Air National Guard)
2. Reinstatement to flying duty for CT ANG

**6. I BELIEVE THE RECORD TO BE IN ERROR OR UNJUST FOR THE FOLLOWING REASONS:** *(Entry required)* See attached requested remark sheet.

1. My OPR does not reflect my duties for my commander
2. Those duties identified the anthrax vaccine mandate as illegal
3. I was wrongfully discharge now that a federal judge concurred
4. I should be reinstated and my OPR reaccomplished to set the record straight

**7. ORGANIZATION AND APPROXIMATE DATE** *(YYYYMMDD)* **AT THE TIME THE ALLEGED ERROR OR INJUSTICE IN THE RECORD OCCURRED** *(Entry required)*   September 1998 - March 1999

**8. DISCOVERY OF ALLEGED ERROR OR INJUSTICE**

a. DATE OF DISCOVERY *(YYYYMMDD)*   2008 02 22

b. IF MORE THAN THREE YEARS SINCE THE ALLEGED ERROR OR INJUSTICE WAS DISCOVERED, STATE WHY THE BOARD SHOULD FIND IT IN THE INTEREST OF JUSTICE TO CONSIDER THE APPLICATION.   The Federal Court ruling on Dec. 22, 2003 makes it a matter of law that the AVIP was illegal absent a final rule for use with inhaled anthrax, both issues I discovered.

**9. IN SUPPORT OF THIS APPLICATION, I SUBMIT AS EVIDENCE THE FOLLOWING ATTACHED DOCUMENTS:** *(If military documents or medical records are pertinent to your case, please send copies. If Veterans Affairs records are pertinent, give regional office location and claim number.)*   I will provide any additional documents when interviewed by the board, plus see cover & Attch(s) enclosed.

**10. I DESIRE TO APPEAR BEFORE THE BOARD IN WASHINGTON, D.C.** *(At no expense to the Government) (X one)*

| X | YES. THE BOARD WILL DETERMINE IF WARRANTED. | | NO. CONSIDER MY APPLICATION BASED ON RECORDS AND EVIDENCE. |
|---|---|---|---|

**11.a. COUNSEL** *(If any)* **NAME** *(Last, First, Middle Initial)* **and ADDRESS** *(Include ZIP Code)*   SELF & Hanscom AFB ADC Capt. Grover Baxley, USAF

b. TELEPHONE *(Include Area Code)*   860-668-1512

c. E-MAIL ADDRESS   Grover.Baxley@hanscom.af.mil   Thomas.Rempfer@hanscom.af.mil   781-377-3983

d. FAX NUMBER *(Include Area Code)*   860-668-1513

**12. APPLICANT MUST SIGN IN ITEM 15 BELOW.** If the record in question is that of a deceased or incompetent person, LEGAL PROOF OF DEATH OR INCOMPETENCY MUST ACCOMPANY THE APPLICATION. If the application is signed by other than the applicant, indicate the name *(print)* _____ and relationship by marking one box below.

| SPOUSE | | WIDOW | | WIDOWER | | NEXT OF KIN | | LEGAL REPRESENTATIVE | | OTHER *(Specify)* |
|---|---|---|---|---|---|---|---|---|---|---|

**13.a. COMPLETE CURRENT ADDRESS** *(Include ZIP Code)* **OF APPLICANT OR PERSON IN ITEM 12 ABOVE** *(Forward notification of all changes of address.)*   3811 Phelps Rd. W. Sutfield, CT 06093

b. TELEPHONE *(Include Area Code)*   same

c. E-MAIL ADDRESS   TRempfer@AOL.com

d. FAX NUMBER *(Include Area Code)*   same

**14. I MAKE THE FOREGOING STATEMENTS, AS PART OF MY CLAIM, WITH FULL KNOWLEDGE OF THE PENALTIES INVOLVED FOR WILLFULLY MAKING A FALSE STATEMENT OR CLAIM.** *(U.S. Code, Title 18, Sections 287 and 1001, provide that an individual shall be fined under this title or imprisoned not more than 5 years, or both.)*

CASE NUMBER *(Do not write in this space.)*   AR-0007TLR

**15. SIGNATURE** *(Applicant must sign here.)*

**16. DATE SIGNED** *(YYYYMMDD)*   2004 03 19   0 400944

FORM 149, MAY 2003          PREVIOUS EDITION IS OBSOLETE.

A 5

**Major Thomas L. Rempfer**
3811 Phelps Road
West Suffield, Connecticut  06093

Board for Correction of Air Force Records
SAF / MRBR                                                                March 20, 2004
550-C Street West, Suite 40
Randolph AFB, TX  78150-4742

Dear Sir or Madam:

I respectfully submit the following appeal in accordance with AFI 36-2401 and AFP 36-2607 via the accompanying DD Form 149 for correction of records.  My case is very straightforward based on being wrongfully dismissed, yet is complex and historic in detail.  As well, my OPR did not include the reasons for my dismissal, nor the events that led up to my dismissal, requiring correction. I maintain that I was wrongfully forced to resign my state commission, and dismissed as an officer in the CT NG after being a member of a commander's investigative team. My dismissal was due solely to unresolved legality concerns over the anthrax vaccine immunization program (AVIP). My desire is to gain reinstatement and serve again as a citizen-soldier in the 103rd Fighter Wing (FW) of the CT NG, while continuing to uphold my oath of office to support and defend the Constitution. I also want my OPR corrected to properly document the events of 1998 and 1999 when I was wrongfully dismissed. These goals have never wavered since my dismissal due to the AVIP on March 25th, 1999.

Beginning in the fall of 1998, the 103rd Fighter Wing Commander of the Connecticut Air National Guard (CT ANG) tasked me to investigate improprieties related to the AVIP as a member of an *ad hoc* investigative panel termed "Tiger Team Alpha." Our team submitted documented questions about substantiated problems to our Wing Commander and awaited answers. Documents revealed severe inconsistencies vis-à-vis the known "investigational" status of the vaccine. We advised that the order to submit to a compulsory investigational vaccine was not legal. Our Wing Commander acknowledged at the time: "the peer reviewed, extensive scientific study that clearly proves, without a doubt, this stuff works against inhalation anthrax—that doesn't exist." Since my duty has been clear from my earliest training to challenge orders or policies that violate U.S. law, I refused the vaccine. My refusal to submit to the investigational vaccine led to my wrongful dismissal and this review request. Recently a federal court confirmed my concerns in Doe v. Rumsfeld, 297 F. Supp. 2d 119 (D.C. Cir. 2003). The judge stated, "[t]his Court is persuaded that AVA [anthrax vaccine] is an investigational drug and a drug being used for an unapproved purpose. As a result of this status, the DoD is in violation of 10 USC 1107, Executive Order 13139, and DoD Directive 6200.2."

Prior to my discharge, my chain of command ordered me to out-process for refusing the anthrax vaccine, and for exercising fundamental rights by speaking to the media in January 1999. Our Wing Commander overtly referred to us as "hard liners," and publicly labeled us "traitors," while saying we were "*spoofing*" America," if we didn't transfer expeditiously. Despite this pressure to resign, I also received the principled word of my Squadron Commander that if my concerns were validated in the future I would be reinstated. My subsequent transfer was based on this pledge. Recently, in the midst of the federal court ruling substantiating my concerns, I applied to be reinstated to the CT ANG, but my request was denied. Therefore, I appeal under the auspices of state law for you to intervene. If you concur, following an assessment by whatever reviewing authority you deem appropriate, that the CT NG should resurvey its actions related to my dismissal, I respectfully request to be reinstated as an officer in good standing in the CT ANG. I affirm my standing in this request due to the fact that prior to the recent court ruling misinformation pertaining to the vaccine's status caused a less than fully

AR-0008TLR

6

informed discharge order by the CT NG. My termination from flying duty for the CT ANG by the former CT ANG Wing Commander was based on this previous misinformation. The following core facts lie at the heart of my dismissal and justify my appeal:

1. **The CT NG violated the letter and spirit of the law** without grounds **by withholding records** documenting our dismissals, initially obscuring Tiger Team Alpha's existence.

2. A federal court recently ruled that **the anthrax vaccine program violated U.S. law** because the vaccine was investigational, and its license rule was never finalized.

3. The CT ANG **Commander did not have the legal authority to dismiss** me, did not convene a discharge board, and did not convey concerns about the illegality of the AVIP.

4. The CT ANG Wing **Commander defrauded the State of Connecticut with falsities**, and constructed an unprofessional and maligning environment, forcing my resignation.

5. **Coercion preceded my transfer from the CT ANG, and perpetuated the fraud** with an unconstitutional retaliatory infringement of fundamental rights and due process rights.

6. **Tiger Team Alpha's warning was hastily dismissed, but later corroborated** by Congressional reports, as well as by the CT Attorney General and federal judicial review.

7. I endeavored through previous **attempts in good faith to return to the 103rd Fighter Wing** to no avail, because the previous pledge of reinstatement was not honored.

I am submitting this application reluctantly to your board, as I did with my original transfer application to the federal United States Air Force Reserves (USAFR), only after exhausting appropriate avenues for redress of my grievances in 1999. In hindsight, due to recent court rulings, it is clear that the core problems with the anthrax vaccine were not the responsibility of our CT NG or Tiger Team Alpha. However, in light of our tasking, we searched for and found the truth, nonetheless. We upheld loyal adherence to the oath of office, requiring us to support and defend the Constitution — by *insisting* that orders implemented within the CT NG and the US military were lawful. I performed this duty to the utmost of my ability as a dedicated citizen-soldier and resident of our great state. Now, based on the above facts, it is my ardent desire to continue my service as an officer and pilot for the CT ANG. Upon your review of my circumstances, I hope you will agree that I committed no wrongdoing, and my conduct was reasonable and dutifully professional. As a result, responsibility for the anthrax vaccine's troubling history, along with the untenable burden imposed on our state due to these problems, resides outside of Connecticut—not with CT ANG soldiers. My specific goals for the BCMR include:

1. Properly document my official duties for my commander on Tiger Team Alpha on my OPR, and that findings about the investigational use of the vaccine were not reported.

2. Properly document the constructive nature of my dismissal based on the commander saying I was a "hard liner," a "traitor," and was "spooging America" if I did not leave.

3. Properly document and include that my commander admitted there was not an "official government position on some of their [Tiger Team Alpha's] issues does not exist."

4. Properly document and include in my revised OPR that I questioned the efficacy of inhalation anthrax for the anthrax vaccine, and questioned the legality of the mandate with my commander based on questionable efficacy.

5. Properly include that the commander admitted data proving efficacy "doesn't exist."

6. Properly include in this retroactive OPR correction that the federal court ruling, verifying my concerns from 1998, necessitates the re-accomplishment of the OPR.

7. Recommend or direct my reinstatement to the CT ANG and my previous flying duties.

8. Direct back pay, longevity, lost "command pilot" rating, and reinstatement to rank commensurate with my position upon return, plus lost pay for lost rank accordingly.

2

AR-0009TLR

7.

I contend your board has the authority to take these actions on my behalf, because of the disturbing absence of the factual documentation in my OPR of events listed in the background information below; also, because the three year normal deadline is clearly tolled by the recent federal court ruling; and finally, based on the federal origins of the AVIP, your board is an appropriate level of jurisdiction for my requests. I also request an audience with your board.

I respectfully request your aid in rectifying this unresolved injustice by returning me to flying duty for Connecticut. After five years of concentrating on the broader national scope of the AVIP implementation by the DoD, I now request the assistance of your board in rectifying my own personal and professional unresolved situation with regard to the absence of documentation in my OPR, and reinstatement to flying duty. I respectfully request an objective hearing by your board and a personal appearance to make my case as you justly adjudicate the issues related to my refusal to submit to the anthrax vaccine, my coerced resignation, and the resultant hostile and wrongfully constructed retaliatory dismissal.

Very respectfully,

Major Thomas L. Rempfer

**Attachments**:

DD 149

CTANG OPR

Letter of Recommendation from Current USAF Reserve Supervisor

Letter of Recommendation from Previous F117 USAF Supervisor

Background Information

Congressional Report and Hearing Links

GAO Report and Testimony Links

Medical Report Links

Federal Court Ruling(s)

Congressional Testimony Chronology

Col Burns' Memo to the NGB

Tiger Team Alpha Inputs to Col Burns

Tiger Team Bravo Inputs to Col Burns

Col Burns' Partial Testimony to the DoD Inspector General

Letter from CT ANG: "second and final" Refusal to Rehire Major Rempfer

Letter from DoD IG refusing to investigate reprisal, retaliation, wrongfully constructed dismissal

Copies of additional OPRs demonstrating previous and subsequent performance

AR-0010TLR

# Letters of Recommendation from Current USAF Reserve Supervisor, & from Previous F117 USAF Supervisor

AR-0011TLR

9



# DEPARTMENT OF THE AIR FORCE
### HEADQUARTERS ELECTRONIC SYSTEMS CENTER (AFMC)
### HANSCOM AIR FORCE BASE MASSACHUSETTS

January 3, 2004

MEMORANDUM FOR:   Col John Swift, 103rd Fighter Wing Vice Commander

FROM:    ESC/SE
         3 Robins Street
         Hanscom AFB MA 01731-1702

SUBJECT:  Letter of Recommendation to Return to Flying


Sir, I am Maj Tom Rempfer's supervisor here at Hanscom AFB. For the past 2 years, Tom has been working with the safety office. He has relayed to me that he would like to go back to the CT ANG in the future. I am aware of the history between the unit and Maj Rempfer, but my intent is just to give you a fair assessment of his performance while working for me.

Tom is a valuable asset to the Hanscom community. He is an Operational Risk Management (ORM) instructor, flight safety officer, and crew member of the test bed Paul Revere. His performance in each of these jobs has been superb. Every time he teaches an ORM class I get outstanding feedback about his instructor skills and enthusiasm. He teaches at least two ORM classes a month to the Hanscom population. He is a master on ORM.

Flying is in Tom's blood. He has tried on many occasions to find a flying job in the guard or reserve. While here at Hanscom, he volunteered to be part of the test bed Paul Revere. This is a B-707 being used to test new technologies that will be incorporated in the new E-10 that will eventually replace the AWACS and JSTAR. His operational knowledge has been indispensable to this high vis project. Also, he continuously provides support to our 14-aircraft aero club.

Tom works an average of 7-10 days each month. He has currently volunteered to do a 139-day deployment in support of OIF. His deployment date should be in late Feb, early March. As you can see, Tom has been an integral part of the Hanscom team. Even though I would hate to see him go, I truly believe he would be a great asset to the CT ANG. I can assure you that he will give you 110%.

Again, if you have any questions or desire to know more, please feel free to contact me at DSN 478-5135. Thank you for your time.

Very Respectfully,

//signed//

Lt Col Juan Gaud

ESC Director of Safety

AR-0012TLR

**Colonel Mace Carpenter**
Joint Staff J8/JCD; Pentagon Room 1D964; Wash DC 20318-8000

Governor John G. Rowland                                         March 19, 2004
State Capitol
210 Capitol Avenue
Hartford, Connecticut 06106

Dear Governor Rowland:

I supervised Major Tom Rempfer at Holloman AFB, NM when he was on active duty flying F-117 Nighthawks. Tom not only excelled as a 'stealth fighter pilot', but also deployed for several months to Kuwait in support of operations over southern Iraq. I personally attest he is a leader of the highest character and integrity, and one of our nation's most dedicated officers. Tom consistently places not only *service before self,* but places the welfare of others above and beyond his own personal concerns.

The Anthrax issue has been a challenge for our military and our nation. It continues to challenge us today. The rightness or wrongness of the Anthrax program aside, Tom recognized problems in the program. With others foremost in his mind, he acted selflessly and at very significant expense to himself. It took great moral courage to do this—the courage to take a stand on an issue against numerous institutions and detractors. We need individuals with such fortitude in our society—people that are willing to stand up and ensure we, as a society, are taking very hard and objective looks at critical matters.

I wholeheartedly encourage you bring Major Rempfer back into the Guard. He really did take a selfless stand for many of us, and we should communicate to the rest of our society, that we embrace vigorous discourse, not penalize for it. And above all, we must be seen to be fair in all actions we take which affect those who speak out. Thanks you for your time and consideration.


//Signed//


P. Mason Carpenter, Colonel, USAF
Joint Staff, J8 Plans and Integration

AR-0013TLR

# Officer Performance

# Report (OPR) in Question

# From the CT ANG,

# Which does not

# Document my

# Duties for Tiger Team

# Alpha, my warning

# To my Commander about

# The illegality of the vaccine

# Mandate, Or the truth

# About of my documented,

# Ordered Resignation.

AR-0014TLR

## COMPANY GRADE OFFICER PERFORMANCE REPORT

### I. RATEE IDENTIFICATION DATA *(Read AFI 36-2402 carefully before filling in any item)*

| 1. NAME *(Last, First, Middle Initial)* REMPFER, THOMAS L. | 2. SSN 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 | 3. GRADE CPT (NONEAD) | 4. DAFSC W11F3Y |
|---|---|---|---|

| 5. PERIOD OF REPORT From: 9 Jul 98 Thru: 14 Dec 98 | 6. NO. DAYS SUPERVISION 182 | 7. REASON FOR REPORT CRO |
|---|---|---|

| 8. ORGANIZATION, COMMAND, LOCATION 103 Operations Support Group (ACC) Bradley ANG Base, East Granby, CT 06026 (CTANG) | 9. PAS CODE B71CFHLJ |
|---|---|

### II. UNIT MISSION DESCRIPTION

Maintains a worldwide deployment capability and upon deployment, be prepared to employ in the tactical aviation role of Offensive Air Support to destroy enemy forces and facilities through the delivery of all types of tactical weapons compatible with the weapons systems possessed.

### III. JOB DESCRIPTION

**1. DUTY TITLE:** CHIEF, WEAPONS TRAINING

**2. KEY DUTIES, TASKS, AND RESPONSIBILITIES:** Maintains mission ready status and worldwide mobility tasking in the A/OA-10A fighter aircraft. Prepares the squadron to employ the A/OA-10A in all phases of Close Air Support (CAS), Air Interdiction (AI), and Combat Search and Rescue (CSAR) to include the accurate delivery of ordnance on target from high or low altitude patterns in varied weather conditions. Additional duties: Plan, organize and implement the squadron's weapons training program. Ensures all squadron pilots have a solid working knowledge of all weapon systems. Conducts monthly UTA training sessions and semi-annual weapons testing. Plans, briefs and leads multi-ship sorties on local flying training missions.

### IV. IMPACT ON MISSION ACCOMPLISHMENT

- Enthusiastic effort while in upgrade training program enhanced his performance and set example for others
  -- Solid briefings to his Instructor Pilot prior to flying missions increased the effectiveness of the training
  -- His excellent knowledge of threat, weapon and aircraft systems maximized the value of flying training
- Superior flight leadership resulted in effective combat training missions during his requalification program
  -- Sound decisions in time critical airborne situations improved the safe conduct of the flight at all times
  -- Complex employment tactics utilizing the A-10A aircraft were above standards on all training sorties
- Demonstrated excellent communication skills in all phases of his ground and flight training sessions
  -- His meaningful feedback during mission debriefs succinctly detailed areas requiring improvement
  -- Successfully applied brevity procedures during missions to minimize in-flight radio transmissions

| V. PERFORMANCE FACTORS | DOES NOT MEET STANDARDS | MEETS STANDARDS |
|---|---|---|
| 1. Job Knowledge Has knowledge required to perform duties effectively. Strives to improve knowledge. | ☐ | ☒ |
| 2. Leadership Skills Sets and enforces standards. Works well with others. Fosters teamwork. Displays initiative. Self-confident. | ☐ | ☒ |
| 3. Professional Qualities Exhibits loyalty, discipline, dedication, integrity, honesty, and officership. Adheres to Air Force standards. Accepts personal responsibility. Is fair and objective. | ☐ | ☒ |
| 4. Organizational Skills Demonstrates ability to plan, coordinate, schedule effectively, and uses resources effectively and efficiently. Meets suspenses. | ☐ | ☒ |
| 5. Judgement and Decisions Makes timely and accurate decisions. Emphasizes logic in decision making. Retains composure in stressful situations. Recognizes opportunities. Requires minimal supervision. | ☐ | ☒ |
| 6. Communication Skills Listens, speaks, and writes effectively. | ☐ | ☒ |

AF FORM 707B, OCT 95 *(EF -V2) (PerFORM PRO)*     PREVIOUS EDITION IS OBSOLETE.

AR-0015TLR

## VI. RATER OVERALL ASSESSMENT

Captain Rempfer returned to the squadron after a two and a half year active duty tour flying F-117A's at Holloman AFB. He gained tremendous experience in strike package and stealth operations. His expertise has added a valuable resource to our current contingency planning capability. During this rating period Captain Rempfer returned to his civilian occupation as an airline pilot for a major carrier. His civilian occupation required his absence from the unit for airline upgrade training and he did not complete his upgrade combat ready status. At the end of this rating cycle, Captain Rempfer indicated his intentions to resign from the the unit and seek a position in another Air Force reserve component. Captain Rempfer is a very capable officer and will bring a wealth of flying experience and knowledge to his future reserve assignment. I have confidence he will excel in his future military endeavors.

Last performance feedback was accomplished on: _____ (consistent with the direction in AFI 36-2402.)
(If not accomplished, state the reason)

Performance feedback was not accomplished with this individual due to his civilian career training requirements and subsequent conflicting schedules.

| NAME, GRADE, BR OF SVC, ORGN, COMD & LOCATION | DUTY TITLE | | DATE |
|---|---|---|---|
| RICHARD A. MITCHELL, LTC, CTANG | Commander, 103 Operations Support Flight | | 9 Feb 99 |
| 103 Operations Support Flight (ACC) | SSN | SIGNATURE | |
| Bradley ANG Base, East Granby, CT 06026-9309 | 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 | *R.A. Mitchell* | |

## VII. ADDITIONAL RATER OVERALL ASSESSMENT     ☒ CONCUR     ☐ NONCONCUR

Captain Rempfer's decision to resign from the unit and seek a position in another Air Force reserve component was a disappointment. We expended valuable training resources on Captain Rempfer and were looking forward to reaping the benefit of his active duty experience. During his training missions he exhibited the expertise and skill of a seasoned fighter pilot. His preparation for every mission was commendable. His enthusiasm and skill will serve him well in his future career.

| NAME, GRADE, BR OF SVC, ORGN, COMD & LOCATION | DUTY TITLE | | DATE |
|---|---|---|---|
| ROBERT J. MCCUSKER, COL, CTANG | 103 Operations Group Commander | | 9 Feb 99 |
| 103 Operations Group (ACC) | SSN | SIGNATURE | |
| Bradley ANG Base, East Granby, CT 06026 | 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 | *Robert J. McCusker* | |

## VIII. REVIEWER     ☒ CONCUR     ☐ NONCONCUR

| NAME, GRADE, BR OF SVC, ORGN, COMD & LOCATION | DUTY TITLE | | DATE |
|---|---|---|---|
| WALTER L. BURNS, COL, USAF/CTANG | Wing Commander | | 9 Feb 99 |
| 103 Fighter Wing (ACC) | SSN | SIGNATURE | |
| Bradley ANG Base, East Granby, CT 06026 | 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 | *Walter L. Burns* | |

### Instructions

All: Recommendations must be based on performance and the potential based on that performance. Promotion recommendations are prohibited. Do not comment on completion of or enrollment in PME, advanced education, previous or anticipated promotion recommendations on AF Form 709, OER indorsement levels, family activities, marital status, race, sex, ethnic origin, age, or religion.

Rater: Focus your evaluation in Section IV on what the officer did, how well he or she did it and how the officer contributed to mission accomplishment. Write in concise "bullet" format. Your comments in Section VI may include recommendations for augmentation or assignment.

Additional Rater: Carefully review the rater's evaluation to ensure it is accurate, unbiased and uninflated. If you disagree, you may ask the rater to review his or her evaluation. You may not direct a change in the evaluation. If you still disagree with the rater, mark "NON-CONCUR" and explain. You may include recommendations for augmentation or assignment.

Reviewer: Carefully review the rater's and additional rater's ratings and comments. If their evaluations are accurate, unbiased and uninflated, mark the form "CONCUR" and sign the form. If you disagree with previous evaluators, you may ask them to review their evaluations. You may not direct them to change their appraisals. If you still disagree with the additional rater, mark "NONCONCUR" and explain in Section VIII. Do not use "NONCONCUR" simply to provide comments on the report.

| IX. ACQUISITION EXAMINER/AIR FORCE ADVISOR (Indicate applicable review by marking the appropriate box(es).) | | ACQUISITION EXAMINER (if applicable) | AIR FORCE ADVISOR (if applicable) |
|---|---|---|---|
| NAME, GRADE, BR OF SVC, ORGN, COMD & LOCATION | SIGNATURE | | DATE |
| | AR-0016TLR | | |

AF FORM 707B, OCT 95 (REVERSE) (EF-V2    FORM PRO)

**Background Information:**  (Hard copies or PDF's of all documentation available on request.)

## 1. The CT NG violated the letter and spirit of the law by withholding records:

The following background information demonstrates that the anthrax vaccine controversy led directly to my ordered transfer from flying duty for the CT ANG. The Connecticut FOI (Freedom of Information) Commission held a hearing during my pursuit to obtain documentation related to my transfer. The CT ANG withheld multiple documents relevant to my ordered resignation and forced transfer in violation of FOI law.

The official tasking to investigate the anthrax vaccine was ordered by my chain of command, originating from the 103rd Fighter Wing Commander (FW/CC), Col Walter Burns. My Squadron Commander, then-Lt Col John Swift, relayed the tasking to me and then-Major Russell E. Dingle, a CT ANG Flight Commander, to participate on the Wing Commander's investigative team. The team's charter was to research and document the merits of the allegations made against the safety, efficacy and legality of the anthrax vaccine so that Col Burns could officially voice our unit's concerns to Higher Headquarters (HHQ).   Our panel was named "Tiger Team Alpha." Russell E. Dingle, now Lt Col (ret) US Air Force (USAF) Reserves, led our Commander's team.

Our team left "no stone unturned," and our extensive, well-documented research ultimately led to recurring, unyielding questions concerning the improper use of the vaccine. In a variety of documents provided to the Wing Commander from October 1998 to February of 1999, we made it clear that we concluded the vaccine mandate was not legal due both to an "off label" and to "investigational" use of the vaccine. Additionally, we questioned the "experimental" use of the vaccine without providing "informed consent," as required by regulations and law.[1] We made multiple written and verbal appeals about the apparently ill-conceived and contrary-to-law nature of the mandate to our Wing Commander. These appeals were documented in videotaped mass squadron briefings, personal meetings, and written exchanges on several occasions.

Tiger Team Alpha documentation and dismissal records became central to the public record, because CT ANG leaders didn't document the team's duties or our official warning to Col Burns about the investigational use of the vaccine. Instead, the CT ANG maintained that officers departed the CT ANG voluntarily. Lacking a public acknowledgment, these records became necessary to prove that the anthrax vaccine and the Tiger Team Alpha tasking led to my dismissal. The absence of, and unwillingness to produce, these records followed a pattern of improper processes. Eventually such improper procedures compounded. What began with the improper use of the vaccine even with unanswered questions about its investigational status, evolved into our subsequent dismissals without appropriate due process, and was later followed by our discovery of incomplete vaccine licensure. The CT FOI Commission analyzed the issues at hand and affirmed, notwithstanding objections of CT NG attorneys, that I was ordered to resign by CT ANG leaders. The FOI hearing included testimony by military officers similarly ordered to resign. The Commission published official findings, and fined the CT NG for violating FOI law. The Commission stated in its findings:

> "It is found that, during 1998 and 1999, the Connecticut Army National Guard [hereinafter "the Guard"] was in the process of addressing the controversial issue of an anthrax vaccine program, that the complainant herein was an officer in the Guard during such time, that he was assigned by the Guard to research the vaccine, that he decided

---

[1] Dingle, RE. Rempfer, TL. Tiger Team Alpha inputs to the 103rd FW/CC.  September and October 1998.

AR-0017TLR

not to take the vaccine, and that he ultimately resigned his commission as a Guard officer as a result of the anthrax vaccine controversy, after being ordered to so resign." [2]

Unfortunately, internally within the CT ANG these FOI Commission proceedings, as well as our participation in the entire anthrax vaccine investigation, were framed in a negative light as though we were "hurting" the Guard. To the contrary, we performed our duty in our Tiger Team Alpha tasking for our unit, the Guard and our nation's armed forces. My subsequent attempt to obtain the documents related to my dismissal was intended to support my eventual reinstatement into the CT ANG so that I could return to my assigned duties as an Air Force trained pilot. Equally unfortunate was the fact that the CT NG would not release those documents in accordance with state law. Because I was "assigned by the Guard to research the vaccine," and this assignment led to my dismissal, it was pivotal to collect these documents. It became particularly imperative when I learned that the CT ANG inaccurately asserted that I left voluntarily, implying personal versus professional factors. Many of the documents contained in this background information were ultimately obtained only after the FOI Commission found that the Guard:

> "[S]imply ignored the complainant's requests in this matter, and that such inaction resulted in the respondents' violations of the complainant's rights under the FOI Act, both in letter and spirit. It is further found that such violations were without reasonable grounds, within the meaning of §1-206(b)(2), G.S." [3]

This case is not—and was not—about anthrax. From the outset the ordeal was about compliance with the law and the execution of proper processes. The FOI example is merely a case in point. Without the FOI Commission hearing findings, and their order for the CT NG to produce documents, there would be little to no record of the wrongful dismissals in question, or this unprecedented period of time in the history of the CT ANG. In the same manner that the FOIA laws were disregarded so too did the CT ANG 103rd Fighter Wing Commander deny the requirements of proper due process in ordering, or allowing the ordered, resignations of CT ANG officers. Just as the FOIA laws were ignored by the Connecticut Military Department, so too were officer's officially tasked and duty bound inputs to their commander about the investigational status of the anthrax vaccine, which rendered the compulsory immunization program illegal.

Extensive documentation is normally a military *forté*. The absence of this typically professional characteristic of detailed record keeping makes the lack of documentation surrounding Tiger Team Alpha's duties and inputs to the CT ANG Wing Commander perplexing and disturbing. Therefore, a clarification of the timeline of events, beginning in the fall of 1998, is essential for the record to be set straight:

❖ In September 1998 our unit developed a roster of pilots to deploy to the Persian Gulf (or "desert"). I was an immediate volunteer to deploy. The DOD guidelines were that you weren't required to take the vaccine unless you were spending more than thirty days in the theater, or "high threat area." Col Burns confirmed this fact in a "mandatory" video broadcast to all unit members saying, "DoD policy is 30 days or more ... any less than that you will not get the shot." [4] In this video Col Burns addressed and swiftly dismissed many of the legitimate questions posed by Tiger Team Alpha. Reference the video, Col Burns encouraged people to "get the word to our traditional guardsman over drill as best you can."

---

2 http://www.state.ct.us/foi/2001fd/20010110/FIC2000-303.htm.  At para. 12.

3 http://www.state.ct.us/foi/2001fd/20010110/FIC2000-304.htm.  At para. 22.

4 Col Burns videotaped meeting discussing unanswered anthrax vaccine issues and possible refusals prior to October 1998 unit training assembly (drill).

AR-0018TLR

During this timeframe most pilots would be going for less than three weeks to the desert, so we weren't required to get the shots. Col Burns held a meeting on September 27, 1998. He announced an alteration to DoD policy saying, "all officers and everyone going to the desert" would take the vaccine. The capricious and contradictory nature of the policy began at this point, because even Col Burns also maintained, "You can't run counter to DoD policy."[5] At this point I became uncomfortable with the growing irregularities, so I removed my name from the voluntary deployment roster, along with 16 fellow pilots (½ the roster).

❖ In October 1998, following the formal tasking by Col Burns of Tiger Team Alpha, the legality questions surfacing about the vaccine mandate by CT ANG pilots, and the deployment volunteer vacancies; the policy arbitrarily was no longer mandatory not for all officers, but instead, only for all pilots. Col Burns justification from the outset was, "It's a force protection issue. The people going to the desert need to be protected against the biological threat, the very real threat, posed by Saddam Hussein and his folks." Tiger Team Alpha specifically presented 15 questions with supporting information to the commander. Examples of our documents include an FDA report showing microbial contamination in the sublots our unit's lot was derived from (FAV 030). Col Burns openly admitted that when it came to "safety and sterility … I owe you some more answers on the safety and quality control piece of it, and I'm gonna get you that as best I can." He also acknowledged, "I'll tell you right up front some of the things I don't have answers to."[6]

❖ In November 1998 our leadership arranged for a briefing by Dr. David Huxsoll, Dean of Veterinarian Medicine at LSU and former commander of the US Army's biological warfare laboratory at Ft. Detrick, to appear at the unit to dispel our concerns. As this meeting approached, all unit members were provided with a guidance sheet of what they could and could not ask. For instance, the pivotal legal issue of vaccine efficacy was officially placed off limits. Maj Dingle attended the event. The meeting was video taped and later broadcast on Air National Guard closed circuit TV. It created more concern than calm. Maj Dingle asked more questions to which the ex-military expert had no answers. The expert even agreed with him about the problems. It became apparent that the answers to the Tiger Team inquiries were not forthcoming, and we were told that the anthrax debate was over, that our questions could not be answered, and that the shots would begin. Col Burns even publicly acknowledged the unanswered concerns over proven efficacy of the vaccine for the "Cutaneous threat versus the inhalation threat" saying, "You're looking for the peer reviewed, extensive scientific study that clearly proves, without a doubt, this stuff works against inhalation anthrax – that doesn't exist."[7] Whether Col Burns realized it at the time, the problem was that this proof, Col Burns admitted "doesn't exist," was the legal standard required in order to mandate the vaccinations.

❖ In December 1998 we were encouraged to leave the unit ASAP, or our fate might be out of our commander's hands. I was also relayed the message by one of our commanders, from our State's Adjutant General, that anyone refusing the vaccine and trying to leave over it, would never work in the military again in any capacity. Our unit leaders issued a policy letter establishing a deadline of the January Unit Training Assembly (UTA, or "drill") to submit to the vaccine. All pilots not in compliance would be grounded, despite earlier assurances that flying status would not be used as a punishment for refusal. I also gained access to an unclassified NGB message about the AVIP. It specifically stated three phases, where the most liberal interpretation classified the CT ANG as Phase II. So why the rush to take the vaccine in January of 1999 when we had a January of 2000 deadline? It seemed

---

5 Col Burns videotaped meeting discussing unanswered anthrax vaccine issues and possible refusals prior to October 1998 unit training assembly (drill).

6 Col Burns videotaped meeting discussing unanswered anthrax vaccine issues and possible refusals prior to October 1998 unit training assembly (drill).

7 Col Burns videotaped meeting discussing unanswered anthrax vaccine issues and possible refusals prior to October 1998 unit training assembly (drill).

AR-0019TLR

there was ample time to get unanswered questions addressed. We were told it was to get rid of those who could not be relied upon, but I had also made it clear that I would take the vaccine if activated and sent into combat. But Col Burns maintained: "If you do not get the shot during this time period ... all you're doing is kicking the can ... if some of these issues are burning inside you. And you're going, 'whew, man I escaped that one -- I don't have to get the shot this time,' ... all you're doing is delaying that decision down the road, and from a commander's perspective all I'm asking you to do is to make that decision now, because this unit is on a very short string to go execute some war plans if the stuff hits the fan ... and the last thing I want to do is have this unit called up and some of you say well it's been nice being a Flying Yankee but I don't think I can take that anthrax shot. I don't think I'm gonna go to war ... Can't have that because words like **traitor** start coming up in my mind, and I don't have a lot of time for those kind of people." Col Burns added that if we didn't take the shot he didn't want pilots that would "suck this unit dry." Col Burns added, "If you're not going to be ready to go to war whenever we're called, you are spooging America as far as I'm concerned."[8]

❖ In January 1999 nine pilots refused to submit to the anthrax vaccine (25% of the unit's pilots). Another pilot decided in October to transfer to a non-flying position, so he was not included in the numbers. In light of Tiger Team Alpha's myriad unresolved findings, I could not in good conscience submit to what I believe was an illegal order, implemented in a unprecedented unprofessional manner. The squadron commander issued a letter confirming the 8 losses. But publicly the unit reported that only 2 pilots departed due to the anthrax issue. All the involved pilots were upset at the misrepresentation and signed a letter confirming it was the anthrax policy that forced them out of the cockpit. [9] Prior to being grounded for my refusal, I was also ordered not share my information with other unit members. I complied with this order. I was also ordered not to speak to the media, which I believed was also an unlawful order and I did not comply. I was then called at my home on January 22nd, 1999 and ordered to immediately resign for making a conscious choice to speak publicly to get the truth out.[10]

❖ In February 1999 we provided the Col Burns with more Tiger Team Alpha research, which evolved into an 11-page document and 17 questions. Amazingly, we did obtain 17 detailed answers to our questions from a General in the Pentagon, outside our chain of command. He heard about our Tiger Team Alpha duties and in an email message to me he sympathized, "know this weighs heavy on you." He shared with us answers to our questions, referring to them as the "latest from the JS [Joint Staff] duty LTC who's tracking the issues." He clarified for us that the answers were talking points prepared for a Sam Donaldson interview with "LtGen Roadman and LTG Blanck for a 20/20 piece to be aired 23 Feb 99." He added, "three points will be brought out from the interview." These included emphasizing that the disease is uniformly lethal, that anthrax was weaponized by at least 10 countries, and that the vaccine is FDA-approved and safe based on sound science. Our Tiger Team Alpha research placed each of these points distinctly into question. In early February Col Burns met with me and other officers to field our concerns directly after being grounded for refusing the vaccine. He made renewed efforts to get questions addressed by HHQ. We never saw answers to the questions from Col Burns, and were subsequently encouraged to leave the unit ASAP. We were also ordered to stay away from the Squadron area so as not to cause unrest. Col Burns also had out-processing packages prepared for those that spoke publicly.

---

8 Col Burns videotaped meeting discussing unanswered anthrax vaccine issues and possible refusals prior to October 1998 unit training assembly (drill).

9 Letter to Col Burns by eight CT ANG officers / pilots – Dingle, Erff, Jacobson , Koroluk, Marchese , Possemato, Rempfer, and Smith.

10 CT ANG pilots refusing the anthrax vaccine were grounded on January 10th, 1999 IAW a 103rd OG/CC memo. Those who spoke to the media were called at their homes and ordered to resign and out process on or about January 22nd, 1999.

AR-0020TLR

18

This timeline of events, and my involvement in Tiger Team Alpha, was not documented in my performance report either. Based on the lack of internal documentation, and the evidence I can provide supporting this aforesaid timeline of events, I contend my records were not properly documented with the known reason for my forced transfer—unresolved concerns over the legality of the anthrax vaccine mandate. As well, the records related to my ordered resignation were likewise absent. These records would have demonstrated that my fundamental rights and my due process rights were denied in the Wing's rush to quash rationale dialog. The lack of records, so out of character within the realm of supervisory military affairs, reinforces my contentions about the improper processes of implementation of the AVIP and the hasty discharge of officers. At the time of these events my intuition told me that something was wrong, based on the way my superior military officers were acting. Follow on research, legislative findings and recommendations, judicial opinions and scientific reports back up the validity of Tiger Team Alpha's original concerns, leading me to the conclusion that my discharge in 1999 from the CT ANG was premature and unnecessary.

Originally, in 1998 and 1999, I was concerned that the order of the day became unquestionable obedience to a mandate I believed was unlawful. Those concerns have only been reinforced in the interim years. As an officer, I was not—and am not—charged to blind obedience. In fact, I am required under Title 10, as I was required while serving as a CT ANG officer under Title 32, to not obey *unlawful* orders. With respect to all of these concerns, I am not aware of my complaints to my commanders about the violations of my due process rights, or our inputs concerning the unlawful nature of AVIP, ever having been transmitted to my Governor's office, as required by law (C.G.S. § 27-264 directs that Commanders "shall forward" such complaints).[11]

More specific background points for this application, similar to those filed in the spring of 1999 under C.G. S. § 4-61dd,[12] follow this section. An additional extensive chronology is available with the CT Auditor of Public Accounts. Another chronology is available as a written submission accompanying a Congressional testimony submitted on March 24th, 1999 (Chronology attached).[13]

## 2. The anthrax vaccine program violated U.S. law:

Recent judgments from the U.S. District Court, District of Columbia, have vindicated Tiger Team Alpha's concerns documented over five years earlier. A federal judge wrote in his ruling on December 22, 2003 about both the lack of a final license rule for anthrax vaccine, as well as the facts regarding the vaccine's investigational status. The court confirmed:[14] (Ruling(s) attached).

"To date the AVA [anthrax vaccine adsorbed] label does not specify which method of anthrax exposure it protects against. The Proposed Rule published in the December 13, 1985, Federal Register has never been finalized. ... This Court is persuaded that AVA is an investigational drug and a drug being used for an unapproved purpose. As a result of this status, the DoD is in violation of 10 USC 1107, Executive Order 13139, and DoD Directive 6200.2." (Emphasis added).

---

11 http://www.cga.state.ct.us/2001/pub/Chap507.htm#sec27-264.htm.

12 http://www.cga.state.ct.us/2001/pub/chap048.htm#sec4-61dd.htm. "Open" Case # 1999-83 dated March 11th, 1999. Ref. "...forcing unit members to resign. ... My primary goal is to secure reinstatement ..." And "Open" case # 2000-210. May 23rd, 2000. Ref. "illegal order."

13 http://frwebgate.access.gpo.gov/cgi-bin/getdoc.cgi?dbname=106_house_hearings&docid=f:57559.pdf.

14 http://www.dcd.uscourts.gov/03-707.pdf.  At pg. 32.

AR-0021TLR

19

If a U.S. federal court judge found credible grounds to rule the AVIP in violation of the law, based in part on pre-1998 documentation, it is also reasonable to assume from history's lens that a group of officers charged with investigating the AVIP on behalf of their Commander in 1998 may also have discovered that the mandated program was in violation of the law. Those officers believed it was their duty, therefore, to refuse to submit to the unlawful order. They believed that the order to submit to an unlawful activity was, in fact, itself an unlawful order.

The pivotal issue of the vaccine's effectiveness, or its investigational status was central to the concerns of Tiger Team Alpha and proved to be central as well to the federal court five years later. Effectiveness, according to the FDA, is the "desired measure of a drug's influence on a disease condition. Effectiveness must be proven by substantial evidence consisting of adequate and well-controlled investigations, including human studies by qualified experts, that prove the drug will have the effect claimed in its labeling."[15] This issue warrants discussion because Col Burns even publicly acknowledged the unanswered concerns over proven efficacy of the vaccine with respect to the "cutaneous threat versus the inhalation threat." He specifically said, "You're looking for the peer reviewed extensive scientific study that clearly proves without a doubt this stuff works against inhalation anthrax – that doesn't exist."[16] By default, if "that doesn't exist" than the anthrax vaccine most certainly cannot meet the FDA legal threshold for effectiveness, which "must be proven by substantial evidence consisting of adequate and well-controlled investigations." The scientific studies, which Col Burns condescendingly and less than conversantly admitted "doesn't exist" was also the legal standard identified by Tiger Team Alpha that should have been complied with before the CT ANG could mandate the vaccine.

Instead of prudently getting the questions posed by his investigative panel answered, Col Burns instead maintained, "if you're that distrustful of the government that employs you, you might think about going somewhere else to work."[17] While at the same time, Col Burns admitted on video to the entire CT ANG that "We can do better and I have no doubt that's true," he also disregarded this requirement with the rhetorical contention, "Why spend dollars and time and effort to come up with something that might work a little bit better whenever this one works good enough against whatever we expect to face."[18] When Col Burns referred to "this one works good enough," he was referring to the anthrax vaccine, which he simultaneously admitted the proof that doesn't exist."[19] The absurd circularity of acknowledging problems, but dismissing them outright was accomplished in military fashion through Col Burns' assertion of his position of power and command authority. He conveyed the overt message that anyone who didn't comply with the policy, or leave ASAP, were "traitors," and "hardliners" that were "spooging America."

When comparing these early exchanges to the requirements of US law, formalized specifically for the armed forces in 10 USC § 1107, the dialogue takes on added significance and severity. The law unequivocally states that when using an "investigational new drug or a drug unapproved for its applied use" specific actions are required, to include:[20]

---

[15] http://www.fda.gov/fdac/special/newdrug/bengloss.html.

[16] Col Burns videotaped meeting discussing unanswered anthrax vaccine issues and possible refusals prior to October 1998 unit training assembly (drill).

[17] Col Burns videotaped meeting discussing unanswered anthrax vaccine issues and possible refusals prior to October 1998 unit training assembly (drill).

[18] Col Burns videotaped meeting discussing unanswered anthrax vaccine issues and possible refusals prior to October 1998 unit training assembly (drill).

[19] Col Burns videotaped meeting discussing unanswered anthrax vaccine issues and possible refusals prior to October 1998 unit training assembly (drill).

[20] http://www4.law.cornell.edu/uscode/10/1107.html.  EFFECTIVE DATE OF 1998 AMENDMENT Pub. L. 105-261, div. A, title VII, Sec. 731(a)(2), Oct. 17, 1998, 112 Stat. 2071, provided that: 'Subsection (f) of section 1107 of title 10, United States Code (as added by paragraph (1)), shall

AR-0022TLR

2D

"Whenever the Secretary of Defense requests or requires a member of the armed forces to receive an investigational new drug or a drug unapproved for its applied use, the Secretary shall provide the member with notice containing the information specified in subsection (d)."

"Limitation and Waiver. - **(1) In the case of the administration of an investigational new drug or a drug unapproved for its applied use to a member of the armed forces in connection with the member's participation in a particular military operation, the requirement that the member provide prior consent to receive the drug** in accordance with **the prior consent requirement** imposed under section 505(i)(4) of the Federal Food, Drug, and Cosmetic Act (21 U.S.C. 355(i)(4)) **may be waived only by the President.**"

This Presidential waiver never occurred. The requirement for the highest level of accountability was put into place by the US Congress explicitly because of the poor reputation DoD created with the use of experimental drugs during the first Gulf War, not to mention past military medical controversies such as Agent Orange and nuclear testing. It is particularly disturbing that DoD violated this law on an institutional level in light of the fact that the Congress put the law into place to protect soldiers based on past comparable abuses. Though the requirements of this law were similar prior to October 17, 1998 via other FDA and DoD regulations, the new law, passed prior to the CT ANG's administration of the anthrax vaccine, raised the decision to mandate the use of investigational or experimental vaccines to the President. Bottom-line: Mandating the anthrax vaccine wasn't within Col Burns' discretion as the Commander of the 103rd Fighter Wing, not to mention the fact that it was not within his discretion to kick out soldiers that loyally asked legitimate questions, as they had been trained and tasked to do, about the legality of the vaccine.

As a logical outgrowth of our research, Maj Dingle and I discovered and reported the never-finalized nature of the anthrax vaccine license rule to the government.[21] The federal court affirmed the import of our discovery in the abovementioned ruling. Coincidentally, one week after the court imposed an injunction against continuing the mandatory AVIP, the Food and Drug Administration (FDA) issued a final license ruling for the anthrax vaccine, updating the license to include an approval for inhalation anthrax.[22] The ruling by the federal court that "the DoD's administration of the inoculation without consent of those vaccinated amounts to arbitrary action," confirmed the concerns voiced by Tiger Team Alpha as early as 1998, and plainly conflicted with the mantra repeatedly asserted during that period that the AVIP was "safe, effective and FDA approved." The very requirement of a final license ruling, with its new approval by the FDA, contravened the previous rhetoric. The prior rhetoric, in no uncertain terms, was used to justify our groundings from flight duty and to force our resignations. It is also important to note that this new license rule is currently under a judicial review challenge at the request of the federal district court ("appellate" for purposes of rulemaking adjudication) based on the fact that new scientific data has been discreetly introduced into the regulatory administrative record without following federal rulemaking procedures, or allowing the requisite public comment.

Note also that the pivotal issue of proper legal licensure of this vaccine had been a matter of significant controversy long before Tiger Team Alpha was even formed. Unbeknownst to Tiger Team Alpha at the time, the DoD had assisted the manufacturer of anthrax vaccine with a September 20, 1996 investigational new drug (IND) application to garner a proper approval for

---

apply to the administration of an investigational new drug or a drug unapproved for its applied use to a member of the Armed Forces in connection with the member's participation in a particular military operation on or after the date of the enactment of this Act (Oct. 17, 1998).'

21 http://www.fda.gov/ohrms/dockets/dailys/01/Oct01/101501/101501.htm#_Toc527850400. At pg. 3.

22 http://a257.g.akamaitech.net/7/257/2422/14mar20010800/edocket.access.gpo.gov/2004/pdf/03-32255.pdf.

AR-0023TLR

Z1

"inhalation anthrax." This application was never approved, and, in fact was only recently rescinded in January 2004. This demonstrative proof of the known investigational use of anthrax vaccine is compounded by Pentagon documents that acknowledge the vaccine was indeed experimental and not approved for use in biological warfare.

The lack of public record evidence of these facts in 1998 and 1999 add perspective to the hurried nature of the CT ANG dismissals. Tiger Team Alpha had discovered information that drove to the core of an illegal order with an improperly licensed vaccine that was known to be both inadequate and experimental, originating from a non-validated manufacturer. The findings were so potentially serious that the subsequent actions of the federal officer / Wing Commander in charge of the CT ANG in 1999 in suppressing the investigative findings of Tiger Team Alpha can be placed in proper context only by an understanding of their significance and the pressure Col Burns claimed he faced when forcing the premature personnel actions. Supporting Tiger Team Alpha, in the face of such pressure, may have required the Commander to also "fall on his sword."

The information that surfaced following Tiger Team Alpha's investigation exacerbated the embarrassing truth with more revelations about the known "experimental" status of the vaccine. This information included Congressional reports, discoveries of unapproved manufacturing changes, our research that revealed a non-finalized license, and medically significant updates made to the vaccine's product label. Despite these problems, which were known internally by the federal officers promoting the anthrax vaccine program, I was grounded for questioning and refusing the directive. I was then ordered to resign. These actions remain particularly significant to me because my tasking to learn the truth derived directly from my Squadron and Wing Commanders.

In addition to our team highlighting for these same leaders the illegality of mandatory "investigational" use of the vaccine, Tiger Team Alpha also identified that "doses other than those approved [were] considered investigational." Eventually, according to Congressional investigations, the CT ANG did administer doses at other than the approved regimen. Therefore, not only was binding "investigational" use of the vaccine for inhaled anthrax illegal, but the regimen had also become investigational and unlawful. The conclusions about the failures to follow the vaccine regimen by Congressional investigators were made in part due to scrutinizing CT ANG records. Evidence also suggests CT ANG leaders attempted to obstruct this investigation in the fall of 1999. Regardless, the record unmistakably shows we were grounded and forced to resign for refusing to be a part of such a multifaceted illegal scheme.

Independent of the post-dismissal revelations mentioned above, in 1998, Tiger Team Alpha discovered and forwarded several other concerns that are only now reaching the light of day. These included concerns about the anthrax vaccine's impact on fertility problems possibly caused by the invalidated status of the manufacturing process. Issues also arose from the supplemental testing of the 103rd Fighter Wing's vaccine lot. With respect to this latter concern, the FDA cited our unit's specific lot of vaccine as having contamination problems prior to supplemental testing. The supplemental testing was required in the first place because of previous deviations, documented by the FDA, from current good manufacturing practices (CGMPs), and because the FDA served a Notice of Intent to Revoke License (NOIR) upon the anthrax vaccine manufacturer, dated March 11, 1997.[23] Yale University's Dr. Gerard Burrow, considered DoD's "independent expert," completed his review of the vaccine, corroborating many problems soldiers found:[24]

---

[23] http://www.fda.gov/cber/infosheets/mich-inf.htm.

[24] http://www.defenselink.mil/other_info/burrows.html.

AR-0024TLR

"There have been no controlled clinical trials of the currently licensed US vaccine in humans." ... "The decision to perform supplemental tests was based on a March 11, 1997 letter to MBPI [previously "MDPH," then later privatized as "BioPort"] from FDA, outlining a number of systemic issues." ... "The FDA directed MBPI to do a comprehensive review to demonstrate that deviations in biologic product lines did not impact anthrax vaccine quality and integrity."

This prerequisite review of the AVIP was also suspect because the DoD's "independent expert" later admitted, "The Department of Defense was looking for some (sic) to review the program in general and make suggestions, and I accepted out of patriotism. I was very clear that I had no expertise in anthrax, and they were very clear that they were looking for general oversight of the vaccination program." But Dr. Burrow's review demonstrated that the DoD was aware of the risk of soldiers being concerned about Gulf War Illness. Dr. Burrow specifically warned, "The communication problem will be compounded by the fact that anthrax vaccine has been mentioned as possibly playing a role in the health effects experienced by some Gulf War veterans." Based on the mounting unanswered questions, we asked our Squadron Commander to obtain the supplemental testing results for the vaccine since the Defense Secretary directed this as a precondition for the vaccine mandate. We were only provided with the 1996 paperwork for the original production testing. The 1998 supplemental testing results were not provided prior to our discharges.

This mandatory prerequisite supplemental testing was later suspended due to "inconsistencies." According to documents subpoenaed by the US Congress, during the very same period Tiger Team Alpha officers were questioning this very suspect supplemental testing, this testing had been suspended because results were "all over the board." Internally, DoD and anthrax vaccine manufacturer officials agreed to "suspend any further potency testing," or such results were to "be reported to the FDA."[25] This chain of events is the subject of continued investigation by federal authorities.

Tiger Team Alpha also discovered that the anthrax vaccine manufacturer lost its FDA validation six months prior to the team's formation. The manufacturer's license remained invalidated for the next four years, virtually halting AVIP.[26] Later discovery actions revealed that although the previous 103rd Fighter Wing Commander forwarded Tiger Team Alpha's inputs to the National Guard Bureau [NGB] in Washington, DC, he omitted an internal written appeal to the NGB Inspector General (IG), but this complaint was likewise rebuffed. The IG explained their "hands were tied" and that the order was lawful. The public record also implies that the Commander did not convey to HHQ the investigative team's belief the vaccine was in violation of the law. The weighty implications of the Commander's failure to convey Tiger Team Alpha's concerns to HHQ's cannot be overstated. We had discovered a patently illegal order, and the inference of legality for military commands "does not apply to a patently illegal order," according to the DoD legal manuals for courts-martial.[27] Because the mandate has now been determined to be unlawful, the inference of legality has been stripped, and consequently, our disobeying this unlawful order should not have been at the "peril of the subordinate"[28] as normally is the case. In reality, the professional peril was misplaced, and accountability wrongly imposed.

---

25 Little, J. Email to Mike Gilbreath, JPOBD. Ref. May 5, 1998.

26 http://www.anthrax.mil/media/pdf/slowdownpolicy2.pdf.

27 www.jag.navy.mil/documents/mcm2000.pdf. At pg. IV-19.

28 www.jag.navy.mil/documents/mcm2000.pdf. At pg. IV-19.

AR-0025TLR

13

## 3. Commander did not have the legal authority to dismiss:

Because the 103rd Fighter Wing's Commander, Col Burns, was a full-time active duty federal military officer on exchange to the Guard, he did not hold the legal authority he asserted in forcing me to resign. Col Burns had been counseled by his own CT NG Staff Judge Advocate (SJA) about his "unique legal status," because of the fact he was a Title 10 (federal active duty) officer commanding a state National Guard Wing. [29] National Guard command authority is granted in accordance with 32 U.S.C. However, Col Burns was not commissioned under 32 U.S.C. as an officer by the Governor of the State of Connecticut in line with C.G.S. §§ 27-10 and 27-49, [30] nor was his command executed under this Title. Thus, the command authority Col Burns asserted, while constructing the environment leading to my discharge, was in violation of statutes.

Brigadier General (BGen) (ret) David McGinnis, US Army National Guard, who served as the National Guard Association's Senior Defense Fellow during the timeframe of my dismissal, confirmed, "A Regular Air Force Officer detailed to a National Guard unit should have been given a temporary commission [under Title 32 U.S.C. § 315] in the Connecticut Guard." Such a commissioning did not occur, as evidenced by the SJA caution to Col Burns. [31] This distinction is particularly relevant if the Commander did not convey to higher levels of his chain of command in Connecticut or beyond that his subordinate officers questioned the fundamental legality of the AVIP mandate based on his Tiger Team Alpha tasking. Since C.G.S. § 27-14 requires the Governor "to be Commander-in-chief," with the responsibility of ensuring that "all orders and regulations" for the National Guard must "conform at all times to the laws and regulations of the United States," [32] it was of vital concern that he was informed by the former Wing Commander of the challenge raised against the legality of the anthrax vaccine mandate.

BGen McGinnis added that Col Burns' command was "outside of the provisions of state law, could be in violation of the Sixteenth Clause, Article I, Sect 8, of the US Constitution, and could have violated any state statute that prohibits posing as a state official. In addition, if he attempted to enforce any federal statute or regulation upon a member of the National Guard not in federal service, he could be in violation of Posse Comitatus." And, in fact, I was not in federal status. BGen McGinnis concluded that any punishments and orders to resign fell under Title 32 as well, "and it does not include any provisions for summarily demanding an officer's resignation." These facts demonstrate that the previous Commander acted beyond the scope of his authority when he directed and/or oversaw the summary dismissals of the Tiger Team Alpha officers and others. Accordingly, I contend Col Burns' leadership at the time of the dismissals was both arbitrary and capricious *ab initio*.

From a historical perspective BGen McGinnis opined on Tiger Team Alpha's central role writing, "The National Guard has three roles, only one is the Reserve of the Air Force (or Army); the others are the constitutional militia and the common law militia. ... we take it to all three roles, and the role you and your colleagues are performing now straddles the latter two. That's the beauty of our constitution; power is not located in any single node. Would you believe the founding fathers intended you to fly high cover on the Federal Military establishment?" BGen

---

[29] Marconi, R. Staff Judge Advocate memo to 103rd FW/CC regarding the AVIP. October 7th, 1998.

[30] http://www.cga.state.ct.us/2001/pub/Chap507.htm.

[31] Marconi, R. Staff Judge Advocate memo to 103rd FW/CC regarding the AVIP. October 7th, 1998.

[32] http://www.cga.state.ct.us/2001/pub/Chap504.htm#sec27-14.htm.

AR-0026TLR

24

McGinnis cited a U.S. Supreme Court precedent, "Perpich v. Department of Defense,"[33] which said:

> "Notwithstanding the brief periods of federal service, the members of the State Guard unit continue to satisfy this description of a militia. In a sense, all of them now must keep three hats in their closets - a civilian hat, a state militia hat, and an army hat - only one of which is worn at any particular time."

No different than the CT NG SJA caution to Col Burns about his status, it is apparent upon further reflection and research that our instincts in 1999 were correct as we wore our "state militia hat" in providing our professional dissent over the anthrax vaccine. Colonel Burns, our Commander, was wearing the "Army hat" of the federal military, because he was a full-time active duty officer on exchange from the Pentagon to the National Guard. The Supreme Court has upheld that only one hat of the three "is worn at any particular time," and therefore a reasonably assumed Constitutional conflict is apparent whereby a federal military officer wearing his federal "hat" orchestrated the rushed dismissals of state Guard officers wearing their unique "state militia hat."

## 4. Commander defrauded the state of Connecticut with falsities:

Although I would prefer not having to broach this topic because it highlights the willfully blind implementation of the AVIP by the CT ANG, nonetheless, not merely for my sake but for the sake of others, I must also discuss Col Burns' testimony before a DoD investigative panel. Placed under oath by the DoD Inspector General's (DoD IG) office, Col Burns acknowledged that he had Tiger Team Alpha "get together and try and capture the sentiments of all the people who had concerns, whether little or big, concerning the anthrax policy. And they did that."[34] The Commander further testified that he took the input and "condensed it into a memo" and sent it "to MGen Weaver and BGen McKinley, who were the Director and the Deputy Director [of the Air National Guard] at the time." Col Burns then told investigators, on the one hand, he was "not equipped to answer the issues and the questions that [were] outlined in [the] attachment," and he pleaded, "Please give me some help." (Memo attached)

On the other hand, Col Burns also claimed, "I eventually got answers to those questions. But it took - it was after we had come back from the desert. It was way too late." In other words, Col Burns acknowledged he wasn't equipped to answer Tiger Team Alpha's fall 1998 questions, yet somehow he *was* equipped to discharge those officers before a full vetting of these questions had transpired. Col Burns pressed for prompt transfers.[35] The timeframe Col Burns referred to (spring of 1999) was the period in which CT ANG officers who refused the vaccine—pending resolution of Tiger Team Alpha's findings—were grounded and summarily dismissed through coerced transfers, while our concerns were willfully ignored.

Although our concerns were willfully ignored, Col Burns understood their severity. Therefore, his willful ignorance or blindness was a facade. The CT ANG Wing Commander knew the vaccine might be investigational based upon our input, and thus the mandate—AVIP—might be illegal. This federal officer's coordination with the offices of other federal employees with no direct legal

---

33 US Supreme Court. Perpich v. Department of Defense. 496 U.S. 334 (1990), 496 U.S. 334, No. 89-542. Argued Mar. 27, 1990. Decided Jun. 11, 1990.

34 Testimony by former CT ANG 103rd Fighter Wing Commander on January 18, 2001 relating to anthrax vaccine refusals and dismissals of Air Reserve Component officers.

35 Burns, W. 103FW/CC. Email to Captain Rempfer. February 25th, 1999.

AR-0027TLR

25

authority over the CT ANG, such as the acting Assistant Secretary of Defense for Reserve Affairs,[36] the Director of the ANG in Washington at the NGB,[37] and with the Surgeon General of the USAF,[38] also present the possibility that the policy implementation in the state was contrary to the spirit of the Administrative Procedures Act and Executive Order (EO) requirements regarding "federalism," or proper legal coordination with the states.[39]

EO 13132 clarifies: "Policies that have federalism implications refers to regulations ... and other policy statements or actions that have substantial direct effects on the States, on the relationship between the national government and the States, or on the distribution of power and responsibilities among the various levels of government." It is reasonable to conclude that the expulsion of state Guard officers over federal policy at the direction of a federal officer had—and has—federalism implications. Despite the traditional deference granted in military affairs, the circumstances revolving around our terminations in 1999 as state Guard officers by Col Burns was tantamount to a U.S. Department of Justice official overseeing the termination of a Connecticut Attorney General Office employee, or a White House Office liaison coordinating the dismissal of personnel in the Governor's Office. Neither are acceptable, or in line with the separation of powers rudiments of government.

Unfortunately, Col Burns' false statements went beyond the boundaries of internal communications to the NGB and to the CT ANG. The Hartford Courant quoted Col Burns during the discharge process as saying, "The orders to take a controversial drug were just the last straw for pilots who would rather spend more time with their families, and at their more lucrative full-time jobs."[40] Col Burns further defended the dismissals in his public comments to the Hartford Courant by saying that he challenged, "anyone concerned about safety to show him any evidence that the anthrax vaccine was unsafe or ineffective, and no one could." This sharply conflicts with Col Burns' admitting to the DoD IG two years later that he was "not equipped to answer the issues' and the questions. ... Please give me some help." Tiger Team Alpha *had* shown Col Burns evidence. Yet according to public record the Commander never publicly disclosed, conveyed to his chain of command, conveyed to other members of CT NG, or conveyed to you, Commander of the CT NG, that he received and was "not equipped" to address Tiger Team Alpha's inputs.

However, one would never realize this fact, judging solely from Col Burns' contact with the media where he claimed, "no one could [show him such evidence]." Tiger Team Alpha *did* show Col Burns the evidence he challenged, "anyone concerned about safety" to find. He willfully chose to disregard this evidence, and dismissed us. Moreover, he slandered Tiger Team Alpha's members—and other Veterans—by characterizing their legitimate refusal to receive the anthrax vaccine as having motivations grounded in selfishness and greed, rather than in *duty*, our true motivation. The contention was also absurd in my case because I lived within five miles of the unit and my new position of service required me to commute hundreds of miles and spend countless of nights away from my family in the years that followed. Whether intentional or not, Col Burns colored honorable CT ANG members with fraudulent, defamatory comments as a public smokescreen covering the real issue: a documented challenge to a patently unlawful order.

36 Burns, W. 103FW/CC. Email to Captain Rempfer. February 11th, 1999.

37 Burns, W. 103FW/CC. Email to Captain Rempfer. February 9th, 1999.

38 Burns, W. 103FW/CC. Email to Captain Rempfer. February 3rd, 1999. Quote: "we'll get your questions delivered directly to the Surgeon General."

39 Executive Orders 12612 and 13132 ensure that states will be afforded a dialog in federal Administrative Procedures Act activities under 5 U.S.C. § 553, 3 C.F.R. § 252, 255.

40 Hartford Courant. "Pilots Quit Guard Unit in Anthrax Argument." January 15, 1999.

AR-0028TLR

26

Pentagon press corps officials parroted Col Burns' misleading statements in their public comments. The Assistant Secretary of Defense for Public Affairs dismissed our ousting when questioned in a Pentagon press briefing saying, "Some may have found that the pressures of staying in the Air Guard and training were hard to balance with their family or business lives ... some may not have wanted to deploy to the gulf for personal reasons."[41] The subtle disparagement from a soldier's perspective was clear, but I didn't blame the Pentagon for the misrepresentation. DoD official's facts were only as accurate as Col Burns conveyed. The Pentagon's public assertions were inaccurate, and they should have been corrected, but were not. For that reason, all eight officers, grounded from flying duty, signed a letter to Col Burns in February of 1999 to set the record straight, clarifying that our dismissals were exclusively caused by the anthrax vaccine, but all were dismissed anyway.[42]

Each of the above events, perpetrated by a federal military officer posing as a state official, qualify as false official statements under § 27-245 of the C.G.S. In this case, Col Burns had "intent to deceive," and he made a "false official statement knowing it to be false."[43] Fraud—as defined by C.G.S. § 27-257[44]—also applies, because Col Burns knew I did not depart the CT NG over family or financial pressures. I left because I was *forced* to leave. I had written Col Burns a professional letter of concern prior to his public remarks, and in it I made clear my motivations.[45] Had Col Burns, as a federal officer, been subject to Connecticut's Code of Military Justice, he would have been at risk of being in violation of state law for making a "false or fraudulent statement," given these same facts. Unfortunately, Pentagon, DoD and NGB officials republished Col Burns' subtly slanderous remarks, and his fraudulent statements went uncorrected.

Also unfortunately, these statements weren't the only less-than-honest actions committed by Col Burns. For instance in a letter to HHQ dated October 1998, Col Burns transmitted the abbreviated version of Tiger Team Alpha's concerns, omitting our challenge to the chain of command about the unlawfulness of the AVIP mandate. This is noteworthy, because the Commander would not have been able to summarily dismiss his own officers if he had advised the chain of command, or the Governor's office, that his officially-tasked investigators had challenged the fundamental legality of the program *he* charged them to investigate. If Col Burns had informed the Pentagon or ANG headquarters that Tiger Team Alpha had challenged the lawfulness of the order, it would seem he would have been duty-bound to follow up on our allegations in accordance with his oath of office, one mutually sworn to by state and federal officers alike.

Col Burns would have also been duty-bound not to color CT ANG officers, commissioned by the state of Connecticut, as "hardliners" in light of his officers' legitimate, tasked concerns. Yet this is precisely what he did in his earliest memo to the Pentagon.[46] It appears that Col Burns didn't explain to NGB officials in Washington about his Commander's tasking of Tiger Team Alpha, but instead discussed the "unanswered questions posed by some of my folks." While insisting he would "not blindly enforce a policy," he also staunchly explained, "I fully intend to implement DoD policy and everyone here is crystal clear on that point." Col Burns then added, "if we lose some folks along the way, then my guess is we will be a better organization in the long run." In this memo to HHQ Col Burns overtly acknowledged that an "official government position on some of their issues does not exist," yet he disingenuously described us as "hard liners." Col Swift confirmed to us in November 1999 that "there are no answers to your questions," while

41 http://www.defenselink.mil/news/Jan1999/t01211999_t121asd_.html.

42 Letter to Col Burns by eight CT ANG officers / pilots – Dingle, Erff, Jacobson, Koroluk, Marchese, Possemato, Rempfer, and Smith.

43 http://www.cga.state.ct.us/2001/pub/Chap507.htm#sec27-245.htm.

44 http://www.cga.state.ct.us/2001/pub/Chap507.htm#sec27-257.htm.

45 Rempfer, T. Letter to 103rd FW/CC. September 30th, 1998.

46 Burns, W. "Col, USAF/CTANG Commander. Memo to "NGB/CF (MG Paul Weaver)." October 1998.

AR-0029TLR

27

informing unit members that the shots would go forward in the CT ANG. These acknowledgments leave it clear that the questions went unanswered, while officers were pressured to tender their resignations.

Col Burns, as the federal officer Commander of the state National Guard Wing, even signed this memo with his title, "COL, USAF/CTANG Commander," emphasizing the conflict of federal "USAF" versus state "CTANG." This signature block was innocent enough, but represented a departure from the norms of state sovereignty envisioned by the Founding Fathers, and the constitutional requirement of separation of powers required for our nation, even in the warily defined stratums of the armed forces. Though Col Burns would attempt to have subordinate Title 32 Commanders sign directives ordering execution of the mandate in 1998, and make phone calls directing resignations in 1999, it is clear from the documentary trail that Col Burns acted as the Commander. Col Burns wore two hats at once and served two sovereigns in conflict with US law, because as the Supreme Court upheld, "only one [hat] is worn at any particular time."

In doing so, Col Burns created an untenable environment in the squadron for Tiger Team Alpha members—even though he admitted questions remained unanswered—eventually constructing the backdrop for our expulsions. In concluding this topic, I'd like to point out that one of my primary reasons for appealing to your board is precisely to regain my good name and reputation, taken away from me by Col Burns' actions and defaming comments. I respectfully recommend that returning me to my unit would be the best method of achieving this goal.

## 5. Coercion preceded my transfer from the CT ANG, perpetuating the fraud:

Col Burns, as the Commander of our fighter wing, and the one coordinating with Pentagon officials, was responsible for the unprofessional atmosphere that permeated the 103rd Fighter Wing. More egregious yet, Col Burns stated in official meetings that pilots who wanted to remain and fly in the fighter squadron, pending resolution of the unanswered questions, were "traitors." [47] The offensive environment created by using this most serious charge against another officer of treason paved the way for my coerced transfer. In passing, I would note that this videotaped remark from Col Burns qualifies as libel under Connecticut law, and this colloquy is similar to one later witnessed by at least three other ANG officers in Col Burns' office where he accused us of failing to live up to the USAF core value of "Service before self" for refusing the vaccine and not leaving the unit promptly in early February of 1999. [48]

During this meeting Col Burns added that people outside of CT and the ANG, from the Pentagon and Washington DC, were pressuring him to get us out of the unit ASAP. Col Burns later sent me an email reiterating this point that "those senior to me (not just those in CT) wanted to take aggressive action or implied aggressive action was appropriate," as well as maintaining he told senior leaders above him that we were "professional officers ... having the gonads to act on their conscience." [49] But Col Burns' complimentary comments and blame shifting contradicted his public accusation about our failure to uphold the USAF core value of "service before self," as well as his tagging us as "hard liners" and "traitors." Col Burns also stated to all three officers during the meeting that he relied on his subordinate CT ANG Commanders to inform him of the severity of our concerns, and he implied they had not. This stab at shifting blaming is

---

47 Col Burns videotaped meeting discussing unanswered anthrax vaccine issues and possible refusals prior to October 1998 unit training assembly (drill).

48 Meeting with 103rd FW/CC. Attended by Col Scace, Captain Rempfer and Captain Marchese. February 2nd, 1999.

49 Burns, W. Email to Captain Rempfer. April 21st, 1999.

AR-0030TLR

contravened by our inputs imparted through the chain of command, and Col Burns' condensed memo to the NGB.

Col Burns' subordinate leadership also added to the adverse environment, following their Wing Commander's lead. I was ordered to resign via a phone call on January 22, 1999 after talking to the media about the anthrax vaccine controversy. I was specifically told I, "you serve at the pleasure of the Adjutant General" and that my services were no longer required.[50] The implication was voiced clearly that we "hurt" the unit by speaking publicly, and we couldn't be depended on to follow orders. Our CT ANG leaders previously ordered us not to share our Tiger Team Alpha research with other unit members and to not speak to the press. In December 1998 I was specifically relayed the veiled threat that if I didn't leave quietly I'd never work in the military again. I testified to this fact under oath to the US Congress in March of 1999.[51] As a direct result, I cautiously began my out processing plans due to this exchange, and the fact that I'd never been threatened in my previous almost 16 years of military service to that point.

It is important to note the hypocrisy of my being ordered to resign over participating in news reports, while others who approached the media were promoted multiple grades since 1998 in comparison to pilots and others who were driven out of the CT ANG. One example included an article written by a CT ANG leader during the same timeframe for the Journal Inquirer Newspaper titled, "Pilots' decision to quit Guard does not uphold oath." Emails from another subordinate Guard command also warned me about the "fallout at the guard from the news releases," and about having "been asked to expidite [sic] your departure."[52] Though my subsequent resignation was publicized as being voluntary, in actuality it was under duress, inspired by the defaming comments of top CT ANG Commanders. These leaders' remarks were the direct result of the tenor pervading our unit, based on examples set and actions of Col Burns and other senior leaders. These succeeding actions, of slander *per se*, included referring to us as "cowards," and telling their subordinates our information was "propaganda," originating from "Nazi websites."[53]

A legislative staffer also sent me an electronic message during this timeframe to express concern and caution for our situation, further confirming the unprofessional environment that preceded and followed our ordered resignations. The staffer wrote, "I've heard you were summoned, told to resign ..." Cautions by this staffer included his paraphrased recall of conversations with Guard leaders. They told him, "things would be OK 'as long as they keep quiet.'" The staffer warned me that there was "a lot of animosity building in the unit" and that he had "no impression" that CT NG leaders "were doing anything to quell any animosity. Quite the contrary. Fomenting jealousy in the enlisted ranks is a time-tested tactic. Watch your backs. They're attempting to close ranks and paint you guys as disgruntled quacks."[54] Needless to say, such accounts captured the setting in the CT ANG that forced the largest exodus of pilots from a fighter squadron in US history. In contrast to the public accusations by CT ANG leaders that our actions did "not uphold oath," it is now confirmed, in light of the federal judge's ruling, that our actions upheld the oath of office to support and defend the Constitution, which is about laws. We did our duty as tasked and trained. But in light of brewing animosity fomented by the CT ANG leadership, I realized I needed to transfer until the truth came to light.

Other members of the ANG force around the country also relayed evidence of contradictory communications to me. Col Burns distorted the events and concerns of Tiger Team Alpha to

50 Transcribed text from telecom by CT ANG subordinate Commander. January 22nd, 1999.

51 House Report 106-17 Written Testimony. March 24th, 1999. PDF available at: http://frwebgate.access.gpo.gov/cgi-bin/getdoc.cgi?dbname=106_house_hearings&docid=f:57559.pdf.

52 CT ANG subordinate Commander email. February 3rd, 1999.

53 CT ANG Non-commissioned officer allegations compiled via emails and interview. February to April, 1999.

54 Retaliation warning emails from Congressional staffer. January 23rd and 24th, 1999.

AR-0031TLR

29

other ANG members by forwarding them our emails—taken out of context—informing them for instance that, "Capt. Rempfer is now convinced the vaccine is safe."[55] A member of the Washington Air National Guard also described a briefing by a visiting Pentagon NGB official, Chief MSgt Broadbent, addressing Tiger Team Alpha's research, and "attacking the CT ANG pilots who refused the vaccine."[56] According to the Washington Air National Guard members, Chief Broadbent maintained that Col Burns was happy to see the pilots go. This corresponded to Col Burns' note to the Director of the ANG, referring to us as "hard liners," and maintaining that the unit would be better off after we were gone.

It defied reason that Col Burns would discharge the very officers he solicited to pass questions and concerns up the chain of command because, while he acknowledged an "official government position on some of their issues does not exist."[57] It challenged commonsense that then, in his words, he pleaded with HHQ, "Please give me some help." Further, Col burns admitted he, "eventually got answers to those questions. But ... It was way too late."[58] Col Burns later confirmed that even after we were ordered to leave he was still trying to "get the Q&A's out of draft as soon as possible and get them to the field." Yet, Col Burns made it clear, when referring to me or others and the possibility of "coming back on flying status," based upon the fact that the questions we presented remained unanswered, that "the unanimous position was that would not serve the best interests of the squadron or the wing." Col Burns maintained, despite the unresolved legality concerns, that "short of a very compelling argument, I don't see any possibility of returning anyone to flying status."[59] Unfortunately, again Col Burns effectively blamed our grounded status on the "unanimous position" of others, and assumed there would never be a future "compelling argument." In retrospect, the federal court ruling shows that a "compelling argument" was forthcoming based on the merits of our concerns. Therefore, Col Burns reliance on this "unanimous position" was inaccurate, premature, arbitrary and capricious.

The conflict evident in all these communications is relevant because it betrays the truth Col Burns wished to hide. Col Burns articulated differing positions depending on the audience he addressed, while at all times knowing his officers expressed professional dissent about the safety, efficacy and legality of the anthrax vaccine, out of a sense of duty and conscience. When he communicated with us, he claimed to hold us in high regard. However, Col Burns communicated to CT ANG members, to National Guard Bureau officials, and indirectly to other Air National Guard units that we believed the vaccine to be safe—that he wanted us out of the CT ANG. Col Burns' comments in the Courant article further corroborate this pattern of hiding the truth while impugning our motives and character.

Each of these examples demonstrates that indeed, members of Tiger Team Alpha were not the ones who failed to obey orders, but rather the Commander of the CT ANG may have been the one that failed to obey orders, regulations or laws in accordance with C.G.S. § 27-231.[60] If he was indeed commissioned as an officer under the Governor and was in fact compelled to comply with Connecticut's statutes, there is ample evidence, above, to demonstrate he did not do so. These statutes govern a "failure to obey orders or regulations," and Tiger Team Alpha clearly informed Col Burns about the probability that AVIP violated law.

---

55 Leeper, M. OH ANG. Comments to his troops titled, "Anthrax Questions and Answers." March 3rd, 1999. Reference conversations with Col Burns, and his forwarded emails by Captain Rempfer. February 5th, 1999.
56 WA ANG Unit Training Assembly debrief of speech by NGB Enlisted Advisor Broadbent. February 13th, 1999.
57 Burns, W. "Col, USAF/CTANG Commander. Memo to "NGB/CF (MG Paul Weaver)." October 1998.
58 Testimony by former CT ANG 103rd Fighter Wing Commander on January 18, 2001 relating to anthrax vaccine refusals and dismissals of Air Reserve Component officers.
59 Burns, W. 103FW/CC. Email to Captain Rempfer. March 10th, 1999.
60 http://www.cga.state.ct.us/2001/pub/Chap507.htm#sec27-231.htm.

AR-0032TLR

Though not an officer commissioned in the State, or under the jurisdiction of the Connecticut Code of Military Justice (CCMJ), Col Burns fell under the jurisdiction of the Uniform Code of Military Justice (UCMJ) as a federal officer. The Manual for Courts-martial, specifically the Rule 916 defenses,[61] does not excuse "an act performed pursuant to an unlawful order" if the entities involved "knew it to be unlawful or a person of ordinary sense and understanding would have known it to be unlawful." The fact that Col Burns' officers informed him about the investigational use of the vaccine means that Col Burns was on notice of its unlawful nature, and thus should have at least questioned the order's legality. Also, in light of Col Burns' questionable Title 10 status in our ANG unit, and the unfortunate manner in which he executed his command, two more references to the Manual for Courts-marital requirements are relevant to his conduct:

First, by referring to us publicly as "traitors," in videotaped briefings to other unit members, Col Burns exercised improper command influence. As well, by emphasizing to us that people in Washington DC wanted us out of the unit, Col Burns exercised improper command influence in pressuring us to leave, versus dealing with the documented challenge of an unlawful order by his officers. Instead, he successfully forced us out of the CT ANG by disparaging us and denying due process discharge rights. In spite of his methods, he also exercised this questionable command influence and authority improperly in light of the fact that Connecticut military Staff Judge Advocates warned him about his lack of a Title 32 commission. (Manual for Courts-martial: Rule 104, "Unlawful command influence," and Article 90 (2) (ii) Authority of issuing officer").[62]

Second, Col. Burns also knew, or should have known, his order was either patently unlawful or at least highly questionable (i.e., there was no reasonable "inference of lawfulness"), in light of evidence he had been given concerning AVIP (Manual for Courts-martial: Article 90 (2) (i) "Inference of lawfulness").[63] Though we did not use "patently illegal" terminology to describe the AVIP mandate, our recognized actions and knowledge base at the time verified the sense the severity of our convictions in our charge of illegality of the order for any reasonable observer. Therefore, Rule 104 and 916 apply, because Col Burns "knew" the "orders to be unlawful,"[64] or at least of our allegation of such illegality, yet he unduly forced the resignations of his own officers. Regardless, under Article 90, we were reasonable in our actions to challenge or "willfully disobey" an unlawful order since the mandate lacked an "inference of lawfulness."

Each of these potential infractions is crucial as well in reinforcing the fact that I was coerced out of the CT ANG over the anthrax vaccine versus the "voluntary" position purported publicly. It's important to point out that Col. Burns admitted to the DoD IG, "two out of the six, I am convinced that the only reason they left the unit is over anthrax." I was one of those two according to Col Burns transcript testimony. Yet he also admitted, "there was really no documentation on my eight guys. At least official documentation. I mean, I had plenty of memos and notes to myself as we're working it with – internally there. But in terms of official documentation, no, there wasn't any that I'm aware of." Col Burns also acknowledge my concerns to a certain extent saying, "Some of the guys wanted to come in and talk to me and give me an earful. And some of them left resisting – I mean, they didn't really want to leave, but they knew they had to."[65] But "they had to" — left no question that even two years later Col Burns stood by his decision to force me out of the unit despite my appealing to him personally and professionally over the unanswered questions.

---

61 www.jag.navy.mil/documents/mcm2000.pdf. At pg. II-111.

62 www.jag.navy.mil/documents/mcm2000.pdf. . At pg. II-4.

63 www.jag.navy.mil/documents/mcm2000.pdf. At pg. .IV-19.

64 www.jag.navy.mil/documents/mcm2000.pdf. At pg. .II-111.

65 Testimony by former CT ANG 103rd Fighter Wing Commander on January 18, 2001 relating to anthrax vaccine refusals and dismissals of Air Reserve Component officers.

AR-0033TLR

Col Burns addressed the lack of punishments, beyond being grounded from flight duties, saying, "So we didn't put any bad paper on them, either." Col Burns was specifically asked by the DoD IG investigators, "Did it get documented anywhere – is it a matter of record anywhere regarding those eight pilots that anthrax was a factor in their decision to leave?" He answered, "For LTC (redacted) it did, because I wrote his OPR [officer performance report.]"[66] But Col Burns only endorsed my OPR and didn't add any comments. Mine did not have anthrax vaccine or Tiger Team Alpha duties documented anywhere. This is significant because I was a member of Tiger Team Alpha and addressed my professional dissent over the issue to Col Burns, and each of the officers writing my performance report, in no uncertain terms. Despite my request for them to do so, these officers did not document my departure due to the anthrax vaccine, or my duties for Tiger Team Alpha, in any manner. The OPR did not follow me to my new base for approximately a year, so I was unable to protest this omission while still a member of the CT ANG.

Finally, to dispel any residual beliefs that I may have left the CT ANG voluntarily, or for other family or financial reasons, Col Burns made it clear to the DoD IG investigators that this was not the case. He was asked by a DoD IG investigator, "But again, but it's your testimony that it was understood – that you understood, or believed it to be primarily anthrax? Col Burns answered, "Yes, Primarily anthrax, yes." And the DoD IG investigators asked, "So, sir, none of that information was forwarded up? Col Burns explained to the investigator that he told us, "You're not doing us any good here. So I need you to move on out. And they eventually did."[67]

In concluding this section, it is worthwhile asking a thoughtful question. What if today we were to view a movie of a military commander telling his soldiers in the 1940's that if they didn't stand and witness the atomic blasts that they were "traitors"—what would our reaction be? Or, imagine if we viewed a movie in the late 1960's where a commander told his troops, despite not knowing if Agent Orange was harmful, that they were "spooging America" if they did not expose themselves to the toxic effects of dioxin. In retrospect each of the examples border on the absurd, but they reflect similarities to what Col Burns did to his officers by implying they were "traitors" and were "spooging America." All we did was ask for patience in the implementation of a policy that was not required according to DoD guidance at the time for a vaccine that came from a plant that was shut down for quality control problems, and one that appeared to any critical thinking soldier to be investigational because of the studies "that [don't] exist."

## 6. Tiger Team Alpha's warning was hastily dismissed, but later corroborated:

In the years following Tiger Team Alpha's investigation and our forced transfers, I maintained my family's residence in Connecticut, adjacent to the CT ANG base, and commuted over 200 miles round trip to a desk assignment. My intention has always been to return to the CT ANG, in due time, once the controversial questions were properly addressed. Each of these background issues revolving around our dismissals is important, but it is also important to note that the anthrax vaccine program was never required for the entire CT ANG. Even based on

---

[66] Testimony by former CT ANG 103rd Fighter Wing Commander on January 18, 2001 relating to anthrax vaccine refusals and dismissals of Air Reserve Component officers.

[67] Testimony by former CT ANG 103rd Fighter Wing Commander on January 18, 2001 relating to anthrax vaccine refusals and dismissals of Air Reserve Component officers. Also note with respect to this DoD IG case (#74-998, filed 14 JAN 00) -- The first transcript submission via the FOIA was not complete due to ongoing investigations – transcript of Col Burns testimony to the DoD IG was missing pages: 1 to 8, 11 to 14, 16 to 19, 21 to 33, 38 to 39, 43 to 47, and 50 to the end. Complete transcript pending.

AR-0034TLR

32

command guidance the CT ANG was not due to take the vaccine until January of 2000, a full year after my ordered resignation. I base this statement on official NGB / DoD messages.[68]

In fact, at the time our unit was to be deployed, the vaccine wasn't even required, based upon the limited duration we were to be deployed in the "high threat area." And even if it was, the deployment was strictly voluntary based on the fact the CT ANG was not activated. Of course, I *was* a volunteer to deploy to the Middle East, and I had deployed to this region several times before, in more hostile environments and for longer durations. As a result of these past deployed experiences without the vaccine, I was *not* predisposed to endanger my squadron mates or myself by complying with an order I questioned as unlawful. Though policies were altered multiple times, DoD guidance did not require me to take the vaccine.[69] The entire ordeal, and my dismissal, was avoidable.

As a result of my desire to continue to serve in the CT ANG, I stayed on the task originally chartered to Tiger Team Alpha. Along with Lt Col, Dingle, I persisted in my efforts to seek out the truth. Our actions in the years that followed reflected our commitment to our original tasking. It is worthy to note that our dedicated reputations and credibility on the AVIP issues elicited requests from top government officials. Examples included our research received by Mr. Karl Rove, White House Office (WHO) Senior Advisor to the President, on March 22nd, 2001.[70] Mr. Rove received our information and tasked Deputy Defense Secretary Paul Wolfowitz to investigate. In his letter dated April 25th 2001, Mr. Rove explained to Mr. Wolfowitz the "need to examine the issues of both Gulf War Syndrome and the Anthrax vaccine and how they can be dealt with. They are political problems for us."[71] I then received a call from Mr. Rove on May 22nd, 2001. He asked that I provide our most current research to his secretary and gave me an email address.[72] The information was passed on to the National Security Counsel (NSC), specifically to Mr. Stephen Hadley, the Deputy National Security Advisor, according to Mr. Rove's secretary. On July 23, 2001 a NSC staffer contacted me and asked for a summation of the AVIP controversies. Mr. Rove also informed me that two Office of the Secretary of Defense (OSD) Under Secretaries in the DoD, later discovered to be Mr. "Pete" Aldridge and Dr. David Chu, were in the process of reviewing the issues for the DoD in the spring of 2001.

On August 10, 2001 Under Secretaries Aldridge and Chu provided their recommendations to Defense Secretary Rumsfeld, including continuing the AVIP "at a minimum level," "implement an acquisition strategy to purchase additional bio-detectors and stockpiles of antibiotics to augment force protection in the absence of an anthrax vaccine," "develop a coherent institutional process to assess and prioritize biological threats and approve the use of associated countermeasures," and "develop a national long-range vaccine that will address the full range of requirements of the DOD, DHHS, and other stakeholders in this plan." Although the manufacturing facility did receive an expedited approval after the anthrax mailings in the fall of 2001, President Bush also aptly directed the "acquisition of the next-generation" vaccine to "fight anthrax" in both his 2002 and 2003 State of the Union Addresses.[73] The high-level recommendations by the DoD Undersecretaries and the Presidential directives mirrored my letter to Col Burns in 1998, as well as Lt Col Dingle's and my inputs to the WHO and the OSD in 2001.

---

[68] Unclassified USAF and NGB message traffic provided through FOIA (Freedom of Information Act).

[69] http://www.anthrax.mil/media/pdf/oneday.pdf.

[70] Perot, H. Ross. "(Exhibit B), a booklet prepared by two Air Force Academy graduates on the anthrax vaccine problem." March 22nd, 2001.

[71] Rove, K. Letter to Deputy Defense Secretary Paul Wolfowitz, stamped "W00554 01," received on April 27th, 2001 by the Office of the Secretary of Defense White House Section. April 25th 2001.

[72] Communications with WHO from May 24th, 2001 to September 17th, 2001 regarding the AVIP.

[73] White House Press Release. February 5th, 2002. www.whitehouse.gov/news/releases/2002/02/20020205-1.html.

AR-0035TLR

33

In January 2002, I was also asked by another OSD official come to the Pentagon to brief an Assistant Secretary of Defense concerning my knowledge of the AVIP issues. These senior DoD officials later specifically asked me for, "the questions that must be answered and the conditions that you feel must be fulfilled, before you would would accept providing the NEW vaccine to our troops?" [74]In response, I concurred that the vaccine was a "new" drug, just as the federal judge recent ruled, and as a result, I maintained that "The AVIP must comply with the specific tenets of laws passed by the US Congress including 10 U.S.C. § 1107, and 21 U.S.C. § 355, 21 U.S.C. § 355, 5 U.S.C. § 301, as well as Presidential Executive Order 13139, and DoD Directive 6200.2."[75]

As a result of my being called upon by the various government officials, I was also deemed an "anthrax vaccine expert" on my ensuing officer performance reports. Of course, the federal court recently confirmed the vaccine's investigational status absent a final license ruling, restating my clear-cut contention to these officials that the "DoD is in violation of 10 USC 1107, Executive Order 13139, and DoD Directive 6200.2"[76] US Army officials attempted to refute our research, specifically responding to the lack of a final rule for anthrax vaccine as a "bureaucratic loose end ... which apparently has no regulatory meaning." Current events prove these officials were wrong in that regard too. The CT NG was also misled by these officials' incorrect advice, resulting in the relaunch of the AVIP with the same vaccine, a perpetuation of the illegal policy.

Over the years other government officials also became experts and rendered findings or recommendations about the anthrax vaccine controversy. For example, Representative Nancy Johnson of Connecticut made a clarion call early on with a letter to the Pentagon expressing her "vehement opposition to dishonorably discharging service members who leave because they fear the health consequences of the mandatory anthrax vaccine." She added, "every soldier is well aware of the dangers that come with serving in the military, but I doubt they ever expected their government would force them to take a vaccine that has unknown long-term side effects." Representative Johnson's concerns about unknown long-term side effects are confirmed in General Accounting Office (GAO) reports (see attachments).

Representative Johnson submitted written testimony to a House hearing reiterating her call to "suspend the mandatory aspect of the program and to reverse the dishonorable discharges of servicemen who have refused to take the vaccine." Within six months Representative Johnson's concerns about the lack of evidence on the safety of the vaccine were also substantiated by an Institute of Medicine's (IOM) conclusion saying, "There is a paucity of published peer-reviewed literature on the safety of the anthrax vaccine."[77] Representative Johnson's suspicions were also later supported by a Congressional report, which corroborated that the anthrax vaccine mandate was not executed in accordance with FDA regulations and deemed the vaccine "experimental:"[78]

House Report 106-556 Findings excerpt: "Efficacy of the vaccine against biological warfare is uncertain. The vaccine was approved for protection against cutaneous (under the skin) infection in an occupational setting, not for use as mass protection against weaponized, aerosolized anthrax."

House Report 106-556 Recommendations excerpt: "While an improved vaccine is being developed, use of the current anthrax vaccine for force protection against biological

---

74 Email request by OSD PDASD/RA, March 25th, 2002.

75 Rempfer, Major. Email response to PDASD/RA, March 25th, 2002.

76 http://www.dcd.uscourts.gov/03-707.pdf.

77 http://www.nap.edu/html/anthrax_vaccine/.

78 http://frwebgate.access.gpo.gov/cgi-bin/getdoc.cgi?dbname=106_cong_reports&docid=f:hr556.106.

AR-0036TLR

34

warfare should be considered experimental and undertaken only pursuant to FDA regulations governing investigational testing for a new indication."

This singular Congressional report stands unchallenged to this day in the Senate or the House, but is corroborated by an earlier Senate Staff Report from 1994, which also detailed the "investigational" use of the vaccine. This report was also supplied to the CT ANG 103rd Fighter Wing Commander in the fall of 1998 by Tiger Team Alpha.[79] Another recent Senate action also included Senate Resolution 278, which asks the Secretary of Defense and Board for Correction of Military Records to "reconsider adverse actions already taken or intended to be taken against servicemembers for refusing to accept the anthrax or smallpox vaccine."[80]

Now the federal courts become the second branch of the US federal government to rule on the illegality of the anthrax vaccine mandate. It is important to reiterate that the legislative and judicial opinions cite the precise same problems originally identified by Tiger Team Alpha in 1998, i.e., that the anthrax vaccine was "investigational with respect to inhalation anthrax." At the time, Tiger Team Alpha's conclusions and recommendations for prudence and patience were fraudulently discarded, while we were swiftly dismissed. Had Tiger Team Alpha's salient cautions been dealt with fairly in 1998 and 1999, these legislative and judicial inquires might never have been necessary.

Substantive concerns related to fertility issues also surfaced in subsequent years. These issues were directly related to the same questions initially raised by Tiger Team Alpha officers. More specifically, birth defects, based on a US Navy study are now documented on the new FDA approved product label as "Category D" - meaning "positive evidence of human fetal risk based on adverse reaction data from investigational or marketing experience or studies in humans."[81] When Col Burns addressed this issue, as early as October of 1998, he specifically dismissed, without any expertise to do so, the fertility issue by saying the vaccine "does not represent a threat to reproductive capability." He was incorrect on this account, as he was when incorrectly addressing concerns raised about aspects of the vaccine's product label or product insert.

In addressing the "insert" and "effects on fertility," Col Burns dismissed the line of questioning about the package insert saying, "why, because a lawyer wrote that," and added that the insert was "written by a lawyer to protect them from unknowns." To further put off legitimate health questions, Col Burns added that the insert "is a CYA [cover your ass] type thing that they use." Unfortunately, Col Burns' disregard for the seriousness of the questions, once again, followed a pattern of inaccurately and prematurely gaffing off his subordinate's concerns. The actual reason for a package insert according to the FDA is: "A Patient Package Insert (PPI) contains information to aid a patient's understanding of how to safely use a drug product. It is part of the FDA-approved labeling."[82] This insert may be written by or reviewed by FDA attorneys, but its purpose is to aid the patient, and even the doctor, with a particular prescription medicine. The anthrax vaccine is indeed a prescription drug.[83] Col Burns attitude regarding the insert was similar to his attitude about his officer's concerns about the illegality of the vaccine—either naïve, ignorantly or arrogantly dismissive. As Officers and Pilots, trained to follow Rules of Engagement (ROE), it became clear to many that traditional ROE in the legality realm was ignored when it came to the AVIP. Perceived violations and contradictions of the ROE surfaced continually during the interim years.

---

[79] Senate Veterans Affairs Committee Staff Report 103-97. Dec. 8, 1994.

[80] http://frwebgate.access.gpo.gov/cgi-bin/getpage.cgi?position=all&page=S16031&dbname=2003_record.

[81] http://www.fda.gov/cber/label/biopava0131022LB.pdf.

[82] http://www.fda.gov/cder/drugsatfda/instructionsRegulatory.htm.

[83] http://www.fda.gov/cber/label/biopava0131022LB.pdf. "Federal (U.S.A.) law prohibits dispensing without a prescription."

AR-0037TLR

35

The anthrax vaccine product labeling, too easily dismissed by the CT ANG leaders not trained in medicine or pharmaceuticals, also now indicates significant adverse reaction rates up to *175 times greater* than first acknowledged by both the manufacturer and the Army.[84] The federal court issuance of an injunction against AVIP also referenced the hundredfold increases in adverse rates documented on the new FDA product label, as well as the lack of a final license rule for the anthrax vaccine.[85] The GAO also confirmed this significant safety anomaly dealing with the hundredfold discrepancy in potency saying:

"The systemic reaction rate reported through the survey represents a level more than a hundred times higher than the 0.2 percent published in the product insert. We were unable to determine why the AVIP reaction rates so exceeded the product insert rates for the vaccine as approved in 1970. However, we found two studies conducted by DoD that looked at the short-term safety of the vaccine -- one in Korea and one in Hawaii. Both reported reaction rates similar to those reported in our survey and disclosed a markedly higher rate of reaction for female shot recipients. Since we first reported these results from our survey in September 2000, the manufacturer's product insert has been revised to include the adverse reaction rates reported in post licensure survey studies."

"In addition, although DoD has maintained from AVIP's outset that the anthrax vaccine is very safe and causes minimally adverse effects, our survey disclosed that a significantly large number of vaccine recipients reported experiencing adverse events. Further, the results of two DoD studies on anthrax vaccine reactions, both of which used active monitoring systems, as opposed to a passive system such as VAERS, for gathering information on adverse events, are consistent with and support the results of our survey. The rates disclosed in the survey and the DoD studies are each significantly higher than those stated in the vaccine product insert until recently. Such marked variances from the product insert data suggest the possibility of change in the composition of the vaccine from the vaccine originally approved in 1970."[86]

Lt Col (ret) Dingle, USAFR, and I also first reported the absence of a final anthrax vaccine license rule to the FDA in 2001. This discovery was based on our original research first conducted for Tiger Team Alpha, which began at the Connecticut State Library. The lack of a final license rule represented another illustration of the pattern of improper or incomplete processes related to the anthrax vaccine. We believed, and were later validated by the federal court ruling, about the pivotal importance of the fact that the FDA never "finalized" or completed the licensing of the vaccine.[87] We also discovered that the vaccine had "not been employed in a controlled field trial" as required by law, according to these same government records about the vaccine from the Federal Register. That government document confirmed, with respect to the anthrax vaccine, that there was "No meaningful assessment of its value against inhalation [or inhaled] anthrax" — its intended use. We discovered that even the initial studies submitted for licensure could "hardly be accepted as scientific evidence for efficacy of the vaccine" according to the government's own documents.[88] Each of these facts contradicted

---

84  http://www.fda.gov/cber/label/biopava0131022LB.pdf., and -- http://www.fda.gov/cder/drugsatfda/instructionsRegulatory.htm.: "Labels. (current and older) The FDA approved label is the official description of a drug product, which includes indication (what the drug is used for); who should take it; adverse events (side effects); instructions for uses in pregnant women, children, and other populations; and safety information for the patient.

85 Federal Court ruling / citation: "The AVA product insert, which originally stated that the adverse reaction rate to the vaccine was 0.2 percent, was recently revised to reflect an adverse reaction rate between 5.0 percent and 35.0 percent." http://www.dcd.uscourts.gov/03-707.pdf.

86 GAO Report GAO-02-445. "Anthrax Vaccine. GAO's Survey of Guard And Reserve Pilots and Aircrew." September 2002. Available at: http://frwebgate.access.gpo.gov/cgi-bin/useftp.cgi?IPaddress=162.140.64.21&filename=d02445.txt&directory=/diskb/wais/data/gao.

87 Federal Register. 50 FR 51002. "21 CFR 610. Biological Products; Bacterial Vaccines and Toxoids; Implementation of Efficacy Review;" Proposed Rule. Dec. 13, 1985.

88 Pittman, M. Dr. Ad Hoc Committee Chair for DBS IND 180. February 6, 1969.

AR-0038TLR

DoD's rhetoric, which maintained the vaccine was fully safe, effective and FDA approved. As a result of these discoveries, we filed a docket with the FDA on October 15, 2001, under the Title 21 laws governing drugs, specifically requesting the FDA: "Issue a Final Rule on the drug category placement of anthrax vaccine ... amending the as yet to be finalized Proposed Rule as published in the Federal Register 13 December 1985."[89]

LtCol Dingle and I also later became aware of manufacturing anomalies in addition to these aforementioned licensing irregularities. Specifically, we discovered and reported unapproved, adulterating major alterations to the anthrax vaccine manufacturing process to the US Congress and the GAO in the spring of 2000, and later to the Department of Justice in the fall of 2000. The GAO corroborated these concerns, issuing a consequential critical testimony following their investigation.[90] (See GAO report also referenced in attachments).

On top of the aforementioned federal legislative and judicial actions, the Attorney General for Connecticut also agreed with the conclusions of Tiger Team Alpha as early as 2001. Just as the federal court ruled in December 2003, our state's Attorney General wrote to the DoD and the FDA in 2001 saying, "Mandatory vaccination of troops with a biologic product not licensed for its current use violates the Federal Food, Drug and Cosmetic Act and 10 U.S.C. § 1107. I call upon the DoD to cease and desist from its illegal conduct and to abandon its plans for Anthrax Vaccine inoculation of the Armed Forces." He added, "the Department of Defense should make inoculation voluntary as the United Kingdom has done, or properly invoke the President's powers as required by statute."[91] The Attorney General reiterated his position in 2003, following the federal court ruling that the vaccine was "experimental" and the AVIP was in violation of the law.

Lt Col Dingle and I also continued our efforts by providing an analysis of the anthrax vaccine program to the federal military chain of command in accordance with military regulations. Congressman Robert Simmons of CT also provided a copy of this Operational Risk Management Analysis of the Anthrax Vaccine Immunization Program (AVIP) to the Pentagon.[92] This May 2003 analysis posed some of the same questions originally asked by Tiger Team Alpha, plus additionally cautioned, "What if the federal courts decide in favor of the plaintiffs, and not the military, in the various pending legal actions? How will this affect the future credibility of the military to implement force health protection initiatives with vaccines and drugs?" Officers are trained and duty bound to ask such questions. Officers are not obligated to capitulate to threats and leave the service if they've discovered possible illegal conduct simply because, as Col Burns admitted to HHQ, an "official government position on some of their issues does not exist."[93]

Clearly, the issues surrounding the anthrax vaccine are complex and historic. In years to come these events will be studied by the federal courts, the federal legislature, and hopefully within the federal and state military realms as an example, good and bad, of how to implement future force protection initiatives. Deep-rooted questions will, in time, be answered concerning the vaccine's connections to Gulf War Illness.[94] Another federal military officer responsible for the anthrax vaccine program, BGen Eddie Cain, posed this very question when he asked, "how can DoD say that reported desert storm illnesses were not cause (sic) by the anthrax vaccine when we have no record of who received the shots. If we cannot answer these questions we (DoD &

---

89 FDA Title 21 Citizen Petition Docket #01p-0471: http://www.fda.gov/ohrms/dockets/dailys/01/Oct01/101501/101501.htm#_Toc527850400

90 http://www.gao.gov/new.items/d02181t.pdf.

91 http://www.cslib.org/attygenl/press/2001/health/dod.pdf.

92 Operational Risk Management Analysis of the AVIP available at: http://www.aviationmedicine.com/ORM_analysis_of_the_AVIP.doc. Additional process analysis available at: http://www.airpower.maxwell.af.mil/airchronicles/cc/rempfer.html.

93 Burns, W. "Col, USAF/CTANG  Commander. Memo to "NGB/CF (MG Paul Weaver)." October 1998.

94 "K-STATE RESEARCHERS FIND 'SIGNIFICANT' ASSOCIATION BETWEEN ANTHRAX VACCINATION, MEDICATION AND HEALTH PROBLEMS OF GULF WAR VETERANS:" http://www.mediarelations.ksu.edu/WEB/News/NewsReleases/gulfanthrax50602.html.

AR-0039TLR

37

the Administration) are in big time trouble."[95] BGen Cain's internal awareness and questioning transpired within one month of my expulsion from the CT ANG. Needless to say, Tiger Team Alpha's questions are among those unanswered, and, in fact, were concurrently being asked internally by DoD officials, but those officials were not cornered with summary dismissal.

In fairness to Col Burns, he did not invent the AVIP. Years later he acknowledged to me that when it came to the AVIP debate, "There are two polarized positions." He also pondered, "... once the question of ethics has been raised, addressed, reviewed, and a formal institutional position established, where does that leave the military member who disagrees with the institutional position? He concluded his note sympathetically saying, "So I salute your attempt at continuing the debate but it is more than anthrax."[96] I agreed that there were two polarized positions, with immutable lines drawn. But just as Col Burns even agreed prior to my reluctant transfer saying, "short of a very compelling argument, I don't see any possibility of returning anyone to flying status,"[97] the federal court has now made the "very compelling argument". The compelling argument is the confirmation of the validity of Tiger Team Alpha's concerns.

The federal court, and its compelling argument, helps to expose the root cause of the original problem — the "institutional position," or breakdown thereof. The root causes of the anthrax vaccine policy problems were its lack of honest foundations. Misinformation from DoD was the initial deficiency, the "root cause" of the "stray in tactical execution" by the CT ANG Wing Commander.[98] This misinformation was subsequently the proximate cause of the loss of CT ANG officers, pilots and later at least two enlisted soldiers. I only revert to the root causes of the problems, and expound upon the dilemma's larger issues, in this appeal because as Col Burns fittingly said, "... once the question of ethics has been raised, [the debate] is more than anthrax."

Here, Col Burns was correct. Accordingly, our professional military education teaches that ethical dilemmas fall into several conflicting categories: short versus long-term, integrity versus loyalty, and individual versus organization.[99] The anthrax vaccine dilemma challenged all three ethical dilemma categories. Arguably, the AVIP was a reactive policy, lacking candid foundations, and one that potentially threatened the long-term integrity of the military institution. Individual rights were violated in order to accomplish organizational goals. Col Burns had a difficult choice to balance in either supporting his officers in exposing the truth, or blindly enforcing an arguably illegal policy, while loyally supporting institutional policy. Col Burns, most likely, initially at least, was unaware of the deeper problems associated with the AVIP.

Col Burns was not alone in being misled, and merely repeated multiple falsities, about the vaccine, as was evidence from the earliest informational presentations to the CT ANG. We were told, for instance, that civilian veterinarians and Cornell University Veterinary School in particular, used the vaccine routinely.[100] This contention turned out to be patently false, and later the U.S. Army formally clarified that "routine" vaccine use was only by military laboratory workers. Army entities corrected the misinformation officially in the Army Times on April 5, 1999, explaining they "did not intend to mislead or confuse people." Col Burns should have been able to trust the facts provided by HHQ, but as CT ANG officials will agree the information often turned out to be incorrect. This deceptive example illustrating the sales pitch beneath the

95 Congressional subpoenaed records of email exchange between US Army Brigadier General Eddie Cain and Colonel John Wade, with respect to 29 APR 99 Congressional testimonies. Email dated May 3, 1999.

96 Burns W. Col AEFC/CV. Email to Captain Rempfer. May 22, 2001.

97 Burns, W. 103FW/CC. Email to Captain Rempfer. March 10th, 1999.

98 Denning, T. "Debriefing to Win." Fighter Weapons Review, Summer 1991: 15 –18.

99 Air Command and Staff College text. Version 3.2. Maxwell AFB. Alabama. 2003. (Ref. Kidder, R. How Good People Make Tough Choices. Fireside. New York. 1995.

100 Pilot meeting at Wing HQs in September 1998.

AR-0040TLR

38

AVIP is far from exclusive, and merely shows that Col Burns and the CT ANG were not the genesis, or root causes, of the problems.

This is why Lt Col Dingle and I concentrated on the policy and its intrinsic problems in the years that followed our dismissals. Our concerns were not about Connecticut. And the dispute was not about the anthrax vaccine, *per se*, but instead it was one of ethics, and therefore could not be addressed with mere imperatives of good order and discipline. So, now that the institution's position has been demonstrated, as a matter of law, to be erroneous due to investigational use of the vaccine absent complete licensure, I've attempted to have my reinstatement handled at the lowest possible level by applying to return to flying duty with the CT ANG leaders that gave me their word I'd be rehired.

In good faith, I trusted that the CT ANG would focus on the root causes of my departure, the AVIP, and would offer me reinstatement now that the federal court has expressed the "compelling argument". In putting this faith in the CT ANG, I had—and have—every confidence in their leaders. I have every confidence that my previous professional impasse with CT ANG leaders over the AVIP was a unique situation, and will almost certainly be handled more prudently in the future. As a result, the past inscrutable controversy will not preclude my rapid assimilation back into the ranks of the CT ANG, since the origins of past problems do not lie within Connecticut. In my eventual return to the CT ANG, I will also be proud to have the opportunity to serve in the next generation of leadership of the CT ANG.

## 7. Attempts in good faith to return to the 103rd Fighter Wing:

In order to secure reinstatement, I submitted my request to return to my flying duties on two occasions directly to current CT ANG leaders. I did this because the previous squadron Commander, now Vice Wing Commander, Col John Swift, told me I would be offered my position back if it was later determined my position of professional dissent over the anthrax vaccine was proven correct. My first application to return to the CT ANG was in the summer of 2002, when I believed the AVIP would not be reinitiated. I did so at the encouragement of an interim Squadron Commander, Lt Col Ed Bolduc. Lt Col Dennis Yount, who replaced Lt Col Bolduc, responded in the negative to my application to return.

The second application was in January 2004. On the second occasion, I applied to return based on the recent federal court ruling, the FDA action finalizing the license, and the prior word of CT ANG leaders that I would be offered reinstatement. My objective was to return to the CT ANG in as professional and amicable manner possible. I did as I was asked in each instance, applying by submitting a current resume, along with a sincere professional request to return. My goal was to return and be absorbed smoothly back into the flying operations of the squadron without notice.

Most recently though, I received a sincere, but disappointing, call from Col Swift on February 12, 2004, who informed me that the Squadron Commander, Lt Col Dennis Yount, had decided I would not be rehired. Lt Col Yount was not in the 103rd Fighter Wing when the anthrax vaccine controversy befell the CT ANG in the winter of 1998 / 1999, but filled one of the vacancies created by myself and other officers ordered to resign in 1999. Col Swift then explained that officers with my level of experience were "stacked up like a cord of wood." Lt Col Yount's reasons in particular, according to Col Swift, included:

1. I am now too senior to return to the CT ANG and would interfere with the promotion opportunities of those officers that replaced me and others, and

AR-0041TLR

2. When the original commitment was made for reinstatement, 5 years is now considered too lengthy a timeframe, evidently overriding the previous pledge.

Neither of these justifications would be necessary were it not for the root reasons leading to this application, i.e., my ordered resignation from the CT ANG resulting from the "federal" root cause of the dilemma: the anthrax vaccine program that was advanced untruthfully and in violation of US law, an Executive Order and DoD Directives. Though the chain of command of the CT ANG kept few written records of the reasons for my dismissal, according to documents recovered via the FOIA, I compiled extensive records that verify my dismissal from the CT ANG was due to my concerns over the unanswered questions about illegality of the mandate after being tasked to investigate unit concerns. Now I only ask that these events be given the just review they deserve.

To this day the US Army's Military Academy at West Point Cadet Handbook counsels:

"Within our school of military thought, higher authority does not consider itself infallible. Either in combat or out, in any situation where a majority of military trained Americans become undutiful, that is sufficient reason for higher authority to resurvey its own judgments, disciplines, and line of action."[101]

In the present case of the anthrax vaccine, I request a review of previous and current judgments and lines of action. Those past judgments disregarded our charge of the illegality of the anthrax vaccine mandate and current lines of action similarly ignore this reality. My less than willing departure from the CT ANG was based on my duty to challenge illegal orders. Despite this fact, the current diversionary reasons used to justify not reinstating me ignore root causes of my dismissal, and are actually in conflict with past hiring practice and current policy. Non-exclusive examples of other CT ANG pilots hired after long periods out of fighter type cockpits, and other officers with no A-10 flying experience include:

1. Hiring Lt Col Sischo, non-current in fighter type aircraft for a similar duration.
2. Recently hiring Maj Depatie, with zero A-10 Thunderbolt II flying experience.
3. Recently hiring Maj Girnius, with zero A-10 Thunderbolt II flying experience.

Each of these examples exposes the pretense of using flying experience, training investment, or rank as justifications to bar my reinstatement. Such reasons are disappointing professionally, repeating the pattern of conduct that defined the dilemma originating for me as CT ANG officer in 1998 and 1999 when Col Burns invented alternative explanations for our dismissals.

Not being candid about such issues leads only to problems as was evidenced by a General Officer who was sanctioned over a testimonial before the U.S. Congress for understating, or properly attributing, the attrition caused by the vaccine. The DOD Inspector General's office analyzed this General Officer's testimony and found it to have "lacked the necessary element of 'straightforwardness,' and so was inconsistent with guidelines for honesty as set forth by the Joint Ethics Regulations (JER)."[102] The Inspector General's analysis went so far as to say, "We understand the strong objections" about the General's testimony, and the "apparent opinion" that the General "intentionally misled the Subcommittee by understating the resistance to AVIP." The DoD IG added that the General presented the information "in such a way as to lead recipients to confusion, misinterpretation, or inaccurate conclusions." Such "inaccurate conclusions" and secondary sanctions would be unnecessary if the attrition costs of the AVIP, including those pilots lost in Connecticut, were justifiable. If the losses were justifiable based on

---

101 Excerpt transcribed from the West Point Cadet Handbook.

102 Lieberman, J. Deputy DoD Inspector General analysis of September 29th, 2001 testimony before Congress. March 2nd, 2001.

AR-0042TLR

40

the merits of the program, testimony "inconsistent with guidelines for honesty" would not be necessary, and leaders would be forthright about the roots causes of the attrition—the AVIP. Fortunately, personnel losses can be reversed and inaccurate conclusions are no longer required.

In a telephone call on December 27, 2003, Col Swift acknowledged what he recalled as our "conversation in December 1998," but disagreed that his word in that conversation was a "promise" to reinstate me. Instead, he explained alternative reasons why I cannot return to flying duty in 2004. These explanations defy the root causes of my departure, the previous honorable word to reinstate me if proven correct, and the untenable burden placed on the CT NG by the AVIP. Following a straightforward evaluation of my case, there should be no question that I have served as an "experienced" A-10 pilot, an experienced F-16 pilot, as well as an experienced F-117 instructor pilot,[103] and will be re-qualified in the A-10 in minimum time, given my previous "distinguished" flying experience and exemplary record in training and operational duties.

Since all officers are bound from their schooling as cadets to adhere to the Honor Code, I'm confident that CT ANG leaders will corroborate the events I've described in his appeal. Though their opinion, or representations, of these events may initially differ, I assert this is only because they have not expertly documented the events, or were not aware of the details, that I present in this application. This is understandable, since they have less time accommodate any one military issue while commanding a fighter wing, but once the full set of facts have been presented, I think they will honorably concur with the "root issues" at stake. The Honor Code we share assures conclusions upon private, personal and professional reflection. This code, sworn by all officer candidates, says, "We Will Not Lie, Steal Or Cheat, Nor Tolerate Among Us Anyone Who Does."[104] And equally important in this matter is a well-known honor code subtlety, which also prohibits "quibbling."[105] Quibbling, or "evasive statements, or the use of technicalities to conceal guilt are not tolerated."[106]

In the final analysis, no one can quibble with the following facts: I was transferred from the CT ANG over my concerns about the anthrax vaccine. I was told if I left, and was later vindicated, I would be offered my job back. A hostile, unprofessional work environment ensued, ostensibly due to speaking out publicly while wearing my "civilian hat." I was then ordered to resign in a telephone call by a CT ANG Commander. I resigned reluctantly in hopes that in time our questions would be answered. The vaccine was later determined to be investigational, and the vaccine's license never finalized by the FDA, and therefore, the order was in violation of law. Now, though I have been told I am not qualified to return to the CT ANG, this decision is being made in blindness as to the root issues I outline, and by someone not present at that time.

**Conclusion**:

In concluding the background information in my application for reinstatement to the CT ANG, I believe it's important to describe another aspect of the background upon which we operate as soldiers, officers, and pilots in particular. We operate in accordance with our training. In the case of the anthrax vaccine we saw a seemingly broken and unsafe operation for a gamut of

---

103 Fighter "experience" is dictated by USAF regulations.

104 http://www.usafa.af.mil/pa/factsheets/honor.htm.

105 http://www.af.mil/news/speech/current/The_Bedrock_of_Integrit.html.

106 http://www.west-point.org/users/usma1983/40768/docs/taylor.html.

AR-0043TLR

41

reasons: unresolved links to Gulf War Illness,[107] unapproved manufacturing changes,[108] a non-validated manufacturing process due to chronic quality control problems,[109] a non-finalized license ruling and proven investigational / experimental use for inhaled anthrax in violation of US law.[110]

Utilizing the ethical and operational tools from our military, we were obligated to call a temporary "knock it off" with the AVIP as investigators for Col Burns' Tiger Team Alpha. No different than we would as A-10 fighter pilots if we had an engine problem, challenging the obvious improprieties of the AVIP became a duty in accordance with our training. Our earliest training as pilots required us to stop a maneuver, analyze the situation and take the proper action if an unsafe or questionable situation developed. Full circle in our professional military careers, our current USAF Operational Risk Management tools require us to similarly analyze risks, and never accept them if the risks outweigh the benefit of a certain aspect of an operation.[111] Air Combat Command pilots are currently directed on a daily basis to act upon these same principles by constantly assessing risk, considering options to limit that risk, and taking appropriate action.[112]

Tiger Team Alpha performed each of these duties, as trained, in 1998 and 1999. The breakdowns that occurred were not within our team. Absent Col Burns' legally questionable leadership of the CT ANG, our Title 32 leadership would not have forced the AVIP on our ranks in the face of the documented malfunctions with the anthrax vaccine. Tiger Team Alpha would never have been necessary. Ironically, the same DoD official that reviewed the AVIP for the DoD in 2001, Undersecretary Aldridge, anticipated these very challenges. He also served years earlier as the Secretary of the US Air Force in 1987. He delivered the commencement speech to my graduating class from the Air Force Academy. On May 27th, 1987 he predicted the quandary we faced: [113]

> "You will be in a position to identify and resolve irritants and establish positive programs in your organization. ... I encourage you to look for the factors that are irritating your people—the rules, regulations, and procedures that are getting in the way of performing their mission. ...And, if a regulation or policy doesn't make sense, get involved; propose a revision that does contribute to your mission."

Secretary Aldridge undoubtedly didn't envision soldiers would lose their jobs for attempting to do as he advised. But he would likely be pleased that we took his graduation guidance seriously. As a result, today our concerns have been validated. Today, no one can quibble with the fact that the anthrax vaccine was not properly licensed and finalized. The mandate was not legal. The process of "looking for the factors," "identifying and resolving irritants," "getting involved," and "proposing a revision that does contribute to your mission" was not easy, but I did my duty, nonetheless. Such guidance by our military leaders like Secretary Aldridge, or by the civilian authority that controls the armed forces, is directly relevant to this discussion since it forms the foundation of our conduct as military members. This guidance was responsible for our reaction to the absurd events that pervaded the CT ANG in 1998 and 1999. Particularly in hindsight, it is clear that the officers of Tiger Team Alpha did not create this element of

---

107 See House Report 106-556, footnote #1: "the anthrax vaccine is still being studied as a potential causative or contributing factor in Gulf war veterans' illnesses." Ref. Public Law 105-277, title XVI, sec. 1603(d)." See: http://frwebgate.access.gpo.gov/cgi-bin/getdoc.cgi?dbname=106_cong_reports&docid=f:hr556.106.

108 ANTHRAX VACCINE Changes to the Manufacturing Process. http://www.gao.gov/new.items/d02181t.pdf.

109 http://www.fda.gov/cber/infosheets/mich-inf.htm.

110 http://www.dcd.uscourts.gov/03-707.pdf.

111 http://safety.kirtland.af.mil/AFSC/CSAF_ORM_memo.pdf.

112 http://www2.acc.af.mil/combat-edge/past_issues/September%202003/PDFs/ACTdailyriskmngmnt.pdf.

113 Aldridge, Secretary of the USAF. Commencement speech at the USAF Academy. May 27th, 1987.

AR-0044TLR

42

absurdity, or the ethical dilemma surrounding the anthrax vaccine. Tiger Team Alpha knew at the time that the behavior of Col Burns and his disparagement of our duties was absurd, to say the least. A Harvard philosopher of military affairs once discussed such an ethical dilemma in his text called the *Soldier and the State.* Huntington rhetorically asked:

> "What does the military officer do when he is ordered by a statesman to take a measure which is militarily absurd when judged by professional standards? ... The existence of professional standards justifies military disobedience."

In the years prior to my experience with the anthrax vaccine, and in the years that followed, our professional standards have been made very clear to us: "Integrity first, service before self, and excellence in all we do." Our Honor Code, and our Oath of Office oblige these standards. I have attempted to live up to these standards to the best of my ability. I've worked hard in the years that followed my dismissal from the CT ANG to highlight institutional wrongdoing, specifically for the hundreds of service members whose records were tarnished due to the AVIP. With legislation to accomplish this objective "in the works" according to the Congress, I now am compelled to resolve my own professional situation in the best interests of my family. Much of the information contained within the preceding background data is new as a result of my not concentrating on my situation previously. Now I believe it is time to return to my trained duties as a pilot for the CT ANG, and I sincerely hope we can put this ordeal behind us.

Therefore, I respectfully request reinstatement to flight duty for the CT ANG, my state and country in order to set the record straight, and to help rectify my former wrongful constructive discharged.[114]

---

114 A constructive discharge is where circumstances are made intolerable for an employee, requiring them to leave their employment. 891 F. Supp. 719 (D. Conn. 1995) affirmed 101 F.3d 109. Constructive discharge theory requires the employee to act reasonably.

AR-0045TLR

43

**Congressional Resolutions, Reports and Hearings on the anthrax vaccine:**

- <u>Senate Resolution 278</u>: Asks the Secretary of Defense and Board for Correction of Military Records to "reconsider adverse actions already taken or intended to be taken against servicemembers for refusing to accept the anthrax or smallpox vaccine."[115]

- <u>Unproven Force Protection</u>: House Report 106-556 -- <u>TEXT</u>[116]  PDF

- <u>The Anthrax Vaccine Immunization Program--What Have We Learned?</u>: Hearing No. 106-249 -- <u>TEXT</u>[117]  PDF

- <u>Anthrax Vaccine Adverse Reactions</u>: Hearing No. 106-131 -- <u>TEXT</u>[118]  PDF

- <u>Defense Vaccines: Force Protection or False Security</u>? Hearing No. 106-130 -- <u>TEXT</u>[119]  PDF

- <u>Force Protection: Improving Safeguards for Administration of Investigational New Drugs to Members of the Armed Forces</u>: Hearing No. 106-123 -- <u>TEXT</u>[120]  PDF

- <u>The Impact of the Anthrax Vaccine Program on Reserve and National Guard Units</u>: Hearing No. 106-102 -- <u>TEXT</u>[121]  PDF

- <u>Department of Defense's Sole-Source Anthrax Vaccine Procurement</u>: Hearing No. 106-36 -- <u>TEXT</u>[122]  PDF

- <u>DOD's Mandatory Anthrax Vaccine Immunization Program for Military Personnel</u>: Hearing No. 106-26 -- <u>TEXT</u>[123]  PDF

- <u>The Anthrax Immunization Program</u>: Hearing No. 106-17 -- <u>TEXT</u>[124]  PDF

---

115 http://frwebgate.access.gpo.gov/cgi-bin/getpage.cgi?position=all&page=S16031&dbname=2003_record.
116 http://frwebgate.access.gpo.gov/cgi-bin/getdoc.cgi?dbname=106_cong_reports&docid=f:hr556.106.
117 http://frwebgate.access.gpo.gov/cgi-bin/getdoc.cgi?dbname=106_house_hearings&docid=f:73979.wais.
118 http://frwebgate.access.gpo.gov/cgi-bin/getdoc.cgi?dbname=106_house_hearings&docid=f:65673.wais.
119 http://frwebgate.access.gpo.gov/cgi-bin/getdoc.cgi?dbname=106_house_hearings&docid=f:65604.wais.
120 http://frwebgate.access.gpo.gov/cgi-bin/getdoc.cgi?dbname=106_house_hearings&docid=f:64776.wais.
121 http://frwebgate.access.gpo.gov/cgi-bin/getdoc.cgi?dbname=106_house_hearings&docid=f:63501.wais.
122 http://frwebgate.access.gpo.gov/cgi-bin/getdoc.cgi?dbname=106_house_hearings&docid=f:60212.wais.
123 http://frwebgate.access.gpo.gov/cgi-bin/getdoc.cgi?dbname=106_house_hearings&docid=f:58959.wais.
124 http://frwebgate.access.gpo.gov/cgi-bin/getdoc.cgi?dbname=106_house_hearings&docid=f:57559.wais.

AR-0046TLR

44

**General Accounting Office (GAO) reports about the anthrax vaccine are also available:**

- Anthrax Vaccine: GAO's Survey of Guard and Reserve Pilots and Aircrew. GAO-02-445[125] September 20, 2002.

- Anthrax Vaccine: Changes to the Manufacturing Process. GAO-02-181T[126] October 23, 2001.

- Serious Problems in the Anthrax Vaccine Immunization Program. GAO-01-21[127] December 13, 2000.

- Anthrax Vaccine: Preliminary Results of GAO's Survey of Guard / Reserve Pilots and Aircrew Members. GAO-01-92T[128] October 11, 2000.

- DOD's Anthrax Vaccine Manufacturer Will Continue to Need Financial Assistance. T-NSIAD-00-140[129] April 14, 2000.

- DOD Continues to Face Challenges in Implementing Its Anthrax Vaccine Immunization Program. T-NSIAD-00-157[130] April 13, 2000.

- Summary of GAO's Findings on the Safety and Efficacy of the Anthrax Vaccine. NSIAD-00-54R[131] November 4, 1999.

- DOD Faces Challenges in Implementing Its Anthrax Vaccine Immunization Program. NSIAD-00-36[132] October 22, 1999.

- Anthrax Vaccine: Safety and Efficacy Issues. T-NSIAD-00-48[133] October 12, 1999.

- Issues Concerning the Anthrax Vaccine. T-NSIAD-99-226[134] July 21, 1999.

- Observations on DOD's Financial Relationship with the Anthrax Vaccine Manufacturer. T-NSIAD-99-214[135] June 30, 1999.

- Safety and Efficacy of the Anthrax Vaccine. T-NSIAD-99-148[136] April 29, 1999.

---

[125] http://www.gao.gov/new.items/d02445.pdf.
[126] http://www.gao.gov/new.items/d02181t.pdf.
[127] http://www.gao.gov/new.items/d0121.pdf.
[128] http://www.gao.gov/new.items/d0192t.pdf.
[129] http://www.gao.gov/archive/2000/ns00140t.pdf.
[130] http://www.gao.gov/archive/2000/ns00157t.pdf.
[131] http://archive.gao.gov/pdf/163014.pdf.
[132] http://www.gao.gov/archive/2000/ns00036.pdf.
[133] http://www.gao.gov/archive/2000/ns00048t.pdf.
[134] http://www.gao.gov/archive/1999/ns99226t.pdf.
[135] http://www.gao.gov/archive/1999/ns99214t.pdf.
[136] http://www.gao.gov/archive/1999/ns99148t.pdf.

AR-0047TLR

45

**Medical Reports:**

- <u>Hypersensitivity pneumonitis following anthrax vaccination</u>. Naval Hospital, Pensacola, FL. "A case of hypersensitivity pneumonitis (HP) following anthrax vaccination is described."[137]

- <u>Inflammatory causes of gastroparesis</u>. "Anthrax Vaccines / adverse effects."[138]

- <u>Lymphocytic vasculitis associated with the anthrax vaccine</u>: case report and review of anthrax vaccination. "A case of a patient with lymphocytic vasculitis temporally associated with the anthrax vaccine is reported."[139]

- <u>Oral pemphigus vulgaris after anthrax vaccine administration</u>: association or coincidence? "Accordingly, continued observation and documentation of true adverse events is needed."[140]

- <u>The Jordan Report for 2000</u>. National Institutes of Health. "Anthrax Vaccine Adsorbed (AVA) ... There are no data to support the efficacy of AVA for pulmonary anthrax in humans."[141]

- <u>20th Anniversary Edition of Jordan Report</u>. "The efficacy of AVA for preexposure vaccination against pulmonary anthrax has only been demonstrated in animal models."[142]

- <u>An Assessment of the Safety of the Anthrax Vaccine</u>. A Letter Report by the Institute of Medicine (IOM). "Conclusions on Human Studies ... There is a paucity of published peer-reviewed literature on the safety of the anthrax vaccine."[143]

- <u>Anthrax Vaccine, Gulf War Syndrome and Anti-Squalene Antibodies</u>. "Data published in the February 2000 and August 2002 issues of *Experimental and Molecular Pathology* strongly suggests that Gulf War Syndrome is caused by a vaccine contaminated with squalene."[144]

- <u>The Anthrax Vaccine: Is It Safe? Does It Work</u>? Institute of Medicine. The IOM "committee also concluded that AVA is reasonably safe ... The committee concluded, however, that a new vaccine, developed according to more modern principles of vaccinology, is urgently needed."[145]

- <u>Comments on the Institute of Medicine's 2002 report on the safety of anthrax vaccine</u>. "Institute of Medicine ignored evidence of several recent research studies from three different nations that have implicated vaccines, often including anthrax vaccine, in the epidemiology of Gulf War illnesses."[146]

- <u>K-State Researchers Find 'Significant' Association Between Anthrax Vaccination, Medication And Health Problems of Gulf War Veterans</u>. Kansas State University.[147]

---

[137] http://www.ncbi.nlm.nih.gov/entrez/query.fcgi?cmd=Retrieve&db=PubMed&list_uids=12171861&dopt=Abstract&itool=iconabstr.

[138] http://www.ncbi.nlm.nih.gov/entrez/query.fcgi?cmd=Retrieve&db=PubMed&list_uids=12498282&dopt=Abstract

[139] http://www.ncbi.nlm.nih.gov/entrez/query.fcgi?cmd=Retrieve&db=PubMed&list_uids=14585454&dopt=Abstract&itool=iconabstr.

[140] http://www.ncbi.nlm.nih.gov/entrez/query.fcgi?cmd=Retrieve&db=PubMed&list_uids=14699385&dopt=Abstract

[141] http://www.niaid.nih.gov/publications/pdf/jordan.pdf. Page 31.

[142] http://www.niaid.nih.gov/dmid/vaccines/jordan20/jordan20_2002.pdf. Page 192.

[143] http://www.nap.edu/html/anthrax_vaccine/.

[144] http://www.autoimmune.com/GWSGen.html.

[145] http://www.nap.edu/books/0309083095/html.

[146] http://www.ncbi.nlm.nih.gov/entrez/query.fcgi?cmd=Retrieve&db=PubMed&list_uids=12353779&dopt=Abstract&itool=iconabstr.

[147] http://www.mediarelations.ksu.edu/WEB/News/NewsReleases/gulfanthrax50602.html.

AR-0048TLR

46